**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**
**(NEW ORLEANS DIVISION)**

| | | |
|---|---|---|
| **THE PARISH OF PLAQUEMINES,** | * | **CIVIL ACTION NO. 2:18-CV-05256** |
| | * | |
| **Plaintiff,** | * | **JUDGE JAY C. ZAINEY** |
| | * | |
| **versus** | * | **MAGISTRATE JUDGE JOSEPH C.** |
| | * | **WILKINSON, JR.** |
| **TOTAL PETROCHEMICALS &** | * | |
| **REFINING USA, INC., et al.,** | | **SECTION "A"** |
| | | |
| **Defendants.** | | |

**<u>Removing Defendants' Opposition to Joint Motion to Remand</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

PROCEDURAL HISTORY ............................................................................................... 4

ARGUMENT ....................................................................................................................... 7

    I.    The Texas Company and Gulf "acted pursuant to" the direction of federal officers. ............................................................................................................... 8

        a.    The Texas Company and Gulf produced avgas and other critical war products under contract with the federal government................................. 9

        b.    Plaintiffs' claims regarding the "acting under" element are meritless. ............................................................................................. 12

    II.    Plaintiffs' challenges to The Texas Company's and Gulf's production methods in Delta Duck Club and Grand Bay "relate to" The Texas Company's and Gulf's conduct as federal contractors. ......................................... 15

    III.    The removing Defendants have colorable federal defenses. ................................ 21

    IV.    This case was timely removed. .............................................................................. 23

    V.    Plaintiffs' complaints about delay are unfounded. ............................................... 24

    VI.    If the Court grants Plaintiffs' remand motion, this Court should delay issuance of the remand order for five days to provide time to move for a stay pending appeal................................................................................................. 25

CONCLUSION................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ackerson v. Bean Dredging*,
    589 F.3d 196 (5th Cir. 2009) .......................................................................... 22

*Arbaugh v. Y&H Corp.*,
    546 U.S. 500 (2006) ........................................................................................ 21

*Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*,
    894 F.3d 692 (5th Cir. 2018) .......................................................................... 23

*Baker v. Atl. Richfield Co.*,
    962 F.3d 937 (7th Cir. 2020) .................................................................. 8, 9, 11

*Bordenkircher v. Hayes*,
    434 U.S. 357 (1978) ........................................................................................ 23

*Boyle v. United Techs.*,
    487 U.S. 500 (1988) ........................................................................................ 22

*BP P.L.C. v. Mayor & City Council of Baltimore*,
    141 S. Ct. 1532 (2021) .................................................................................... 24

*Broussard v. Huntington Ingalls, Inc.*,
    No. 20-CV-836, 2020 WL 2744583 (E.D. La. May 27, 2020) ......................... 8

*Butler v. Coast Electric Power*,
    926 F.3d 190 (5th Cir. 2019) .......................................................................... 22

*Campaign for S. Equal. v. Bryant*,
    773 F.3d 55 (5th Cir. 2014) ............................................................................ 25

*Cavallini v. State Farm Mut. Auto Ins. Co.*,
    44 F.3d 256 (5th Cir. 1995) ............................................................................ 24

*Clark v. Huntington Ingalls, Inc.*,
    No. 19-CV-01709, 2021 WL 1186997 (E.D. La. Mar. 30, 2021) ................... 15

*Exxon Mobil Corp. v. United States*,
    No. CV H-10-2386, 2020 WL 5573048 (S.D. Tex. Sept. 16, 2020) ..... 3, 19, 20

*In re Commonwealth's Mot. to Appoint Counsel Against or Directed to Def. Ass'n of*
    *Phil.*, 790 F.3d 457 (3d Cir. 2015) .................................................................... 9

ii

*Jefferson Cnty. v. Acker*,
    527 U.S. 423 (1999)..................................................................................... 4, 8

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994)......................................................................................... 23

*Latiolais v. Huntington Ingalls, Inc.*,
    951 F.3d 286 (5th Cir. 2020) (en banc) ................................................. passim

*Legendre v. Lamorak Ins.*,
    No. 19-CV-14336, 2021 WL 1207798 (E.D. La. Mar. 31, 2021) ..................... 8

*Maguire v. Hughes Aircraft*,
    912 F.2d 67 (3d Cir. 1990)............................................................................ 22

*Maryland v. Louisiana*,
    451 U.S. 725 (1981)....................................................................................... 22

*Mutual Pharmaceutical Co. v. Bartlett*,
    570 U.S. 472, 480 (2013)............................................................................... 22

*Ohio v. Wright*,
    992 F.2d 616 (6th Cir. 1993) ........................................................................ 24

*Par. of Plaquemines v. Chevron USA, Inc. (Plaquemines I)*,
    7 F.4th 362 (5th Cir. 2021) .................................................................. 4, 5, 23

*Par. of Plaquemines v. Riverwood Prod. Co.*,
    No. 18-CV-5217, 2019 WL 2271118 (E.D. La. May 28, 2019)........................ 5

*Plaquemines Par. v. Hilcorp Energy Co.*,
    No. 18-CV-05210, ECF No. 91 (E.D. La. Dec. 29, 2022)................................. 1

*Plaquemines Par. v. Riverwood Prod. Co.*,
    No. 18-CV-5217, 2022 WL 843118 (E.D. La. Mar. 22, 2022) ................. 24, 25

*Plaquemines Par. v. Rozel Operating Co.*,
    No. 18-CV-05189, ECF No. 58 (E.D. La. Dec. 29, 2022)................................. 1

*Plaquemines Parish v. Chevron USA, Inc. (Plaquemines II)*,
    No. 22-30055, 2022 WL 9914869 (5th Cir. Oct. 17, 2022) (per curiam)................. passim

*Pliva v. Mensing*,
    564 U.S. 604 (2011)....................................................................................... 23

*St. Charles Surgical Hospital, L.L.C. v. Louisiana Health Service & Indemnity Co. (St.*
    *Charles II)*, 990 F.3d 447 (5th Cir. 2021)............................................. 13, 14, 16

*United States v. Rice*,
    327 U.S. 742 (1946) ........................................................................................... 24

*Watson v. Philip Morris Cos.*,
    551 U.S. 142 (2007) .............................................................................. 6, 8, 9, 12

*Willingham v. Morgan*,
    395 U.S. 402 (1969) ........................................................................................... 22

*Yearsley v. W.A. Ross Constr.*,
    309 U.S. 18 (1940) ............................................................................................. 22

## STATUTES

28 U.S.C. § 1442 .................................................................................................. 4, 13

33 U.S.C. § 1311(a) .................................................................................................. 23

33 U.S.C. § 1344 ...................................................................................................... 23

33 U.S.C. § 403 ........................................................................................................ 23

## REGULATIONS

15 C.F.R. § 930.65(b) ............................................................................................... 23

**INTRODUCTION**

This case is one of 42 cases filed against approximately 200 oil-and-gas companies challenging their oil-production activities on the Louisiana coast, including during World War II ("WWII"). The briefing of Plaintiffs' motion to remand this case remained on hold pending resolution of *Plaquemines Parish v. Chevron USA, Inc. (Plaquemines II)*, No. 22-30055 (5th Cir.), which resolved an appeal from the lead case in this District: *Plaquemines Parish v. Riverwood Production Company*, No. 18-CV-5217 (E.D. La.) ("*Riverwood*"). In *Riverwood*, upon which Plaintiffs' motion heavily relies, the district court found all elements of the test for federal-officer removal were met except for one: the "acting under" element. In affirming that decision, the Fifth Circuit expressly noted the *specific facts* that *would* meet the "acting under" requirement. Those specific facts exist here.

In *Plaquemines II*, the Fifth Circuit held that the Defendants in that case ("the *Riverwood* Defendants") did not act under federal officers when they produced oil in the Potash field and then shipped that oil to refineries operated by other oil companies that made petroleum products for the government's war effort. 2022 WL 9914869 (5th Cir. Oct. 17, 2022) (per curiam). Defendants Chevron U.S.A. Inc., Chevron U.S.A. Holdings Inc., Chevron Pipeline Company, The Texas Company, Shell Oil Company, ExxonMobil Corporation, Burlington Resources Oil & Gas Company LP, and BP America Production Company (together, "the removing Defendants") respectfully disagree with that decision, and the *Riverwood* Defendants will file a petition for writ of certiorari to the Supreme Court. Accordingly, this Court may wish to defer consideration of Plaintiffs' motion to remand until the Supreme Court resolves the *Plaquemines II* petition, as another section of this Court has already done. *See Plaquemines Par. v. Rozel Operating Co.*, No. 18-CV-05189, ECF No. 58 (E.D. La. Dec. 29, 2022); *Plaquemines Par. v. Hilcorp Energy Co.*, No. 18-CV-05210, ECF No. 91 (E.D. La. Dec. 29, 2022).

Nevertheless, this case is removable for independent reasons. Despite affirming the district court's remand order, the Fifth Circuit expressly recognized that "refineries, who had federal contracts and acted pursuant to those contracts, can likely remove under § 1442 . . . ." *See Plaquemines II,* 2022 WL 9914869, at *4. Thus, in a different factual setting—where a defendant was operating *both* as a refiner who provided refined petroleum products to the government through government contracts *and* as a producer of crude oil sent to its refinery producing wartime goods under government contract—the defendant would be "acting under" a federal officer and thus entitled to remove a case challenging WWII production activities. This case presents *precisely* that fact pattern. The removing Defendants thus file this brief for two purposes. *First*, this brief and its exhibits provide this Court with the evidence necessary to preserve for appeal the removing Defendants' arguments pending the Supreme Court's resolution of the forthcoming petition for a writ of certiorari in *Plaquemines II. Second*, this brief and its exhibits provide this Court with additional evidence and arguments made relevant by the language in *Plaquemines II* cited above to support federal-officer jurisdiction in this case.

Specifically, during WWII, The Texas Company and Gulf Oil Company ("Gulf")—a predecessor to removing Defendant Chevron U.S.A. Inc.[1]—were integrated oil companies, with upstream (production) operations in the Delta Duck Club and Grand Bay fields in Plaquemines Parish (and elsewhere) and downstream (refining) operations at their refineries in Port Arthur, Texas. In 1942, both The Texas Company and Gulf contracted with the Defense Supplies

---

[1] The Texas Company and Texaco Inc. are predecessors-in-interest to Chevron U.S.A. Inc., *see* Affidavit of Gina K. Lee, Ex. 3, ¶ 20, not Chevron U.S.A. Holdings Inc. as Plaintiffs incorrectly allege, *see* Petition for Damages to the Plaquemines Parish Coastal Zone ¶ 2, *Par. of Plaquemines v. Total Petrochemicals & Refining USA, Inc.*, No. 61-002. Plaintiffs correctly allege that Gulf is predecessor-in-interest to Chevron U.S.A. Inc. *See id.*

Corporation ("DSC"), a corporation created and administered by the federal government,[2] for their Port Arthur refineries to produce 100-octane aviation gasoline ("avgas") for supply to the federal government. One hundred-octane avgas was one of the federal governments' most critical war products: "The nation's avgas production was viewed as essential to military victory over the Japanese and Axis forces." *Exxon Mobil Corp. v. United States*, No. CV H-10-2386, 2020 WL 5573048, at *13 (S.D. Tex. Sept. 16, 2020). The Texas Company and Gulf also had government contracts to produce other critical war products, including 91-octane avgas, 87-octane avgas, alkylate, cumene, and 80-octane gasoline. Accordingly, The Texas Company and Gulf extracted crude oil from Delta Duck Club and Grand Bay (and other fields) and transported that crude to their Port Arthur refineries to be used for all of these critical war products to fulfill government contracts in accordance with federal-government specifications.

In short, unlike the Defendants in *Plaquemines II*, The Texas Company and Gulf both produced crude oil and then refined that crude to fulfill government contracts for products during WWII needed to support the war effort. Because The Texas Company and Gulf were direct federal contractors, there is an additional layer of government direction and control present in this case; and, under the above-cited language in *Plaquemines II*, The Texas Company and Gulf were "acting under" federal officers. And the charged conduct— The Texas Company's and Gulf's alleged "bad faith" wartime production practices in Delta Duck Club and Grand Bay challenged by Plaintiffs— are "connected or associated with" The Texas Company's and Gulf's contractual obligations to supply the federal government with critical war products. These facts support federal-officer jurisdiction, especially because this Court must credit the removing Defendants' theory of the case

---

[2] *See* Declaration of Alfred M. ("A.J.") Gravel, Ex. 1, ¶ 6(7) n.7 ("Gravel Declaration") ("The DSC was a government corporation organized in August 1940 as a subsidiary of the Reconstruction Finance Corporation to finance plant expansion and purchase 100-octane aviation gasoline.").

when evaluating removal. *See, e.g.*, *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999). Plaintiffs' motion to remand should be denied. Should the motion be granted, however, issuance of the mandate to state court should be delayed and a temporary stay entered to allow the removing Defendants sufficient time to seek a stay pending appeal.

## PROCEDURAL HISTORY

This case is one of 42 suits with virtually identical allegations, all filed by the same private law firm on behalf of various coastal parishes in Louisiana. The suits seek to use a 1980 state permitting law to challenge, as unlawful, activity that Defendants undertook long before 1980—and as far back as WWII, when a national emergency drove and dictated a massive increase in coastal oil production. The State of Louisiana intervened in all of the cases.

The removing Defendants timely removed this case from the 25th Judicial District Court in Plaquemines Parish under, *inter alia*, 28 U.S.C. § 1442, which permits removal of cases involving federal officers and persons assisting such officers.[3] The removing Defendants based the removal on new allegations in Plaintiffs' *Rozel* Expert Report, which "revealed, for the first time, the specific conduct that the [defendant oil] companies engaged in before 1980 that supported [Plaintiffs'] theory of liability," including Defendants' activities during WWII under the direction and control of federal officers. *Par. of Plaquemines v. Chevron USA, Inc. (Plaquemines I)*, 7 F.4th 362, 373 (5th Cir. 2021).

Plaintiffs in this case and the other 41 cases moved to remand across the docket.[4] To facilitate efficient resolution of the jurisdictional issues implicated by the remand motions—which overlapped across many of the cases but were not identical—the parties briefed one lead case in each district: *Riverwood* in this District, and *Cameron v. Auster Oil & Gas Inc.*, No. 2:18-CV-677

---

[3] *See* ECF No. 1 at 21–32.
[4] *See* ECF No. 49.

4

(W.D. La.) ("*Auster*"). In the lead case in this District, the *Riverwood* Defendants filed oppositions to Plaintiffs' remand motions on October 19, 2018.[5]

The *Riverwood* district court granted Plaintiffs' motions to remand, *see Par. of Plaquemines v. Riverwood Prod. Co.*, No. 18-CV-5217, 2019 WL 2271118, at *1 (E.D. La. May 28, 2019), and the *Riverwood* Defendants appealed.[6] The Fifth Circuit remanded for the district court to determine whether federal-officer jurisdiction existed in light of the intervening decision in *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020) (en banc). *See Plaquemines I*, 7 F.4th at 365.

On remand, the *Riverwood* Defendants submitted supplemental briefing with additional evidence in support of removal to demonstrate that they satisfied the four-part test for federal-officer jurisdiction.[7] That test requires a defendant to show: (1) it is a "'person' within the meaning of the statute"; (2) it has "asserted a colorable federal defense"; (3) it "acted pursuant to a federal officer's directions"; and (4) "the charged conduct is connected or associated with an act pursuant to a federal officer's directions." *Latiolais*, 951 F.3d at 296. The district court found that the *Riverwood* Defendants met all but one element—the "acting under" element—of this test, and again granted the motion to remand. *See Par. of Plaquemines v. Riverwood Prod. Co.*, No. 18-CV-5217, 2022 WL 101401, at *6–10 (E.D. La. Jan. 11, 2022).

The *Riverwood* Defendants appealed that order.[8] As noted above, while the Fifth Circuit affirmed in *Plaquemines II*, the *Riverwood* Defendants will file a petition for a writ of certiorari

---

[5] *See Plaquemines Par. v. Riverwood Prod. Co.*, No. 18-CV-5217, ECF No. 47 ("Defs. *Riverwood* Opp."); *Plaquemines Par. v. Riverwood Prod. Co.*, No. 18-CV-5217, ECF No. 48.

[6] *See Plaquemines Par. v. Riverwood Prod. Co.*, No. 18-CV-5217, ECF No. 88. The removing Defendants in *Auster* also appealed the district court's order granting remand to the Fifth Circuit, which consolidated the *Auster* appeal with the *Riverwood* appeal. *See Plaquemines I*, 7 F.4th at 365.

[7] *See Plaquemines Par. v. Riverwood Prod. Co.*, No. 18-CV-5217, ECF No. 104 ("Defs. *Riverwood* Supp. Opp."); *Plaquemines Par. v. Riverwood Prod. Co.*, No. 18-CV-5217, ECF No. 110.

[8] *See Plaquemines Par. v. Riverwood Prod. Co.*, No. 18-CV-5217, ECF No. 119.

from the Supreme Court seeking review of that decision. Although the Fifth Circuit affirmed the district court's remand order, the Fifth Circuit expressly recognized that federal-officer jurisdiction would likely exist in a case where a removing Defendant was a refiner "who had federal contracts and acted pursuant to those contracts." *Plaquemines II*, 2022 WL 9914869, at *4.

As described above, the *Riverwood* Defendants will seek U.S. Supreme Court review of *Plaquemines II*, and the removing Defendants here expressly preserve the arguments made in support of federal-officer jurisdiction in that case. The *Riverwood* Defendants showed that, during WWII, they engaged in the production practices that Plaintiffs challenge as part of an "unusually close" or "special" relationship with the federal government, in which they massively increased their production of crude oil to fuel the government's war effort with a minimum use of critical materials under the direction and control of a temporary government agency. *Watson v. Philip Morris Cos.*, 551 U.S. 142, 151, 153 (2007). Indeed, during WWII, "[s]o closely and continuously did [the government and the oil industry] work together, that it is often all but impossible to say where one left off and the other began."[9] Additionally, the *Riverwood* Defendants engaged in the challenged production practices while acting as federal subcontractors, specifically by supplying federally contracted refineries with crude oil essential to produce aviation gasoline ("avgas").

To facilitate resolution of Plaintiffs' remaining motions to remand, the parties have stipulated that the appellate record in *Plaquemines II* is part of the record in this case.[10] To avoid burdening the Court with briefing on the issues the Fifth Circuit considered in *Plaquemines II*, the removing Defendants respectfully incorporate by reference the *Riverwood* Defendants' briefing and evidence and expressly preserve the issues and arguments presented in *Plaquemines II* pending the resolution by the Supreme Court of the forthcoming petition for a writ of certiorari. This brief

---

[9] *Plaquemines II* ROA.14212.
[10] *See* ECF No. 86.

and its exhibits provide this Court with additional evidence and arguments that confirm federal-officer jurisdiction is proper in this case because, among other reasons, The Texas Company and Gulf both produced *and* refined oil from the Delta Duck Club and Grand Bay fields to fulfill government contracts during WWII.

## ARGUMENT

The Texas Company and Gulf satisfy all four elements of the test for federal officer removal, as set forth above. As the district court in the lead *Riverwood* case, upon which Plaintiffs' motion to remand now relies, found, (1) The Texas Company and Gulf are "persons";[11] and (2) The Texas Company and Gulf have asserted (through their successors in interest) multiple federal defenses, such as immunity and preemption, that are at least "colorable." The Texas Company and Gulf satisfy element (3)—the "acting under" element for the reason expressly noted by the Fifth Circuit in *Plaquemines II*: The Texas Company and Gulf acted pursuant to a federal officer's directions because they fulfilled federal contracts for the manufacture of avgas. Finally, (4) the charged conduct— The Texas Company's and Gulf's WWII crude-oil-production practices—is connected or associated with their fulfillment of government contracts for avgas.

Indeed, the crude oil The Texas Company and Gulf produced from the Delta Duck Club and Grand Bay fields named in the Plaintiff's Petition here was the essential ingredient in the government's avgas. The Texas Company and Gulf transported that crude to their Port Arthur refineries in order to fulfill their contracts with the government, underscoring that The Texas Company and Gulf were "refineries, who had federal contracts and acted pursuant to those contracts, [and] can likely remove under § 1442." *Plaquemines II*, 2022 WL 9914869, at *4 (quoting *Riverwood*, 2022 WL 101401, at *7). In short, Section 1442 allows a defendant to remove

---

[11] Plaintiffs conceded in *Riverwood* that Defendants are persons but contended that the other prongs were not met. *See* Defs. *Riverwood* Opp. at 2.

to federal court "[a] civil action … that is commenced in a State court and that is against or directed to … any person acting under [a federal officer] … for or relating to any act under color of such office."  Plaintiffs' lawsuit is against The Texas Company and Gulf, which are persons acting under a federal officer by virtue of their WWII federal contracts to produce avgas and other military petroleum products, and the lawsuit is "relating to" an act under color of federal office because it challenges The Texas Company's and Gulf's activities to produce the key component required to fulfill their federally-contracted obligations to produce WWII avgas.

Importantly, "[S]ection 1442 does not require" the removing Defendants "to 'win [their] case before [they] can have it removed.'" *Latiolais*, 951 F.3d at 296–97 (quoting *Jefferson Cnty.*, 527 U.S. at 431). At this stage of the proceedings, the removing Defendants are entitled to "the benefit of all reasonable inferences from the facts alleged" in support of removal. *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 945 (7th Cir. 2020). "There can be no doubt that after *Latiolais*, jurisdiction under Section 1442 must be broadly construed, and that factual disputes must be resolved in favor of maintaining federal jurisdiction." *Legendre v. Lamorak Ins.*, No. 19-CV-14336, 2021 WL 1207798, at *4 (E.D. La. Mar. 31, 2021).

## I.    The Texas Company and Gulf "acted pursuant to" the direction of federal officers.

Courts routinely recognize that § 1442(a)'s "acting under" requirement "is satisfied where a plaintiff's allegations are directed at a private entity's actions undertaken while executing a contractual duty to produce an item for the federal government which, absent a contract with a private firm, the government would have been forced to produce on its own." *Broussard v. Huntington Ingalls, Inc.*, No. 20-CV-836, 2020 WL 2744583, at *5 (E.D. La. May 27, 2020) (collecting cases). Indeed, the textbook case for federal-officer jurisdiction is where, as here, a private firm is "providing the Government with a product that it used to help conduct a war." *Watson*, 551 U.S. at 154. That is *this* case. If DSC had not contracted with The Texas Company

and Gulf (and others) for the production of avgas in accordance with the federal government's specifications, the federal government would have had to produce that critical war product itself.

### a. The Texas Company and Gulf produced avgas and other critical war products under contract with the federal government.

The Texas Company and Gulf "acted pursuant to" the direction of federal officers because they produced 100- and 91-octane avgas, among other essential wartime refined petroleum products, to federal-government specifications under their government contracts using crude from their Delta Duck Club and Grand Bay fields. To satisfy § 1442(a)'s "acting under" requirement, a private firm must be under the "subjection, guidance, or control" of a federal superior, and its actions "must involve an effort to assist, or to help carry out, the duties or tasks of [a] federal superior." *Id.* at 152. Those efforts must go "beyond simple compliance with the law," such as by "helping the Government to produce an item that it needs." *Id.* at 153. Yet, the complained-of conduct need not have been at the *behest* of federal officers: "'It is sufficient for the "acting under" inquiry that the allegations are directed at the relationship' between the [removing Defendants] and the federal government." *Baker*, 962 F.3d at 944–45 (quoting *In re Commonwealth's Mot. to Appoint Counsel Against or Directed to Def. Ass'n of Phil.*, 790 F.3d 457, 470 (3d Cir. 2015)).

The "acting under" analysis is very straightforward in this case: The Texas Company and Gulf "acted under" federal officers because they were federal contractors during the war and produced 100- and 91-octane avgas for the military—as well as numerous other critical war products—to detailed, government-set specifications at their Port Arthur refineries using Delta Duck Club and Grand Bay crude.[12] In 1942, on behalf of the federal government, DSC executed two contracts with the Texas Company and one contract with Gulf for their respective Port Arthur

---

[12] *See* Gravel Declaration ¶¶ 124 (Delta Duck Club), 134 (Grand Bay).

refineries to produce 100-octane avgas.[13] As part of those contracts, both The Texas Company and Gulf agreed to expand their pre-war facilities to more than quadruple their daily capacity to produce 100-octane avgas.[14] Underscoring the federal government's immense need for avgas, DSC agreed to provide The Texas Company and Gulf up to a combined $31.45 million—the equivalent of nearly *$560 million today*— to finance the expansions at their Port Arthur refineries.[15]

Both The Texas Company's and Gulf's contracts required production of avgas using detailed, government-set specifications.[16] Both The Texas Company's and Gulf's contracts gave the federal government the right "to purchase all or any part of the aviation gasoline" produced at each company's Port Arthur refinery.[17] Under their government contracts, The Texas Company and Gulf refined huge quantities of crude oil into avgas and other critical war products for sale to the federal government: Collectively, The Texas Company's and Gulf's Port Arthur refineries produced 22.9 million barrels of 100-octane avgas and 5.56 million barrels of 91-octane avgas during the war.[18] And the Texas Company and Gulf obtained substantial quantities of crude for

---

[13] *See* Gravel Declaration ¶¶ 125–126 (Delta Duck Club), 138 (Grand Bay).

[14] *See* Gravel Declaration ¶¶ 126 (Delta Duck Club), 139 (Grand Bay). The Texas Company's capacity grew from 2,940 barrels of 100-octane avgas per day to 13,625 barrels per day. *See id.* ¶ 126. Gulf's capacity grew from approximately 2,000 barrels of 100-octane avgas per day to more than 8,700 barrels per day. *See id.* ¶ 139.

[15] *See* Gravel Declaration ¶¶ 126 (Delta Duck Club), 139 (Grand Bay). DSC agreed to loan the Texas Company up to $21.625 million, and DSC agreed to make up to 9.825 million in advance payments to Gulf. *See id.* ¶¶ 126 (Delta Duck Club), 139 (Grand Bay).

[16] *See* Gravel Declaration ¶¶ 125 (Delta Duck Club), 138 (Grand Bay).

[17] *See* Ex. 1-151 to Gravel Declaration, § III (The Texas Company); Ex. 1-142 to Gravel Declaration, § III (Gulf).

[18] *See* Gravel Declaration ¶¶ 127 (Delta Duck Club), 140 (Grand Bay). The Texas Company's Port Arthur refinery produced 14.2 million barrels of 100-octane avgas and 2.6 million barrels of 91-octane avgas. *See id.* ¶ 127. Gulf's Port Arthur refinery produced 8.47 million barrels of 100-octane avgas and 2.96 million barrels of 91-octane avgas. *See id.* ¶ 140.

this production, *inter alia*, from their own fields in Delta Duck Club and Grand Bay and transported that crude to their Port Arthur refineries.[19]

As a result, this case presents paradigmatic government-contractor relationships, which satisfy the "acting under" prong. *See, e.g.*, *Zeringue v. Crane Co.*, 846 F.3d 785, 792 (5th Cir. 2017) (holding that the acting under prong was satisfied where equipment supplied by federal contractor was built to Navy specifications and "the Navy would have had to build those parts" had the contractor not done so); *Baker*, 962 F.3d at 943 ("The government's detailed specifications for the makeup of ISR's materials, 'the compulsion to provide the product to the government's specifications,' and the continuous federal supervision all reveal the necessary relationship between ISR and the government.").

Likewise, the Fifth Circuit's "acting under" analysis in *Plaquemines II* supports removal in this case. There, the defendants offered two theories for why they satisfied § 1442(a)'s "acting under" prong: (1) they had an "unusually close and special relationship" with the federal government to produce crude oil during the war; and (2) they were federal subcontractors because they were crude-oil suppliers to federally contracted refiners.[20] *Plaquemines II*, 2022 WL 9914869, at *2. This case is different: The Texas Company and Gulf were *both* the wartime producers in the Delta Duck Club and Grand Bay fields *and* refiners of oil from Delta Duck Club and Grand Bay that was used to manufacture the refined petroleum products needed to fulfill government contracts. In other words, The Texas Company and Gulf "had federal contracts and acted pursuant to those contracts," which is the exact factual scenario that *Plaquemines II* expressly recognized would be removable. *Id*. at *4. As a result, the removing Defendants are entitled to federal-officer removal because this is a civil action that is "for or relating to" acts that The Texas

---

[19] *See* Gravel Declaration ¶¶ 119 (Delta Duck Club), 133 (Grand Bay).
[20] The removing Defendants expressly preserve those same theories here, as applied to the facts of this case.

Company or Gulf took as federal contractors, including, as shown below, this action challenging their activities in Delta Duck Club and Grand Bay. *Id.* (quoting *Riverwood*, 2022 WL 101401, at *7).

> **b. Plaintiffs' claims regarding the "acting under" element are meritless.**

Plaintiffs resist this logical conclusion by mischaracterizing the removing Defendants' arguments, misstating the law, and incorrectly representing the facts of this case.

*First*, Plaintiffs suggest that the "WWII refinery contracts" at issue in this case did not "impose a level of control sufficient to satisfy the 'acting under' prong."[21] Not so. As outlined above, The Texas Company's and Gulf's contracts with DSC required them to transform their Port Arthur refineries into war machines. Texas Company's and Gulf's contracts directed them to produce massive quantities of avgas to detailed, government-set specifications[22]—all for sale to the federal government—and the federal government even financed Texas Company's and Gulf's expansions of their avgas-production facilities.[23] These government-contractor relationships—*i.e.*, where The Texas Company and Gulf "provid[ed] the Government with a product that it used to help conduct a war"—are classic examples of a private firm "acting under" federal officers. *Watson*, 551 U.S. at 154. That is especially true because the Petroleum Administration for War ("PAW") closely supervised the allocation of crude oil to refineries to facilitate fulfillment of government contracts for refined products.[24]

*Second*, Plaintiffs mischaracterize the removing Defendants' position as arguing "that if a government-contracted refinery was owned by a corporate entity . . . that also produced some of

---

[21] ECF No. 85-2 at 5.
[22] *See* Gravel Declaration ¶¶ 125, 127 (The Texas Company), 138, 140 (Gulf).
[23] *See* Gravel Declaration ¶ 126 (The Texas Company), 139 (Gulf).
[24] *See* Gravel Declaration ¶¶ 71–72.

the crude that it refined, that corporate entity was 'acting under' federal officers for all purposes."[25] That is incorrect. The argument is far simpler: The Texas Company and Gulf "acted under" the direction of federal officers because they were direct federal contractors during the war and produced 100-octane avgas and other critical war products to federal-government-mandated specifications at their Port Arthur refineries. In other words, The Texas Company and Gulf "acted under" federal officers not for all purposes but in their capacities as government-contracted avgas refiners. Under *Latiolais*, The Texas Company and Gulf can thus remove a civil action challenging conduct connected to or associated with their acts as federally-contracted refiners, like Plaintiffs' lawsuit here.

Plaintiffs rely on *St. Charles Surgical Hospital, L.L.C. v. Louisiana Health Service & Indemnity Co. (St. Charles II)*, 990 F.3d 447 (5th Cir. 2021), to argue that "a company found to be 'acting under' a federal officer for purposes of its avgas refining is not 'acting under' for purposes of its crude oil production when its avgas refining is subject to federal controls and its crude production is not."[26] That argument misses the point. For this case to be removable, The Texas Company and Gulf did not need to be "acting under" federal officers *when producing crude oil* in the Delta Duck Club and Grand Bay fields. To the contrary, The Texas Company's and Gulf's crude-oil-production practices in Delta Duck Club and Grand Bay need only be *related to* their actions *as refiners* under the federal government's subjection, guidance, and control. *See Latiolais*, 951 F.3d at 292 ("[S]ection 1442(a)(1) makes removable to federal court 'a civil action . . . that is against or directed to . . . any person acting under a federal officer . . . for or relating to *any act* under color of such office.'" (quoting 28 U.S.C. § 1442(a)(1) (emphasis added)). *St. Charles II* does not support Plaintiffs' position. Here, as demonstrated further below, The Texas Company's

---

[25] ECF No. 85-2 at 4.
[26] ECF No. 85-2 at 6.

and Gulf's production, including the dramatic surge that WWII required to meet the federal government's demands, is plainly related to the government's requirement that the Texas Company and Gulf fulfill their contracts for refined petroleum products.[27]

***Third***, Plaintiffs argue that "[t]he charged conduct as set forth in the complaint must be directed by a federal officer to satisfy the 'acting under' prong."[28] ***That is decidedly not the law***. The Fifth Circuit—in the very same case on which Plaintiffs hang their entire argument—held that "[i]n order to satisfy the 'acting under' requirement, a removing defendant *need not show that its alleged conduct was precisely dictated by a federal officer's directive*." *St. Charles II*, 990 F.3d at 454 (emphasis added). Indeed, *Latiolais* merely requires that a removing defendant have "acted pursuant to a federal officer's directions" and that "the charged conduct" be "connected or associated with an act pursuant to a federal officer's directions." *Latiolais*, 951 F.3d at 296. Plaintiffs are improperly conflating the "acting under" and "for or relating to" elements of the test for federal-officer jurisdiction in a way that would simply reimpose the "causal nexus" requirement that the Fifth Circuit expressly jettisoned in *Latiolais*. *See id.* (overruling past cases that "erroneously relied on a 'causal nexus' test after Congress amended section 1442(a) to add 'relating to'"). The charged conduct need not have been at the behest of federal officers. *See, e.g.,*

---

[27] Plaintiffs further misread *St. Charles II* in contending that "Section 1442 jurisdiction requires that the complaint include '**federally governed claims**.'" ECF No. 85-2 at 6 (emphasis in original) (quoting *St. Charles II*, 990 F.3d at 454. *St. Charles II* involved an insurance company's payment of *health insurance claims*, some of which were for patients insured under the Federal Employees Health Benefits Act ("FEHBA"). *St. Charles II*'s reference to "federally governed claims" therefore did not mean that the claims *in the lawsuit* were "federally governed"; rather, it was a description of the underlying *insurance* claims, to distinguish the "federally governed" insurance claims from insurance claims by patients insured under other, non-federal insurance plans. *See id*. at 449, 455 (explaining that "St. Charles produced discovery documents that detailed individual patient transactions at issue in the litigation" among which were documents that the insurer contended "contained 'dozens' of claims that implicated FEHBA-governed insurance benefits" and noting that the district court could "conclud[e] that St. Charles's complaint does not include any federally-governed claims, because the discovery disclosures to the contrary were inadvertent").

[28] ECF No. 85-2 at 7.

*Clark v. Huntington Ingalls, Inc.*, No. 19-CV-01709, 2021 WL 1186997, at *2 (E.D. La. Mar. 30, 2021) (finding "connection" prong satisfied as to plaintiffs' negligence and failure-to-warn claims where defendants used asbestos on Navy ships under contracts with the federal government, even though "the government did not prevent Defendants from protecting or warning its employees about asbestos").

In short, the removing Defendants here have demonstrated that this case was properly removed under Section 1442(a)(1) because (1) The Texas Company and Gulf were acting under federal officers by virtue of their avgas-production and other petroleum refining operations at their Port Arthur refineries under contract with the federal government and (2) the charged conduct— The Texas Company's and Gulf's crude-oil-production activities in Delta Duck Club and Grand Bay—is closely connected to their federal refining contracts. *See Latiolais*, 951 F.3d at 296. Indeed, that connection is strengthened because The Texas Company and Gulf were integrated oil companies with both production and refining operations. The fact that Plaintiffs' Petition "says nothing about refining" is irrelevant.[29] Plaintiffs' arguments attempting to discount the Fifth Circuit's clear statement that "refineries, who had federal contracts and acted pursuant to those contracts, can likely remove under § 1442" are meritless. *Plaquemines II*, 2022 WL 9914869, at *4. The removing Defendants have satisfied *Latiolais*'s "acting under" requirement, just as the Fifth Circuit articulated in *Plaquemines II*.

## II.    Plaintiffs' challenges to The Texas Company's and Gulf's production methods in Delta Duck Club and Grand Bay "relate to" The Texas Company's and Gulf's conduct as federal contractors.

The Texas Company and Gulf (through its successor) need only show that their "charged conduct is connected or associated with" an "act under color of federal office." *Latiolais*, 951 F.3d

---

[29] ECF No. 85-2 at 7.

at 292. "This test is, by intention, quite broad, and covers any and all acts that 'stand in some relation; have bearing or concern; or pertain' to acts under color of federal office." *Riverwood*, 2022 WL 101401, at *6 (cleaned up) (quoting *Latiolais*, 951 F.3d at 292). To satisfy *Latiolais*'s "connection" requirement, it is not necessary for Plaintiffs' claims to arise out of a federal directive: "[T]hough the 'acting under' and 'connection' elements may often ride in tandem toward the same result, they are distinct." *St. Charles II*, 990 F.3d at 454.

Here, Plaintiffs challenge the production methods The Texas Company and Gulf used in Delta Duck Club and Grand Bay to produce the crude oil that they shipped to their Port Arthur refineries to satisfy government contracts to produce avgas and other critical war products. That conduct bears far more than "some relation" to The Texas Company's and Gulf's actions as federally contracted avgas refiners. PAW identified Delta Duck Club as field producing a "preferential type crude used for making aviation gasoline by normal distillation methods."[30] PAW also designated Grand Bay as a critical field, in part because Grand Bay had "high formation pressures and substantial reserves" and produced "crudes of high value to the war program."[31] During the war, The Texas Company and Gulf had significant operations in Delta Duck Club and Grand Bay. The Texas Company completed eleven wells in Delta Duck Club, produced approximately 400,000 barrels of crude, and transported much of that crude to its Port Arthur refinery.[32] Gulf completed twenty-three wells, produced more than ten million barrels of crude, and transported that crude to its Port Arthur refinery.[33] Indeed, crudes from Delta Duck Club and

---

[30] Gravel Declaration ¶ 118.
[31] Gravel Declaration ¶ 131.
[32] Gravel Declaration ¶¶ 117, 119–120; Declaration of Louis F. Gilbert, Ex. 2, ¶¶ 7, 13–23 ("Gilbert Declaration"). Production in Delta Duck Club increased more than sixfold during the war. Gravel Declaration ¶ 117.
[33] Gravel Declaration ¶¶ 129, 133; Gilbert Declaration ¶¶ 7, 24–46. Production in Grand Bay increased 54% during the war. Gravel Declaration ¶ 129.

Grand Bay were critical raw materials for the war products produced at The Texas Company's and Gulf's Port Arthur refineries, including, most notably, 100- and 91-octane avgas.[34]

Plaintiffs allege that The Texas Company's and Gulf's oil-production practices in Delta Duck Club and Grand Bay violated state law because they were in "bad faith" and therefore not "legally commenced"[35]:

- **High Production Rates**. Plaintiffs allege that Defendants should not have extracted oil at the high production rates they maintained during the war, because that production "generated accelerated wave action that erodes levees and destroys marshes."[36] Slowing production rates would have caused less crude to be extracted and shipped to The Texas Company's and Gulf's Port Arthur refineries for the production of avgas.

- **Vertical Wellbores**. Plaintiffs allege that Defendants should have drilled wells directionally from a centralized location, rather than spacing wells and drilling vertically into oil reservoirs.[37] Plaintiffs' preferred practice would have slowed the production and shipping of crude to The Texas Company's and Gulf's Port Arthur refineries, particularly given the limitations of directional drilling technology at the time. It also would have required the use of far more critical restricted materials (especially steel) and violated federal directives that mandated all wells be drilled vertically and uniformly spaced at one oil well to each 40 surface acres.[38]

- **Earthen Pits**. Plaintiffs allege that Defendants should have used individual saltwater disposal tanks at each well site, instead of earthen pits and flowlines to central tank batteries, which Plaintiffs claim "leaked and seeped waste, produced saltwater and hydrocarbons into the marsh."[39] Constructing steel tanks for each well site would, of course, have required the use of extensive amounts of steel, in direct contravention of federal directives to minimize the use of steel and other critical wartime materials.[40]

- **Disposal of Saltwater**. Plaintiffs fault Defendants for not using saltwater disposal "wells . . . at the onset of saltwater production" in the field, because Plaintiffs claim that "overboard discharges were contrary to industry

---

[34] Gravel Declaration ¶¶ 121–122, 137.
[35] *See Rozel* Expert Report at 68, 82–83, ECF No. 1-3.
[36] *Rozel* Expert Report at 13, ECF No. 1-1.
[37] *See Rozel* Expert Report at 13, ECF No. 1-1; *Rozel* Expert Report at 125, ECF No. 1-4.
[38] *See* Gravel Declaration ¶¶ 49, 55–56.
[39] *Rozel* Expert Report at 68, ECF No. 1-3; *Rozel* Expert Report at 125–26, ECF No. 1-4.
[40] *See, e.g.*, Gravel Declaration ¶¶ 43, 48.

knowledge and prudent practices and killed the marsh."[41] But saltwater disposal wells would have required voluminous amounts of steel casing, and federal wartime priorities did not permit steel to be used for such purposes.[42]

- **Tubing Thickness**. Plaintiffs allege that Defendants "design[ed] wells, production flowlines, etc. with minimum and inadequate tubular wall thicknesses," which resulted in "failures that caused leaks and spills that caused pollution."[43] But using thicker tubing would have required the use of extra steel, which would have undermined federal directives to minimize the use of steel.[44]

- **Dredging Canals**. Plaintiffs criticize Defendants for their pre-1980 dredging of "a maze of canals accessing each and every drilling site, both productive and dry, that . . . collectively [led] to marsh collapse over the entire area covered by the maze *and even kilometers beyond*."[45] Instead, Plaintiffs suggest that Defendants should have constructed "networks of roads with drainage opening to protect the marsh from erosion."[46] But wartime federal directives severely constrained the use of roads because asphalt was heavily restricted.

Plaintiffs' alleged "prudent practices" would have hampered crude oil production and required the use of critical restricted materials like steel and asphalt, in direct contravention of the federal government's directive to "maxim[ize] production of petroleum . . . with a minimum expenditure of material."[47] *See Riverwood*, 2022 WL 101401, at *9 ("The challenged activities at issue in this jurisdictional dispute are, almost to a one, related to WWII efforts and/or regulatory directives."). And slowed production in the field would undoubtedly have contradicted government directives to federally contracted refiners, such as The Texas Company's and Gulf's refineries in Port Arthur,

---

[41] *Rozel* Expert Report at 126, ECF No. 1-4.

[42] Under Conservation Order M-68, steel could not be used for "[m]aterial to be used for pumping or artificial lifting equipment." Ex. 1-202 to Gravel Declaration, § 1047.1(c)(5). Likewise, under Petroleum Administrative Order No. 11, steel could be used in some circumstances for "salt water disposal or injection equipment" but not for the disposal well itself or flow, lead, and gathering lines from the well. Ex. 1-210 to Gravel Declaration, § 1515.6(b)(9)

[43] *See Rozel* Expert Report at 14, ECF No. 1-1.

[44] *See, e.g.*, Gravel Declaration ¶¶ 43, 48.

[45] *Rozel* Expert Report at 52, ECF No. 1-2 (emphasis added).

[46] *Rozel* Expert Report at 83, ECF No. 1-3.

[47] Gravel Declaration ¶ 48.

to "greatly increase[ ]" their production of avgas and other petroleum-based war products for sale to the government.[48]

PAW, The Texas Company, and Gulf knew that Delta Duck Club and Grand Bay crude was critically important to The Texas Company's and Gulf's abilities to meet their obligations to supply the federal government with 100- and 91-octane avgas, both of which were among the most crucial war products. For example:

- Between January and September 1942, The Texas Company reported to PAW that its Port Arthur and Port Neches refineries ran 16,153 barrels (approximately 59 per day) of Delta Duck Club crude, which represented most (if not all) of the Texas Company's production in the field.[49]

- In March 1942, Gulf reported to PAW that its Port Arthur refinery received 192,300 barrels per month (6,410 barrels per calendar day) of Grand Bay crude.[50]

- In July 1942, Gulf reported to PAW's Temporary Barge Subcommittee that any crude moving westward from Louisiana—which would include crude from Grand Bay—to its Port Arthur refinery was "mostly used for war products."[51]

- In September 1942, a Texas Company official reported to PAW that the company needed 4,068 barrels of day of "Garden Island-Delacroix-Delta Duck Farms [*sic*]" crude at the company's Port Arthur and Port Neches refineries.[52] Once there, that crude was to be used to produce "essential products," including "Aviation Gasoline (100 base stock)" and "Solvent Refined Motor Oils."[53]

- In October 1942, Gulf applied for an exception to Conservation Order M-68 to deepen and recomplete a well in Grand Bay. PAW approved the request, finding the proposal to be "necessary and appropriate in the public interest and to promote the war effort."[54]

---

[48] Gravel Declaration ¶ 15; *cf. Exxon*, 2020 WL 5573048, at *7 ("[T]he government's emphasis on maximum efficiency in producing avgas and other wartime products required Exxon to defer or forego maintenance and repairs that would require shutting down all or part of the refinery and related facilities.").
[49] Gravel Declaration ¶ 120. In February 1944, The Texas Company's Port Arthur refinery ran 57 barrels per day Delta Duck Club crude. *Id.* ¶ 123.
[50] Gravel Declaration ¶ 135.
[51] Gravel Declaration ¶ 137.
[52] Gravel Declaration ¶ 121.
[53] Gravel Declaration ¶ 121.
[54] Gravel Declaration ¶ 130

- In November 1942, the Chairman of PAW's District 3 Coastwise and Inland Waterways Subcommittee remarked that The Texas Company's Port Arthur refinery was "making war products from every barrel of crude coming from Southern Louisiana," which included crude delivered from Garden Island Bay.[55] A Texas Company official likewise noted that the Texas Company was "producing essential war materials from all crudes we are receiving from South Louisiana by water."[56]

- In September 1943, Gulf applied for an exception to Petroleum Administrative Order No. 11 to deepen and recomplete a well in Grand Bay and (2) drill ten new wells.[57] PAW approved Gulf's exception request.[58]

As this evidence demonstrates, PAW recognized that The Texas Company's and Gulf's crude-oil-production operations in Delta Duck Club and Grand Bay were connected to—indeed, closely intertwined with— The Texas Company's and Gulf's avgas-production activities under government contract at their Port Arthur refineries.

During WWII, the federal government exercised control at the field- and refinery-level by making decisions that ensured both sufficient production of critical war products and conservation of crucial materials. The government conscripted the *entire petroleum industry*—from operators to transporters to refiners and everyone in between—into its "war of oil."[59] And the federal government's scheme was *comprehensive*: The government prescribed how to drill for, produce, ship, and refine crude into critical war products.[60] The federal government made a deliberate decision: "military needs were given priority over environmental consequences." *Exxon*, 2020 WL 5573048, at *2. The challenged production activities are plainly related to the acts The Texas

---

[55] Gravel Declaration ¶ 122.

[56] Gravel Declaration ¶ 122.

[57] Gravel Declaration ¶ 132.

[58] Gravel Declaration ¶ 132.

[59] Gravel Declaration ¶¶ 7–8, 73; *see also id.* ¶¶ 21–56 (Federal Wartime Agencies Controlled and Directed the Petroleum Industry during WWII).

[60] *See* Gravel Declaration ¶¶ 14–20 (Federal Government 100-Octane Avgas Contracts), ¶¶ 21–56 (Federal Wartime Agencies Controlled and Directed the Petroleum Industry during WWII), ¶¶ 57–61 (Federal Government Controls on Oil and Gas Production), ¶¶ 62–70 (Federal Government Controls on Petroleum Transportation), ¶¶ 71–72 (PAW Management of Crude Oil Supplies).

Company and Gulf took under color of federal office to fulfill their government contracts for refined petroleum products.

Under *Latiolais*'s broad test, removal is proper because there is a connection between the demands of The Texas Company's and Gulf's contracts with the federal government and the consequences of those demands on The Texas Company's and Gulf's production operations, including the production methods they used in Delta Duck Club and Grand Bay. *See, e.g.*, *Riverwood*, 2022 WL 101401 at *9 (noting that the "connection or association" prong was "very broad" and finding that prong satisfied where the plaintiffs' allegations were very similar to those in this case). The Texas Company's and Gulf's production operations in Delta Duck Club and Grand Bay, using government-mandated methods that Plaintiffs now claim were unlawful, are certainly "related to" the contractual obligations the federal government imposed on The Texas Company and Gulf as refiners, including, most notably, to produce huge volumes of avgas. That is especially true because The Texas Company and Gulf were integrated oil companies during the war: they produced oil in Delta Duck Club and Grand Bay, transported that crude to their refineries in Port Arthur, and used that crude to manufacture 100- and 91-octane avgas and other refined products under federal contract during WWII.

## III.    The removing Defendants have colorable federal defenses.

The district court in the lead *Riverwood* case found this element was met, and the same is true here. At this stage of the case, the removing Defendants need only show a "colorable" federal defense to a plaintiff's claim, *i.e.*, one that is neither "immaterial and made solely for the purpose of obtaining jurisdiction" nor "wholly insubstantial and frivolous." *Zeringue*, 846 F.3d at 790 (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513 n.10 (2006)). The removing Defendants easily carry that burden, and Plaintiffs do not argue otherwise. The removing Defendants have raised federal defenses based on (1) immunity, (2) preemption, (3) due process, and (4) failure to exhaust

administrative remedies.[61] As described below, those defenses are colorable such that their validity "should be determined in the federal courts." *Willingham v. Morgan*, 395 U.S. 402, 409 (1969); *see also Riverwood*, 2022 WL 101401, at *6–*7 (finding in similar circumstances that the defendants had alleged "colorable" federal preemption and due process defenses).

*Federal Immunity*. The removing Defendants are immune from Plaintiffs' state-law claims under federal-officer jurisdiction for at least two reasons. First, because The Texas Company and Gulf were government contractors and subcontractors that acted under the federal government's wartime direction, they have government contractor immunity. *See Boyle v. United Techs*., 487 U.S. 500, 505 (1988); *Yearsley v. W.A. Ross Constr*., 309 U.S. 18, 20-21 (1940). That immunity extends to contractors and subcontractors. *E.g., Maguire v. Hughes Aircraft*, 912 F.2d 67, 72 (3d Cir. 1990). Second, The Texas Company and Gulf have an immunity defense because, irrespective of any contract, they acted under the government's direction and control, which was acting pursuant to its war powers. *See Ackerson v. Bean Dredging*, 589 F.3d 196, 205-07 (5th Cir. 2009). The powerful federal interest here is underscored by the extraordinary steps the Justice Department took during WWII to free oil companies from potential antitrust liability.[62]

*Federal Preemption*. Preemption is a colorable federal defense for purposes of federal officer removal. *See, e.g., Butler v. Coast Electric Power*, 926 F.3d 190 (5th Cir. 2019). Plaintiffs contend that defendants' pre-1980 activities, including WWII activities, were unlawful. But federal permits and authorizations—including wartime authorizations discussed herein—would trump state regulations under the Supremacy Clause. *See Maryland v. Louisiana*, 451 U.S. 725, 746 (1981); *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472, 480 (2013). Plaintiffs' claims

---

[61] *See* Defs. *Riverwood* Opp. at 23–25; Defs. *Riverwood* Supp. Opp. at 24–25.
[62] PAW "fused" an industry of competitors "in effect, though not formally," into an enterprise with antitrust immunity under government direction to provide the government with a product essential to its functions. Gravel Declaration ¶ 9 & n.45.

are further preempted by the Rivers and Harbors Act (RHA), the Clean Water Act (CWA), and permits issued by the U.S. Army Corps of Engineers ("Corps"). The CWA bars "discharge of any pollutant by any person" without a permit (33 U.S.C. § 1311(a)), and the RHA prohibits the excavation of or filling of canals or other navigable waters without a federal permit (33 U.S.C. § 403). The Corps issues permits and supervises activities governed by these statutes. *See Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 693–96 (5th Cir. 2018). These laws preempt plaintiffs' claims because they forbid the remedial actions (e.g., filling canals) that plaintiffs seek absent federal permits. *See Pliva v. Mensing*, 564 U.S. 604, 620-24 (2011). Defendants had federal authorizations for the pre-1980 activities challenged, and the discharge of material into wetlands to fill canals may be performed today only subject to federal law and federal permits. *See, e.g.*, 33 U.S.C. §§ 403, 1311(a), 1344.

*Federal Due Process*. A "presumption against retroactive legislation is deeply rooted" in the Due Process Clause. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). Plaintiffs seek to punish pre-1980 conduct as "unpermitted" when those activities did not require a permit in the first place. The Constitution bars these claims. Punishing a defendant for conduct that was lawful when it occurred is "a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978).

*Failure to Exhaust Federal Administrative Remedies*. When a state challenges coastal activities subject to federal permits because they are now allegedly "having coastal effects substantially different than originally described," the state must pursue an administrative action before NOAA. 15 C.F.R. § 930.65(b). Plaintiffs have not done so here.

## IV.    This case was timely removed.

The Fifth Circuit found that removal, based on Plaintiffs' new allegations in their *Rozel* expert report, was timely in *Riverwood*. *See Plaquemines I*, 7 F.4th at 372. The same holds true in

this case, which was removed on the same day and on similar bases as *Riverwood*.[63] This is undisputed by Plaintiffs.

## V.    Plaintiffs' complaints about delay are unfounded.

Plaintiffs assert that Defendants are improperly seeking to delay resolution of this case.[64] Plaintiffs also criticize the time that the district court and the Fifth Circuit took to address the critical issues of federal-officer jurisdiction in the lead *Riverwood* case,[65] which has appropriately delayed resolution of Plaintiffs' motion to remand in this case. Neither argument is persuasive. Judge Vance previously addressed these very complaints, explaining that "plaintiffs' arguments regarding the delay imposed by . . . a stay [pending appeal] are not persuasive, because defendants' 2018 removal on federal-officer grounds was a direct and prompt response to plaintiffs' expert report, which plaintiffs issued for the first time over four years after the commencement of this suit." *Plaquemines Par. v. Riverwood Prod. Co.*, No. 18-CV-5217, 2022 WL 843118, at *3 (E.D. La. Mar. 22, 2022) (granting stay pending appeal). Since the 2018 removal, the removing Defendants have simply availed themselves of the protections afforded by Congress for persons who assist the government in fulfilling government tasks and under federal direction and control. In 2011, Congress determined that remand orders in federal-officer cases were appealable, 28 U.S.C. § 1447(d), thereby "express[ing] a heightened concern for accuracy" in such cases "and accept[ing] the delay [appellate review] can entail." *BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1542 (2021). Plaintiffs' continued reliance on cases that pre-date Congress providing this important protection to federal officers is therefore misplaced.[66]

---

[63] *See* ECF No. 1; Defs. *Riverwood* Opp. at 4–11.
[64] *See* ECF No. 85-2 at 8.
[65] *See* ECF No. 85-2 at 8–9.
[66] *See* ECF No. 85-2 at 8–9 (citing *United States v. Rice*, 327 U.S. 742, 751 (1946), *Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F.3d 256, 264 n.16 (5th Cir. 1995), and *Ohio v. Wright*, 992 F.2d 616, 617 (6th Cir. 1993)).

**VI.    If the Court grants Plaintiffs' remand motion, this Court should delay issuance of the remand order for five days to provide time to move for a stay pending appeal.**

If the Court is inclined to grant Plaintiffs' motion to remand, the removing Defendants respectfully request that the Court delay issuance of the remand order to state court for five days to provide the removing Defendants with sufficient time to move for a stay pending appeal. This case involves "a serious legal question," namely whether, following *Plaquemines II*, federal-officer jurisdiction exists in this case involving removing Defendants that were both government-contractor refiners and producers of crude oil used by their refineries to fulfill government contracts. *Campaign for S. Equal. v. Bryant*, 773 F.3d 55, 57 (5th Cir. 2014). And the "balance of equities [would] weigh[ ] heavily in favor of granting [a] stay," *id.*, because the removing Defendants "would face the possibility that the state court would decide the merits of the claims or address dispositive motions before [the removing] Defendants' appeal is fully exhausted." *Riverwood*, 2022 WL 843118, at *3  (quotation marks omitted) (granting a stay pending appeal).

**CONCLUSION**

The Texas Company and Gulf were separate, integrated oil companies during WWII. They operated extensively in Delta Duck Club and Grand Bay during the war, transported Delta Duck Club and Grand Bay crude to their Port Arthur refineries, and used that crude to produce 100-octane and 91-octane avgas and other essential wartime petroleum products under contract with the federal government. This case belongs in federal court. For the reasons explained above—as well as those explained in the *Riverwood* Defendants' briefing opposing remand in *Riverwood*—Plaintiffs' motion to remand should be denied.

Dated: January 20, 2023                    Respectfully submitted:

                                           */s/ Alexandra White*
                                           Alexandra White (#29478)
                                           lwhite@susmangodfrey.com
                                           **SUSMAN GODFREY L.L.P.**
                                           Eric J. Mayer (#14184)
                                           emayer@susmangodfrey.com
                                           1000 Louisiana Street, Suite 5100
                                           Houston, Texas 77002-5096
                                           Telephone: (713) 651-9366
                                           Facsimile: (713) 654-6666

                                           **KEAN MILLER LLP**
                                           Charles S. McCowan III (#19699)
                                           trey.mccowan@keanmiller.com
                                           Pamela R. Mascari (#25162)
                                           pam.mascari@keanmiller.com
                                           II City Plaza
                                           400 Convention St., Suite 700
                                           Post Office Box 3513 (70821)
                                           Baton Rouge, Louisiana 70802
                                           Telephone: (225) 387-0999
                                           Facsimile: (225) 388-9133

                                           -and-

                                           **KEAN MILLER LLP**
                                           Michael R. Phillips (#21020)
                                           mike.phillips@keanmiller.com
                                           Claire E. Juneau (#33209)
                                           claire.juneau@keanmiller.com
                                           909 Poydras, Suite 3600
                                           New Orleans, LA 70112
                                           Telephone: (504) 585-3050
                                           Facsimile: (504) 585-3951

                                           ***Attorneys for Chevron U.S.A. Inc., Chevron***
                                           ***U.S.A. Holdings Inc., Chevron Pipeline Company***
                                           ***and The Texas Company***

                                           -and-

*/s/ R. Keith Jarrett*
R. Keith Jarrett (#16984)
Mark L. McNamara (#25170)
Kelly Brechtel Becker (#27375)
rkjarrett@liskow.com
mlmcnamara@liskow.com
kbbecker@liskow.com
**LISKOW & LEWIS**
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana  70139
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

***Attorneys for Shell Oil Company***

-and-

*/s/ Robert B. McNeal*
Robert B. McNeal (No. 14211)
rbmcneal@liskow.com
**LISKOW & LEWIS**
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Michael P. Cash (No. 31655)
mcash@liskow.com
**LISKOW & LEWIS**
First City Tower
1001 Fannin Street
Houston, Texas 77002-6756
Telephone: (713) 651-2900
Facsimile: (713) 651-2908

Jamie D. Rhymes (No. 24621)
jdrhymes@liskow.com
**LISKOW & LEWIS**
822 Harding Street
Lafayette, Louisiana 70503
Telephone: (337) 232-7424
Facsimile: (337) 267-2399

-and-

27

Martin A. Stern (No. 17154)
Glen M. Pilié (No. 1539)
Jeffrey E. Richardson (No. 23273)
Alexandra G. Roselli (#37847)
martin.stern@arlaw.com
glen.pilie@arlaw.com
jeffrey.richardson@arlaw.com
alexandra.roselli@arlaw.com
**ADAMS AND REESE LLP**
701 Poydras Street, Suite 4500
New Orleans, Louisiana 70139
Telephone: (504) 581-3234
Facsimile: (504) 566-0210

-and-

Roy C. Cheatwood (No. 04010)
Monica A. Frois (No. 20187)
Matthew A. Woolf (No. 27146)
Tyler L. Weidlich (No. 30790)
rcheatwood@bakerdonelson.com
mfrois@bakerdonelson.com
mwoolf@bakerdonelson.com
tweidlich@bakerdonelson.com
**BAKER, DONELSON,
BEARMAN,CALDWELL & BERKOWITZ**
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone: (504) 566-5200
Facsimile: (504) 636-4000

*Attorneys for Exxon Mobil Corporation*

-and-

*/s/ George Arceneaux III*
George Arceneaux III (#17442)
garceneaux@liskow.com
**LISKOW & LEWIS**
822 Harding Street
P.O. Box 52008
Lafayette, Louisiana 70505
Telephone: (337) 232-7424
Facsimile: (337) 267-2399

28

-and-

Nancy G. Milburn (pro hac vice)
**ARNOLD & PORTER KAY SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8383
Facsimile: (212) 836-8689
E-mail: nancy.milburn@arnoldporter.com

Matthew T. Heartney (pro hac vice)
**ARNOLD & PORTER KAYE SCHOLER LLP**
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017-5844
Telephone: (213) 243-4150
Facsimile: (213) 243-4199
E-mail: matthew.heartney@arnoldporter.com

***Attorneys for BP America Production Company***

-and-

*/s/ Michele DeShazo*
Deborah D. Kuchler, T.A. (#17013)
Sarah E. Iiams (#22418)
Michele Hale DeShazo (#29893)
mdeshazo@kuchlerpolk.com
dkuchler@kuchlerpolk.com
siiams@kuchlerpolk.com
**KUCHLER POLK WEINER, LLC**
1615 Poydras Street, Suite 1300
New Orleans, LA  70112
T. 504-592-0691
F. 504-592-0697

***Attorneys for Burlington Resources***

**CERTIFICATE OF SERVICE**

I hereby certify that on January 20, 2023 a copy of the above and foregoing was electronically filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

*/s/ Alexandra White*
Alexandra White