# Exhibit 1-135

# A.J. Gravel

Environmental Solutions
Senior Managing Director

6903 Rockledge Drive, Suite 1000 – Bethesda, MD 20817
+1 301 591 8014
aj.gravel@fticonsulting.com

## Education

B.S. in Health Sciences,
Springfield College,
Springfield, MA
Master of International
Business Management,
University of Maryland,
University College,
College Park, MD

## Associations

American Bar Association
(Associate Member,
Environment and Natural
Resources Section)
American Society of
Environmental History
Environmental Law Institute
National Council on Public
History (NCPH)

## Expertise

Forensic History
Environmental Cost Analysis
Complex Litigation Strategy
Settlement Strategy

A.J. Gravel is a Senior Managing Director in FTI Consulting Inc.'s (FTI) Forensic Litigation and Consulting segment and is co-leader of the Environmental Solutions Practice.  He also heads the Forensic History and Analysis group.  Mr. Gravel is based in the Washington DC area and has over thirty years combined experience as a strategy consultant and expert witness.  He has managed the execution of hundreds of environmental, product liability, and litigation support projects in all ten USEPA Regions and three U.S. Territories and has provided testimony as a fact witness, Rule 30(b)(6) corporate designee and expert witness.

Mr. Gravel's primary areas of expertise include forensic history and environmental cost analysis.  His work in these areas has been used to support among other things, liability assessments, corporate restructuring, mergers and acquisitions, bankruptcy analyses, settlement negotiations and litigation.

In the area of forensic history, Mr. Gravel's experience includes using the results from historical research to help clients understand how historical activities and events relate to current knowledge and/or environmental conditions.  He has used forensic history to perform potentially responsible party (PRP) investigations; contaminant nexus analyses; natural resources damages (NRD) baseline studies; site history reconstruction; federal involvement studies; corporate lineage and financial viability analysis; industry practices analyses; alternate causations studies; product and chemical-specific histories; and state-of-knowledge and standard-of-care studies.

In the area of environmental cost analysis, Mr. Gravel's experience includes assisting clients with the recovery of environmental response costs under federal and state authorities and assessing damages claims put forth by others seeking recovery from his clients.  His work in this area has included: developing damages and/or response cost claim packages and evaluating claims developed by opposing experts; developing cost allocation frameworks to allocate environmental response costs among PRPs; environmental cost estimation; creating waste-in databases to perform waste volume analysis; and National Contingency Plan (NCP) and cost recoverability analysis.

Mr. Gravel's work also involves advising clients on complex litigation and settlement strategies often involving matters in multiple jurisdictions or portfolios of sites, sometimes numbering in the hundreds.  He has experience with a variety of industries such as mining and smelting, petroleum, chemicals, shipbuilding and scrapping, utilities and manufacturing and has worked on former operating facilities, mining, contaminated sediment, groundwater contaminant plume and permitted and unpermitted landfill sites across the U.S.

Mr. Gravel has worked on matters domestically and internationally for a diverse clientele that includes private and public-sector entities, law firms and joint defense groups.

**EXPERTS WITH IMPACT™**



A.J. Gravel

## Representative Engagements

Expert and Rule 30(b)(6) Witness Assignments

— *MRP Properties Company, LLC et al. v. United States of America.* *Mr. Gravel was retained by the plaintiffs to conduct historical research, perform related analysis, and present opinions regarding the nature and extent of the Federal government's involvement at twelve petroleum refineries during World War II. He offered opinions on the Federal government's coordination, direction, and control of the nation's petroleum industry, the refining branch of the petroleum industry, and the twelve refineries at issue in the litigation.*

— *Alcoa, Inc. v. Alcan, Inc.* Mr. Gravel was retained to provide opinions related to environmental cost recoverability, including whether the response actions performed, and associated costs incurred, were in substantial compliance with the applicable requirements of the NCP and resulted in a CERCLA-quality cleanup. Mr. Gravel also provided opinions documenting the total amount of recoverable response costs.

— *Chemtronics, Inc. v. Northrop Grumman Systems Corporation.* Mr. Gravel developed an allocation framework for a complex, multi-party Superfund site in North Carolina. The work involved analyzing the voluminous Site record; evaluating potential allocation approaches; creating a framework for allocating past and future response costs between parties; and, presenting/defending the allocation framework in both mediation and binding arbitration contexts.

— *The Parish of Plaquemines v. Riverwood Production Company, et al.* Mr. Gravel was retained to conduct forensic historical research and perform analyses relating to Federal government involvement in oil and gas field exploration, development and operation in southern Louisiana during WWII. He offered opinions on the level of control exercised by Federal agencies such as the War Production Board and Petroleum Administration for War over the oil and gas industry during wartime.

— *Weintraub Financial Services, Inc. v. Frank Butler Properties, Inc. et al.* Mr. Gravel was retained to conduct forensic historical research, perform analysis and present opinions relating to industry practices concerning the storage, use and disposal of solvents generally used in the fiberglass boat building industry and at a specific site in the Los Angeles area. He also opined on the validity and usefulness of regulatory agency inspections for documenting the use and disposal of regulated materials.

— *Cyprus Amax Minerals Company v. TCI Pacific Communications, Inc.* In this matter Mr. Gravel was retained by Cyprus Amax Minerals Company to conduct research, perform analysis and provide expert opinions relating to: 1) the historic operations of two primary zinc horizontal retort smelters in Collinsville, Oklahoma; whether response actions taken by Cyprus were consistent with the National Contingency Plan ("NCP"); and whether the costs incurred were necessary costs of response and complied with the Cost Documentation and Cost recovery provision (§300.160(a)) of the NCP.

— *The United States of America v. Cornell Dubilier Electronics, Inc. and Home Insurance Company v. Cornell Dubilier Electronics, Inc.* Mr. Gravel was retained by a corporate entity, London Market Insurers and CNA to conduct a PRP investigation to identify possible contributors to PCB contamination present in sediments in a watercourse located proximate to a former Cornell Dubilier Electronics, Inc. site in New Jersey; he also addressed the adequacy of PRP investigation activities undertaken by USPEA and Cornell Dubilier.

— *Georgia-Pacific LLC v. OfficeMax Incorporated and Boise Cascade, LLC.* Mr. Gravel was retained by counsel for the plaintiff to conduct analyses and provide opinions relating to a former lumber mill site located in California. His analyses focused on, the evaluation of the response actions taken at the Site and their substantial compliance with the applicable provisions of the National Contingency Plan ("NCP") for cost recovery purposes, and the development of a cost allocation framework for the Court's consideration in determining the appropriate equitable allocation of response costs among the parties to the litigation.

— *Florida Power Corporation v. First Energy Corp.* Mr. Gravel was retained to conduct historical research, perform related analysis and present opinions relating to, the operations of two manufactured gas plants ("MGPs") and their relationship to a utility system holding company, the use of management service contracts as a means of domination



and control over the MGPs, and the identification and evaluation of the parties responsible for day-to-day operational decisions relating to the storage and disposal of hazardous wastes generated at the two MGPs at issue in the litigation.

— *ExxonMobil Corporation v. United States of America.* Mr. Gravel was retained to conduct historical research, perform related analysis and present opinions relating to the federal government's involvement in the petroleum industry in general, and in two refineries, from 1941 to 1955. He was also asked to opine on the federal government's nexus to contamination at the facilities and to compile and perform cost recoverability analyses, including validation of response costs in compliance with the NCP.

— *Betty Jean Cole, et al. v. ASARCO Incorporated et al. and Sammy Beets, et al. v. Blue Tee Corp. et al*. Mr. Gravel was retained to conduct historical research, perform related analysis and present opinions relating to the federal government's involvement in mining, milling and related activities in the Picher Field; historical mining and milling operations of the corporate predecessors of Blue Tee Corporation and Gold Fields American Industries in the Oklahoma portion of the Tri-State Lead and Zinc District; chat generation and use as a salable product; and the role of municipal entities in the dispersal of chat throughout the Picher Field.

— *The Quapaw Tribe of Oklahoma (O-Gah-Pah) v. Blue Tee Corporation, et al.* In connection with litigation relating to a Natural Resource Damages ("NRD") claim, Mr. Gravel was retained to conduct historical research, perform related analysis and present opinions regarding the federal government's involvement in mining, milling and related activities in the Picher Field; its involvement with, and awareness of, mine and surface cave-ins and collapses over time; and the historical operations of the defendants' alleged predecessors in the Picher Field.

— *New York State Gas & Electric Corporation v. FirstEnergy Corp*. Mr. Gravel was retained to conduct historical research, perform related analysis and to present opinions related to the development and roles of certain public utility holding and management service companies as they related to the operational management of 18 manufactured gas plants located in the State of New York.

— *The Quapaw Tribe of Oklahoma (O-Gah-Pah) v. Blue Tee Corporation, et al.* Mr. Gravel was retained to provide Rule 30(b)(6) testimony on the historical mining and milling operations of the corporate predecessors of Blue Tee Corporation and Gold Fields American Industries in the Oklahoma portion of the Tri-State Lead and Zinc District as well as corporate knowledge and awareness of certain other topics relating to potential NRD issues.

— *Moraine Properties, LLC v. Ethyl Corporation*. Mr. Gravel was retained to provide opinions related to whether the plaintiff undertook reasonable operational practices with regard to its management of wastewater treatment sludge, including identifying and addressing PCB issues; and whether the response actions taken and associated environmental costs incurred by the plaintiff were necessary costs of response incurred in substantial compliance with the applicable requirements of the NCP and resulted in a CERCLA-quality cleanup. Mr. Gravel was also retained to examine Ethyl Corporation's historical operations as they related to a paper mill site and to provide Rule 30(b)(6) testimony on specific topics related to those operations.

— *Evansville Greenway and Remediation Trust v. Southern Indiana Gas and Electric Company, Inc., et al.* Mr. Gravel was retained to provide opinions related to environmental cost recoverability, including whether the response actions performed, and associated costs incurred by the plaintiff, were in substantial compliance with the applicable requirements of the NCP and resulted in a CERCLA-quality cleanup.

— *Innis Arden Golf Course v. Pitney Bowes, Inc. et al*. Mr. Gravel was retained to provide opinions related to cost recoverability, including whether the response action and associated costs incurred by the plaintiff were in substantial compliance with the applicable requirements of the NCP and resulted in a CERCLA-quality cleanup.

— *Price v. Price.* Mr. Gravel was retained to evaluate the cost impacts of a United States Environmental Protection Agency (USEPA) Consent Judgment for a landfill in New York, and to determine the effect of the pending Consent Judgment on the ability a real estate appraiser to perform an accurate valuation of the landfill.

— *BNSF Railway Company v. The Doe Run Resources Corporation, et al.* Mr. Gravel was retained to provide opinions on the regulatory development of the Hazardous Materials Transportation Act as it related to the transport of specific



A.J. Gravel

commodities; the nature and extent to which lead-containing materials were used by the railroad in the course of its operations over time, and identification of anthropogenic sources of lead that could have potentially contributed to contamination along tracks and in rail yards.

— *Jersey City Municipal Utilities Authority v. Honeywell International, Inc.* Mr. Gravel was retained to present opinions related to the historical operations of the Jersey City Municipal Authority and Jersey City Incinerator Authority from 1910 to the present and related to environmental cost allocation.

— *In re: Dana Corporation, et al.* In this bankruptcy proceeding, Mr. Gravel was retained to perform several tasks including: 1) analyzing the federal government's historical role in the operations of a former capacitor manufacturing facility and its potential contribution to contamination for which cleanup costs were claimed; 2) quantifying environmental response costs and evaluating indirect and oversight costs and discount rates; 3) quantifying the claim of the NRD Trustees; and 4) performing environmental cost allocation analysis to develop the Debtor's net cost share percentage of claimed costs. Mr. Gravel also provided Rule 30(b)(6) testimony in this matter.

— *Perrine et al. v E.I. DuPont de Nemours and Company et al.* Mr. Gravel was retained to provide opinions related to the historical operations of the facility and the identification of anthropogenic sources that may have contributed to contamination in the class area over time.

— *Tonya Lee Drummond et al. v. E.I. DuPont de Nemours and Company et al.* Mr. Gravel was retained to provide opinions related to historical standard-of-care and the appropriateness of landfill practices with regard to disposal of smelting residues.

— *Disabled in Action of Pennsylvania v. Southeastern Pennsylvania Transportation Authority.* Mr. Gravel was retained to investigate and render an opinion related to the history, development, growth and character of land use in the Penn Center and Suburban Station area of downtown Philadelphia from 1890 through 2005.

— *Bill and Jackie Holder, et al. v. Gold Fields Mining Corporation, et al.* Mr. Gravel was retained to conduct a historical investigation and render opinions related to mining and milling techniques; the role and influence of the federal government on mining activities and methods; whether chat, tailings and other mining by-products were/are saleable products that possess commercial value; the state of knowledge regarding the toxic effects of lead in chat, tailings and surface dust; the role of local state and federal public works projects in the dispersal of chat in the Tri-State Lead and Zinc District; and the total amount of crude ore mined by the defendants' alleged predecessors as a percentage of the total production for Ottawa County, Oklahoma.

— *Jimmy Dale Palmer and Teresa Palmer, v. ASARCO Incorporated, Inc., et al.* Mr. Gravel was retained to conduct a historical investigation and render opinions on mining and milling techniques; the role and influence of the federal government on mining activities and methods; whether chat, tailings and other mining by-products were/are saleable products that possess commercial value; and the state of knowledge regarding the toxic effects of lead in chat, tailings and surface dust.

— *Trenton Herd et al. v. ASARCO Incorporated, Inc., et al.* Mr. Gravel acted as a Rule 30(b)(6) witness, testifying as a company representative. In this capacity, Mr. Gravel provided testimony in several areas related to historical mining operations and practices on both restricted and unrestricted Indian lands located in Ottawa County, Oklahoma, from the 1890sProject lead and designer of the FTI Healthcare Transformation Reform Model used in the Respiratory Project for the West Essex ACP

Representative Engagements: Forensic History and Environmental Cost Analysis

— Working on behalf of a Fortune 500 company facing a series of product liability lawsuits alleging public nuisance stemming from the manufacture of a widely used chemical. Claimed damages varied but included costs for addressing infrastructure replacement and upgrades, sediment cleanup, natural resources damages and other alleged harms. Mr. Gravel developed and executed a plan to assist the client in its defense. Mr. Gravel's work included analysis of alternate causation, detailed reconstruction of sewer conveyance systems and wastewater treatment plant infrastructure in several municipal jurisdictions. Research involved the review of federal, state and local records



A.J. Gravel

relating to numerous public and private entities, including their historical manufacturing processes, waste disposal practices, regulatory frameworks, state-of-knowledge and point source contribution relating to the target chemical.

— Working on behalf of a PRP group, Mr. Gravel directed a PRP investigation aimed at expanding the number of members in an existing performing parties group. Part of this work involved presenting nexus cases to Regional Counsel for USEPA Region 6 which subsequently issued General Notice Letters to a number of responsible parties. Mr. Gravel was also asked to develop a cost allocation framework which was used by the existing Group to negotiate interim allocation settlements with entities that were added to the performing parties group.

— Working on behalf of a Fortune 500 pharmaceutical company addressing chlorinated solvent contamination in groundwater at a site in New Jersey, Mr. Gravel directed an investigation evaluating potential sources of solvent contamination. A portion of this work involved identifying hundreds of potential contributors and researching in detail the industrial operations of several dozen entities across multiple industrial sectors in order to determine their actual or potential contribution to solvent contamination in the subject area.

— Working on behalf of four Fortune 500 companies, Mr. Gravel directed a PRP investigation, the development of a response costs claim package and a cost allocation for a contaminated groundwater site located in Southern California. The cost allocation was presented to a mediator and was used to support settlement negotiations among the parties involved at the site.

— Working on behalf of a major communications industry client, Mr. Gravel directed both the analysis of facility operations and the development of a response costs claim package supporting a CERCLA cost recovery claim of over $100 million for a nuclear waste cleanup site. The work involved documenting historical facility operations and cleanup activities; assessing the appropriate response costs to be claimed (consistent with the NCP); documenting claimed costs both at the summary and detail levels; developing a proposed cost allocation between the parties; and supporting settlement negotiations between the client and the U.S. Department of Justice.

— Working on behalf of a petroleum industry client, Mr. Gravel directed a federal-government-involvement project, encompassing eight facilities. The work included determining the extent to which the federal government was involved in the construction and/or operations of the facilities during World War I, World War II, the Korean War; establishing the historical fact basis and federal nexus for each site; overseeing the development of past and future remedial cost estimates; validating response costs for the claim; ensuring claimed costs were consistent with the NCP for cost recovery purposes; developing a cost allocation using time-temporal and production-weighted approaches; and assisting with claims preparation and negotiations between the client and federal government.

— Working on behalf of a multi-national media company addressing chlorinated solvent contamination in groundwater at a site in Alabama, Mr. Gravel directed an investigation evaluating potential sources of solvent contamination. This work involved evaluating the client's potential contribution, as well as identifying over a dozen other commercial and industrial contributors operating across multiple industrial sectors in order to determine their actual or potential contribution to solvent contamination in the subject area.

— Working on behalf of the Debtor in the bankruptcy context, Mr. Gravel acted as one of project team's key leaders performing environmental claims (response costs and NRD) estimation for a matter that involved claims exceeding $6 billion. Mr. Gravel's primary work on this matter involved managing the case team and acting as liaison between Debtor's Counsel, Debtor and outside Counsel; conducting analysis of NRD claims; conducting analysis and developing debtor cost share percentages for specific sites; assisting in the development of expert and rebuttal reports; and supporting the testifying experts.

— Working on behalf of a PRP Group, Mr. Gravel managed the execution of an investigation focused on the identification of PRPs contributing to sediment contamination on a waterway located in the Midwest. The work performed related to an NRD claim brought by federal and state NRD trustees, including the U.S. Fish and Wildlife Service and the State of Ohio. Mr. Gravel developed and executed a research plan that documented the contribution of a number of parties to the contamination present in the sediments and assisted in obtaining information of use in conducting a baseline determination to support a habitat equivalency analysis ("HEA"). He also documented the nexus of a number of



entities that operated on, or in close proximity to, the waterway by examining various contaminant pathways relating to specific historical operations.  Mr. Gravel also assisted in developing of a cost allocation framework to facilitate settlement among the performing party group.

— Working on behalf of a joint defense group, Mr. Gravel developed and executed a work plan aimed at identifying contributors to trichloroethylene ("TCE") contamination in a groundwater plume located in California.  Mr. Gravel worked with Common Counsel to establish and execute a work plan that examined a number of industries and specific industrial plants in an attempt to document both the use of TCE by the target entities and specific releases or operations practices that may have resulted in contributions to the contamination by these entities.  Research involved a review of federal, state and local records and records related to both specific target entities and certain manufacturing processes employed by those entities.

— Working on behalf of a PRP Group, Mr. Gravel managed the execution of an investigation focused on the identification of PRPs contributing to sediment contamination on a waterway in the northwestern United States.  Mr. Gravel developed and executed a research plan that documented the contribution of several parties to the contamination.  His emphasis involved documenting the operations of several federal entities on the waterway and developing nexus packages for certain federal entities.  He was also involved in initial efforts aimed at examining cost allocation issues and securing the participation of the federal entities through the U.S. Department of Justice.  Working on behalf of a large manufacturing client, Mr. Gravel developed a work plan and managed the execution of an extensive PRP investigation aimed at identifying parties that contributed to PCB contamination of a waterway in the Midwest.  He directed an investigation examined several industries and entities and provided Counsel with detailed information on several parties.  The investigation focused on several specific issues, such as the historical use of PCBs by specific entities in specific processes or equipment. Research included federal and state repositories, historical societies, local repositories and specialized private and industrial collections.

— Working on behalf of Dade County, Florida, Mr. Gravel acted as a consulting expert in support of a cost recovery action against the U.S. government for TCE contamination at Miami International Airport.  Mr. Gravel assisted Counsel with developing and implementing a discovery plan; managed the execution of a research effort aimed at documenting U.S. government involvement at Miami International Airport over time; interviewed and assisted with witness preparation for trial; provided research and related support to expert witnesses; and provided assistance with the development of trial exhibits and other materials.

— Working on behalf of a large private manufacturing client, Mr. Gravel developed and executed a work plan aimed at identifying contributors to the contamination of a river located in New England. Mr. Gravel worked with Counsel, examining several industries and specific industrial plants along the river to document the potential contribution of these plants to PCB and other contamination.  Research involved the review of federal, state and local records and records relating to specific entities located along the river as well as certain manufacturing processes employed by those entities.

— Working on behalf of a PRP Group, Mr. Gravel managed the execution of a PRP search involving a large multi-parcel, multi-use landfill site located in the Midwest.  Mr. Gravel and his team conducted historical research and interviewed witnesses in order to develop a baseline historical operation report for the sites and to identify generator and transporter PRPs.  Mr. Gravel also supervised the development of a transactional database, based on manifests, invoices and other data, which was used as the basis for developing an interim cost allocation; he coordinated the establishment of a document repository to house the Group's records related to the sites; and he worked with the Group on other related allocation process and investigations issues.

— Working on behalf of a major transportation company, Mr. Gravel managed a PRP investigation, involving an oil recycling facility that operated from approximately 1950 to 1965.  The work performed involved directing research into National Archives military records, state and local agency records, historical society archival sources, library records, and other repositories. He identified several PRPs and witnesses not previously named by the USEPA.  He also directed a witness location and interview process to obtain oral histories.  In addition, he compiled volumetric information from



transactional data and examined waste volume ratios between federal entities and private parties in support of cost allocation efforts.

— Working on behalf of a major U.S. energy provider, Mr. Gravel managed the execution of a PRP search for a waterway in New York.  The work performed involved developing a historical research and investigation work plan, overseeing research at federal, state, local and private repositories, identifying PRPs, conducting waste stream analysis, managing witness identification and location, and interviewing and developing PRP profiles to be presented to the USEPA on behalf of the client. Mr. Gravel also oversaw the development of a database that included PRP profiles as well as waste-in data that ultimately will be used to apportion responsibility among parties on the waterway.

— Working on behalf of a joint defense group composed of electric utility companies, Mr. Gravel managed the execution of several research efforts aimed at assisting the Group with the collection of EPA and Congressional materials related to the development, implementation and enforcement of the Clean Air Act, and, specifically New Source Review (NSR). The work involved commenting on the method proposed by EPA for producing documents responsive to the defendant's discovery requests and conducting research in various archives and Federal and State government repositories to assist with the documentation of the program's history and implementation and the Federal government's role in its development and enforcement.

## Publications

— Lisa Walsh and A.J. Gravel, A. "Quantifying Environmental Liabilities in the Bankruptcy Context," *Pratt's Journal of Bankruptcy Law*, February/March 2009.

— Bookspan, S., Corley, J., Gravel, A.J., 2015. "Site History: The First Tool of the Environmental Forensics Team," in *Introduction to Environmental Forensics,* Academic Press.

— Bookspan, S., Corley, J., Gravel, A.J., 2015. "Essential Historical Research Methods and Their Application to Environmental Forensics." in *Introduction to Environmental Forensics,* Academic Press*.*

— "WWII, Forensic History and Righting Environmental Wrongs," *Law360*, June 6, 2014

— "Case Study in the Use of Forensic History in Matters Involving Pipeline Ruptures," published in Oil Spill Environmental Forensics Case Studies, edited by Scott A. Stout and Zhendi Wang, Butterworth-Heinemann, 2018, Pages 499-513. Written in conjunction with Sandra Layland and Julie Corley.

— "Remote Depositions – An Expert's Perspective" Environmental Law Institute, July 1, 2020



# Exhibit 1-136



# FEDERAL REGISTER

VOLUME 7 — 1934 — NUMBER 237

*THE NATIONAL ARCHIVES OF THE UNITED STATES*

---

## Washington, Friday, December 4, 1942

---

### The President

#### EXECUTIVE ORDER 9276

ESTABLISHING THE PETROLEUM ADMINISTRATION FOR WAR AND DEFINING ITS FUNCTIONS AND DUTIES

By virtue of the authority vested in me by the Constitution and statutes, as President of the United States and Commander in Chief of the Army and Navy, and in order to coordinate and centralize the war policies and actions of the Government relating to petroleum with a view toward providing adequate supplies of petroleum for the successful prosecution of the war and for other essential purposes, it is hereby ordered as follows:

1. Whenever used in this order:

a. The term "petroleum" means petroleum, petroleum products, and associated hydrocarbons, including but not limited to natural gas, except that natural gas which has entered into gas transmission lines from field gathering lines shall not be so included.

b. The term "petroleum industry" means the production, refining, treating, storage, shipment, receipt, or distribution within the United States, its territories and possessions, of petroleum, exclusive of: (1) the transportation of petroleum, (2) the transmission of natural gas from the point of its entry into gas transmission lines from field gathering lines, and (3) the distribution of natural gas.

c. The term "transportation" means transportation as defined in U. S. Code, Title 49, section 1 (3) (a), and in Executive Orders No. 8989[1] and No. 9156.[2]

2. There is established a Petroleum Administration for War, at the head of which shall be a Petroleum Administrator who shall be directly responsible to the President. The Secretary of the Interior shall serve ex officio as Petroleum Administrator hereinafter referred to as the Administrator.

3. The Administrator shall:

a. Subject to the provisions of this order, establish basic policies and formulate plans and programs to assure for the prosecution of the war the conservation and most effective development and utilization of petroleum in the United States and its territories and possessions, issue necessary policy and operating directives to parties engaged in the petroleum industry, and appoint such general, regional, local, or functional petroleum industry committees or councils as the Administrator finds necessary: *Provided,* that no directive issued hereunder shall conflict with any direction which may be issued by the Chairman of the War Production Board pursuant to Paragraph 1 of Executive Order No. 9125 of April 7, 1942.[3]

b. Serve, as far as practicable, as the liaison and channel of communication between the units of the petroleum industry and the several departments and agencies of the Federal Government on matters directly involving the functions and duties of the Administrator.

c. (1) Obtain from the Departments of War and the Navy, the Office of Lend-Lease Administration, the Department of State and the Board of Economic Warfare, the several divisions and branches of the War Production Board, and such other Federal departments and agencies as may be appropriate, estimates of the amounts of petroleum which will be required from the United States, its territories and possessions, to meet direct and indirect military, and essential industrial and civilian, requirements; and compile and analyze such estimates and submit them to the War Production Board with recommendations for the allocation of petroleum to meet such requirements.

(2) Prepare and recommend to the War Production Board estimates of the quantities and kinds of material needed by the petroleum industry to produce, refine, store, distribute (excluding transportation), or otherwise make available the amount of petroleum recommended by the Administrator for allocation by the War Production Board.

d. Subject to the direction of the Chairman of the War Production Board, exercise the powers, authority, and the discretion conferred upon the Chair-

---

[1] 6 F.R. 6725.
[2] 7 F.R. 3349.

[3] 7 F.R. 2719.

(Continued on next page)

---

### CONTENTS

#### THE PRESIDENT

EXECUTIVE ORDER:                    Page
Petroleum Administration for War; establishment and definition of functions and duties _____ 10091

#### REGULATIONS AND NOTICES

ALIEN PROPERTY CUSTODIAN:
Vesting orders:
  Administrazione dei Monopoli di Stato_____ 10117
  Asahi Corp_____ 10119
  Ballot, Leon, Enterprises_____ 10117
  Gaurebeck, August T._____ 10118
  Ricordi, G., and Co., Inc. (2 documents)_____ 10119, 10120
  Romana, Steaua_____ 10118
  Scholler, H_____ 10119
  Teplitzer Maschinenfabriks A. G_____ 10118
BITUMINOUS COAL DIVISION:
  Minimum price schedules amended:
    District 3_____ 10093
    District 8_____ 10095
    District 11_____ 10115
    District 15_____ 10098
CIVIL AERONAUTICS BOARD:
  Pan American Airways, Inc., and American Export Airlines, Inc., postponement of oral argument_____ 10116
FEDERAL COMMUNICATIONS COMMISSION:
  Applications involving construction of telephone or telephone lines; policy_____ 10114
  Columbia Broadcasting System, Inc., et al., hearing____ 10116
FEDERAL POWER COMMISSION:
  Hearings, etc.:
    Georgia Power Co_____ 10117
    Tennessee Gas and Transmission Co_____ 10117
OFFICE OF DEFENSE TRANSPORTATION:
  Chicago, Burlington & Quincy Railroad Co.; substitution of motor vehicle for rail passenger service_____ 10121
  Discontinuance of passenger service between:
    Edgemont, S. Dak., and Billings, Mont_____ 10120

(Continued on next page)

10092                FEDERAL REGISTER, *Friday, December 4, 1942*



**FEDERAL REGISTER**

Published daily, except Sundays, Mondays, and days following legal holidays by the Division of the Federal Register, The National Archives, pursuant to the authority contained in the Federal Register Act, approved July 26, 1935 (49 Stat. 500), under regulations prescribed by the Administrative Committee, approved by the President.

The Administrative Committee consists of the Archivist or Acting Archivist, an officer of the Department of Justice designated by the Attorney General, and the Public Printer or Acting Public Printer.

The daily issue of the FEDERAL REGISTER will be furnished by mail to subscribers, free of postage, for $1.25 per month or $12.50 per year, payable in advance. Remit money order payable to the Superintendent of Documents directly to the Government Printing Office, Washington, D. C. The charge for single copies (minimum, 10¢) varies in proportion to the size of the issue.

There are no restrictions on the republication of material appearing in the FEDERAL REGISTER.

Telephone information: DIstrict 0525.

---

## CONTENTS—Continued

OFFICE OF DEFENSE TRANSPORTATION—Continued.
Discontinuance of passenger service between—Con.          Page
New Albany, Ind., and Princeton, Ind _____ 10120
International-Great Northern Railroad, and Texas and New Orleans Railroad Co.; establishment of shuttle train _____ 10121
OFFICE OF PRICE ADMINISTRATION:
Adjustments, etc.:
Architectural Decorating Co_ 10113
Brooklyn Cooperage Co_____ 10112
40-Fathom Fish, Inc_____ 10112
General Ceramics Co_____ 10122
Irvington Varnish and Insulator Co_____ 10113
Jackson Coal Co_____ 10121
Levin Bag and Burlap Co_____ 10113
Norwood-White Coal Co____ 10122
Scozarro, Josephine_____ 10122
United States Testing Co_____ 10121
Bags, second hand (Rev. MPR 55) _____ 10104
Ferrosilicon (Supp. Reg. 14, Am. 70) _____ 10111
Gasoline rationing regulations:
Mileage (Ration Order 5C, Supp. 1) _____ 10110
Puerto Rico (Ration Order 5B, Am. 11) _____ 10109
Virgin Islands:
(Ration Order 8, Am. 2)___ 10110
(Revocation of Rationing Emergency Order 1)__ 10109
Iron ore:
Great Lakes, transportation (Supp. Reg. 14, Am. 73)_ 10111
Minnesota, Wisconsin and Michigan, maximum prices (MPR 113, Am. 2)_ 10108
Lumber, aircraft (Rev. MPR 109) _____ 10100

## CONTENTS—Continued

OFFICE OF PRICE ADMINISTRATION—Continued.          Page
Machines and parts, and machinery services (MPR 136, Am. 60) _____ 10109
Nickel oxide (Rev. Supp. Reg. 4, Am. 14) _____ 10111
Prunes, dried, and raisins (MPR 242, Am. 1) _____ 10108
Rubber goods, mechanical (MPR 149, Am. 3)_____ 10103
Seasonal commodities, retail and wholesale (Corr. to MPR 210, Am. 4)_____ 10109
PUBLIC DEBT BUREAU:
United States Savings Bonds, Series F and G; revocation of designation as war savings bonds_____ 10115
TREASURY:
Hawaii, general licenses under currency regulations (2 documents) _____ 10099
WAGE AND HOUR DIVISION:
Learner employment certificates, various industries (2 documents) _____ 10115
WAR PRODUCTION BOARD:
Butadiene production agreement (Certificate 23) _____ 10123
Cooking appliances, domestic (L-23-d) _____ 10099
Ethyl alcohol and related compounds (M-30) _____ 10099
WAR SHIPPING ADMINISTRATION:
War risk insurance, automatic coverage on import cargoes, etc_____ 10114

---

man by Paragraph 1 of Executive Order No. 9125 of April 7, 1942, by issuing, and taking appropriate action to enforce, such orders or directives to the petroleum industry as the Administrator may deem necessary, in order to:

(1) Provide adequate supplies of petroleum for military, or other essential uses; or

(2) Effect the proper distribution of such amounts of materials as the Chairman of the War Production Board may allot for the use of the petroleum industry.

e. Compile data and make continuing surveys with respect to the effect of the prices charged for petroleum upon the efficient wartime operations of the petroleum industry and the maintenance of adequate supplies of petroleum for war and essential industrial and civilian uses. On the basis of such surveys, the Petroleum Administrator shall consult with and recommend to the Administrator, Office of Price Administration, such upward or downward adjustments in the schedule of prices charged for petroleum as will, in the judgment of the Petroleum Administrator, assure the efficient wartime operation of the petroleum industry and the maintenance of adequate supplies of petroleum for war, and essential industrial and civilian uses. In order to enable the Petroleum Administrator to make appropriate recommendations, the Price Administrator shall advise with the Petroleum Administrator prior to the establishment or

alteration by the Price Administrator of any schedule of prices to be charged for petroleum.

f. Be advised of all plans or proposals which deal with the civilian rationing of petroleum and consult with rationing authorities in the development of such plans or proposals; and, in those instances where rationing is for the purpose of maintaining adequate supplies of petroleum for war and essential industrial and civilian requirements, determine, after advising with the War Production Board, the areas and the times within which such rationing should be effective and the amount of petroleum available for such purpose.

g. Consult with the War Shipping Administration with respect to the assignment of tankers and the movement of petroleum, and, subject to the requirements of the Departments of War and the Navy, recommend allocations as between units of the petroleum industry of available tankers under the control of the War Shipping Administration.

h. Designate the quantity and kind of petroleum to be shipped and received by those engaged in the petroleum industry, and certify such designations to the Office of Defense Transportation for appropriate action in providing the necessary transportation.

i. Review all plans or proposals for the construction, extension, enlargement or interconnection of petroleum pipe lines; subject to the over-all responsibilities of the Office of Defense Transportation, approve such plans or proposals as are, in his judgment, necessary to provide adequate supplies of petroleum for war and other essential uses and recommend to the War Production Board programs covering the amounts and kinds of materials needed for such pipe lines. The Administrator shall direct the physical operation of petroleum pipe lines to the extent of prescribing the quantity and kind of petroleum to be transported by and the direction of flow through such pipe lines: *Provided,* that nothing herein shall be deemed to limit the functions and authority of the Office of Defense Transportation under Executive Order No. 8989 of December 18, 1941, with respect to the provision of necessary additional transportation facilities and equipment, or to coordinate and direct domestic traffic movements.

j. Advise the several Federal departments and agencies concerned with the construction, enlargement, or additional interconnection of any natural gas transmission line as to the supply and availability of natural gas at the proposed sources of production whenever such construction, enlargement, or interconnection will result in substantially altering the rate of production at such sources.

k. Perform the duties and responsibilities with relation to petroleum and the facilities used in the petroleum industry imposed by Executive Order No. 9165 of May 19, 1942,[4] upon the Department of the Interior.

---

[4] 7 F.R. 3765.

1. Certify to the various State regulatory bodies having jurisdiction with respect to the production of petroleum, the amounts and kinds of petroleum which should be produced in their respective States, and collaborate with such State regulatory bodies in the co-ordination of their activities with the programs and policies of the Administrator.

m. Keep the President informed with respect to the progress made in carrying out this order and perform such related duties as the President may from time to time assign or delegate to him.

4. The Administrator shall collaborate with the appropriate Federal departments and agencies authorized to determine plans and policies with respect to foreign petroleum activities. The Administrator shall, in conformity with such plans and policies, issue directives concerning the physical operations of their foreign petroleum facilities to units of the American petroleum industry which directly or indirectly engage in such operations in foreign countries. The Administrator shall be the channel of communication on foreign petroleum matters between the Federal departments and agencies and such units of the American petroleum industry.

5. The Administrator shall perform the functions with respect to rubber conferred upon the Office of Petroleum Coordinator for War by Executive Order No. 9246 of September 17, 1942,[5] subject to such directives as the Rubber Director may issue pursuant to such order. Nothing in this order shall apply to or in any way limit the functions and authority, or the manner of executing the same, of the Chairman of the War Production Board or the Rubber Director in the exercise of control over and administration of the Nation's rubber program pursuant to said Executive Order No. 9246, or the functions and authority of any department, establishment or agency in the execution of such aspects of the rubber program in such manner and for such period of time as the Rubber Director may direct pursuant to said Executive Order.

6. Subject to such restrictions as may be imposed by the Departments of War and the Navy with respect to their own requirements, the several Federal departments and agencies shall supply such information and data as the Administrator may require in performing his functions and shall advise with the Administrator before undertaking any action which might affect the continuous, ready availability of petroleum for military and essential industrial and civilian needs. In order to assist him in carrying out the purposes of this order, the Administrator may establish or designate committees or groups of advisors, representing two or more departments or agencies of the Federal Government, or States. The Administrator shall meet at regular and special intervals with representatives of the various Federal departments and agencies having continuing functions directly related to petroleum or the petroleum industry.

7. The Administrator may appoint, with the approval of the President, a Deputy Administrator, who shall report directly to the Administrator, and to whom he may delegate any and all power, authority, and discretion conferred upon him by this order. The Deputy Administrator shall serve as Acting Administrator in the absence of the Administrator. The Administrator, within the limits of such funds as may be allocated or appropriated for the purpose, may employ necessary personnel and make provision for necessary supplies, facilities, travel, and services.

8. The Office of the Petroleum Coordinator for National Defense, later changed to the Office of Petroleum Coordinator for War, established by the letter of the President dated May 28, 1941, is abolished, and its personnel, records, property, and funds are transferred to the Petroleum Administration for War, effective fifteen days from the date of this order. All orders, directives, agreements, recommendations, and other documents issued or entered into under the functions, duties, and authorities of the Petroleum Coordinator for War shall remain in force as the responsibility of the Administrator until such time as he may revoke, alter, or otherwise change such documents under provisions of this Executive Order.

9. Nothing in this order shall be deemed to limit in any way the authority of the Departments of War and Navy to initiate or carry out directly, without review or approval by the Administrator, any action relating to petroleum or the petroleum industry which either Department deems to be a matter of military necessity or expediency and which arises in such areas and is of such military urgency as to require special or secret disposition; or to limit in any way the functions and authority of the Secretary of State, under the direction of the President, in the formation of the foreign policy and the conduct of the foreign relations of this Government; or to limit in any way the statutory powers of the Interstate Commerce Commission with respect to rates, charges, statistics, accounts, car service (including emergency service powers) or operating authority; or to limit in any way the exercise of the authority of the Federal Power Commission or the performance of its functions and authority under the Natural Gas Act (52 Stat. 821) as amended; or to limit the functions and authority of the Board of Economic Warfare under the Act of June 30, 1942 (56 Stat. 463); or to limit in any way the powers of the Price Administrator under the Emergency Price Control Act (56 Stat. 23) and as amended by Public Law 729—77th Congress, Second Session.

10. Any provisions of pertinent Executive Orders in conflict with the provisions of this order are hereby superseded: *Provided,* that nothing herein shall be deemed in any way to limit the functions and authority of the Chairman of the War Production Board under Executive Orders No. 9024 of January 16, 1942,[6] No.

9040 of January 24, 1942,[7] No. 9125 of April 7, 1942, and No. 9246 of September 17, 1942; or to limit in any way the functions and authority of the Federal Power Commission under Executive Order No. 8202 of July 13, 1939;[8] or to limit in any way the functions, duties, or authority of the War Shipping Administration with respect to the operation, control, purchase, requisition, charter, repair, use, or insurance of any vessel or cargo; or to limit the functions and authority of the Board of Economic Warfare under Executive Orders No. 8839 of July 30, 1941,[9] as amended, No. 8900 of September 15, 1941,[10] No. 8926 of October 28, 1941,[11] No. 8942 of November 19, 1941,[12] and No. 9128 of April 13, 1942;[13] or to limit the functions and authority of the Office of Lend-Lease Administration under Executive Order No. 8926 of October 28, 1941.

FRANKLIN D ROOSEVELT

THE WHITE HOUSE,
*December 2, 1942.*

[F. R. Doc. 42-12787; Filed, December 2, 1942; 4:03 p. m.]

## Regulations

TITLE 30—MINERAL RESOURCES

Chapter III—Bituminous Coal Division

[Docket No. A-1702]

PART 323—MINIMUM PRICE SCHEDULE, DISTRICT No. 3

ORDER GRANTING RELIEF, ETC.

Order granting temporary relief and conditionally providing for final relief in the matter of the petition of District Board No. 3 for the establishment of price classifications and minimum prices for the coals of certain mines in District No. 3.

An original petition, pursuant to section 4 II (d) of the Bituminous Coal Act of 1937, having been duly filed with this Division by the above-named party, requesting the establishment, both temporary and permanent, of price classifications and minimum prices for the coals of certain mines in District No. 3; and

It appearing that a reasonable showing of necessity has been made for the granting of temporary relief in the manner hereinafter set forth; and

No petitions of intervention having been filed with the Division in the above-entitled matter; and

The following action being deemed necessary in order to effectuate the purposes of the Act;

*It is ordered,* That, pending final disposition of the above-entitled matter, temporary relief is granted as follows: Commencing forthwith, § 323.6 (*Alphabetical list of code members*) is amended by adding thereto Supplement R–I, § 323.8 (*Special prices—*(b) *Railroad fuel prices for all movements except via*

---

[5] 7 F.R. 7379.

[6] 7 F.R. 329.

[7] 7 F.R. 527.
[8] 4 F.R. 3243.
[9] 6 F.R. 3823.
[10] 6 F.R. 4735.
[11] 6 F.R. 5519.
[12] 6 F.R. 5909.
[13] 7 F.R. 2899.

# Exhibit 1-137



VOLUME 7 NUMBER 12

*Washington, Saturday, January 17, 1942*


## *The President*

REGULATIONS PERTAINING TO ALIEN ENEMIES

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION

WHEREAS section 21 of title 50 of the United States Code provides as follows:

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies. The President is authorized in any such event, by his proclamation thereof, or other public act, to direct the conduct to be observed, on the part of the United States, toward the aliens who become so liable; the manner and degree of the restraint to which they shall be subject and in what cases, and upon what security their residence shall be permitted, and to provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom; and to establish any other regulations which are found necessary in the premises and for the public safety.

WHEREAS by sections 22, 23, and 24 of title 50 of the United States Code further provision is made relative to alien enemies;

WHEREAS by Proclamation No. 2525 [1] of December 7, 1941, and Proclamations Nos. 2526 [2] and 2527 [3] of December 8, 1941, I prescribed and proclaimed certain regulations governing the conduct of alien enemies; and

WHEREAS I find it necessary in the interest of national defense to prescribe regulations additional and supplemental to such regulations:

NOW, THEREFORE, I, FRANKLIN D. ROOSEVELT, President of the United States of America, acting under and by virtue of the authority vested in me by the Constitution of the United States and the aforesaid sections of the United States Code, do hereby prescribe and proclaim the following regulations, additional and supplemental to those prescribed by the aforesaid proclamations of December 7, 1941, and December 8, 1941:

All alien enemies within the continental United States, Puerto Rico, and the Virgin Islands are hereby required, at such times and places and in such manner as may be fixed by the Attorney General of the United States, to apply for and acquire certificates of identification; and the Attorney General is hereby authorized and directed to provide, as speedily as may be practicable, for the receiving of such applications and for the issuance of appropriate identification certificates, and to make such rules and regulations as he may deem necessary for effecting such identifications; and all alien enemies and all other persons are hereby required to comply with such rules and regulations. The Attorney General in carrying out such identification procedure, is hereby authorized to utilize such agents, agencies, officers, and departments of the United States and of the several states, territories, dependencies, and municipalities thereof and of the District of Columbia as he may select for the purpose, and all such agents, agencies, officers, and departments are hereby granted full authority for all acts done by them in the execution of this regulation when acting by the direction of the Attorney General. After the date or dates fixed by the Attorney General for completion of such identification procedure, every alien enemy within the limits of the continental United States, Puerto Rico, or the Virgin Islands shall at all times have his identification card on his person.

IN WITNESS WHEREOF, I have hereunto set my hand and caused the seal of the United States to be affixed.

DONE at the City of Washington this 14th day of January in the year of our Lord nineteen hundred and forty-two, and of the Independence of the United States of America the one hundred and sixty-sixth.

[SEAL]

FRANKLIN D ROOSEVELT

By the President:

CORDELL HULL,
*Secretary of State.*

[No. 2537]

[F. R. Doc. 42-452; Filed, January 16, 1942; 10:49 a. m.]

[1] 6 F.R. 6321.
[2] 6 F.R. 6323.
[3] 6 F.R. 6324.

*Contents appears on last page*

EXECUTIVE ORDER

ESTABLISHING THE WAR PRODUCTION BOARD IN THE EXECUTIVE OFFICE OF THE PRESIDENT AND DEFINING ITS FUNCTIONS AND DUTIES

By virtue of the authority vested in me by the Constitution and statutes of the United States, as President of the United States and Commander in Chief of the Army and Navy, and in order to define further the functions and duties of the Office for Emergency Management with respect to the state of war declared to exist by Joint Resolutions of the Congress, approved December 8, 1941, and December 11, 1941, respectively, and for the purpose of assuring the most effective prosecution of war procurement and production, it is hereby ordered as follows:

1. There is established within the Office for Emergency Management of the Executive Office of the President a War Production Board, hereinafter referred to as the Board. The Board shall consist of a Chairman, to be appointed by the President, the Secretary of War, the Secretary of the Navy, the Federal Loan Administrator, the Director General and the Associate Director General of the Office of Production Management, the Admin-



HeinOnline -- 7 Fed. Reg. 329 1942



Published daily, except Sundays, Mondays, and days following legal holidays by the Division of the Federal Register, The National Archives, pursuant to the authority contained in the Federal Register Act, approved July 26, 1935 (49 Stat. 500), under regulations prescribed by the Administrative Committee, approved by the President.

The Administrative Committee consists of the Archivist or Acting Archivist, an officer of the Department of Justice designated by the Attorney General, and the Public Printer or Acting Public Printer.

The daily issue of the FEDERAL REGISTER will be furnished by mail to subscribers, free of postage, for $1.25 per month or $12.50 per year; single copies 10 cents each; payable in advance. Remit money order payable to the Superintendent of Documents directly to the Government Printing Office, Washington, D. C.

istrator of the Office of Price Administration, the Chairman of the Board of Economic Warfare, and the Special Assistant to the President supervising the defense aid program.

2. The Chairman of the War Production Board, with the advice and assistance of the members of the Board, shall:

a. Exercise general direction over the war procurement and production program.

b. Determine the policies, plans, procedures, and methods of the several Federal departments, establishments, and agencies in respect to war procurement and production, including purchasing, contracting, specifications, and construction; and including conversion, requisitioning, plant expansion, and the financing thereof; and issue such directives in respect thereto as he may deem necessary or appropriate.

c. Perform the functions and exercise the powers vested in the Supply Priorities and Allocations Board by Executive Order No. 8875[1] of August 28, 1941.

d. Supervise the Office of Production Management in the performance of its responsibilities and duties, and direct such changes in its organization as he may deem necessary.

e. Report from time to time to the President on the progress of war procurement and production; and perform such other duties as the President may direct.

3. Federal departments, establishments, and agencies shall comply with the policies, plans, methods, and procedures in respect to war procurement and production as determined by the Chairman; and shall furnish to the Chairman such information relating to war procurement and production as he may deem necessary for the performance of his duties.

4. The Army and Navy Munitions Board shall report to the President

[1] 6 F.R. 4483.

through the Chairman of the War Production Board.

5. The Chairman may exercise the powers, authority, and discretion conferred upon him by this Order through such officials or agencies and in such manner as he may determine; and his decisions shall be final.

6. The Chairman is further authorized within the limits of such funds as may be allocated or appropriated to the Board to employ necessary personnel and make provision for necessary supplies, facilities, and services.

7. The Supply Priorities and Allocations Board, established by the Executive Order of August 28, 1941, is hereby abolished, and its personnel, records, and property transferred to the Board. The Executive Orders No. 8629[2] of January 7, 1941, No. 8875[1] of August 28, 1941, No. 8891[3] of September 4, 1941, No. 8942[4] of November 19, 1941, No. 9001[5] of December 27, 1941, and No. 9023[6] of January 14, 1942, are hereby amended accordingly, and any provisions of these or other pertinent Executive Orders conflicting with this Order are hereby superseded.

FRANKLIN D ROOSEVELT

THE WHITE HOUSE,
*January 16, 1942*

[No. 9024]

[F. R. Doc. 42-482; Filed, January 16, 1942; 1:45 p. m.]

---

## Rules, Regulations, Orders

---

### TITLE 10—ARMY: WAR DEPARTMENT

#### CHAPTER VI—ORGANIZED RESERVES

PART 64—ENLISTED RESERVE CORPS[7]

§ 64.13 *Separation from service*—(a) *Discharge before expiration of enlistment.* When on inactive status or active status for training, a member of the Enlisted Reserve Corps will not be discharged before the expiration of his term of enlistment, except—

(1) By order of the President or of the Secretary of War.

(2) By direction of the commander of a corps area, or such officers as may be designated by him for that purpose:

(i) On account of physical disability;

(ii) Upon acceptance of a commission in the Regular Army, Officers' Reserve Corps, or National Guard;

(iii) For the purpose of enlisting in the Regular Army, Navy, Marine Corps, National Guard or Coast Guard;

(iv) On account of absence beyond the continental limits of the United States for a period of six months or longer;

[2] 6 F.R. 191.
[3] 6 F.R. 4623.
[4] 6 F.R. 5909.
[5] 6 F.R. 6787.
[6] 7 F.R. 302.
[7] § 64.13 (a) is amended.

(v) Upon application in writing forwarded through channels 90 days before the discharge is to take effect in cases of those authorized to be enlisted for one year;

(vi) On account of sentence of imprisonment by a civil court whether suspended or not;

(vii) Under the provisions of paragraph 25, AR 150-5; or

(viii) On account of minority, action in such cases to be as provided for the Regular Army under the provisions of paragraph 33, AR 615-360.[2]

(3) Pursuant to sentence of a general court-martial, the enlisted man being in an active duty status.

(4) In compliance with an order of one of the United States courts or a justice or judge thereof on a writ of habeas corpus.

When on active duty in a national emergency (§ 64.2 (b)), the discharge of a member of the Enlisted Reserve Corps will be governed by the provisions of Army Regulations applicable to enlisted men of the Regular Army. (39 Stat. 195, 41 Stat. 780, 44 Stat. 705; 10 U.S.C. 421, 423-427) [Par. 22, AR 150-5 Sept. 30, 1931, amendments in Cir. 167, W.D., Aug. 13, 1941 (6 F.R. 4360) having been rescinded by Cir. 6, W.D., Jan. 9, 1942]

*      *      *      *      *

[SEAL]                         E. S. ADAMS,
                              *Major General,*
                              *The Adjutant General.*

[F. R. Doc. 42-447; Filed, January 15, 1942; 2:19 p. m.]

---

#### CHAPTER VII—PERSONNEL

PART 71—ENLISTMENT IN THE REGULAR ARMY[1]

§ 71.5 *Enlistments in the Regular Army requiring special authority from the War Department.* The following classes of personnel will not be enlisted or reenlisted in the Regular Army without special authority in each case from The Adjutant General:

*      *      *      *      *

(b) Former enlisted men over 45 years of age who were last discharged as privates and failed to reenlist within 3 months thereafter. In such cases the application must show that the reenlistment will be for the interests of the service. (41 Stat. 765; 10 U.S.C. 42) [Par. 16b, AR 600-750, April 10, 1939, as amended by Cir. 5, W.D., January 8, 1942]

*      *      *      *      *

[SEAL]                         E. S. ADAMS,
                              *Major General,*
                              *The Adjutant General.*

[F. R. Doc. 42-448; Filed, January 15, 1942; 2:22 p. m.]

[1] § 71.5 (b) is amended.
[2] Administrative regulations of the War Department relative to discharge of enlisted man.

Case 2:18-cv-05256-JCZ-DPC    Document 87-2    Filed 01/20/23    Page 16 of 377

# Exhibit 1-138

# SEVENTEENTH BIENNIAL REPORT

# Department of Conservation

# State of Louisiana

# 1944--1945



Published by
**DEPARTMENT OF CONSERVATION**
Baton Rouge, La.
April 15, 1946

Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

## OIL AND GAS DEVELOPMENT IN LOUISIANA
## DURING 1944-45

Previous Biennial Reports of the Department of Conservation have given a rather complete history of oil development in Louisiana from its beginning in 1902 with the discovery of the Jennings Field, Jefferson Davis Parish, and carrying through the year 1943. These reports have detailed the efforts of the Legislature to enact the laws necessary to conserve our mineral resources from the first attempt in 1906 which by Act 71 made it a criminal offense to allow a gas well to remain out of control or to burn or blow into the air wastefully the natural gas from any well, on through Act 157 of 1940 which is recognized as one of the most progressive and comprehensive of all oil and gas laws. This report, for the sake of brevity, shall not review these aspects but will be confined to the calendar years of 1944 and 1945.

During the period of 1944-45 Louisiana maintained its position of third among the oil producing states and second among those producing natural gas. During these war years production of oil in the State reached an all time high in an effort to supply the huge demand, both military and civilian. From the following table it can be seen that the allowable fixed by the Department reached the maximum in July, 1945, the month preceding the surrender of Japan.

In calculating the allowables as issued, the recommendation of P.A.W. which include condensate, distillate and natural gasoline was used as the market demand. From this figure we subtracted the estimated volume of liquid other than "crude oil" that would be produced, which left the volume of crude oil to be produced daily. To this figure was then added the net amount of underproduction which our records indicated would result in the ensuing month. This, then, was the amount of oil allocated, which figure was our estimate of the necessary allowable to be set that would result in the actual production of that amount recommended by P.A.W. It will be interesting to note that for the

Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

*Department of Conservation of Louisiana*    15

year 1944 Louisiana's production over the recommended P.A.W. figure amounted to 1.64%. For the year 1945 it amounted to plus 0.169%. The average production over the recommended figure for the two year period amounted to less than 1%.

Production of crude oil in Louisiana increased from 237,212,842 barrels during the biennium of 1942-43 to 275,709,168 barrels during the biennium 1944-45, or an increase of 16.2%. The increase in 1944-45 over 1940-41 (the biennium just preceding the war) was approximately 28.5%. This accelerated rate of production was achieved in the face of reduced drilling activities as a result of the restrictions placed on the allocation of material necessary to drill and complete wells by the P.A.W. From the following table it can be seen what effect this allocation of material had on drilling activities in the State.

### PERMITS TO DRILL

| Year | 1935 | 1936 | 1937 | 1938 | 1939 | 1940 | 1941 | 1942 | 1943 | 1944 | 1945 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of permits issued | 1508 | 1145 | 1253 | 1191 | 1580 | 1782 | 1749 | 1040 | 918 | 975 | 1201 |

### OIL PRODUCTION

Forty-five new fields, including three re-discoveries, were found during 1944-45. Three of these new discoveries —Delhi in Northeast Louisiana, Good Hope in Southeast Louisiana, and West Tepetate in Southwest Louisiana— should add considerably to Louisiana's oil reserves. The Weeks Island Field in Iberia Parish may, however, eventually develop into a considerable reserve. The other discoveries were either gas condensate or of apparently little consequence.

Statewide production for 1944-45 was 275.6 (approximate) million barrels of crude oil and gas condensate, amounting to about 8.1 per cent for 1944 and about 12.3 per cent for 1945 of the total production in the United States. A comparison of production for two years shows that during 1944 natural gas production increased by 94,000,000 MCF and casinghead gas by 6,000,000 MCF above 1943, and that during 1945 Louisiana produced 2.4 million more barrels of oil—an increase of 1.8 per cent over 1943.

Digitized by Google    Original from UNIVERSITY OF CALIFORNIA

# Exhibit 1-139

# FINAL REPORT

## on the

# Reconstruction Finance Corporation



Pursuant to Section 6(c)
Reorganization Plan No. 1 of 1957

## SECRETARY OF THE TREASURY

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON 1959

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington 25, D.C. • Price $1.25



THE SECRETARY OF THE TREASURY
WASHINGTON

May 6, 1959

Sirs:

I have the honor to submit herewith the final report on the Reconstruction Finance Corporation which is required under Section 6 (c) of Reorganization Plan No. 1 of 1957.

The report was prepared under the direction of Mr. Laurence B. Robbins, who presently is serving in the capacity of Assistant Secretary of the Treasury. Prior to confirmation in his present position, Mr. Robbins served both as Deputy Administrator and Administrator of the Reconstruction Finance Corporation and directed the liquidation of that Corporation's affairs.

Robert B. Anderson

Secretary of the Treasury

To the President of the Senate

To the Speaker of the House of Representatives

iii

research work. The operators were required to grant the Company an extensible patent immunity under all inventions made in the course of research and development work which it financed. Research contracts with nonprofit institutions provided that all patent rights covering inventions made in the course of RRC-financed research work would be assigned to the Company.

The RRC also entered into numerous agreements with private industrial enterprises relating to the interchange of technical information and operating rights under patents. In general, the Company was granted royalty-free licenses under synthetic rubber patents.

The story of rubber—both natural and synthetic—from 1940 onward is so complex and is of such a technical nature that no more than a bare outline has been attempted in this description of the activities of Rubber Reserve Company. Full descriptions of the Government's wartime rubber programs and the ultimate disposal of the synthetic-rubber-producing facilities are available in the documents listed in appendix D.

Rubber Reserve Company was dissolved on July 1, 1945, and its functions, assets, and liabilities merged with those of RFC as provided by the act approved June 30, 1945. Before dissolution, the operation of RRC had provided funds sufficient to repay all but about $300 million of the $1,725 million advanced by RFC. After July 1, 1945, the RFC continued the liquidation of the assets and liabilities received from RRC, and such amounts as were unrecovered on June 30, 1947, were included in the RFC notes payable to the Secretary of the Treasury which were canceled by direction of the Congress.

## Defense Plant Corporation

Defense Plant Corporation was organized on August 22, 1940, under the authority of section 5(d) of the RFC Act, as amended. The Corporation had capital stock of $5 million subscribed and paid for by RFC, and during its existence borrowed from RFC a total of $7,993,290,847. (See table W-3 in app. C.)

The purpose for which Defense Plant Corporation was created was to aid in the national defense program by financing and supervising the construction and equipping of industrial facilities.

The management of DPC was vested in a Board of Directors appointed by RFC. Most of the members of DPC's Board, and most of the officers appointed by that Board, also served as directors or officers of RFC itself or of RFC's other subsidiaries.

During its existence, DPC (and its successor, RFC's Office of Defense Plant) authorized a total of more than 2,550 projects for the construction and equipping of manufacturing plants and other facilities. The amounts authorized for these projects totaled nearly $9

billion. Disbursements amounting to $7.3 billion were made on 2,300 of the projects. The plants and other projects which were partially or wholly financed by DPC embraced almost every type of manufacturing industry in the Nation. Over 50 percent of DPC's outlays flowed directly or indirectly into aviation. To build aircraft, their engines, and parts, the Corporation directly invested $2.6 billion in land, buildings, machines, and other equipment in several hundred new plants. Including production facilities for aviation gasoline and aluminum and magnesium metals, which were constructed in order to increase the supply of materials for aircraft, over $4 billion was provided to meet wartime aviation needs.

Metals production and processing plants accounted for $2.2 billion of DPC's investments. Nearly $1 billion of the total was expended to enlarge steel and pig-iron capacity. Facilities for production of synthetic rubber, which was a new industry, were supplied almost in their entirety by the $740 million investment of DPC. Other manufacturing facilities in which DPC played a major role in expansion were ordnance, shipbuilding, and chemicals. It built and equipped shipyards and erected plants for the manufacture of ship parts. It helped to finance the expansion of production facilities for chemicals such as alcohol, toluene, sulfuric acid, oxygen, and acetylene, all of which were vital in the manufacture of munitions and to general industry. DPC also made substantial investments in plants for expanding the radio and communications industry. Another way in which DPC assisted in the war effort was by stimulating the increased production of machine tools and thereby facilitate the conversion of industry to war production as well as to equip the new plants constructed by DPC.

In addition to manufacturing plants, some of which were the largest in the Nation, a wide range of other facilities were provided, such as tugboats and barges for river transportation, railroad tank cars for transportation of products such as butadiene and chlorine, pipelines (notably the Big Inch and Little Big Inch) for the transportation of petroleum and petroleum products, 1,200 sleeper cars and 400 kitchen cars for troop trains, and streetcars and buses for transportation of war workers.

DPC assisted the War Department's pilot-training program through the purchase and expansion of 62 flying schools and by providing training planes and housing for cadets.

The variety of projects undertaken by DPC was very extensive. Among the most unusual were the financing of facilities to process rice by a new method which permitted the United States to augment the rice supply for China without danger of weevil infestation, to develop milkweed to relieve the shortage of kapok for stuffing life preservers, to produce desalting kits for installation in liferafts, and

to breed rodents for use in medical laboratories. Four floating generator plants were constructed to relieve electric power shortages in areas that could be reached by water. A large underground stone quarry in Kansas was converted into refrigerated storage space. Facilities were provided for dehydrating, curing, and concentrating fruits and vegetables for distribution to American troops and allies. Also, DPC financed the expansion of laboratory facilities to produce penicillin. The number of plants at which DPC projects were located and the amounts authorized for them are summarized by industry classification in the table below.

| Type of facility | Number of plant locations | Amount authorized (in thousands of dollars) |
|---|---|---|
| Total | 2,492 | $8,977,506 |
| Manufacturing facilities | 2,265 | 8,470,822 |
| Aircraft, aircraft engines, and parts | 623 | 3,207,328 |
| Aluminum and magnesium | 152 | 1,291,884 |
| Aviation gasoline | 45 | 324,142 |
| Chemicals | 199 | 214,038 |
| Machine tools | 166 | 90,939 |
| Minerals | 79 | 178,869 |
| Ordnance | 120 | 495,778 |
| Radio and communication equipment | 167 | 119,599 |
| Shipbuilding | 100 | 200,827 |
| Steel and iron | 225 | 1,147,788 |
| Synthetic rubber | 159 | 1,055,936 |
| Other manufacturing | 230 | 143,694 |
| Nonmanufacturing facilities | 227 | 506,684 |
| Flying schools | 66 | 47,414 |
| Transportation facilities | 116 | 423,761 |
| Housing | 29 | 29,496 |
| Miscellaneous | 16 | 6,013 |

The data in the table above are cumulated through August 31, 1946, and include amounts authorized by RFC's Office of Defense Plant after the dissolution of DPC on June 30, 1945.

Under the provisions of its charter, DPC could undertake to construct and equip facilities on its own authority. However, with very few exceptions, DPC undertook projects only upon the recommendation and sponsorship of other Government agencies administering defense and war programs. The amounts of DPC authorizations sponsored by such agencies is shown in the following table:

| Sponsoring Agency | Amount authorized (in thousands of dollars) | Sponsoring agency | Amount authorized (in thousands of dollars) |
|---|---|---|---|
| Total | $8,977,506 | Navy Department | $694,367 |
| | | Petroleum Administrator for War | 525,926 |
| War Department | 4,156,190 | Office of Defense Transportation | 155,742 |
| War Production Board | 2,398,076 | Maritime Commission | 104,823 |
| Rubber Reserve Company | 836,309 | Other agencies | 106,073 |

The "Other agencies" shown in the foregoing table as sponsors of DPC projects include Department of Agriculture, Commodity Credit Corporation, Metals Reserve Company, Solid Fuels Administration, Civil Aeronautics Authority, Office of Strategic Services, Office of War Information, War Shipping Administration, Foreign Economic Administration, Treasury Department, War Relocation Authority, and National Housing Administration.

For more than half of the amounts authorized by DPC for industrial projects, the Corporation had "takeout" agreements with the sponsoring agencies under which DPC was eventually to be reimbursed for all or part of its investment. In most cases these "takeout agreements" provided for DPC to recover from 40 to 50 percent of the cost of a project as construction progressed. The remainder was to be received at some later date, if and when the sponsoring agency would request and receive specific appropriations from Congress for that purpose. Ownership of the facilities covered was to remain in DPC, but a sponsoring agency retained the right to take ownership upon fulfillment of its part of the "takeout" agreement. To June 30, 1945, DPC had received $1,360,974,000 in reimbursements and $6,969,000 in interest under these arrangements. It was originally intended that final settlement with sponsoring agencies would be made on or before June 30, 1945—later extended to June 30, 1946. However, since at the close of the war it appeared that no useful purpose would be accomplished by appropriating funds for agencies to pay over to DPC, none of the sponsors requested appropriations for the purpose of making final settlements under the "takeout" agreements.

Defense Plant Corporation relied upon the sponsoring agencies to determine the nature of the various projects built, their size and location, the processes to be employed, and the selection of the private enterprise concerns to operate them under lease agreements. The agreements between DPC and the plant operators were in two parts: one for the design, purchase, and construction of the facilities for the account of and under the supervision of DPC; and the other part for the lease and operation of the properties. Generally, the lease agreements with the operators were of the following types:

1. Leases specifying a rental of $1 per year were used when the entire output of a plant was intended for the use of a Government procurement agency, or when the property was leased to another Federal agency. These leases usually were associated with the "takeout" agreements noted above.

2. Leases calling for the payment of rentals based upon a percentage of construction cost. These were used in cases where conditions were favorable for the lessee to assume all financial

133

risks in operating the facilities. The rental rates in these leases usually were 5 percent per annum on land and buildings and 12 percent on equipment, payable quarterly or annually.

3. Leases providing for rentals to be based upon either sales, net profit, or volume of production. These were used where unstable market conditions, untried products, or new processes made the lessees unwilling to assume full financial risks in operating DPC facilities.

4. Lease agreements providing for the payment of fixed amounts of rentals during each month, quarter, or other time period.

Although the lessees of DPC facilities generally were private concerns, 92 projects were operated under agency agreements for the account of other RFC subsidiaries, a few were leased to other agencies of the Government, and 39 were operated for the account of DPC itself under agreements with private companies, which undertook to serve as agents, generally on a fee basis.

Except for those covering aluminum, magnesium, and synthetic rubber plants, the leases included options under which the lessees might acquire the facilities upon expiration or cancellation of the leases.

In certain cases, separate units of machinery, tools, and equipment became excess to the needs of the projects of which originally they had been a part. At the request of either the War or Navy Departments, DPC would install these units in privately owned plants under leasing arrangements underwritten by the department making the request. Such arrangements were made in nearly 1,600 instances, and the users of the equipment paid monthly rentals at the rate of 1 percent of the cost of the equipment.

In addition to its activities in connection with the construction and equipping of industrial facilities, Defense Plant Corporation undertook to stimulate the production of machine tools, gages, and cutting tools needed for the conversion of industry to war production and to equip the new plants being constructed. To do this, DPC entered into firm purchase agreements with manufacturers for specific types and quantities of cutters, grinders, millers, shapers, planers, borers, drop hammers, and tools and related equipment. In effect, these purchase agreements were underwritings. For the most part, the manufacturers were to sell the machines directly to industrial enterprises even though their manufacture was covered by DPC purchase orders. DPC agreed to take deliveries of unsold machines within 30 days after availability, at a discount of 17½ percent. Also, DPC agreed to pay losses incurred by the manufacturers because of cancellation of DPC purchase orders.

134

To assist in financing the manufacturing program, DPC agreed to advance up to 30 percent of the amount of each purchase order. The funds so advanced were to be repaid proportionately as deliveries progressed under the purchase order.

Commitments made by DPC for the purchase of machine tools and related equipment aggregated approximately $2 billion. The Corporation advanced $418 million to aid in financing the production of equipment ordered. Under its agreements to purchase unsold machines, DPC was required to take delivery of equipment with a purchase price of only $27 million, before discount.

Defense Plant Corporation was dissolved July 1, 1945, and its functions, assets, and liabilities merged with RFC in accordance with the provisions of the act approved June 30, 1945. At the time of its dissolution, DPC held plants, facilities, and other assets which had cost the Corporation nearly $7 billion. Recoveries to June 30, 1945, from "takeout" agreements, rentals, and other sources had aggregated about $2.5 billion, leaving DPC indebted to its parent to the extent of about $5.1 billion for capital stock and loans.

After June 30, 1945, RFC continued to liquidate DPC's assets and some further recoveries were made. However, with the bulk of DPC's assets consisting of industrial facilities which subsequently were declared surplus, substantial recoveries by RFC were precluded, and such of DPC's expenditures as were unrecovered on June 30, 1947, made up a large part of the $9.3 billion of RFC notes payable to the Secretary of the Treasury which were canceled at that time as representing the unrecovered costs of the Corporation's national defense, war, and reconversion activities.

## Defense Supplies Corporation

Defense Supplies Corporation was organized on August 22, 1940, under the authority of section 5(d) of the RFC Act, as amended. The Corporation was financed with $5 million of capital stock subscribed and paid for by RFC, and during its existence borrowed from RFC a total of $6,389,345,975. (See table W-5 in app. C.)

The charter of the Corporation provided that the affairs of DSC should be managed by a Board of Directors appointed by RFC. Most of the members of DSC's Board of Directors, and most of the officers appointed by them, also were directors of RFC or of its other subsidiaries.

The Corporation had two principal functions. One, the procurement, stockpiling, and disposal of nonmetallic commodities defined as strategic and critical by the President. The other, the payment of subsidies to producers and transporters of strategic and critical materials and for purposes of price stabilization.

All programs and activities of DSC were undertaken at the request or under the sponsorship of other Government agencies. The Corporation did not assume responsibility for the policymaking functions incident to its undertakings, but assumed responsibility for procedural and administrative functions only. Policies for the commodity trading operations were determined by the War Production Board, the Office of Price Administration, the Board of Economic Warfare (and its successor, the Foreign Economic Administration), the War and Navy Departments, and other interested agencies. For the subsidy operations, policies were laid down by the Office of Economic Stabilization, the Office of Price Administration, the Department of Agriculture, the Petroleum Administration for War, and others.

The commodity trading activities of DSC included the development, procurement, manufacture, stockpiling, and disposal of strategic and critical materials, chiefly those of a nonmetallic character. The table below shows the types and quantities of materials and supplies acquired by Defense Supplies Corporation (and its successor, RFC's Office of Defense Supplies) through June 30, 1948.

| Material | Unit | Quantity |
|---|---|---|
| Abaca | Pound | 37,798,308 |
| Acetylene black | do | 9,296,350 |
| Agar | do | 577,477 |
| Agave fiber | do | 1,682,673,605 |
| Airplanes | Each | 421 |
| Albarco logs and lumber | Board foot | 724,464 |
| Alcohol | Wine gallon | 1,254,475,826 |
| Alcohol byproducts | do | 428,326 |
| Alkylate, aviation | Gallon | 27,475,114 |
| Aluminum | Pound | 3,538,784 |
| Aluminum rivets | do | 11,452,821 |
| Aluminum wire | do | 17,805 |
| Antifriction bearings | Each | 1,366,908 |
| Arms, accessories, and ammunition | Dollar | 19,711,689 |
| Arms, frozen stocks [2] | do | 629,461 |
| Automobiles [1] | Each | 5,389 |
| Aviation gasoline: | | |
| 91 octane | Barrel | 3,940,023 |
| 100 octane | do | 332,073,378 |
| Benzol | do | 4,812 |
| Balsa logs and lumber | Board foot | 9,186,337 |
| Barbed wire [3] | Pound | 26,978,200 |
| Belladonna leaves | do | 201,093 |
| Benzol, pure | Gallon | 179,433,668 |
| Benzol byproducts | do | 26,226,955 |
| Binder twine and rope | Pound | 236,886,999 |
| Burlap | Yard | 2,252,642,279 |
| Butchers' frocks [2] | Each | 15,295 |
| Calcined petroleum coke | Ton | 98,891 |
| Calcium carbide | Pound | 809,125,635 |
| Caledon khaki dye | do | 112,000 |
| Carbon black | do | 250,540,121 |
| Carbonyl, iron | do | 299,675 |
| Cashew nut oil | do | 2,241,318 |
| Catalyst (petroleum cracking) | do | 2,380,782 |
| Chemicals | Ton | 733,985 |
| Cinchona bark | Pound | 28,171,770 |
| Coal: | | |
| Anthracite | Ton | 272,563 |
| Bituminous | do | 62,776 |
| Unclassified | do | 4,948 |
| For liberated European countries | Long ton | 4,196,378 |
| Coir yarn and products | Dollar | 705,696 |

See footnotes at end of table.

136

FINANCING RFC'S WARTIME SUBSIDIARIES

| Material | Unit | Quantity |
|---|---|---|
| Copra | Pound | 7,981,955 |
| Cork | Metric ton | 74,526 |
| Cotton and flax | Pound | 84,589,072 |
| Cotton fabrics | Yard | 145,550,528 |
| Cotton linters | Pound | 56,518,697 |
| Cresylic acid | Gallon | 6,136,037 |
| Crude oil, west Texas | Barrel | 5,387,586 |
| Diamond bort and cleavage points | Carat | 10,101 |
| Diamond bort, foreign | do | 30,000 |
| Diamond dies: | | |
|     Domestic | Each | 6,048 |
|     Foreign | do | 16,635 |
| Die stones | Carat | 180 |
| Duck feathers | Pound | 107,915 |
| Elastic web and braid | Yard | 15,431,571 |
| Emergency field rations | Each | 36 |
| Ergot | Pound | 288,377 |
| Ethyl cellulose | do | 1,249,936 |
| Fiber and fiber seed samples | do | 1,010,389 |
| Fiber, roselle and malva | do | 112,858 |
| Gas and coal furnaces [1] | Each | 732 |
| Goat and kid skins | do | 50,565,330 |
| Goose down | Pound | 7,582 |
| Hair | do | 1,188,755 |
| Hides | Each | 780,404 |
| Hydrogenated naphtha | Barrel | 2,579,339 |
| Hydrogenated byproducts | do | 851,088 |
| Hyocine hydrobromide | Ounce | 300 |
| Insulated wire | Foot | 3,516,748 |
| Iodine | Pound | 496,705 |
| Istle fiber | do | 101,205,164 |
| Jewel bearings: | | |
|     Domestic | Each | 13,361,581 |
|     Foreign | do | 82,634,007 |
| Jute: | | |
|     Fiber | Pound | 368,916,299 |
|     Yarn | do | 4,090,442 |
| Kapok | do | 15,092,682 |
| Laundry and drycleaning machinery [1] | Dollar | 33,309 |
| Leather | do | 7,740,001 |
| Leather, South American | Bale | 2,439 |
| Leather and woolen mittens [3] | Pair | 34,777 |
| Linseed oil | Pound | 2,348,162 |
| Loofa sponges | Piece | 5,257,518 |
| Mahogany logs and lumber | Board foot | 3,301,900 |
| Manila fiber | Bale | 149,239 |
| Manila fiber, Philippine | Pound | 25,984,800 |
| Meta para cresol | do | 258,000 |
| Mexican prairie or junk bones | Metric ton | 1,769 |
| Milkweed floss | Pound | 1,664,855 |
| Molasses | Gallon | 1,251,633,474 |
| Motor vehicles [1] | Each | 97 |
| Nitrate of soda | Ton | 1,347,958 |
| Oil burners [1] | Each | 5,425 |
| Oiticica oil | Pound | 4,180,407 |
| Opium | Ounce | 10,817,686 |
| Pig bristles | Pound | 4,218,864 |
| Pine lumber, Mexican | Board foot | 8,102,815 |
| Polydichlorostyrene | Pound | 16,416 |
| Polyvinyl chloride | do | 1,050,000 |
| Pyrethrum | Dollar | 5,294,559 |
| Quartz crystal plates | Each | 173 |
| Quinine products | Ounce | 13,756,842 |
| Radio components [3] | Dollar | 40,868 |
| Raffia fiber | Pound | 451,597 |
| Rapeseed oil | do | 7,602,688 |
| Rayon twill and acetate taffeta | Yard | 587,608 |
| Red squill | Pound | 822,906 |
| Refrigerators [1] | Each | 36,824 |
| Requisitioned materials [3] | Dollar | 2,212,663 |
| Revolvers [3] | Each | 115,629 |
| Roofing rags | Pound | 4,659,438 |
| Rotenone | do | 2,452,569 |
| Rubber thread | do | 1,579,459 |
| Sanseveria fiber | do | 41,250 |
| Sapphire | Ounce | 11,293 |
| Sapphire boule | Carat | 126,000 |
| Senna seeds | Pound | 388 |
| Sewing machines and equipment [3] | Dollar | 14,412 |
| Sharkskins and sharklivers | Kilogram | 200 |
| Shearlings and lambskins | Each | 764,925 |
| Shellac | Pound | 64,490,616 |
| Shoe pacs [3] | Pair | 14,436 |

See footnotes at end of table.

137

FINAL REPORT ON THE RECONSTRUCTION FINANCE CORPORATION

| Material | Unit | Quantity |
|---|---|---|
| Silk | Pound | 8,745,040 |
| Silk and nylon hosiery, used | do | 15,954,858 |
| Silk waste | do | 54,919 |
| Sisal machinery | Dollar | 5,495 |
| Space heaters, oil and gas [1] | Each | 18,832 |
| Stirrup pumps [2] | do | 1,282,198 |
| Storage tanks [3] | Dollar | 10,480 |
| Sugar: | | |
|   Cuban | Ton | 1,980,710 |
|   Domestic | do | 95,574 |
| Sugar bags | Each | 6,000,000 |
| Sunflower seed oil | Pound | 2,634,771 |
| Sunn hemp | do | 6,280,409 |
| Tetra ethyl fluid | do | 253,565 |
| Tires and tubes [3] | Dollar | 83,888,754 |
| Trailers [1] | Each | 5,412 |
| Trucks (milk) [1] | do | 500 |
| Tung oil | Pound | 27,518,951 |
| Typhus fever vaccine | Liter | 2,000 |
| Undershirts and underdrawers [3] | Each | 181,751 |
| Used clothing | Pound | 3,348,084 |
| Vinyl acetate | do | 704,747 |
| Wool: | | |
|   Australian and New Zealand | do | 302,670,823 |
|   Requisitioned, South American | do | 5,399,193 |
|   Uruguayan | do | 34,579,290 |
| Xylidines | Gallon | 7,207,837 |

[1] Included in program for relief of dealers in restricted commodities.
[2] Included in program for distribution of restricted commodities.
[3] Commodities requisitioned by War Production Board.

The materials and supplies acquired by DSC in its trading programs were either placed in stockpile or sold to manufacturers and other consumers under allocations by the War Production Board and other Government agencies. A substantial portion of the funds used for the procurement of strategic materials and commodities was recovered from sales.

The Corporation's subsidy payment programs, however, afforded no opportunities for recoveries. Disbursements for subsidy purposes made up the largest single class of DSC's expenditures. The table below shows the amounts paid by DSC (and its successor, RFC's Office of Defense Supplies) in each of its subsidy programs through June 30, 1948. The data in this table do not give effect to amounts recovered in cases of overpayment or other adjustments.

| Program | Disbursements | Program | Disbursements |
|---|---|---|---|
| Livestock slaughter | $1,549,623,139 | Sugar transportation | $25,011,274 |
| Petroleum transportation | 846,052,671 | Woodpulp production | 9,649,483 |
| Flour milling | 347,933,431 | Nitrate of soda | 4,076,678 |
| Butter production | 183,314,390 | Others | 375,406 |
| Stripper well oil production | 121,778,584 | | |
| Coal distribution | 63,115,141 | Total | 3,240,062,052 |
| Coffee importation | 46,344,333 | | |
| Building materials, veterans' emergency housing program | 42,787,522 | | |

Defense Supplies Corporation was dissolved July 1, 1945, in accordance with the provisions of the act approved June 30, 1945. Prior to that time, the Corporation's activities had produced funds sufficient to

138

# Exhibit 1-140

RESTRICTED

# AVIATION GASOLINE

### REPORT TO THE

# WAR PRODUCTION BOARD

SEPTEMBER 29, 1945



### PETROLEUM ADMINISTRATION FOR WAR

WASHINGTON, D. C.



DECLASSIFIED
Authority NND730014

80357

## AVIATION GASOLINE REPORT TO THE WAR PRODUCTION BOARD

### IA - GENERAL COMMENT

The last report to the War Production Board on the Aviation Gasoline Program was issued July 10, 1945. Since that date, hostilities have been discontinued and the current report, normally due about September 10, has been delayed to permit a final Aviation Gasoline Report to be prepared.

The primary purpose of this report is to summarize the actual aviation gasoline production data for the period of World War II. This is in contrast with the purpose of previous War Production Board Reports, which has been to present information concerning the estimated future production and requirements of aviation grade gasolines and to direct attention to critical issues in the Aviation Gasoline Program as they arose.

### IB - SUMMARY

The report consists of tables showing aviation gasoline production, blending, shipments, etc. and several charts and graphs to indicate, visually, certain pertinent data with regard to the rates and sources of production preceding and during the war years. The data available on high quality aviation gasoline from foreign sources is included; however, details are shown only for the United States' operations.

The total actual combat grades, 100 Octane and/or Grade 130, blended in the United States from January 1, 1942 through September 1945 was approximately 347,000,000 barrels. Foreign blending of these fuels for the same period was 56,000,000 barrels. In addition to the combat grades of aviation gasoline blended, certain components have been shipped offshore as such or blended to make available greater quantities of the lower quality aviation fuels. These items total approximately 14,000,000 barrels for the period. The sum, therefore, of the high quality


DECLASSIFIED
Authority NND730014

80357

aviation gasoline available during the period totaled 417,000,000 barrels world-wide.

Approximately 76,000,000 barrels of Grade 91/96, primarily utilized in this country for training, was produced from January 1942 through July 1945. Grade 87 and lower quality fuels were also produced in such quantity as was required by the Military; however, since the supply of the fuels was never so critical as for those mentioned above, summary of the data regarding them has not been included.

IC - DETAILED REPORT

The data available from the tables and charts included herein are essentially self-explanatory to those already conversant with the Aviation Gasoline Program; however, some discussion of each is warranted because of the volume of information which has been summarized.

The charts, numbered I through IV, which are probably of the greatest interest to the casual reviewer, are presented in order as Appendix I immediately following the Detailed Report. Tables I through V are to be found in Appendix II following the charts. Appendix III has been included to permit understanding of the methods used to calculate, and credit to the source of manufacture, the equivalent production of high quality aviation components regardless of whether or not they were blended at the point of manufacture, diverted to other grades, or shipped to other blenders, or shipped as such offshore. The discussion of the charts and tables is given below.

1.      CHART I - ACTUAL PRODUCTION RATE OF 100 OCTANE GASOLINE -
                 JANUARY 1942-JULY 1945 INCLUSIVE.

This chart is an extension of one that has appeared in certain previous WPB Reports and other reports prepared by PAW to indicate the monthly World-Wide rate of production of 100 Octane Number Fuel (includes Grades 100, 100/130, 98/130,

2


DECLASSIFIED
Authority NND730014

80357

99/130 regardless of tetraethyl lead content) for the period of World War II. The increments of the chart indicate the breakdown of the production into the specific items which contributed to the increase in the rate of production, starting with the capacity to produce Grade 100 with 3.0 cc TEL January 1, 1942. It should be understood the effect of the increase in TEL from 3.0 to 4.0 applies to all production from January 1, 1942 forward, and if at any time the lead content had been reduced from 4.0 to 3.0 cc there would have been a marked decrease in the width of all increments and in the total production.

The major programs and their effect on the production of Grade 100 or higher aviation gasoline are readily apparent from Chart I. The production rate is observed to have increased approximately 10-fold with the major portion of the increase being caused by the successful operation of new facilities completed as a part of the War Program. A substantial portion of the increase, however, is noted to be attributable to the various conversions, bottleneck removal, cumene, codimer and like projects. It is worthy of note that the increase from such items continued to the end of the program, with the exception of the cases in which certain steps were knowingly taken to reduce the contribution to effect other gains. Such an instance was the diversion of codimer to alkylation instead of hydrogenation which caused an indicated decrease in the codimer contribution but was responsible for a greater increase in the production from new facilities.

2.          CHART II – GRADE 130 AVIATION GASOLINE –

1942-1943-1944-1945 PRODUCTION BREAKDOWN.

The data accumulated for Chart I was utilized to indicate in Chart II the same breakdown of factors contributing to production on a yearly basis. In this instance the item referred to as "Pre-War Facilities" indicates the production rate January 1, 1942 with 4.0 cc TEL. Chart II emphasizes again the major contribution

DECLASSIFIED
Authority NND7300l4

80357

of New Facilities, which was insignificant in 1942 and well over 50 per cent in the first eight months of 1945. For the entire period of World War II, New Facilities contributed 41.4 per cent of the production.

The total accumulated production indicated on Chart II is 411,000,000 barrels which is 6,000,000 barrels less than the figure given in the summary above. This discrepancy is caused by the fact that accurate data on inventories of components for Grade 100 blending January 1, 1942 were not available and the factors used (See Appendix III) for evaluating the various components were slightly low for the years of 1942 and 1943.

In table form, and in order of decreasing importance to the Aviation Gasoline Program, the data in Chart II are as follows:

| FACTORS CONTRIBUTING TO THE ACCUMULATED 100 OCTANE (GRADE 130) PRODUCTION FOR WORLD WAR II JANUARY 1942-AUGUST 1945, INCL. | PER CENT OF TOTAL |
|---|---|
| New Facilities | 41.4 |
| Pre-War Facilities | 18.3 |
| Foreign Facilities | 13.7 |
| Cumene | 6.1 |
| Miscellaneous | 5.8 |
| Increased TEL, 4.0 - 4.6 cc | 4.2 |
| Converted Catalytic Units | 4.0 |
| Codimer | 2.9 |
| Ordnance & Rubber Programs | 2.5 |
| C-S | 1.1 |
| | 100.0 |

It should be noted that the Foreign increment also includes the effect of changes in TEL content, new facilities, etc. Data are not available to break down these items.


DECLASSIFIED
Authority NND730014

4

80357

3.      CHART III - HIGH QUALITY AVIATION GASOLINE -

RELATIONSHIP BETWEEN PRODUCTION AND BLENDING -

JANUARY 1942 - AUGUST 1945 INCLUSIVE.

Chart III has been prepared to indicate the relationship of production as
calculated by the factor methods used by PAW (discussed in Appendix III) and the
actual blended volume of 100 octane fuel for the stated period. It is readily
seen that by far the greater portion of the components produced when calculated
on their equivalent basis, did, as would be anticipated, show up as blended fuel.
The comments made previously regarding inventory changes and low factors for a
period during the early part of the war apply to Chart III also and are noted
thereon.

4.      CHART IV - PRODUCTION OF 100 OCTANE AVIATION GASOLINE -

UNITED STATES & FOREIGN BY YEARS.

This chart indicates the 100 octane number fuel production from the time
fuel of this quality or better was first available in commercial quantities in
1935. Two divisions of the data are made, one for the U. S. and the other for
all Foreign production. For this period, the available data indicate U. S.
production has been six times that of the rest of the Allied Nations, excluding
Russia.

5.      TABLE I - U.S.A. ACTUAL HIGH OCTANE AVIATION GASOLINE BLENDED.

Table I indicates the detailed data on the blending of all aviation gasoline,
Grade 100 and higher, from 1935 through September 1945. The actual blending
identified by plants is indicated with a breakdown, as far as it was possible, of
the various Grade 100 or Grade 130 fuels produced under the altered specifica-
tions which were applied from time to time. The reasons for the specification



80357

changes permitting various amounts of TEL to be used and, for a period of time, the blending of Grade 130 fuel to lean mixture octane ratings of below 100, either with or without C-S, is not within the scope of this report.  It was believed advisable, however, to indicate the quantities and sources of the various "100 Octane" fuels.  Those fuels blended to 98 or 99/130 instead of 100/130 are shown in greater detail by plants in Tables Ia and Ib.

6.    TABLE II - ALLIED NATIONS EQUIVALENT PRODUCTION OF 100 OCTANE

AVIATION GASOLINE - JANUARY 1942 THROUGH AUGUST 1945.

The data in Table II are simply a recapitulation of the information that has previously appeared in the regular reports to the WPB, brought up to date since the July 10, 1945 Report.  The equivalent 100 octane production by plants is shown in detail from the period of first production.  These data were first established by utilizing the actual production available from the companies on component production and properly evaluating them by factors as discussed in Appendix III.

The charts (I, II, IV) previously discussed illustrate the pertinent data of Table II.

7.        TABLE III - RELATION BETWEEN EQUIVALENT PRODUCTION

AND ACTUAL BLENDING (U.S. ONLY).

Table III indicates by months the data which, in accumulated total, is presented in Chart III.

9.    TABLE IV - U. S. ACTUAL PRODUCTION OF 91 OCTANE GASOLINE -

JANUARY 1942 THROUGH JULY 1945.

The data in Table V are a recapitulation of that previously made available in the WPB Reports on Grade 91/96 and are included for completeness.

6

DECLASSIFIED
Authority NND730014

80357

## I-D  CONCLUSION

No attempt has been made to outline in this discussion the various phases through which the Aviation Gasoline Program has passed, or to give any historic record of events.  These things are adequately done in the History of the Refining Division and in various other previous publications.  The intent of this paper is to provide, under one cover, the statistical information on high quality aviation blending and production which might be of value to various groups requiring it.

********



CPB:ew
9/17/45

7

80357

## APPENDIX I

### CHARTS

CHART I – ACTUAL PRODUCTION RATE OF 100 OCTANE NUMBER GASOLINE – JANUARY 1942 – JULY 1945, INCLUSIVE

CHART II – GRADE 130 AVIATION GASOLINE – 1942 – 1943 – 1944 – 1945

CHART III – HIGH QUALITY AVIATION GASOLINE – RELATIONSHIP BETWEEN PRODUCTION AND BLENDING

CHART IV – PRODUCTION OF 100 OCTANE AVIATION GASOLINE UNITED STATES & FOREIGN



DECLASSIFIED
Authority NND 730014



DECLASSIFIED
Authority NND730014

DECLASSIFIED
Authority NND730014

# CHART II
# GRADE 130 AVIATION GASOLINE
## 1942 — 1943 — 1944 — 1945*
### PRODUCTION BREAKDOWN

RESTRICTED

37,000,000† BARRELS     76,000,000 BARRELS     164,000,000 BARRELS     134,000,000 BARRELS

   

1942      1943      1944      1945*

## 411,000,000 BARRELS



Foreign   Pre-war Facilities   Miscellaneous   Ordnance & Rubber   C-S   Cumene   Codimer   Converted Catalytic Units   TEL   New Facilities

13.7%   18.3%   5.8%   2.5%   1.1%   6.1%   2.9%   4.0%   4.2%   41.4%

### 1942—1943—1944—1945*

* January through August only.
† 100 Octane Number, not Grade 130.
♣ 4.0 — 4.6 cc TEL

Prepared By:
"REFINING GRAPHICS" — REFINING DIVISION
PETROLEUM ADMINISTRATION FOR WAR

SEPTEMBER 10, 1945

# CHART III
# HIGH QUALITY AVIATION GASOLINE
## RELATIONSHIP BETWEEN PRODUCTION AND BLENDING
### UNITED STATES
### JANUARY 1942 TO AUGUST 1945 INCLUSIVE



OFFSHORE
3.76%

TO LOWER GRADES
0.37%

BLENDED TO COMBAT GRADES
95.88%

Combat Grade Blended................................347,000,000 Barrels
Equivalent Grade 130 Offshore.......................13,000,000   "
Equivalent Grade 130 to lower Grade................1,000,000   "

　　　Total Production....................................361,000,000 Barrels*

* Not adjusted for reduction of Inventories,
　Corrected figure is 354,000,000 Barrels.

SEPTEMBER 10, 1945

RESTRICTED

Prepared By:
"REFINING GRAPHICS" – REFINING DIVISION
PETROLEUM ADMINISTRATION FOR WAR

DECLASSIFIED
Authority NND730014

## CHART IV
# PRODUCTION OF IOO OCTANE AVIATION GASOLINE
## UNITED STATES AND FOREIGN
### BY YEARS

DECLASSIFIED
Authority NND730017

**UNITED STATES**

**37.7,000,000 BARRELS**

**FOREIGN**

**62,000,000 BARRELS**



1935-1939  1940  1941  1942  1943  1944  1945

---

**UNITED STATES PRODUCTION HAS BEEN
6 TIMES THAT OF FOREIGN PRODUCTION**

   ⚓ Total Equivalent Production—1935 through August 1945

   † Estimated

   ✲ January through August only.

SEPTEMBER 10, 1945

RESTRICTED

Prepared By:
"REFINING GRAPHICS" — REFINING DIVISION
PETROLEUM ADMINISTRATION FOR WAR

80357

## APPENDIX II

### TABLES

TABLE I - U.S.A. ACTUAL HIGH OCTANE AVIATION GASOLINE BLENDED

TABLE II - ALLIED NATIONS EQUIVALENT PRODUCTION OF 100 OCTANE AVIATION GASOLINE -
JANUARY 1942 THROUGH AUGUST 1945

TABLE III - RELATION BETWEEN EQUIVALENT PRODUCTION AND ACTUAL BLENDING
(U.S. ONLY)

TABLE IV - U. S. ACTUAL PRODUCTION OF 91 OCTANE GASOLINE - JANUARY 1942 THROUGH
JULY 1945



DECLASSIFIED
Authority NND730014

DECLASSIFIED
Authority NND730014

# RESTRICTED

TABLE I
U.S.A. ACTUAL HIGH OCTANE AVIATION GASOLINE BLENDED
100/130, 99/130, 98/130 & Special Blends of High Quality Fuels
1935 through August 1945
M BARRELS.

DISTRICT I
Atlantic, Point Breeze, Pa.
Pennzoil, Oil City, Pa.
Socony-Vacuum, Buffalo, N.Y.
Socony-Vacuum, Paulsboro, N.J.
Standard New Jersey, Baltimore, Md.
Standard New Jersey, Bayonne, N.J.
Sun Oil Co., Marcus Hook, Pa.
Tidewater, Bayonne, N.J.

DISTRICT II
Ashland, Catlettsburg, Ky.
Associated, Duncan, Okla.
Continental, Ponca City, Okla.
Cooperative, Coffeyville, Kansas
Phillips, Kansas City, Kansas
Phillips, Okla. City, Okla.
Shell, Wood River, Ill.
Sinclair, E. Chicago, Ind.
Socony-Vacuum, E. St. Louis, Ill.
Socony-Vacuum, Trenton, Mich.
Sharpel (Indiana), Whiting, Ind.
Standard (Indiana), Wood River, Ill.
Standard (Ohio), Toledo, Ohio.

DISTRICT III
Aberdeen, Sweeny, Texas
Atlantic, Atreco, Texas
Cities Service, Lake Charles, La.
Cities Service, St. Mary, La.
Crown Central, Houston, Texas
Eastern States, Houston, Texas
Grand Saddhorn, C. Christi, Texas
Gulf, Port Arthur, Texas
Humble, Baytown, Texas
Magnolia, Beaumont, Texas
Pan American, Texas City, Texas
Phillips, Borger, Texas
Pure, Nederland, Texas
Republic, Texas City, Texas
Root, El Dorado, Texas
Shell, Houston, Texas
Sinclair, Corpus Christi, Texas
Sinclair, Houston, Texas
Southport, Texas City, Texas
Standard New Jersey, Baton Rouge, La.
Texas, Port Arthur, Texas

DISTRICT IV
Frontier, Cheyenne, Wyo.
Sinclair, Sinclair, Wyo.
Utah, Salt Lake City, Utah

DISTRICT V
General Petroleum, Torrance Calif.
Mohawk, Bakersfield, Calif.
Richfield, Watson, Calif.
Shell, Martinez, Calif.
Shell, Wilmington, Calif.
Standard of Calif., El Segundo, Cal.
Standard of Calif., Richmond, Cal.
Texas, Wilmington, Calif.
Tidewater, Avon, Calif.
Union, Wilmington, Calif.
Wilshire, Norwalk, Calif.

Total 1000's Barrels
100 Octane 3cc TEL
100/130
120/130
100/130
Sub Total 100/130

99/130 0-2 6.0cc TEL
99/130 0-4 4.0cc TEL
99/130 0-2 6.0cc TEL
99/130 0-4 4.0cc TEL
99/130 0-2 6.0cc TEL
Sub Total 99/130

99/130 0-2 4.0cc TEL
99/130 0-4 4.0cc TEL
99/130 0-2 6.0cc TEL
Sub Total 99/130

113/145 (Total)

TOTAL, ALL HIGH QUALITY FUELS
TOTAL, 1000's BBLS/DAY

Containing 4.0cc TEL/Gal: (a) 34; (b) 90; (c) 108; (d) 163; (e) 148; (f) 49; (g) 149
(h) Containing 6.0cc TEL/Gal.
113/145 Production: (k) 46; (p) 32; (q) 74; (m) 16 (s) 75; (r) 49; (n) 108; (t) 132

° Estimated
°° Includes 3,000 Bbls. estimated for September 1945
     that has not been distributed to manufacturer.
°°° Data years 1935-1941 inclusive, not added to total.
°°°° Grade 100 until January 1943

**RESTRICTED**

TABLE I$_a$

Actual Aviation Gasoline Blended

GRADE 98/130

(AN-F-27 and AN-F-27, Amendment 1)

80357

| ccTEL/Gal. | 4.0 | | | | | 4.6 | | | | | | | | | | | | Total 1943-1944 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Aug. | Sept. | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. | Oct. | Nov. | Dec. | |
| **With C-S:** | | | | | | | | | | | | | | | | | | |
| Atlantic, Pt. Breeze, Pa. | - | - | 56 | 112 | 79 | 161 | 163 | 160 | 89 | 145 | 170 | 273 | 258[a] | 312[b] | 202 | - | - | 2180 |
| Shell, Houston, Texas | 147 | 196 | 314 | 325 | 229 | 322 | 447 | 557 | 483[c] | 470 | 608 | 561 | 506[d] | 508[e] | 603 | - | - | 6276 |
| Shell, Martinez, Calif. | - | - | - | - | - | 88 | 90 | 92 | 112 | 91 | 99 | 163 | 104 | 106 | 60 | 75 | - | 1184 |
| Sinclair, Houston, Texas | - | - | - | 27 | 77 | - | - | - | - | 260 | 195 | 215 | 269[a] | 308 | 180 | - | - | 1427 |
| Union, Wilmington | - | - | - | - | 88 | 72 | 76 | 88 | 56 | - | - | - | - | - | - | - | - | 380 |
| | | | | | | | | | | | | | | | | | | |
| Total 4.0 cc TEL | 147 | 196 | 370 | 464 | 473 | - | - | - | - | - | - | - | - | - | - | - | - | 1650 |
| Total 4.6 cc TEL | - | - | - | - | - | 643 | 776 | 897 | 740 | 966 | 1072 | 1212 | 304 | 766 | 1045 | 75 | - | 8496 |
| Total 6.0 cc TEL | - | - | - | - | - | - | - | - | - | - | - | - | 833 | 468 | - | - | - | 1301 |
| Total | 147 | 196 | 370 | 464 | 473 | 643 | 776 | 897 | 740 | 966 | 1072 | 1212 | 1137 | 1234 | 1045 | 75 | | 11447 |
| **Without C-S:** | | | | | | | | | | | | | | | | | | |
| Mohawk, Bakersfield, Calif. | - | - | - | - | - | - | 13 | 22 | 44 | 43 | 29 | 53 | 56 | 43[f] | - | - | - | 303 |
| Phillips, Borger, Texas | - | - | - | - | - | - | 399 | 374 | 310 | 410 | 379 | 371 | 478[a] | 430[f] | 428 | - | - | 3579 |
| Phillips, Kansas City, Kan. | - | - | - | - | - | - | 112 | 121 | 150 | 126 | 124 | 108 | 115[a] | 121[g] | 87 | - | - | 1064 |
| Phillips, Oklahoma City, Okla. | - | - | - | - | - | 9 | 28 | 40 | 29 | 30 | 21 | 13 | 26 | 33 | 28 | - | - | 257 |
| Wilshire, Norwalk, Calif. | - | - | - | - | - | - | - | 103 | 77 | 95 | 122 | 173 | 158 | 158 | 93 | - | - | 979 |
| | | | | | | | | | | | | | | | | | | |
| Total with 4.6 cc TEL | | | | | | 9 | 552 | 660 | 610 | 704 | 675 | 718 | 240 | 485 | 636 | - | - | 5289 |
| Total with 6.0 cc TEL | | | | | | - | - | - | - | - | - | - | 593 | 300 | - | - | - | 893 |
| Total | | | | | | 9 | 552 | 660 | 610 | 704 | 675 | 718 | 833 | 785 | 636 | | | 6182 |

NOTES:  (a) With 6.0 cc TEL/Gal; (b)  106 M bbls. contained 6.0 cc TEL/Gal.
(c) Also reblended 22 M bbls. of AN-F-28 to Specification AN-F-27; (d)  306 contained 6.0 cc TEL/Gal; (e) contained 6 cc TEL/Gal.
(f)  250 M bbls with 6 cc TEL/Gal.; (g)  50 M bbls. with 6 cc TEL/Gal.


DECLASSIFIED
Authority NND730014

## TABLE I_b

### ACTUAL AVIATION GASOLINE BLENDED

**RESTRICTED**

GRADE 99/130

(AN-F-27a, 4.6cc TEL/Gal. except as noted)

80357

| | 1944 | | | Total |
|---|---|---|---|---|
| | Aug. | Sept. | Oct. | |
| | 1000's Barrels / Month | | | |
| **With C-S** | | | | |
| Gulf, Port Arthur, Tex. | 76 | 376 | 530 | |
| Humble, Baytown, Tex. | – | 1075 | 993 | |
| Magnolia, Beaumont, Tex. | 584 | 560 | – | |
| Standard Louisiana, Baton Rouge, La. | – | – | 596 | |
| Sun, Marcus Hook, Pa. | 100 | 777 | 1179 | |
| Texas, Port Arthur, Tex. | 162 | 732 | 599 | |
| Total with C-S 4.6cc TEL/Gal. | 922 | 3520 | 3897 | 8339 |
| **Without C-S** | | | | |
| Abercrombie, Sweeny, Tex. | – | 191 | 208 | |
| Associated, Duncan, Okla. | 98 | 121 | 21 | |
| Cities Service, Lake Charles, La. | 414 | 488 | 592 | |
| Continental, Ponca City, Okla. | 136 | 154 | 63 | |
| Cooperative, Coffeyville, Kansas | 43 | 54 | 32 | |
| Eastern States, Houston, Tex. | 99 | – | – | |
| Frontier, Cheyenne, Wyo. | – | 44 | 23 | |
| Great Southern, Corpus Christi, Tex. | 216(a) | 142(a) | – | |
| Pure, Nederland, Tex. | 53 | 83 | 96 | |
| Republic, Texas City, Tex. | 57 | – | – | |
| Root, El Dorado, Ark. | 58 | 69 | 61 | |
| Sinclair, Corpus Christi, Tex. | – | 191(a) | – | |
| Socony-Vacuum, E. St. Louis, Ill. | 240 | 134 | 107 | |
| Socony-Vacuum, Paulsboro, N. J. | – | 167 | 218 | |
| Standard (Ohio), Toledo, Ohio | 67 | 107 | – | |
| Standard (Ind.), Whiting, Ind. | – | 312 | 446 | |
| Standard (Ind.), Wood River, Ill. | 107 | 91 | 179 | |
| Sub Total without C-S 4.6cc TEL/Gal. | 1372 | 2015 | 2046 | 5433 |
| Sub Total without C-S 6.0cc TEL/Gal. | 216 | 333 | – | 549 |
| Total without C-S | 1588 | 2348 | 2046 | 5982 |

**Notes:**

(a) With 6.0cc TEL/Gal.



DECLASSIFIED
Authority NND730014

RESTRICTED

DECLASSIFIED
Authority NND730014

TABLE II

ALLIED NATIONS EQUIVALENT PRODUCTION OF 100 OCTANE AVIATION GASOLINE
1942 AND 1943

(Barrels/Day)

| UNITED STATES | 1942 | | | | | | | | | | | | Total 1942 Barrels | 1943 | | | | | | | | | | | | Total 1943 Barrels |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | January | February | March | April | May | June | July | August | September | October | November | December | | January | February | March | April | May | June | July | August | September | October | November | December | |
| **DISTRICT I** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Atlantic, Point Breeze, Pa. | - | - | - | - | - | - | - | - | - | - | - | - | | 4,160 | 5,360 | 5,030 | 4,630 | 4,680 | 6,770 | 6,480 | 5,870 | 5,730 | 5,360 | 4,170 | 2,870 | |
| Socony - Vacuum, Paulsboro, N. J. | 1,900 | 3,700 | 5,200 | 4,300 | 4,600 | 4,400 | 4,100 | 3,800 | 3,950 | 7,550 | 10,130 | 6,420 | | 1,610 | 1,500 | 2,100 | 2,300 | 2,520 | 1,600 | 1,480 | 2,740 | 1,870 | 1,820 | 2,730 | 1,560 | |
| Socony - Vacuum, Brooklyn, N. Y. | - | - | - | - | - | - | - | - | - | - | - | - | | - | - | - | - | - | - | - | - | 700 | 700 | 260 | 700 | |
| Std. N. J. - Baltimore, Md. | - | - | - | - | - | - | - | - | - | - | 250 | 2,900 | | 840 | 2,640 | 3,550 | 1,400 | 2,320 | 2,270 | 2,940 | 3,710 | 2,970 | 4,230 | 5,770 | 4,290 | |
| Std. N. J. - Bayonne, N. J. | - | - | - | - | - | - | - | - | - | - | - | - | | - | 2,110 | 1,190 | 400 | 970 | 870 | 1,840 | - | 3,430 | 2,200 | 2,600 | 3,020 | |
| Sun - Marcus Hook, Pa. | - | - | 5,600 | 5,500 | 5,700 | 7,600 | 6,300 | 8,200 | 8,600 | 8,070 | 8,770 | 12,480 | | 5,390 | 5,360 | 3,230 | 7,100 | 5,360 | 4,370 | 4,230 | 8,060 | 10,870 | 10,060 | 12,770 | 12,840 | |
| Tide Water - Bayonne, N. J. | - | - | - | - | - | - | - | - | - | - | - | - | | - | - | - | - | - | - | - | - | 700 | 710 | 510 | 1,000 | |
| **Total District I** | 1,900 | 3,700 | 10,800 | 9,800 | 10,300 | 12,000 | 10,400 | 12,000 | 12,550 | 15,620 | 19,150 | 21,800 | | 12,000 | 16,970 | 15,100 | 15,830 | 15,850 | 15,680 | 16,970 | 20,380 | 26,270 | 22,980 | 26,810 | 26,090 | |
| **DISTRICT II** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Ashland - Catlettsburg, Ky. | - | - | - | - | - | - | - | - | - | - | - | - | | 580 | 640 | 550 | 400 | 450 | 230 | 320 | 420 | 650 | 290 | 330 | 420 | |
| Cities Service - E. Chicago, Ind. | - | - | - | - | - | - | - | - | - | - | - | - | | - | - | - | - | - | 1,600 | 1,840 | 1,970 | 2,170 | 2,390 | 2,650 | 2,320 | |
| Continental - Ponca City, Okla. | - | - | - | - | - | - | - | - | - | - | - | - | | - | - | - | - | - | - | - | - | - | - | 870 | 1,290 | |
| Globe - Lemont, Ill. | - | - | - | - | - | - | - | - | - | - | - | - | | 900 | 1,680 | 1,360 | 970 | 1,610 | 1,170 | 1,260 | 770 | 2,070 | 1,100 | 1,300 | 1,260 | |
| Mid Continent - Tulsa, Okla. | - | - | - | - | - | - | - | - | - | - | - | - | | 580 | 890 | 1,740 | 1,870 | 1,610 | 2,530 | 2,000 | 2,160 | 2,770 | 1,450 | 1,030 | 1,060 | |
| Ohio - Robinson, Ill. | - | - | - | - | - | - | - | - | - | - | - | - | | 520 | 1,070 | 680 | 530 | 450 | 930 | 970 | 970 | 800 | 520 | 470 | 550 | |
| Phillips - Kansas City, Kans. | - | - | - | - | - | - | - | - | - | - | - | - | | - | - | - | - | 710 | 130 | 970 | 840 | 1,170 | 2,130 | 1,630 | 2,970 | |
| Phillips - Okla. City, Okla. | 800 | 1,400 | 1,400 | 1,100 | 1,200 | 2,500 | 1,200 | 1,000 | 1,200 | 1,200 | 1,700 | 1,870 | | 640 | 540 | 840 | 570 | - | 800 | 740 | 480 | 230 | 550 | 370 | 320 | |
| Shell - Wood River, Ill. | 2,700 | 3,200 | 3,300 | 3,400 | 3,700 | 4,400 | 4,600 | 4,500 | 5,710 | 6,350 | 5,610 | 6,390 | | 6,610 | 7,250 | 5,740 | 5,900 | 6,520 | 6,630 | 7,100 | 8,960 | 8,870 | 8,460 | 8,900 | 8,640 | |
| Sinclair - E. Chicago, Ind. | - | - | - | - | - | - | - | - | - | - | - | - | | 740 | 960 | 770 | 800 | 710 | 580 | 900 | - | 950 | 870 | 1,070 | 1,350 | |
| Skelly - El Dorado, Kansas | - | - | - | - | - | - | - | - | - | - | - | - | | 480 | 450 | 480 | 570 | 550 | 130 | 640 | 420 | 530 | 230 | 900 | 290 | |
| Socony - Vacuum - E. St. Louis, Ill. & Augusta, Kansas | - | - | - | - | - | - | - | - | - | - | - | - | | 640 | 1,250 | 680 | 1,100 | 1,320 | 200 | 1,100 | 450 | 200 | 1,480 | 2,700 | 770 | |
| Socony-Vacuum - Trenton, Michigan | - | - | - | - | - | - | - | - | 640 | 1,700 | 1,700 | 2,230 | | 360 | 640 | 680 | 570 | 230 | 1,000 | 550 | 770 | 130 | 770 | 730 | 520 | |
| Socony-Vacuum - E. Chicago, Ind. | - | - | - | - | - | - | - | - | - | - | - | - | | 1,130 | 1,570 | 480 | 830 | 1,260 | 1,150 | 1,030 | 1,260 | 1,930 | 1,610 | 470 | 740 | |
| Std. Ind. - Whiting, Ind. | 700 | 500 | - | - | - | - | 500 | 500 | 110 | - | - | - | | 1,550 | 1,570 | 1,610 | 1,670 | 1,440 | 1,370 | 1,770 | 290 | 1,500 | 1,740 | 1,970 | 2,900 | |
| Std. Ohio - Toledo, Ohio | 200 | 400 | 900 | 900 | 700 | 900 | 600 | 300 | 540 | 480 | 480 | 840 | | 1,970 | 500 | 1,840 | 2,930 | 2,120 | 1,570 | 2,550 | 2,100 | 5,570 | 1,710 | 1,230 | 2,190 | |
| Texas - Lockport, Ill. | - | - | - | - | - | - | - | - | - | - | - | - | | - | - | - | 1,400 | 1,680 | 2,400 | 1,900 | 2,260 | 1,770 | 2,130 | 3,100 | 2,890 | |
| **Total District II** | 4,400 | 5,500 | 5,600 | 5,400 | 5,600 | 7,800 | 6,900 | 6,300 | 8,200 | 9,730 | 9,490 | 11,330 | | 16,900 | 19,020 | 17,450 | 20,110 | 21,000 | 22,050 | 25,710 | 25,030 | 31,570 | 27,650 | 28,700 | 29,880 | |
| **DISTRICT III** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Abercrombie - Sweeny, Texas | - | - | - | - | - | - | - | - | - | - | - | - | | 1,190 | 2,860 | 2,840 | 1,270 | 2,770 | 3,200 | 1,640 | 480 | 1,270 | 1,580 | 1,370 | 220 | |
| Atlantic - Atreco, Texas | - | - | - | - | - | - | - | - | - | - | - | - | | - | - | - | - | - | - | 2,940 | - | - | - | 130 | 740 | |
| Atlas - Shreveport, La. | - | - | - | - | - | - | - | - | - | - | - | - | | - | - | - | - | - | - | - | - | - | - | - | - | |
| Cities Service - St. Rose, La. | - | 2,000 | 1,600 | 2,100 | 2,000 | 1,400 | 2,100 | 2,500 | - | - | - | - | | 740 | 930 | 1,000 | 1,270 | 1,060 | 1,000 | 1,000 | 1,160 | 1,530 | 1,130 | 1,830 | 2,060 | |
| Continental - Lake Charles, La. | - | - | - | - | - | - | - | - | - | - | - | - | | - | - | - | 200 | 130 | 200 | 130 | 160 | 270 | - | - | - | |
| Continental - Wichita Falls, Tex. | - | - | - | - | - | - | - | - | - | - | - | - | | - | - | - | - | - | - | - | - | - | - | - | - | |
| Gulf - Port Arthur, Texas | 2,700 | 2,100 | - | 1,400 | 400 | 600 | - | - | 240 | 100 | 670 | 580 | | 3,970 | 2,860 | 3,840 | 4,000 | 7,030 | 6,870 | 6,520 | 7,230 | 6,770 | 8,580 | 8,190 | 8,710 | |
| Humble - Baytown, Texas | 6,800 | 7,900 | 9,300 | 6,300 | 8,500 | 7,700 | 8,800 | 10,800 | 10,640 | 14,200 | 14,890 | 17,520 | | 15,610 | 17,790 | 18,360 | 20,600 | 21,840 | 20,270 | 17,680 | 20,030 | 20,870 | 23,940 | 24,280 | 26,720 | |
| Magnolia - Beaumont, Texas | 3,200 | 1,900 | 500 | 1,700 | 1,400 | 2,400 | 1,700 | 1,600 | 1,070 | 4,950 | 7,040 | 4,840 | | 6,900 | 7,000 | 7,450 | 10,130 | 6,360 | 9,270 | 9,260 | 13,160 | 13,230 | 16,230 | 14,930 | 16,100 | |
| Pan American - Texas City, Tex. | - | - | - | - | - | - | - | - | - | - | - | - | | - | - | - | - | - | 1,430 | 610 | 1,350 | 500 | 1,360 | 1,150 | 1,520 | |
| Phillips - Borger, Texas | 3,500 | 2,600 | 3,200 | 2,100 | 2,900 | 3,000 | 3,200 | 1,800 | 2,840 | 2,040 | 3,510 | 3,740 | | 9,260 | 8,570 | 8,000 | 8,730 | 6,840 | 9,430 | 10,250 | 10,320 | 10,130 | 11,610 | 12,000 | 11,610 | |
| Pure - Nederland, Texas | - | - | - | - | - | - | - | - | - | - | - | - | | - | - | - | - | - | - | - | - | - | - | - | 260 | |
| Shamrock - Sunray, Texas | - | - | - | - | - | - | - | - | - | - | - | - | | 2,420 | 2,070 | 2,680 | 2,680 | 2,580 | 2,890 | 2,290 | 3,680 | 2,970 | 2,600 | 2,230 | 1,130 | |
| Shell, Houston, Texas & Norco, La. | 6,400 | 6,700 | 5,500 | 5,300 | 5,100 | 6,200 | 8,000 | 7,500 | 8,000 | 11,500 | 12,410 | 12,190 | | 7,710 | 7,750 | 7,740 | 7,500 | 6,030 | 7,570 | 7,900 | 7,900 | 7,670 | 8,640 | 9,200 | 7,450 | |
| Sinclair - Houston, Texas | - | - | - | - | - | - | - | - | - | - | - | - | | - | - | - | - | - | 3,300 | 5,260 | 4,390 | 2,700 | 4,420 | 4,400 | 4,970 | |
| Std. La. - Baton Rouge, La. | 7,400 | 7,800 | 6,100 | 7,100 | 6,000 | 7,700 | 5,200 | 8,200 | 11,970 | 16,500 | 15,690 | 17,680 | | 16,360 | 18,360 | 17,740 | 27,170 | 24,420 | 23,470 | 22,900 | 28,420 | 28,300 | 29,240 | 28,090 | 18,250 | |
| Texas - Port Arthur, Texas | 3,800 | 5,000 | 4,000 | 5,200 | 3,100 | 5,200 | 5,500 | 5,100 | 4,100 | 3,190 | 750 | 3,770 | | 5,130 | 5,180 | 5,360 | 7,050 | 8,550 | 10,000 | 10,970 | 11,610 | 8,170 | 10,180 | 9,640 | 8,680 | |
| **Total District III** | 33,500 | 36,000 | 30,500 | 31,500 | 29,400 | 34,200 | 34,400 | 37,500 | 38,900 | 52,440 | 54,900 | 60,320 | | 69,890 | 73,370 | 75,040 | 90,580 | 89,350 | 98,610 | 96,390 | 112,870 | 104,380 | 116,200 | 110,780 | 108,690 | |
| **DISTRICT V** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| General Petroleum - Torrance, Calif. | - | - | - | - | - | - | - | - | - | - | - | - | | 60 | 130 | 60 | 130 | 480 | 270 | - | - | - | - | - | - | |
| Richfield - Watson, Calif. | 1,600 | 2,000 | 2,200 | 2,100 | 2,300 | 2,100 | 900 | 2,900 | 2,620 | 2,750 | 2,890 | 3,230 | | 2,550 | 4,110 | 5,610 | 5,830 | 4,840 | 6,200 | 6,100 | 7,000 | 6,130 | 6,460 | 6,350 | 7,970 | |
| Shell - Martinez, Calif. | 900 | 1,000 | 1,100 | 1,100 | 1,200 | 1,300 | 1,300 | 1,200 | 1,280 | 1,540 | 1,150 | 1,350 | | 550 | 710 | 870 | 1,170 | 1,030 | 1,100 | 1,290 | 1,480 | 1,400 | 1,680 | 1,400 | 1,550 | |
| Shell - Wilmington, Calif. | 2,900 | 3,100 | 3,100 | 3,000 | 3,500 | 2,800 | 4,000 | 4,000 | 4,780 | 4,200 | 4,990 | 4,670 | | 5,900 | 4,570 | 5,680 | 5,950 | 5,420 | 5,570 | 4,360 | 4,670 | 7,500 | 8,900 | 6,730 | 10,190 | |
| Std. Calif. - El Segundo, Calif. | 1,700 | 3,800 | 3,000 | 4,200 | 4,200 | 4,200 | 4,400 | 4,400 | 5,350 | 5,820 | 6,300 | 6,900 | | 3,100 | 8,000 | 8,320 | 5,100 | 6,130 | 7,470 | 4,460 | 4,970 | 8,630 | 8,710 | 6,470 | 7,060 | |
| Std. Calif. - Richmond, Calif. | 2,800 | 2,500 | 3,000 | 3,600 | 4,300 | 4,200 | 5,800 | 4,100 | 4,520 | 5,030 | 5,640 | 5,940 | | 4,130 | 5,190 | 5,630 | 5,290 | 5,480 | 5,300 | 5,410 | 5,690 | 7,570 | 8,740 | 10,500 | 12,960 | |
| Texas - Wilmington, Calif. | 1,900 | 1,200 | 1,500 | 1,500 | 1,400 | 1,600 | 1,700 | 1,600 | 1,310 | 1,740 | 2,110 | 3,030 | | 1,290 | 1,180 | 1,000 | 1,280 | 1,320 | 1,350 | 1,610 | 1,870 | 1,630 | 2,290 | 2,690 | 1,600 | |
| Tidewater - Avon, Calif. | 2,800 | 3,000 | 2,800 | 2,700 | 2,700 | 2,800 | 2,600 | 2,900 | 1,880 | 4,640 | 4,380 | 4,450 | | 2,680 | 2,840 | 3,360 | 3,200 | 5,740 | 5,400 | 4,160 | 5,840 | 6,030 | 7,900 | 7,900 | 6,480 | |
| Union - Wilmington, Calif. | 700 | 800 | 800 | 900 | 900 | 1,000 | 800 | 900 | 860 | 1,140 | 1,200 | 1,150 | | 610 | 750 | 840 | 1,170 | 740 | 770 | 740 | 680 | 1,000 | 870 | 1,270 | 1,580 | |
| Wilshire - Norwalk, Calif. | - | - | - | - | - | - | - | - | - | - | - | - | | 840 | 1,040 | 580 | 1,170 | 740 | 670 | 1,020 | 1,030 | 1,000 | 670 | 170 | 160 | |
| **Total District V** | 15,400 | 17,400 | 17,400 | 19,100 | 20,500 | 20,000 | 21,700 | 22,000 | 22,650 | 26,860 | 26,660 | 30,900 | | 19,710 | 26,900 | 29,610 | 28,530 | 31,860 | 35,310 | 30,420 | 36,870 | 40,690 | 45,870 | 44,500 | 50,370 | |
| Miscellaneous U. S. A. | - | - | - | - | - | - | - | - | - | - | - | 840 | | 520 | 420 | 640 | 130 | 3,330 | 3,480 | 3,380 | 2,780 | 4,090 | 5,980 | 5,890 | 6,610 | |
| **TOTAL U. S. A.** | 55,200 | 68,600 | 64,300 | 65,800 | 65,800 | 74,000 | 73,400 | 77,800 | 82,260 | 104,650 | 113,040 | 124,350 | 29,336,900 | 118,420 | 136,680 | 157,840 | 155,180 | 161,390 | 175,130 | 172,870 | 197,930 | 207,000 | 218,680 | 216,650 | 253,640 | 64,599,710(b) |
| **Canada** | | | | | | | | | | | | | | - | - | - | - | 600 | 800 | 1,680 | 2,130 | 1,280 | 1,580 | 1,290 | 1,250 | |
| **Caribbean Area** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Asiatic, Curacao, N.W.I. | na | na | na | na | na | na | na | na | na | 1,600 | 1,600 | 1,600 | | 1,650 | 1,690 | 1,740 | 1,930 | 1,810 | 2,090 | 1,900 | 2,040 | 4,150 | 3,460 | 3,450 | 3,560 | |
| Lago, Aruba, N.W.I. | na | na | na | na | na | na | na | na | na | 2,920 | 3,560 | 4,230 | | 1,580 | 4,500 | 3,650 | 4,330 | 4,830 | 4,770 | 4,440 | 8,200 | 7,260 | 7,160 | 8,160 | 10,780 | |
| Trinidad Leaseholds, Trinidad | na | na | na | na | na | na | na | na | na | 2,600 | 2,400 | 3,440 | | 2,090 | 3,500 | 3,650 | 5,910 | 2,700 | 3,260 | 3,340 | 2,950 | 2,850 | 4,600 | 2,840 | 3,490 | |
| **Persian Gulf:** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Anglo-Iranian, Abadan | na | na | na | na | na | na | na | na | na | 9,650 | 8,800 | 7,680 | | 6,600 | 6,600 | 6,600 | 6,600 | 7,500 | 8,330 | 8,320 | 8,870 | 9,770 | 10,930 | 13,130 | 13,680 | |
| Bahrein, Bahrein Island | na | na | na | na | na | na | na | na | na | 7,530 | 7,530 | 7,530 | | 7,530 | 7,530 | 7,530 | 7,530 | 8,300 | 8,300 | 8,500 | 8,300 | 8,560 | 8,560 | 8,950 | 11,340 | |
| United Kingdom | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Total Foreign** | 17,680 | 18,350 | 17,950 | 17,950 | 18,050 | 19,050 | 19,250 | 18,550 | 19,350 | 24,300 | 23,890 | 24,440 | 7,267,820 | 19,450 | 23,930 | 23,170 | 24,300 | 25,140 | 27,350 | 27,990 | 32,950 | 33,570 | 36,090 | 37,810 | 43,660 | 10,817,510(b) |
| **Total Allied Nations** | 72,880 | 80,950 | 82,250 | 83,750 | 83,850 | 93,050 | 92,650 | 96,350 | 101,630 | 128,950 | 136,930 | 148,790 | 36,604,720 | 137,870 | 160,610 | 161,010 | 179,480 | 186,530 | 202,480 | 200,860 | 230,880 | 240,570 | 254,770 | 254,460 | 297,300 | 75,417,220(b) |

RESTRICTED

Declassified
Authority NND730014

**TABLE II** (Continued)  (Secret)  TABLE II

ALLIED NATIONS EQUIVALENT PRODUCTION OF GRADE 130 AVIATION GASOLINE

1944 THRU AUG. 1945
(Barrels/Day)

| UNITED STATES | 1944 | | | | | | | | | | | | | 1945 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | January | February | March | April | May | June | July | August | September | October | November | December | Total 1944 | January | February | March | April | May | June | July | August | Total 1945 | Total 1942, 1943, 1944 and 1945 |
| **DISTRICT I** | | | | | | | | | | | | | | | | | | | | | | | |
| Atlantic – Point Breeze, Pa. | 4,710 | 6,030 | 4,940 | 2,930 | 4,460 | 5,130 | 6,360 | 4,580 | 5,250 | 6,390 | 8,530 | 8,640 | | 4,060 | 6,720 | 7,510 | 7,570 | 6,970 | 7,470 | 6,360 | | |
| Gulf – Philadelphia, Pa. | - | - | - | - | - | - | - | - | - | - | - | - | | 1,030 | 460 | 1,890 | 230 | 100 | 30 | - | | |
| Pennzoil – Oil City, Pa. | - | - | - | - | 130 | 1,170 | 260 | - | - | 420 | 270 | 1,420 | | 1,100 | 1,960 | 2,230 | 400 | 580 | 2,270 | 2,100 | | |
| Socony-Vacuum – Brooklyn, N. Y. | 710 | 690 | 770 | 1,270 | 840 | 900 | 1,160 | - | - | - | - | - | | - | - | - | - | - | - | - | | |
| Socony-Vacuum – Buffalo, N. Y. | 940 | 580 | 710 | 570 | 260 | 950 | 1,160 | 840 | 500 | 660 | 470 | 350 | | 60 | 940 | 710 | 770 | - | 1,250 | - | | |
| Socony-Vacuum – Paulsboro, N. J. | 2,320 | 1,830 | 2,160 | 1,430 | 2,420 | 1,700 | 3,320 | 2,580 | 3,400 | 7,100 | 6,530 | 5,740 | | 6,130 | 5,110 | 6,740 | 8,160 | 5,800 | 6,930 | 4,480 | | |
| Std. N. J. – Baltimore, Md. | 6,160 | 7,070 | 9,460 | 7,870 | 2,450 | 6,470 | 6,870 | 8,640 | 7,000 | 49,810 | 7,130 | 7,130 | | 9,540 | 10,620 | 10,650 | 10,700 | 4,040 | 4,000 | 4,050 | | |
| Std. N. J. – Bayway, N. J. | 3,320 | 2,720 | 3,160 | 850 | 1,950 | 2,970 | 2,320 | 2,000 | 1,950 | 4,140 | 2,200 | 2,770 | | 2,640 | 3,920 | 2,710 | 2,570 | 2,610 | 2,070 | 3,320 | | |
| Sun – Marcus Hook, Pa. | 17,970 | 15,000 | 11,370 | 16,530 | 17,950 | 18,500 | 18,060 | 12,480 | 15,570 | 16,350 | 13,640 | 12,420 | | 17,810 | 22,000 | 24,230 | 23,230 | 24,710 | 22,470 | 19,900 | | |
| Tide Water – Bayonne, N. J. | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | - | - | 190 | - | | - | - | - | - | - | 3,960 | 3,770 | | |
| **Total District I** | 37,330 | 34,720 | 33,680 | 34,830 | 30,450 | 39,070 | 42,710 | 32,090 | 34,680 | 45,100 | 39,370 | 40,770 | | 42,740 | 51,140 | 56,060 | 53,630 | 42,710 | 50,540 | 44,160 | | |
| **DISTRICT II** | | | | | | | | | | | | | | | | | | | | | | | |
| Ashland – Catlettsburg, Ky. | 320 | 410 | 480 | 330 | 160 | 330 | 260 | 2,070 | 3,950 | 2,000 | 3,400 | 4,580 | | 3,940 | 2,820 | 4,710 | 5,500 | 4,550 | 4,740 | 4,060 | | |
| Associated – Duncan, Okla. | - | - | - | - | - | 2,770 | 4,130 | 4,270 | 1,260 | 4,400 | 5,390 | | 5,120 | 5,110 | 4,870 | 1,000 | 4,550 | 6,130 | 6,190 | | | |
| Champlin – Enid, Okla. | - | - | - | 500 | 2,100 | 2,070 | 2,580 | 2,840 | 2,930 | 940 | 3,030 | 3,260 | | 2,970 | 3,960 | 4,000 | 4,030 | 4,230 | 3,170 | 3,160 | | |
| Cities Service – E. Chicago, Ind. | 2,160 | 2,480 | 2,710 | 3,080 | 2,810 | 2,770 | 3,000 | 2,930 | 3,120 | 3,120 | 2,930 | 4,190 | | 4,450 | 4,500 | 4,350 | 4,500 | 4,260 | 4,050 | 3,610 | | |
| Continental – Ponca City, Okla. | 870 | 310 | 840 | 800 | 2,680 | 6,400 | 3,160 | 5,890 | 4,540 | 2,130 | 5,070 | 5,060 | | 6,740 | 6,430 | 6,410 | 5,650 | 3,840 | 6,110 | 7,870 | | |
| Cooperative – Coffeyville, Ill. | - | - | - | - | - | 330 | 870 | 1,680 | 1,470 | 1,060 | 830 | 1,390 | | 1,770 | 1,180 | 1,550 | 1,600 | 970 | 2,070 | 780 | | |
| Globe – Lemont, Ill. | 1,130 | 1,310 | 1,390 | 1,000 | 1,390 | 1,170 | 1,290 | 970 | 1,500 | 1,710 | 1,600 | 1,650 | | 1,890 | 1,690 | 1,230 | 1,170 | 1,480 | 1,600 | 1,130 | | |
| Mid-Continent – Tulsa, Okla. | 1,680 | 1,660 | 810 | 1,450 | 1,710 | 1,100 | 1,650 | 1,450 | 1,430 | 1,060 | 1,570 | 1,980 | | 1,230 | 1,860 | 1,660 | 1,170 | 1,770 | 1,730 | 1,130 | | |
| Ohio – Robinson, Ill. | 550 | 410 | 480 | 550 | 580 | 670 | 480 | 490 | 600 | 590 | 540 | 920 | | 100 | 300 | 320 | 330 | - | - | - | | |
| Phillips – Kansas City, Kans. | 3,250 | 2,030 | 2,190 | 3,450 | 3,450 | 2,850 | 3,290 | 3,520 | 3,100 | 2,900 | 3,800 | 3,490 | | 4,000 | 3,960 | 4,060 | 2,870 | 3,770 | 3,200 | 3,650 | | |
| Phillips – Okla. City, Okla. | 710 | 690 | 610 | 700 | 450 | 970 | 950 | 840 | 900 | 680 | 770 | 940 | | 770 | 750 | 680 | 730 | 710 | 550 | 710 | | |
| Pure – Toledo, Ohio | - | - | - | - | - | 600 | 740 | 740 | 570 | 260 | 130 | 770 | | 300 | 520 | 230 | 260 | 130 | 140 | 160 | | |
| Shell – Wood River, Ill. | 9,870 | 10,188 | 11,640 | 14,500 | 15,090 | 13,570 | 14,740 | 14,500 | 14,590 | 17,640 | 19,360 | 19,590 | | 19,230 | 17,720 | 17,590 | 15,470 | 15,880 | 16,350 | 13,580 | | |
| Sinclair – E. Chicago, Ill. | 1,350 | 1,100 | 1,260 | 970 | 610 | 1,170 | 1,050 | 1,100 | 1,170 | 1,100 | 1,130 | 740 | | 1,130 | 1,180 | 1,890 | 1,170 | 930 | 1,070 | 1,160 | | |
| Skelly – El Dorado, Kansas | 120 | 590 | 650 | 430 | 580 | 530 | 500 | 360 | 870 | 650 | 600 | 810 | | 650 | 790 | 610 | 670 | 730 | 730 | 650 | | |
| Socony-Vacuum – Augusta, Kan. | - | - | - | - | - | - | - | - | - | 1,030 | 570 | 870 | | 810 | 790 | 460 | 1,670 | 1,770 | 1,490 | 810 | | |
| Socony-Vacuum – E. Chicago, Ill. | 1,060 | 1,450 | - | - | - | - | - | - | - | 1,850 | | 1,840 | 1,360 | 1,840 | | 1,770 | 1,600 | 1,530 | | | | |
| Socony-Vacuum – E. St. Louis, Ill. | 840 | 3,100 | 1,540 | 2,540 | 1,760 | 3,970 | 3,770 | 3,580 | 3,500 | 2,420 | 3,500 | 2,770 | | 4,450 | 4,110 | 4,840 | 4,370 | 3,840 | 2,000 | 1,840 | | |
| Socony-Vacuum – Trenton, Mich. | 550 | - | 1,580 | 1,550 | 1,350 | 1,100 | 870 | 810 | 850 | 740 | 1,770 | 940 | | 1,130 | 1,210 | 580 | 970 | 1,390 | 1,730 | 1,190 | | |
| Standard (Ind.) – Whiting, Ind. | 3,250 | 5,140 | 6,450 | 7,950 | 9,580 | 8,000 | 11,290 | 10,970 | 10,130 | 10,550 | 10,540 | 12,990 | | 12,900 | 12,960 | 10,770 | 11,770 | 11,160 | 15,000 | 14,390 | | |
| Standard (Ind.) – Wood River, Ill. | - | - | - | - | 1,810 | 3,530 | 4,230 | 4,130 | 1,700 | 4,610 | 4,770 | 5,550 | | 4,660 | 4,380 | 6,500 | 5,100 | 4,290 | 5,230 | 3,610 | | |
| Standard (Ohio) – Cleveland, Ohio | - | - | - | - | - | - | 2,550 | 2,260 | 2,590 | 1,180 | 1,030 | 2,640 | | 2,040 | 2,790 | 2,810 | 2,650 | 2,280 | - | - | | |
| Standard (Ohio) – Toledo, Ohio | 2,290 | 2,450 | 2,190 | 3,300 | 2,190 | 2,100 | 2,940 | 3,100 | 1,870 | 3,380 | 2,730 | 3,000 | | 2,840 | 3,420 | 3,350 | 2,870 | 2,230 | 2,130 | 1,900 | | |
| Texas – Lockport, Ill. | 4,220 | 4,470 | 4,250 | 4,200 | 3,060 | 2,800 | 2,740 | 2,600 | 3,000 | 1,360 | 3,230 | 3,260 | | 3,260 | 3,460 | 3,320 | 1,750 | 3,770 | 3,600 | 3,610 | | |
| **Total District II** | 34,280 | 38,580 | 37,190 | 47,000 | 51,320 | 55,810 | 65,120 | 68,890 | 68,100 | 63,320 | 75,470 | 86,000 | | 88,970 | 68,600 | 89,160 | 77,140 | 81,360 | 87,750 | 76,710 | | |
| **DISTRICT III** | | | | | | | | | | | | | | | | | | | | | | | |
| Abercrombie – Sweeny, Texas | - | - | - | 1,450 | 580 | 770 | 1,320 | 2,590 | 4,900 | 5,200 | 5,200 | 5,930 | | 3,030 | 4,790 | 4,260 | 7,750 | 5,410 | 8,270 | 8,490 | | |
| Atlantic – Atreco, Texas | 920 | 1,510 | 1,550 | 770 | 1,590 | 1,500 | 810 | 1,320 | 2,200 | 6,490 | 5,400 | 3,610 | | 3,460 | 6,390 | 4,660 | 4,430 | 4,870 | 2,500 | 2,130 | | |
| Atlas – Shreveport, La. | 900 | 790 | 740 | 890 | 1,000 | 940 | 670 | 970 | 830 | 770 | 940 | 900 | | 900 | 890 | 400 | 4,000 | 990 | 970 | 800 | | |
| Cities Service – Lake Charles, La. | - | - | - | 4,150 | 7,480 | 6,530 | 16,390 | 13,100 | 14,470 | 15,870 | 17,650 | 18,930 | | 18,360 | 19,210 | 18,420 | 6,500 | 17,450 | 23,100 | 23,420 | | |
| Continental – Lake Charles, La. | 1,580 | 2,760 | 2,300 | 2,130 | 1,840 | 1,570 | 1,660 | 1,470 | 1,500 | 1,410 | 1,400 | 1,610 | | 2,050 | 1,790 | 1,410 | 1,650 | 810 | 1,850 | 1,580 | | |
| Continental – Wichita Falls, Texas | - | - | - | 600 | 580 | 290 | 190 | 250 | - | 390 | 470 | 120 | | 580 | 840 | 530 | 550 | 550 | 270 | - | | |
| Cosden Central – Houston, Texas | - | - | - | 930 | 1,030 | 5,100 | 2,630 | 4,650 | 4,450 | 5,140 | | 6,550 | 3,490 | 6,940 | 7,550 | 6,130 | 5,530 | 5,930 | | | | |
| Eastern States – Houston, Texas | - | - | 870 | 1,360 | 2,530 | 900 | 2,610 | 1,830 | 1,520 | 1,610 | 1,640 | 1,910 | | 2,870 | 3,490 | 3,050 | 1,870 | 3,000 | 5,890 | 5,450 | | |
| Great Southern – Corpus Christi, Tex. | - | - | 1,230 | 2,090 | 1,750 | 2,770 | 3,420 | 1,770 | 770 | 3,330 | 3,410 | | 3,490 | 5,610 | 9,240 | 3,090 | 4,140 | 4,180 | 3,710 | | | |
| Gulf – Port Arthur, Texas | 6,920 | 8,590 | 9,770 | 10,320 | 9,140 | 9,570 | 9,710 | 10,740 | 6,840 | 9,180 | 10,100 | 10,990 | | 10,320 | 16,320 | 38,000 | 40,100 | 37,070 | 34,000 | 35,640 | | |
| Humble – Baytown, Texas | 22,580 | 29,100 | 28,100 | 32,340 | 29,360 | 29,600 | 31,100 | 30,290 | 40,200 | 37,420 | 34,000 | 34,800 | | 1,160 | 3,750 | 1,880 | 1,170 | 1,290 | 500 | 3,130 | | |
| Humble – Ingleside, Texas | - | - | - | - | - | - | - | - | - | - | - | | 17,040 | 18,040 | 19,390 | 18,610 | 17,490 | 20,700 | 19,820 | | | |
| Magnolia – Beaumont, Texas | 14,450 | 16,970 | 16,600 | 16,600 | 17,520 | 17,600 | 17,070 | 18,300 | 16,730 | 19,230 | 17,740 | 18,070 | | 10,350 | 11,490 | 13,000 | 9,100 | 7,130 | 5,930 | 13,190 | | |
| Pan American – Texas City, Texas | 4,100 | 4,070 | 5,290 | 7,780 | 7,740 | 10,000 | 10,040 | 9,520 | 8,100 | 10,320 | 5,770 | 11,090 | | 21,810 | 24,750 | 20,740 | 22,070 | 21,250 | 12,970 | 19,300 | | |
| Phillips – Borger, Texas | 12,050 | 13,510 | 14,810 | 15,120 | 14,680 | 12,700 | 15,450 | 15,550 | 18,500 | 14,240 | 19,070 | 19,900 | | 2,050 | 1,710 | 1,000 | 2,270 | 5,000 | 5,280 | 2,580 | | |
| Premier – Cotton Valley, La. | - | - | 1,340 | 1,870 | 1,990 | 1,940 | 1,940 | 1,910 | 1,420 | 1,300 | 2,830 | | 3,450 | 5,430 | 2,040 | 2,270 | 1,250 | 3,550 | 3,090 | | | |
| Pure – Nederland, Texas | 770 | 1,550 | 1,760 | 1,750 | 1,580 | 1,870 | 2,850 | 1,970 | 1,700 | 2,320 | 2,230 | 3,060 | | 1,100 | 2,850 | 2,170 | 2,190 | 1,770 | 1,890 | | | |
| Republic – Texas City, Texas | - | - | - | 160 | 1,200 | 1,410 | 1,360 | 1,560 | 1,400 | 1,200 | | 770 | 890 | 670 | 390 | 400 | 740 | | | | | |
| Root – El Dorado, Ark. | - | - | 870 | 770 | 1,200 | 1,410 | 1,450 | 1,590 | 2,070 | 2,520 | | 3,060 | 3,140 | 3,050 | 6,330 | 7,130 | 7,680 | 7,060 | | | | |
| Shamrock – Sunray, Texas | 2,480 | 2,000 | 2,030 | 3,650 | 1,740 | 1,900 | 1,680 | 2,100 | 1,600 | 1,740 | 1,650 | 2,230 | | 5,060 | 4,210 | 3,050 | 4,180 | 2,870 | 3,370 | 2,970 | | |
| Shell – Houston, Texas | 8,840 | 10,850 | 9,640 | 9,800 | 10,160 | 9,620 | 10,170 | 10,290 | 11,270 | 7,160 | 7,690 | 9,460 | | 5,460 | 6,210 | 9,740 | 10,150 | 4,180 | 6,330 | 6,550 | | |
| Shell – Novac, La. | - | - | - | - | - | - | - | - | 7,580 | 3,890 | 5,940 | | 3,440 | 4,410 | 5,010 | 2,950 | 7,160 | 7,380 | | | | |
| Sinclair – Corpus Christi, Texas | - | - | 5,230 | 6,200 | 4,930 | 4,770 | 6,000 | 6,800 | 6,450 | 6,200 | 5,940 | | 5,430 | 3,500 | 7,070 | 3,940 | 2,380 | 3,370 | 2,970 | | | |
| Sinclair – Houston, Texas | 6,920 | 7,000 | 5,230 | 6,200 | 6,160 | 5,810 | 5,810 | 6,340 | 5,600 | 6,140 | 5,000 | 5,220 | | 4,620 | 4,610 | 4,840 | 4,060 | 5,380 | 6,130 | 6,550 | | |
| Southport – Texas City, Texas | - | - | - | 3,580 | 3,000 | 3,270 | 3,290 | 3,900 | 5,000 | 2,100 | 3,870 | 2,970 | | 3,850 | 3,990 | 3,290 | 4,320 | 1,930 | 4,740 | 3,870 | | |
| Standard La. – Baton Rouge, La. (a) | 31,390 | 36,140 | 37,240 | 39,500 | 30,610 | 36,210 | 33,640 | 43,130 | 42,900 | 43,580 | 45,760 | 50,640 | | 37,340 | 35,440 | 41,700 | 45,750 | 68,900 | 66,200 | 52,770 | | |
| Texas – Port Arthur, Texas | 9,650 | 12,140 | 13,590 | 11,800 | 15,940 | 15,520 | 15,710 | 28,740 | 22,170 | 23,610 | 21,370 | 23,890 | | 26,040 | 23,640 | 23,900 | 24,480 | 28,900 | 24,010 | 23,100 | | |
| **Total District III** | 121,930 | 145,560 | 153,300 | 168,230 | 165,100 | 177,630 | 194,770 | 218,100 | 221,410 | 232,580 | 220,900 | 250,750 | | 239,130 | 254,680 | 254,970 | 254,900 | 225,900 | 268,160 | 241,690 | | |
| **DISTRICT IV** | | | | | | | | | | | | | | | | | | | | | | | |
| Frontier – Cheyenne, Wyo. | - | - | - | - | 1,670 | 1,740 | 770 | 1,800 | 780 | 2,170 | 4,580 | | 1,870 | 1,990 | 1,820 | 1,890 | 1,990 | 1,540 | 1,740 | | | |
| Sinclair – Sinclair, Wyo. | 580 | 690 | 770 | 1,270 | 2,560 | 2,710 | 4,100 | 2,300 | 3,200 | 1,620 | 3,960 | 2,840 | | 3,090 | 3,480 | 3,140 | 4,000 | 4,000 | 4,660 | 4,300 | | |
| Utah – Salt Lake City, Utah | - | - | - | - | 1,590 | 4,390 | 4,000 | 4,350 | 5,100 | 2,770 | 2,930 | | 4,470 | 5,000 | 4,630 | 6,000 | 6,420 | 4,230 | 4,620 | | | |
| **Total District IV** | 580 | 690 | 770 | 1,270 | 5,480 | 7,030 | 8,610 | 8,870 | 8,930 | 7,100 | 8,900 | 10,350 | | 19,260 | 16,470 | 13,590 | 13,370 | 12,305 | 11,450 | 12,160 | | |
| **DISTRICT V** | | | | | | | | | | | | | | | | | | | | | | | |
| General Petroleum – Torrance, Calif. | - | 930 | 3,160 | 2,530 | 2,810 | 3,900 | 6,350 | 8,710 | 6,100 | 5,840 | 5,830 | 6,600 | | 8,550 | 8,070 | 8,900 | 8,830 | 9,680 | 7,330 | 8,650 | | |
| Mohawk – Bakersfield, Calif. | - | - | - | 970 | 530 | 970 | 640 | 840 | 870 | 810 | 170 | 1,130 | | 1,100 | 660 | 1,550 | 1,100 | 1,250 | 440 | 640 | | |
| Richfield – Watson, Calif. | 7,070 | 8,070 | 6,900 | 7,500 | 6,550 | 8,070 | 5,740 | 9,120 | 9,870 | 15,870 | 14,290 | 16,100 | | 18,050 | 15,700 | 17,610 | 17,890 | 18,100 | 16,390 | 14,610 | | |
| Shell – Martinez, Calif. | 2,160 | 2,170 | 1,560 | 1,770 | 1,800 | 1,790 | 2,080 | 3,420 | 2,050 | 3,420 | 1,670 | 1,970 | | 4,950 | 4,390 | 4,710 | 4,500 | 18,190 | 4,040 | 5,150 | | |
| Shell – Wilmington, Calif. | 11,610 | 16,290 | 13,320 | 14,920 | 18,060 | 17,700 | 17,490 | 21,140 | 15,250 | 20,140 | 15,140 | 17,630 | | 9,590 | 9,480 | 9,710 | 8,500 | 18,040 | 7,470 | 7,580 | | |
| Standard California – El Segundo, Calif. | 5,780 | 5,620 | 6,190 | 6,970 | 7,000 | 7,520 | 5,820 | 6,750 | 5,950 | 6,640 | 6,750 | 7,070 | | 22,740 | 27,460 | 13,650 | 13,270 | 11,060 | 9,970 | 21,150 | | |
| Standard California – Richmond, Calif. | 18,190 | 18,240 | 11,000 | 13,920 | 10,540 | 11,360 | 17,620 | 20,030 | 20,100 | 19,920 | 17,070 | 12,900 | | 12,580 | 19,040 | 14,860 | 15,150 | 10,640 | 15,130 | 15,150 | | |
| Texas – Wilmington, Calif. | 1,790 | 1,550 | 1,290 | 2,230 | 2,710 | 3,470 | 5,290 | 4,430 | 5,660 | 8,170 | 10,670 | 9,770 | | 9,140 | 8,570 | 9,140 | 9,070 | 13,150 | | | | |
| Tide Water – Avon, Calif. | 8,120 | 6,570 | 8,710 | 7,970 | 9,480 | 10,370 | 9,420 | 9,220 | 8,940 | 8,940 | 10,660 | 12,300 | | 9,910 | 9,630 | 11,060 | 12,200 | 13,140 | | | | |
| Union – Oleum & Wilmington, Calif. | 1,610 | 2,380 | 8,450 | 3,970 | 5,050 | 5,570 | 6,050 | 6,900 | 6,130 | 8,160 | 8,970 | 13,610 | | 9,110 | 9,210 | 9,600 | 9,200 | | | | | |
| Wilshire – Norwalk, Calif. | 1,450 | 2,310 | 2,540 | 2,830 | 1,180 | 5,220 | 5,060 | 3,610 | 4,030 | 1,200 | 4,200 | 5,160 | | 4,870 | 4,420 | 4,600 | 2,600 | 3,620 | 5,670 | 5,100 | | |
| **Total District V** | 49,360 | 60,340 | 63,160 | 62,830 | 65,000 | 72,330 | 77,610 | 88,640 | 83,100 | 93,710 | 95,000 | 104,750 | | 115,690 | 115,290 | 119,620 | 116,660 | 119,290 | 123,640 | 121,640 | | |
| **MISCELLANEOUS** | 13,760 | 20,970 | 22,100 | 19,770 | 32,450 | 27,680 | 25,650 | 16,580 | 44,300 | 45,140 | 21,960 | 7,290 | | 15,680 | 15,770 | 9,400 | 9,190 | 9,490 | | | | |
| **Total U. S. A.** | 257,260 | 300,860 | 313,820 | 325,950 | 346,800 | 379,750 | 414,900 | 462,970 | 462,170 | 486,970 | 461,600 | 479,910 | 143,378,370 (b) | 577,460 | 513,480 | 528,900 | 465,970 | 490,370 | 501,270 | 522,980 | 302,100 (a) | 116,049,950 | 353,964,290 (b) |
| **CANADA** | | | | | | | | | | | | | | | | | | | | | | | |
| **Caribbean** | | | | | | | | | | | | | | | | | | | | | | | |
| | 1,470 | 1,170 | 920 | 1,490 | 1,970 | 1,430 | 1,170 | 2,740 | 2,710 | 4,360 | 4,390 | 2,490 | | 2,130 | 940 | 1,090 | 3,240 | 2,790 | 3,520 | 3,690 | 2,870 (a) | |
| Aruba – Cayacao, N. W. I. | 4,000 | 1,900 | 3,050 | 3,850 | 2,460 | 4,930 | 4,470 | 14,030 | 9,100 | 7,300 | 9,330 | 9,530 | | 4,650 | 13,480 | 9,070 | 14,640 | 14,790 | 8,610 | 11,000 (a) | | |
| Lago – Aruba, N. W. I. | 11,800 | 12,700 | 12,650 | 12,120 | 10,590 | 14,870 | 13,640 | 10,430 | 12,840 | 12,130 | 9,000 | 12,770 | | 12,000 | 11,750 | 14,990 | 13,740 | 8,910 | 13,370 | 9,000 (a) | | |
| Trinidad Leaseholds – Trinidad, B. W. I. | 3,150 | 1,500 | 1,820 | 3,730 | 4,500 | 3,670 | 4,440 | 6,000 | 4,970 | 4,020 | 5,000 | 4,580 | | 4,670 | 3,120 | 4,470 | 4,990 | 3,900 | 3,000 | 3,000 (a) | | |
| **Persian Gulf** | | | | | | | | | | | | | | | | | | | | | | | |
| Anglo-Iranian, Abadan | 16,900 | 16,800 | 17,900 | 20,800 | 19,600 | 17,650 | 17,640 | 23,320 | 23,520 | 25,320 | 21,950 | 21,770 | | 24,910 | 29,520 | 30,410 | 26,600 | 18,890 | 18,520 | 22,520 | | |
| Bahrein, Bahrein Island | - | - | - | - | - | - | - | - | - | - | - | - | | 11,490 | 15,040 | 15,290 | 14,870 | 13,490 | 11,000 | 14,000 (a) | |
| United Kingdom | 8,370 | 12,220 | 15,100 | 17,160 | 13,750 | 11,480 | 15,460 | 14,070 | 15,910 | 13,740 | 10,470 | 15,480 | | | | | | | | | | |
| **Total Foreign** | 45,690 | 46,890 | 51,080 | 58,950 | 53,570 | 53,860 | 57,640 | 69,990 | 68,600 | 66,870 | 58,040 | 70,060 | 21,356,300 (b) | 58,400 | 74,770 | 78,580 | 75,680 | 73,730 | 64,550 | 71,950 | 78,250 (a) | 17,173,710 | 24,613,310 (b) |
| **TOTAL ALLIED NATIONS** | 302,950 | 347,150 | 364,270 | 384,460 | 400,370 | 433,610 | 472,360 | 532,560 | 531,070 | 553,610 | 519,640 | 549,970 | 164,934,670 (b) | 584,060 | 587,950 | 600,520 | 560,550 | 564,700 | 568,650 | 594,530 | 378,390 (a) | 134,403,660 | 410,578,970 (b) |

○ Socony-Vacuum, Augusta Kansas production included at East St. Louis for those months    (a) Standard Oil Company of New Jersey as of January 1, 1945    (e) Estimated

(b) Net Bbls/Day, Actual Barrels

(na) Not Available

**RESTRICTED**

TABLE III
RELATION BETWEEN EQUIVALENT PRODUCTION AND ACTUAL BLENDING    (U.S. ONLY)
1942, 1943, 1944 Through August 1945
(1000's Barrels)

| | COMBAT GRADE Actual Volume Blended From Table I | EQUIVALENT GRADE 100/130 | | | | Total Production From Table II |
|---|---|---|---|---|---|---|
| | | Blended to Lower Grades | Shipped Offshore | Import From Canada ** | Changes in Inventories Losses, and Misc. | |
| **1942** | | | | | | |
| January | 1,996 | 14 | 209 | -- | (508) | 1,711 |
| February | 1,424 | 33 | 140 | -- | 156 | 1,753 |
| March | 2,608 | 15 | 193 | -- | (823) | 1,993 |
| April | 1,838 | 37 | 191 | -- | (92) | 1,974 |
| May | 2,106 | 15 | 188 | -- | (269) | 2,040 |
| June | 2,441 | -- | -- | -- | (221) | 2,220 |
| July | 2,265 | 30 | -- | -- | (19) | 2,276 |
| August | 2,497 | 13 | 62 | -- | (160) | 2,412 |
| September | 2,201 | 32 | -- | -- | 235 | 2,468 |
| October | 2,632 | 52 | 427 | -- | 133 | 3,244 |
| November | 3,252 | 24 | 22 | -- | 93 | 3,391 |
| December | 3,453 | 14 | 407 | -- | (19) | 3,855 |
| **1943** | | | | | | |
| January | 3,346 | na | 55 | na | 270 | 3,671 |
| February | 3,729 | " | 402 | " | (304) | 3,827 |
| March | 4,276 | " | 217 | " | (220) | 4,273 |
| April | 4,919 | " | 160 | " | (424) | 4,655 |
| May | 4,814 | " | 361 | " | (172) | 5,003 |
| June | 4,478 | " | 810 | " | (34) | 5,254 |
| July | 4,670 | " | 771 | " | (82) | 5,359 |
| August | 5,647 | " | 430 | " | 59 | 6,136 |
| September | 5,935 | na | 782 | " | (507) | 6,210 |
| October | 6,335 | 6 | 592 | " | (154) | 6,779 |
| November | 6,470 | 34 | 486 | " | (490) | 6,500 |
| December | 6,356 | 51 | 564 | na | (38) | 6,933 |
| **1944** | | | | | | |
| January | 7,490 | 46 | 249 | 15 | 205 | 7,975 |
| February | 8,219 | 48 | 423 | 10 | 45 | 8,725 |
| March | 8,676 | 41 | 270 | 8 | 669 | 9,648 |
| April | 9,778 | 50 | 137 | 10 | (177) | 9,778 |
| May | 10,409 | 41 | 230 | 33 | 104 | 10,751 |
| June | 11,425 | 27 | 153 | 23 | (190) | 11,392 |
| July | 12,537 | 110 | 344 | 23 | (106) | 12,862 |
| August | 13,493 | 164 | 249 | 13 | 459 | 14,352 |
| September | 13,572 | 34 | 404 | 2 | (134) | 13,874 |
| October | 14,775 | 53 | 374 | 20 | (86) | 15,096 |
| November | 12,684 | 24 | 557 | 26 | 609 | 13,848 |
| December | 14,166 | 24 | 378 | 43 | 352 | 14,877 |
| **1945** | | | | | | |
| January | 14,616 | 48 | 492 | 50 | 631 | 15,737 |
| February | 13,441 | 27 | 127 | 30 | 804 | 14,369 |
| March | 15,609 | 13 | 335 | 40 | 358 | 16,275 |
| April | 15,251 | 26 | 431 | 20 | (1,130) | 14,558 |
| May | 15,944 | 39 | 117 | 35 | (845) | 15,220 |
| June | 15,125 | 31 | -- | 52 | 21 | 15,125 |
| July | 15,218 | 37 | 325 | 57 | 677 | 16,200 |
| August | 12,365 | na | na | na | (3000)* | 9,365* |
| September | 3,000* | na | na | na | (3000)* | --- |
| **Total** | 347,481 | 1253 | 13,064 | 510 | (7324) | 353,964 |

* Estimated
** Quantities included in Actual Volume Blended

DECLASSIFIED Authority NND730141

DECLASSIFIED
Authority NND730014

RESTRICTED

TABLE IV

U. S. A. ACTUAL PRODUCTION OF 91-OCTANE GASOLINE

JANUARY 1942 THROUGH AUGUST 1945

(in thousands of barrels)

**1942**

| YEAR | JAN. | FEB. | MAR. | APR. | MAY | JUN. | JUL. | AUG. | SEP. | OCT. | NOV. | DEC. | TOTAL FOR YEAR 1942 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DISTRICT I | | | | | | | | | | | | | |
| Atlantic, Point Breeze, Pennsylvania | - | - | - | - | - | 19.0 | 43.0 | 47.0 | 53.0 | - | - | 39.0 | 201.0 |
| Std.-New Jersey, Baltimore, Maryland | - | 16.0 | 6.0 | - | 10.0 | 7.0 | 5.0 | 13.0 | - | - | - | - | 57.0 |
| Std.-New Jersey, Bayonne, New Jersey | 22.0 | 21.0 | - | - | - | - | - | - | - | - | - | - | 43.0 |
| Sun, Marcus Hook, Pennsylvania | - | - | 33.0 | 34.0 | - | - | - | 74.0 | - | 43.0 | - | - | 184.0 |
| Tidewater, Bayonne, New Jersey | - | - | - | - | 15.6 | - | 17.3 | 17.2 | 27.0 | 24.0 | 23.9 | 36.4 | 161.4 |
| Total District I | 22.0 | 37.0 | 39.0 | 34.0 | 25.6 | 26.0 | 65.3 | 151.2 | 80.0 | 67.0 | 23.9 | 75.4 | 646.4 |
| DISTRICT II | | | | | | | | | | | | | |
| Phillips, Okla. City, Okla. | 5.0 | 10.0 | 10.0 | 1.0 | 4.0 | 4.0 | 4.0 | 5.1 | 2.9 | 4.7 | 2.4 | 4.6 | 57.7 |
| Shell, Wood River, Illinois | 7.9 | 17.1 | 17.0 | 24.6 | 30.7 | 37.0 | 48.7 | 68.0 | 32.9 | 29.1 | 49.7 | 47.5 | 410.2 |
| Sinclair, East Chicago, Ind. | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Std.-Indiana, Casper, Wyoming | 4.6 | 3.1 | 6.2 | 3.1 | 3.8 | 4.7 | 4.5 | 4.5 | 6.0 | 4.6 | 5.5 | 7.2 | 57.8 |
| Std.-Indiana, Whiting, Indiana | 16.3 | 13.0 | 17.9 | 12.5 | 6.4 | 22.9 | 24.5 | 23.9 | 27.1 | 23.0 | 29.8 | 9.9 | 227.2 |
| Std.-Ohio, Toledo, Ohio | - | 4.6 | - | - | 3.4 | 6.5 | 7.8 | - | 8.0 | 2.6 | - | 5.3 | 38.2 |
| Total District II | 33.8 | 47.8 | 51.1 | 41.2 | 48.3 | 75.1 | 89.5 | 101.5 | 76.9 | 64.0 | 87.4 | 74.5 | 791.1 |
| DISTRICT III | | | | | | | | | | | | | |
| Amsco, Corpus Christi, Texas | - | - | - | - | 61.6 | 13.4 | 21.5 | 26.7 | 38.0 | 34.9 | 28.7 | 30.8 | 255.6 |
| Cities Service, St. Rose, La. | - | - | - | - | - | - | - | - | - | - | - | 2.0 | 2.0 |
| Coastal, Port Isabel, Texas | - | - | - | 25.0 | 8.0 | - | 7.0 | 17.0 | 33.0 | 29.0 | 34.0 | 35.0 | 188.0 |
| Continental, Lake Charles, La. | 3.0 | 2.0 | 3.0 | 5.0 | 14.0 | - | 12.0 | - | - | - | - | - | 39.0 |
| Coltex, Colorado City, Texas | - | 4.8 | 2.9 | 1.4 | 10.6 | 6.8 | 15.9 | 16.9 | 17.0 | 24.5 | 19.4 | 20.0 | 140.2 |
| Cosden, Big Springs, Texas | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Crown Central, Houston, Texas | - | - | - | - | - | - | - | - | 15.0 | 20.0 | 19.0 | 31.0 | 85.0 |
| Danciger, East Columbia, Texas | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Dist. Products, North Houston, Tex. | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Gr. Southern, Corpus Christi, Texas | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Gulf, Port Arthur, Texas | 63.0 | 76.0 | 73.0 | 112.0 | 55.0 | 68.0 | - | 72.0 | 5.0 | - | 44.0 | 64.0 | 632.0 |
| Humble, Baytown, Texas | 59.8 | 91.7 | 58.2 | 100.2 | 120.1 | 119.1 | 185.8 | 162.5 | 102.2 | 13.7 | 163.4 | 7.2 | 1,183.9 |
| Humble, Ingleside, Texas | 56.8 | 51.6 | 28.5 | 17.1 | 36.7 | 56.8 | 82.3 | 65.5 | 98.9 | 92.0 | 78.5 | 91.4 | 756.1 |
| Humble, Katy, Texas | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Humble, San Antonio, Texas | 11.1 | 9.9 | 12.1 | 14.1 | 14.1 | 9.2 | 13.7 | 14.5 | 12.9 | 11.4 | 12.3 | 11.2 | 146.5 |
| Lion, El Dorado, Arkansas | - | - | - | - | - | - | - | - | - | - | - | 10.0 | 10.0 |
| Magnolia, Beaumont, Texas | 35.0 | - | 8.0 | 33.0 | 38.0 | 47.0 | 31.0 | - | 20.0 | 11.0 | 28.0 | 137.0 | 388.0 |
| Malco, Artesia, New Mexico | - | - | - | - | - | - | 31.3 | 12.0 | 5.2 | 9.9 | 7.5 | 5.0 | 70.9 |
| Maritime, Houston, Texas | 3.5 | 18.0 | 26.9 | 23.0 | 9.5 | 15.2 | 36.3 | 38.7 | 30.2 | 33.3 | 30.5 | 34.0 | 299.1 |
| Pan American, Texas City, Texas | - | - | - | - | 53.0 | 24.0 | 25.0 | 25.0 | - | 69.0 | 50.0 | 44.0 | 270.0 |
| Phillips, Borger, Texas | 14.0 | 20.0 | 11.0 | 26.0 | 14.0 | 23.0 | 73.0 | 75.5 | 17.4 | 63.1 | 105.1 | 106.0 | 548.1 |
| Pontiac, Corpus Christi, Texas | - | 21.5 | 79.8 | - | - | - | 15.9 | 50.2 | 23.6 | 40.2 | 34.6 | 48.5 | 314.3 |
| Pure, Nederland, Texas | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Republic, Corpus Christi, Texas | 10.3 | 16.7 | 21.5 | 29.1 | 14.4 | 14.3 | 29.0 | 20.0 | 36.0 | 24.0 | 13.0 | 25.0 | 253.3 |
| Shell, Houston, Texas | 7.8 | 13.0 | 66.0 | 23.8 | 37.6 | 42.1 | 16.8 | 19.4 | 10.3 | 7.9 | 21.2 | 9.4 | 274.5 |
| Sinclair, Houston, Texas | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sinclair, Corpus Christi, Texas | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Southport, Texas City, Texas | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Southwestern, Corpus Christi, Tex. | 18.4 | 13.2 | 31.2 | 23.0 | 22.6 | 36.9 | 35.0 | 19.2 | 36.7 | 20.2 | 29.2 | 25.8 | 311.4 |
| Std.-Louisiana, Baton Rouge, La. | 78.0 | 90.0 | 50.0 | 98.0 | 66.0 | 82.0 | 122.0 | 46.0 | 55.0 | 103.0 | 64.0 | 90.0 | 942.0 |
| Std.-Texas, El Paso, Texas | - | 4.0 | 3.0 | 4.0 | 1.8 | 2.4 | 3.2 | 3.0 | 3.3 | 3.2 | 6.0 | 6.4 | 39.3 |
| Stanolind, Superior, Texas | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Taylor, Corpus Christi, Texas | - | 70.0 | 47.0 | 33.0 | 52.0 | 57.0 | 43.0 | 16.0 | 46.0 | 40.0 | 40.0 | 37.0 | 481.0 |
| Texas Company, Port Arthur, Texas | 37.0 | 66.0 | 28.0 | 69.0 | 77.0 | 39.0 | 91.0 | 19.0 | 48.0 | 20.0 | 9.0 | 24.0 | 529.0 |
| Total District III | 396.9 | 568.4 | 550.1 | 636.7 | 784.0 | 856.2 | 892.7 | 719.1 | 653.7 | 650.3 | 836.4 | 894.7 | 8,159.2 |
| DISTRICT V | | | | | | | | | | | | | |
| Caminol, Hanford, California | - | - | - | - | - | - | - | - | - | 12.0 | 11.0 | 9.0 | 32.0 |
| Caminol, Santa Fe Springs, Calif. | - | - | - | - | - | - | - | - | - | - | - | - | - |
| General Pet., Torrance, Calif. | - | - | - | - | - | - | - | - | - | - | 3.0 | 4.0 | 7.0 |
| MacMillan, Signal Hill, Calif. | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Mohawk, Bakersfield, California | - | - | - | - | - | - | - | - | 4.5 | 3.9 | - | 3.9 | 12.3 |
| Richfield, Watson, California | - | - | 1.0 | 5.0 | - | 25.0 | 44.0 | 58.0 | 45.0 | 50.0 | 25.0 | 92.0 | 345.0 |
| Rothschild, Santa Fe Springs, Calif. | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Shell, Coalinga, California | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Shell, Martinez, California | - | - | 1.1 | 1.0 | 0.4 | - | 1.5 | - | 0.9 | - | - | 0.2 | 5.3 |
| Shell, Wilmington, California | 14.1 | 18.6 | 13.2 | 19.4 | 16.8 | 31.8 | 9.5 | 12.9 | 1.7 | - | 0.8 | 23.3 | 162.1 |
| Std.-California, Bakersfield, Calif. | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Std.-California, El Segundo, Calif. | 21.0 | 20.0 | 34.0 | 39.0 | 115.0 | 242.0 | 126.0 | 416.0 | 151.0 | 141.0 | 174.0 | 131.0 | 1,610.0 |
| Std.-California, Richmond, Calif. | Not Available | | | | | | 59.0 | 73.0 | 139.0 | 106.0 | 93.0 | 43.0 | 515.0 |
| Texas, Wilmington, California | 1.0 | 2.0 | 3.0 | 5.0 | 4.0 | 8.0 | - | 18.0 | 1.0 | 6.0 | 4.0 | 3.0 | 55.0 |
| Tidewater, Avon, California | - | - | 7.0 | - | - | 56.0 | 58.0 | 28.0 | - | [illegible] | 41.0 | - | 218.0 |
| Tidewater, Watson, California | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Union, Bakersfield, California | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Union, Oleum, California | 3.0 | 5.0 | 7.0 | 10.0 | 11.0 | 9.0 | 9.0 | 2.0 | 2.0 | 55.0 | 15.8 | 5.7 | 134.5 |
| Union, Wilmington, California | 17.0 | 9.0 | 17.0 | 27.0 | 47.0 | 28.0 | 37.0 | 24.0 | 8.0 | 19.0 | 9.7 | 8.7 | 245.4 |
| Wilshire, Norwalk, California | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total District V | 56.1 | 54.6 | 83.3 | 106.4 | 194.4 | 273.8 | 344.0 | 631.9 | 353.1 | 440.9 | 379.3 | 323.8 | 3,241.6 |
| TOTAL U.S.A. | 508.8 | 707.8 | 723.5 | 818.3 | 972.3 | 1,031.1 | 1,391.5 | 1,603.7 | 1,163.7 | 1,222.2 | 1,327.0 | 1,368.4 | 12,838.3 |

**1943**

| YEAR | JAN. | FEB. | MAR. | APR. | MAY | JUN. | JUL. | AUG. | SEP. | OCT. | NOV. | DEC. | TOTAL FOR YEAR 1943 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DISTRICT I | | | | | | | | | | | | | |
| Atlantic, Point Breeze, Pennsylvania | 16.0 | 14.0 | - | 32.0 | 34.0 | 34.0 | 16.0 | 34.0 | 36.0 | 56.0 | 136.0 | 137.0 | 545.0 |
| Std.-New Jersey, Baltimore, Maryland | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Std.-New Jersey, Bayonne, New Jersey | - | - | - | 5.0 | - | - | - | - | - | 7.0 | 54.0 | 35.0 | 101.0 |
| Sun, Marcus Hook, Pennsylvania | 34.0 | 21.0 | 87.0 | - | - | - | 103.0 | 69.0 | 112.0 | 129.0 | 129.0 | 222.0 | 906.0 |
| Tidewater, Bayonne, New Jersey | 12.0 | 12.6 | 29.8 | 45.0 | 29.0 | 38.3 | 44.7 | 59.8 | 56.4 | 66.3 | 66.1 | 57.4 | 518.4 |
| Total District I | 62.0 | 48.6 | 116.8 | 82.0 | 63.0 | 72.3 | 163.7 | 162.8 | 204.4 | 258.3 | 385.1 | 451.4 | 2,070.4 |
| DISTRICT II | | | | | | | | | | | | | |
| Phillips, Okla. City, Okla. | 4.7 | 7.1 | 5.3 | 4.6 | 4.8 | 4.6 | 2.6 | 4.6 | - | 1.1 | 2.3 | 2.2 | 43.9 |
| Shell, Wood River, Illinois | 20.3 | 22.0 | 22.6 | 40.2 | 20.3 | 14.9 | 24.1 | 26.6 | 13.2 | 47.6 | 61.0 | 30.7 | 343.5 |
| Sinclair, East Chicago, Ind. | - | - | - | - | - | - | - | - | - | 4.5 | 92.7 | 125.4 | 222.6 |
| Std.-Indiana, Casper, Wyoming | 4.8 | 0.2 | - | - | - | - | - | - | - | - | - | - | 5.0 |
| Std.-Indiana, Whiting, Indiana | 17.5 | 2.7 | 2.6 | 10.2 | 5.0 | 5.4 | 8.6 | 8.7 | 4.8 | 17.5 | 7.2 | 8.1 | 98.3 |
| Std.-Ohio, Toledo, Ohio | 2.5 | 1.6 | 9.8 | 20.6 | 7.5 | 7.3 | 7.8 | 17.2 | 12.7 | 7.7 | 43.3 | 34.1 | 172.1 |
| Total District II | 49.8 | 33.6 | 40.3 | 75.6 | 37.6 | 32.2 | 43.1 | 57.1 | 30.7 | 78.4 | 206.6 | 200.5 | 885.4 |
| DISTRICT III | | | | | | | | | | | | | |
| Amsco, Corpus Christi, Texas | 23.4 | 30.2 | 36.3 | 36.1 | 23.6 | 31.0 | 37.8 | 36.0 | 43.0 | 87.0 | 42.0 | 49.0 | 425.4 |
| Cities Service, St. Rose, La. | 22.0 | 3.0 | - | - | - | - | - | - | - | - | - | - | 25.0 |
| Coastal, Port Isabel, Texas | 45.0 | 38.0 | 42.0 | 24.0 | 10.0 | 27.0 | 23.0 | 39.0 | 36.0 | 41.0 | 47.0 | 55.0 | 427.0 |
| Continental, Lake Charles, La. | 3.0 | - | - | - | - | - | - | - | - | - | - | - | 3.0 |
| Coltex, Colorado City, Texas | 27.6 | 23.6 | 24.0 | 27.2 | 23.9 | 20.1 | 25.2 | 25.2 | 21.3 | 27.3 | 27.8 | 27.1 | 300.3 |
| Cosden, Big Springs, Texas | - | - | - | - | - | 4.8 | 7.4 | 9.6 | 7.7 | 9.7 | 3.9 | 13.3 | 56.4 |
| Crown Central, Houston, Texas | 15.0 | 11.0 | 54.0 | 26.0 | 32.0 | 32.0 | 33.0 | 41.0 | 30.0 | 37.0 | 39.0 | 48.0 | 398.0 |
| Danciger, East Columbia, Texas | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Dist. Products, North Houston, Tex. | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Gr. Southern, Corpus Christi, Texas | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Gulf, Port Arthur, Texas | - | 61.0 | 25.0 | 95.6 | 43.4 | 35.0 | 72.9 | 70.6 | 146.7 | 132.6 | 57.6 | 129.9 | 870.3 |
| Humble, Baytown, Texas | 42.7 | - | - | - | - | - | - | - | - | - | - | - | 42.7 |
| Humble, Ingleside, Texas | 82.7 | 72.3 | 113.9 | 21.4 | 22.3 | 22.7 | 0.3 | 45.8 | 31.8 | 144.1 | 142.8 | 149.3 | 847.5 |
| Humble, Katy, Texas | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Humble, San Antonio, Texas | 15.3 | 13.0 | 13.7 | 12.7 | 11.1 | 13.0 | 11.1 | 12.5 | 13.9 | 13.8 | 16.8 | 21.2 | 167.9 |
| Lion, El Dorado, Arkansas | 7.7 | 13.0 | 13.8 | 6.0 | 7.6 | 6.0 | 7.6 | 7.8 | 10.0 | 13.1 | 9.3 | 13.0 | 114.9 |
| Magnolia, Beaumont, Texas | - | - | 50.0 | 49.0 | 55.0 | 55.0 | 33.0 | - | 60.0 | 120.0 | 75.0 | 64.0 | 561.0 |
| Malco, Artesia, New Mexico | 2.0 | - | - | - | - | - | - | - | - | - | - | - | 2.0 |
| Maritime, Houston, Texas | 30.5 | 27.3 | 34.5 | 27.9 | 21.0 | 19.7 | 33.5 | 30.0 | 31.7 | 36.7 | 30.7 | 33.3 | 356.8 |
| Pan American, Texas City, Texas | 196.0 | 151.0 | 25.0 | 17.0 | 99.0 | 196.0 | 155.0 | 458.0 | 281.0 | 217.0 | 119.0 | 243.0 | 2,157.0 |
| Phillips, Borger, Texas | 10.0 | 35.2 | - | - | - | - | - | - | 2.6 | 2.7 | 2.7 | - | 53.4 |
| Pontiac, Corpus Christi, Texas | 23.8 | 60.5 | 49.4 | 53.2 | 28.2 | 44.2 | 47.3 | 50.0 | 55.0 | 66.0 | 56.0 | 52.1 | 585.7 |
| Pure, Nederland, Texas | - | - | - | - | - | - | - | - | 8.0 | 1.0 | 18.0 | 9.0 | 36.0 |
| Republic, Corpus Christi, Texas | 34.0 | 24.0 | 46.0 | 53.0 | 51.0 | 30.0 | 39.0 | 43.0 | 32.0 | 45.0 | 25.0 | 48.0 | 470.0 |
| Shell, Houston, Texas | 10.9 | 10.4 | 11.0 | - | 12.7 | 6.0 | 8.6 | 9.0 | 11.5 | 9.7 | 9.1 | 9.7 | 108.6 |
| Sinclair, Houston, Texas | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sinclair, Corpus Christi, Texas | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Southport, Texas City, Texas | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Southwestern, Corpus Christi, Tex. | 44.2 | 30.0 | 29.7 | 34.5 | 22.7 | 16.9 | 27.4 | 35.9 | 55.5 | 63.5 | 66.0 | 49.5 | 475.8 |
| Std.-Louisiana, Baton Rouge, La. | 91.0 | 90.0 | 65.0 | 39.0 | - | 9.0 | 11.0 | 48.0 | 142.0 | 218.0 | 168.0 | 163.0 | 1044.0 |
| Std.-Texas, El Paso, Texas | 16.4 | 9.7 | 11.6 | 9.8 | 4.5 | 11.5 | 5.4 | 11.0 | 10.0 | 13.4 | 12.0 | 14.1 | 129.4 |
| Stanolind, Superior, Texas | - | - | - | - | - | - | - | 1.2 | 3.0 | 1.5 | 3.4 | 4.5 | 13.6 |
| Taylor, Corpus Christi, Texas | 13.0 | 24.0 | 55.0 | 37.0 | 55.0 | 50.0 | 28.0 | 65.0 | 61.0 | 67.0 | 74.0 | 90.0 | 609.0 |
| Texas Company, Port Arthur, Texas | 26.0 | 57.0 | 14.0 | 30.0 | 69.0 | 17.0 | 24.0 | 142.0 | 144.0 | 136.0 | 109.0 | 84.0 | 812.0 |
| Total District III | 782.2 | 784.2 | 713.9 | 599.4 | 572.0 | 616.9 | 630.5 | 1,118.5 | 1,237.9 | 1,453.1 | 1,154.1 | 1,370.0 | 11,092.7 |
| DISTRICT V | | | | | | | | | | | | | |
| Caminol, Hanford, California | 7.0 | - | - | - | - | - | - | - | - | - | 16.0 | 17.0 | 42.0 |
| Caminol, Santa Fe Springs, Calif. | - | - | - | - | - | - | - | - | - | - | - | - | - |
| General Pet., Torrance, Calif. | 62.0 | 45.0 | 95.0 | 24.0 | 79.0 | 94.0 | 105.0 | 76.0 | 105.0 | 86.0 | 169.0 | 130.0 | 1,000.0 |
| MacMillan, Signal Hill, Calif. | 25.0 | 25.0 | 26.2 | 23.9 | 29.3 | 24.5 | 24.2 | 24.7 | 25.5 | 28.4 | 28.6 | 30.4 | 309.5 |
| Mohawk, Bakersfield, California | 3.9 | 7.7 | 11.6 | 3.9 | 7.7 | 7.8 | 7.0 | 11.6 | 4.7 | - | 11.8 | 20.2 | 97.9 |
| Richfield, Watson, California | 69.0 | 54.0 | 28.0 | 6.0 | - | - | - | - | 3.0 | 174.0 | 47.0 | 46.0 | 427.0 |
| Rothschild, Santa Fe Springs, Calif. | - | - | - | - | - | - | - | - | - | - | - | 14.0 | 14.0 |
| Shell, Coalinga, California | - | - | - | - | - | - | - | - | - | 4.9 | 32.6 | 19.7 | 57.2 |
| Shell, Martinez, California | - | - | 0.5 | - | 0.4 | 0.6 | 1.3 | 1.4 | 4.0 | - | - | - | 8.2 |
| Shell, Wilmington, California | - | - | - | - | - | - | - | - | 0.3 | 0.8 | - | - | 1.1 |
| Std.-California, Bakersfield, Calif. | - | - | - | - | 11.0 | 1.0 | - | - | - | 12.0 | 54.0 | 43.0 | 121.0 |
| Std.-California, El Segundo, Calif. | 120.0 | 55.0 | 131.0 | 210.0 | 290.0 | 225.0 | 69.0 | 127.0 | 72.0 | 99.0 | 116.0 | 313.0 | 1,827.0 |
| Std.-California, Richmond, Calif. | 156.0 | 140.0 | 110.0 | 130.0 | 88.0 | 158.0 | 245.0 | 85.0 | 79.0 | 107.0 | 85.0 | 109.0 | 1,492.0 |
| Texas, Wilmington, California | 1.0 | 13.0 | 2.0 | - | 8.0 | 7.0 | - | 4.0 | 9.0 | 6.0 | 6.0 | 6.0 | 62.0 |
| Tidewater, Avon, California | - | 50.0 | - | - | - | - | 38.0 | 101.0 | 79.0 | - | - | - | 268.0 |
| Tidewater, Watson, California | - | - | - | - | - | - | - | 3.0 | 13.0 | - | - | - | 16.0 |
| Union, Bakersfield, California | 0.8 | 8.1 | 12.1 | - | - | - | - | - | - | - | - | - | 21.0 |
| Union, Oleum, California | - | 10.1 | - | 4.9 | 3.9 | 14.1 | 13.2 | 23.8 | 31.4 | 57.5 | 54.5 | 45.8 | 259.1 |
| Union, Wilmington, California | 15.8 | 6.8 | 16.8 | 7.4 | - | 7.9 | 41.0 | 16.7 | - | 54.9 | 12.2 | 13.1 | 192.6 |
| Wilshire, Norwalk, California | 29.3 | 30.2 | 19.8 | 41.0 | 27.1 | 26.7 | 35.4 | 37.0 | 31.7 | 44.6 | 5.8 | 42.9 | 372.7 |
| Total District V | 491.8 | 445.1 | 452.8 | 451.1 | 540.2 | 496.6 | 579.1 | 510.9 | 457.6 | 675.1 | 538.5 | 849.5 | 6,588.3 |
| TOTAL U.S.A. | 1,385.8 | 1,311.5 | 1,323.8 | 1,208.1 | 1,212.8 | 1,248.0 | 1,416.4 | 1,879.3 | 1,903.6 | 2,664.9 | [illegible] | 2,871.4 | 20,636.8 |

**1944**

| YEAR | JAN. | FEB. | MAR. | APR. | MAY | JUN. | JUL. | AUG. | SEP. | OCT. | NOV. | DEC. | TOTAL FOR YEAR 1944 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DISTRICT I | | | | | | | | | | | | | |
| Atlantic, Point Breeze, Pennsylvania | 119.0 | 121.0 | 86.0 | 103.0 | 103.0 | 27.0 | 19.0 | - | - | 86.0 | - | - | 664.0 |
| Std.-New Jersey, Baltimore, Maryland | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Std.-New Jersey, Bayonne, New Jersey | 32.0 | 34.0 | 14.0 | 51.0 | 23.0 | 15.0 | 21.0 | 25.0 | 38.0 | 21.0 | - | 8.0 | 282.0 |
| Sun, Marcus Hook, Pennsylvania | 39.0 | 43.0 | 98.0 | 191.0 | 198.0 | 172.0 | 171.0 | 343.0 | 229.0 | 200.0 | 27.0 | 51.0 | 1,762.0 |
| Tidewater, Bayonne, New Jersey | 61.6 | 79.2 | 79.1 | 83.7 | 99.1 | 67.6 | 91.6 | 93.4 | 91.1 | 77.1 | 33.9 | 57.7 | 915.0 |
| Total District I | 251.6 | 277.2 | 277.1 | 428.7 | 423.1 | 281.6 | 302.5 | 461.4 | 358.1 | 384.1 | 60.9 | 116.7 | 3,623.0 |
| DISTRICT II | | | | | | | | | | | | | |
| Phillips, Okla. City, Okla. | 2.4 | 2.5 | 2.4 | 2.4 | 2.0 | 4.7 | 2.4 | 4.7 | 3.4 | 4.6 | 2.3 | 2.3 | 36.1 |
| Shell, Wood River, Illinois | 35.5 | 33.1 | 27.8 | 51.6 | 112.1 | 22.9 | 147.2 | 124.6 | 96.8 | 71.1 | 18.5 | 19.6 | 760.8 |
| Sinclair, East Chicago, Ind. | 54.6 | - | - | - | - | - | - | 85.0 | - | - | - | - | 139.6 |
| Std.-Indiana, Casper, Wyoming | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Std.-Indiana, Whiting, Indiana | 7.8 | 4.8 | 9.0 | 6.0 | 5.0 | 7.0 | 5.0 | 6.0 | 6.0 | 7.0 | 6.0 | 0.6 | 69.2 |
| Std.-Ohio, Toledo, Ohio | 18.8 | 7.6 | 24.6 | 10.7 | 13.2 | 26.4 | 12.0 | 25.2 | 11.1 | 19.7 | - | 11.5 | 180.8 |
| Total District II | 119.1 | 48.0 | 63.8 | 70.7 | 132.3 | 61.0 | 166.6 | 245.5 | 117.5 | 102.4 | 25.8 | 34.0 | 1,185.5 |
| DISTRICT III | | | | | | | | | | | | | |
| Amsco, Corpus Christi, Texas | 39.0 | 43.5 | 47.0 | 45.5 | 42.9 | 41.8 | 47.0 | 49.4 | 37.4 | 48.1 | 41.5 | 41.2 | 524.3 |
| Cities Service, St. Rose, La. | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Coastal, Port Isabel, Texas | 58.0 | 60.0 | 53.0 | 66.0 | 69.0 | 87.0 | 80.0 | 86.0 | 71.0 | 73.0 | 69.0 | 84.0 | 836.0 |
| Continental, Lake Charles, La. | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Coltex, Colorado City, Texas | 25.8 | 21.5 | 24.6 | 27.3 | 32.8 | 21.9 | 32.9 | 27.4 | 22.4 | 28.6 | 19.6 | 21.0 | 312.6 |
| Cosden, Big Springs, Texas | 9.8 | 3.9 | 19.1 | 11.5 | 9.4 | 12.1 | 16.8 | 16.4 | 21.9 | 23.3 | 24.5 | 24.0 | 192.7 |
| Crown Central, Houston, Texas | 40.8 | 33.0 | 45.0 | 34.6 | 44.7 | 32.3 | 30.1 | 33.4 | 26.1 | 17.2 | 33.6 | 14.9 | 444.9 |
| Danciger, East Columbia, Texas | - | - | - | 7.0 | 5.0 | 4.0 | 5.0 | 4.0 | 4.0 | 5.0 | 5.0 | 5.0 | 44.0 |
| Dist. Products, North Houston, Tex. | - | 6.8 | 2.5 | 18.7 | 28.1 | 25.9 | 27.0 | 32.2 | 32.4 | 22.2 | 27.9 | 23.6 | 247.3 |
| Gr. Southern, Corpus Christi, Texas | 151.2 | 186.8 | 142.1 | 160.0 | 96.0 | 98.0 | 148.0 | 53.0 | 91.0 | 106.0 | 53.0 | 10.0 | 1,295.1 |
| Gulf, Port Arthur, Texas | 65.0 | 68.0 | 72.0 | 110.0 | 143.0 | 84.0 | 84.0 | 121.0 | 68.0 | 66.0 | 69.0 | 47.0 | 1,017.0 |
| Humble, Baytown, Texas | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Humble, Ingleside, Texas | 162.0 | 161.3 | 168.0 | 169.6 | 185.0 | 176.0 | 150.0 | 179.0 | 170.0 | 29.0 | - | - | 1,549.9 |
| Humble, Katy, Texas | - | - | 123.0 | 102.0 | 114.0 | 123.0 | 133.0 | 122.0 | 114.0 | 182.0 | 173.0 | 186.0 | 1,372.0 |
| Humble, San Antonio, Texas | 17.7 | 17.8 | 23.6 | 16.2 | 17.0 | 16.0 | 17.0 | 17.0 | 17.0 | 20.0 | 14.0 | 17.0 | 210.3 |
| Lion, El Dorado, Arkansas | 9.5 | 4.5 | 20.0 | 13.3 | 16.4 | 12.4 | 11.8 | 21.2 | 10.7 | 12.7 | 7.6 | 6.9 | 147.0 |
| Magnolia, Beaumont, Texas | 106.0 | 97.0 | 126.0 | 118.0 | 72.0 | 85.0 | 56.0 | 63.0 | 98.0 | 14.0 | 39.0 | 53.0 | 927.0 |
| Malco, Artesia, New Mexico | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Maritime, Houston, Texas | 37.1 | 33.5 | 36.1 | 38.1 | 15.8 | 31.1 | 37.0 | 40.0 | 33.8 | 40.7 | 36.3 | 35.8 | 415.3 |
| Pan American, Texas City, Texas | 188.0 | 193.0 | 169.0 | 138.0 | 185.0 | 135.0 | 236.0 | 169.0 | 170.0 | 77.0 | 197.0 | 134.0 | 1,991.0 |
| Phillips, Borger, Texas | 2.7 | - | 2.6 | 2.2 | 2.4 | 2.0 | 5.0 | 2.5 | 3.0 | 5.4 | 14.1 | - | 41.9 |
| Pontiac, Corpus Christi, Texas | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pure, Nederland, Texas | 15.0 | 14.0 | 23.0 | 22.0 | 26.0 | - | - | - | - | - | - | - | 100.0 |
| Republic, Corpus Christi, Texas | 38.6 | 42.9 | 33.7 | 48.3 | 64.9 | 40.4 | 44.4 | 77.6 | 47.7 | 29.1 | 37.7 | - | 525.3 |
| Shell, Houston, Texas | 13.8 | 5.8 | 10.6 | 9.2 | 14.1 | 15.1 | 7.7 | 10.1 | 16.3 | 14.6 | 16.8 | 18.5 | 152.6 |
| Sinclair, Houston, Texas | - | - | - | - | - | - | - | 136.4 | - | - | - | - | 136.4 |
| Sinclair, Corpus Christi, Texas | - | - | 7.9 | 85.6 | 62.4 | 107.1 | 62.4 | 16.3 | 69.9 | 94.5 | 67.1 | 53.0 | 626.2 |
| Southport, Texas City, Texas | - | - | - | - | 74.3 | 16.7 | 5.9 | 9.3 | 35.9 | 38.5 | 31.9 | 22.7 | 235.2 |
| Southwestern, Corpus Christi, Tex. | 89.8 | 72.6 | 79.6 | 75.9 | 69.3 | 85.1 | 58.1 | 83.3 | 88.2 | 65.2 | 81.1 | 55.3 | 903.5 |
| Std.-Louisiana, Baton Rouge, La. | 84.0 | 97.0 | 90.0 | 77.0 | 57.0 | 91.0 | 36.0 | 35.0 | 18.0 | 29.0 | 37.0 | 37.0 | 688.0 |
| Std.-Texas, El Paso, Texas | 17.1 | 18.1 | 21.4 | 17.4 | 17.2 | 20.2 | 16.9 | 16.4 | 15.3 | 15.0 | 16.6 | 13.1 | 204.7 |
| Stanolind, Superior, Texas | 4.0 | 3.9 | 3.2 | - | 6.1 | 2.9 | 4.9 | 2.7 | 4.8 | 2.7 | 1.9 | - | 37.1 |
| Taylor, Corpus Christi, Texas | 81.0 | 73.0 | 97.0 | 91.0 | 79.9 | 97.0 | 85.0 | 91.0 | 104.0 | 95.0 | 108.0 | 111.0 | 1,112.9 |
| Texas Company, Port Arthur, Texas | 36.0 | 44.0 | 49.0 | 56.0 | 91.0 | 46.0 | 48.0 | 70.0 | 43.0 | 49.0 | 69.0 | 117.0 | 718.0 |
| Total District III | 1,291.1 | 1,303.9 | 1,509.0 | 1,580.4 | 1,640.7 | 1,529.0 | 1,505.9 | 1,584.6 | 1,458.8 | 1,202.8 | 1,285.0 | 1,111.0 | 17,002.2 |
| DISTRICT V | | | | | | | | | | | | | |
| Caminol, Hanford, California | 17.0 | 17.0 | 16.0 | 15.5 | 17.0 | 9.7 | 11.0 | 15.8 | 13.0 | 12.0 | - | 7.0 | 153.5 |
| Caminol, Santa Fe Springs, Calif. | - | - | - | 6.0 | 11.0 | 9.0 | 11.0 | 11.0 | 11.0 | 10.6 | 1.0 | 6.0 | 76.6 |
| General Pet., Torrance, Calif. | 191.0 | 94.0 | 292.0 | 90.0 | 170.0 | 129.0 | 135.0 | 138.0 | 67.0 | 18.0 | - | - | 1,324.0 |
| MacMillan, Signal Hill, Calif. | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Mohawk, Bakersfield, California | 18.5 | 4.3 | - | - | - | - | - | - | - | - | - | - | 22.8 |
| Richfield, Watson, California | 33.0 | - | - | 19.0 | 14.0 | 15.0 | 21.0 | 17.0 | - | 14.0 | - | 7.0 | 140.0 |
| Rothschild, Santa Fe Springs, Calif. | - | - | 13.0 | 14.0 | 13.0 | 12.0 | 16.0 | 13.0 | 14.0 | 13.0 | 8.0 | 13.0 | 129.0 |
| Shell, Coalinga, California | 29.2 | 37.6 | 31.3 | 34.0 | 24.6 | - | - | - | - | - | - | - | 156.7 |
| Shell, Martinez, California | - | - | - | - | - | - | - | 1.6 | - | - | - | - | 1.6 |
| Shell, Wilmington, California | - | 22.0 | 0.7 | 17.6 | 9.8 | - | 15.5 | 12.8 | 18.9 | 29.6 | 26.2 | 2.1 | 155.2 |
| Std.-California, Bakersfield, Calif. | 47.0 | 33.0 | 44.0 | 50.0 | 54.0 | 41.0 | 28.0 | 62.0 | 81.0 | 32.0 | 7.0 | 11.0 | 490.0 |
| Std.-California, El Segundo, Calif. | 356.0 | 359.0 | 442.0 | 359.0 | 370.0 | 363.0 | 489.0 | 45.8 | 362.0 | 359.0 | 4.0 | 24.0 | 3,532.8 |
| Std.-California, Richmond, Calif. | 247.0 | 128.0 | 119.0 | 280.0 | 271.0 | 246.0 | 93.0 | 48.0 | 16.0 | 28.0 | 21.0 | 27.0 | 1,521.0 |
| Texas, Wilmington, California | 6.0 | 5.0 | 6.0 | 5.0 | 8.0 | 15.0 | 7.0 | - | 4.0 | 6.0 | 6.0 | 12.0 | 80.0 |
| Tidewater, Avon, California | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Tidewater, Watson, California | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Union, Bakersfield, California | - | - | - | - | 5.5 | 28.5 | 33.2 | 34.5 | 33.9 | 39.7 | 27.1 | 26.0 | 228.4 |
| Union, Oleum, California | 21.9 | 22.0 | 32.9 | 17.6 | 28.0 | 18.0 | 28.8 | 28.6 | 30.5 | 14.9 | 16.3 | 27.1 | 291.5 |
| Union, Wilmington, California | 9.4 | 12.9 | 17.6 | - | 15.8 | 8.6 | 4.9 | - | - | - | - | - | 69.2 |
| Wilshire, Norwalk, California | - | 13.0 | - | 8.6 | 4.0 | - | - | 8.6 | - | 5.2 | 15.2 | - | 55.2 |
| Total District V | 976.0 | 752.8 | 1,014.5 | 916.3 | 1,015.3 | 894.8 | 896.4 | 436.0 | 651.3 | 582.7 | 131.8 | 162.2 | 8,430.5 |
| TOTAL U.S.A. | 2,637.8 | 2,382.0 | 2,864.4 | 2,996.1 | 3,211.8 | 2,766.4 | 2,871.4 | 2,727.5 | 2,565.5 | 2,272.0 | 1,503.5 | 1,423.9 | 30,242.2 |

**1945**

| YEAR | JAN. | FEB. | MAR. | APR. | MAY | JUN. | JUL. | TOTAL FOR YEAR 1945 | TOTAL JAN. '42 THRU JULY '45 |
|---|---|---|---|---|---|---|---|---|---|
| DISTRICT I | | | | | | | | | |
| Atlantic, Point Breeze, Pennsylvania | - | - | - | - | 104.0 | - | - | 104.0 | |
| Std.-New Jersey, Baltimore, Maryland | - | - | - | - | - | - | - | - | |
| Std.-New Jersey, Bayonne, New Jersey | 22.0 | 27.0 | 30.0 | 10.0 | 9.0 | 9.0 | 27.0 | 134.0 | |
| Sun, Marcus Hook, Pennsylvania | 52.0 | 59.0 | 56.0 | 45.0 | 49.0 | 87.0 | 70.0 | 418.0 | |
| Tidewater, Bayonne, New Jersey | 39.0 | 42.6 | 68.7 | 56.8 | 59.0 | 53.7 | - | 319.8 | |
| Total District I | 113.0 | 128.6 | 154.7 | 111.8 | 221.0 | 149.7 | 97.0 | 975.8 | 7,315.6 |
| DISTRICT II | | | | | | | | | |
| Phillips, Okla. City, Okla. | 4.6 | 4.6 | 4.6 | 4.2 | 4.6 | 7.0 | 5.0 | 34.6 | |
| Shell, Wood River, Illinois | 14.4 | 13.7 | 17.7 | 27.0 | 10.9 | 15.1 | 19.5 | 118.3 | |
| Sinclair, East Chicago, Ind. | - | - | - | - | - | - | - | - | |
| Std.-Indiana, Casper, Wyoming | - | - | - | - | - | - | - | - | |
| Std.-Indiana, Whiting, Indiana | 6.7 | 4.8 | 5.2 | 4.1 | 2.6 | 7.1 | 1.4 | 31.9 | |
| Std.-Ohio, Toledo, Ohio | 18.7 | 18.1 | 18.0 | - | 12.1 | - | 19.3 | 80.6 | |
| Total District II | 44.4 | 41.2 | 39.5 | 35.3 | 30.6 | 29.2 | 45.2 | [illegible] | 3,129.4 |
| DISTRICT III | | | | | | | | | |
| Amsco, Corpus Christi, Texas | 36.9 | 36.4 | 46.0 | 40.0 | 43.0 | 26.0 | 34.7 | 263.2 | |
| Cities Service, St. Rose, La. | - | - | - | - | - | - | - | - | |
| Coastal, Port Isabel, Texas | 58.0 | 65.0 | 74.0 | 59.0 | 66.0 | 65.0 | 23.0 | 410.0 | |
| Continental, Lake Charles, La. | - | - | - | - | - | - | - | - | |
| Coltex, Colorado City, Texas | 21.8 | 21.7 | 15.4 | 27.1 | 20.7 | 19.3 | 27.0 | 153.0 | |
| Cosden, Big Springs, Texas | 23.2 | 26.5 | 22.6 | 16.4 | 21.6 | 22.9 | 16.9 | 150.1 | |
| Crown Central, Houston, Texas | 42.4 | 27.4 | 29.7 | 19.6 | 31.7 | 18.5 | - | 169.3 | |
| Danciger, East Columbia, Texas | 5.0 | 5.0 | 5.0 | 5.0 | 4.0 | 4.0 | 5.0 | 33.0 | |
| Dist. Products, North Houston, Tex. | 23.6 | 28.2 | 28.1 | 26.4 | 23.2 | 26.9 | 28.0 | 184.4 | |
| Gr. Southern, Corpus Christi, Texas | 1.0 | 34.0 | 16.0 | 30.0 | 35.0 | 2.0 | - | 118.0 | |
| Gulf, Port Arthur, Texas | 49.5 | 67.6 | 51.7 | 62.4 | 84.7 | 43.7 | 85.5 | 445.1 | |
| Humble, Baytown, Texas | - | - | - | - | - | - | - | - | |
| Humble, Ingleside, Texas | 18.0 | - | 27.0 | 28.0 | 44.0 | 44.0 | 15.0 | 176.0 | |
| Humble, Katy, Texas | 187.0 | 184.0 | 181.0 | 175.0 | 187.0 | 48.0 | - | 962.0 | |
| Humble, San Antonio, Texas | 17.0 | 18.0 | 20.0 | 17.0 | 15.0 | 13.0 | 19.0 | 119.0 | |
| Lion, El Dorado, Arkansas | 7.8 | 6.6 | 8.4 | 6.7 | 5.4 | 9.6 | 6.2 | 50.7 | |
| Magnolia, Beaumont, Texas | 88.0 | 59.0 | 60.0 | 60.0 | 48.0 | 38.0 | 95.0 | 448.0 | |
| Malco, Artesia, New Mexico | - | - | - | - | - | - | - | - | |
| Maritime, Houston, Texas | 25.5 | 31.5 | 35.3 | 38.0 | 40.2 | 37.3 | - | 207.8 | |
| Pan American, Texas City, Texas | 155.0 | 112.0 | 107.0 | 101.0 | 136.0 | 138.0 | 78.0 | 827.0 | |
| Phillips, Borger, Texas | 15.1 | 13.2 | 13.7 | 27.2 | 13.9 | 13.6 | 13.6 | 110.1 | |
| Pontiac, Corpus Christi, Texas | - | - | - | - | - | - | - | - | |
| Pure, Nederland, Texas | - | - | - | - | - | - | - | - | |
| Republic, Corpus Christi, Texas | 6.4 | 50.9 | 82.7 | 77.4 | 79.6 | 105.5 | 64.2 | 466.7 | |
| Shell, Houston, Texas | 31.3 | 40.8 | 50.7 | 51.4 | 40.7 | 32.7 | 30.7 | 278.3 | |
| Sinclair, Houston, Texas | - | - | - | - | - | - | - | - | |
| Sinclair, Corpus Christi, Texas | 68.1 | 80.5 | 72.1 | 68.4 | 59.8 | - | 42.5 | 391.4 | |
| Southport, Texas City, Texas | 58.4 | 40.5 | 40.4 | 57.2 | 16.2 | 26.6 | 33.9 | 263.2 | |
| Southwestern, Corpus Christi, Tex. | 56.9 | 71.0 | 96.1 | 70.8 | 108.7 | 85.9 | 93.3 | 582.7 | |
| Std.-Louisiana, Baton Rouge, La. | 18.0 | 33.0 | 30.0 | 44.0 | 38.0 | 33.0 | 51.0 | 247.0 | |
| Std.-Texas, El Paso, Texas | 13.2 | 15.4 | 15.4 | 11.2 | 12.2 | 9.0 | 19.8 | 96.2 | |
| Stanolind, Superior, Texas | 3.2 | - | 3.8 | 5.4 | 8.5 | 3.1 | 2.4 | 22.4 | |
| Taylor, Corpus Christi, Texas | 93.0 | 100.0 | 115.0 | 121.0 | 89.0 | 105.0 | 77.0 | 700.0 | |
| Texas Company, Port Arthur, Texas | 57.0 | 74.0 | 122.0 | 83.0 | 63.0 | 74.0 | 67.0 | 540.0 | |
| Total District III | 1,180.3 | 1,232.4 | 1,369.1 | 1,318.6 | 1,330.9 | [illegible] | 928.7 | [illegible] | 43,860.4 |
| DISTRICT V | | | | | | | | | |
| Caminol, Hanford, California | 8.0 | 5.0 | 6.0 | 6.0 | 6.0 | 6.0 | 5.0 | 42.0 | |
| Caminol, Santa Fe Springs, Calif. | 8.0 | 7.0 | 7.0 | 6.0 | 6.0 | 4.0 | 7.0 | 45.0 | |
| General Pet., Torrance, Calif. | - | - | - | - | - | - | - | - | |
| MacMillan, Signal Hill, Calif. | - | - | - | - | - | - | - | - | |
| Mohawk, Bakersfield, California | - | - | - | - | - | - | - | - | |
| Richfield, Watson, California | 8.0 | 12.0 | 8.0 | 13.0 | - | 6.0 | 6.0 | 53.0 | |
| Rothschild, Santa Fe Springs, Calif. | 13.0 | 14.0 | 14.0 | 14.0 | 18.0 | 7.0 | 10.0 | 85.0 | |
| Shell, Coalinga, California | - | - | - | - | - | - | - | - | |
| Shell, Martinez, California | - | - | 12.9 | - | - | - | - | 12.9 | |
| Shell, Wilmington, California | 20.7 | 12.2 | 18.7 | 20.0 | 4.4 | 20.6 | 15.1 | 111.7 | |
| Std.-California, Bakersfield, Calif. | 25.0 | 33.0 | 32.0 | 29.0 | 23.0 | 14.0 | - | 150.0 | |
| Std.-California, El Segundo, Calif. | 462.0 | 260.0 | 264.0 | 62.0 | 72.0 | 60.0 | - | 1,180.0 | |
| Std.-California, Richmond, Calif. | 38.0 | 50.0 | 67.0 | 69.0 | 115.0 | 30.0 | 97.0 | 466.0 | |
| Texas, Wilmington, California | 4.0 | 6.0 | 16.0 | 12.0 | - | 11.0 | 10.0 | 59.0 | |
| Tidewater, Avon, California | - | - | - | - | - | - | - | - | |
| Tidewater, Watson, California | - | - | - | - | - | - | - | - | |
| Union, Bakersfield, California | 20.6 | 22.0 | 23.3 | 22.5 | 24.8 | 1.6 | 23.4 | 138.2 | |
| Union, Oleum, California | - | 12.8 | 18.7 | 13.4 | 17.5 | 1.7 | - | 64.1 | |
| Union, Wilmington, California | - | - | - | - | - | - | - | - | |
| Wilshire, Norwalk, California | - | - | - | - | - | - | - | - | |
| Total District V | 607.3 | 434.0 | 487.8 | 260.9 | 281.7 | 161.9 | 173.5 | 2406.7 | 20,667.3 |
| TOTAL U.S.A. | 1,945.0 | 1,836.2 | 2,050.9 | 1,726.6 | 1,864.2 | 1,883.4 | 1,244.4 | 12082.7 | 75,770.0 |

RESTRICTED

80357

# APPENDIX III

## METHOD OF CALCULATING GRADE 100/130 EQUIVALENT

## OF AN AVIATION COMPONENT



DECLASSIFIED
Authority NND730014

DECLASSIFIED
Authority NND730014

80357

## APPENDIX III – METHOD OF CALCULATING GRADE 100/130 EQUIVALENT

### OF AN AVIATION COMPONENT.

In order to establish the "equivalent" value of an aviation component, it is necessary to determine the quantity of finished aviation gasoline which could be blended from a unit volume of that component. This volume is a function of certain chemical and physical characteristics of the component. The most important and limiting specification of Grade 100/130 are the 1-C lean and 3-C rich anti-knock blending values, the Reid Vapor Pressure and the volatility characteristics.

Grade 100/130 is usually blended from four types of components:

   (1)   Agents having a high 1-C BON (blending octane number) such as alkylate or hydrocodimer.

   (2)   Agents having a high 3-C BIN (blending index number) such as cumene, toluene, etc.

   (3)   Vapor pressuring agents, and

   (4)   Marginal base stock.

Marginal base stock is the lowest quality component in the blend and is available in excess of the maximum quantity which could be blended with the available high quality blending agent. The anti-knock qualities of marginal base varies somewhat from refinery to refinery; however, through most of the war, it has been available to most refineries with a 1-C BON minimum of 91.0 and a 3-C BIN minimum of 80 when leaded to 4.6 cc TEL/Gal.

During 1942, equivalent production was credited to each producer of alkylate and hydrocodimer on the basis of the percentage of these blending agents in the final blend. These agents were limiting the quantity of fuel blending as there was no rich mixture specification during that period.

80357

In January of 1943, the imposition of a rich mixture specification of the new fuel, AN-F-28, Amendment 1, (Grade 100/130) shifted the ratio of components in the average blend, necessitating a greater proportion of aromatics. Aromatic supplies were deficient and the quantity of Grade 130 fuel which could be blended from a unit volume of a given component became a function of the rich mixture, 3-C BIN. At this time, a formula was developed to evaluate components on the basis of their 3-C rating.

Late in 1943, the ratio of aromatics to isoparaffins was brought into balance and a new formula was developed taking into consideration both the rich and lean anti-knock ratings of a component. This formula was used during 1944 and 1945 in preparation of production estimates and to calculate the actual production for the WPB Report. It has been found to give very good results.

The equivalent method of evaluating a given component may be visualized by referring to the following chart. Line (1) represents a theoretical volumetric blend of alkylate, cumene and straight run base in ratios to meet both anti-knock specifications of Grade 100/130. In line (2), the components are evaluated on an equivalent rich limited basis. Because of its high rich mixture response, the cumene equivalent is four times its actual volume. Alkylate which has an assumed 3-C value of 140 BIN has a-factor equivalent of 1.2. In line (4), the components are evaluated on a lean limited basis. Under these conditions, alkylate has a very high equivalent value whereas cumene is worth slightly less than volume for volume. In line (3), an average of the rich and lean limited cases is developed.

The equation represented graphically by line (3) is as follows were the Grade 100/130 Equivalent of Component, $f_{1,3}$ is:

$$f_{1,3} = \frac{(5.55)\genfrac{(}{)}{0pt}{}{\text{1-C BON of}}{\text{Component}} + \genfrac{(}{)}{0pt}{}{\text{3-C BIN of}}{\text{Component}} - 585}{100}$$

The above equation assumes Grade 91/96 to be the marginal base stock.

2

DECLASSIFIED
Authority NND730014

# RELATIVE EQUIVALENT GRADE 100/130 AVIATION GASOLINE
## ALKYLATE AND CUMENE



¹⁄ Relative Actual Volume to Give Grade 100/130

²⁄ Aromatic Availibility Limiting

³⁄ Balanced Picture

⁴⁄ Isoparaffin Availibility Limiting

SEPTEMBER 10, 1945

RESTRICTED

DECLASSIFIED
Authority NND730014

Prepared By:
"REFINING GRAPHICS" — REFINING DIVISION
PETROLEUM ADMINISTRATION FOR WAR

80357

# Exhibit 1-141

190269

Revised June 15, 1942.

# C O N T R A C T

### between

### DEFENSE SUPPLIES CORPORATION

### and

### CITIES SERVICE REFINING CORPORATION

### (Lake Charles Refinery)

### 100-OCTANE AVIATION GASOLINE

June 16, 1942.

189262
190535

## DEFENSE SUPPLIES – CITIES SERVICE CONTRACT

### (Lake Charles Refinery)

CONTRACT made as of June __16__, 1942, between CITIES SERVICE REFINING CORPORATION, a Delaware corporation, having its principal place of business at 70 Pine Street, New York, New York, hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act, as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of the mutual agreements herein contained the parties agree as follows:

I. Construction of Seller's Refining Facilities.

Seller is willing to construct facilities, consisting of a complete new refinery near Lake Charles, Calcasieu Parish, Louisiana, hereinafter called Seller's Lake Charles Refinery, at an estimated cost of approximately Fifty Million Dollars ($50,000,000.00) which will enable Seller to produce at Seller's Lake Charles Refinery, approximately fourteen thousand two hundred (14,200) barrels per calendar day of 100-Octane aviation gasoline in accordance with Item 1 of Exhibit A attached hereto and made a part hereof, or sixteen thousand five hundred (16,500) barrels of 100-Octane aviation gasoline in accordance with Item 2 of said Exhibit A, as well as raw material sufficient to produce fifty-five thousand (55,000) tons per year of butadiene, sixteen million (16,000,000) gallons per year of toluene, and other petroleum products. Seller shall use its best efforts to complete said facilities as soon as possible and not later than October 1, 1943, and shall maintain work on the construction day and night insofar as the requisite labor and materials are available. The force majeure provisions set forth in Section X hereof shall apply in all respects to the construction of facilities as well as to the sale of gasoline and all other obligations of Seller.

II. Sale and Storage of Products.

(a) When the aforesaid construction of Seller's facilities shall be completed and the facilities are ready for operation, Seller shall promptly notify Buyer, and from and after receipt of such notification

189262
190682

Seller shall sell and deliver and Buyer shall buy and receive, until the end of the original term of this contract in accordance with the provisions of this contract, Seller's production of fourteen thousand two hundred (14,200) barrels per calendar day of 100-Octane aviation gasoline in accordance with Item 1 of Exhibit A hereof or sixteen thousand five hundred (16,500) barrels per calendar day of 100-Octane aviation gasoline in accordance with Item 2 of said Exhibit A, or a corresponding quantity of aviation gasoline of any other specifications which by mutual agreement shall be attached as an addendum to Exhibit A. Whenever in this contract provision is made for the sale and delivery to Buyer of a stated quantity of gasoline, such quantity is an aggregate quantity of the various kinds of gasoline specified in Exhibit A collectively considered. Buyer may apportion such aggregate quantity among the various kinds of gasoline. The damages, if any, for a breach of this Section II (a) shall be in accordance with Section VIII hereof.

(b) Buyer on giving reasonable notice to Seller may require the delivery hereunder of aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with the same refining facilities and the same raw materials as are used in producing aviation gasoline in accordance with the specifications originally set forth in Exhibit A. The prices and specifications of such products shall be determined by negotiation between the parties, and Seller shall not be required to deliver such products unless and until an agreement has been reached. Such agreement shall be reduced to writing as an addendum to Exhibit A and shall constitute a part thereof.

(c) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons and a gallon is a United States gallon of two hundred and thirty-one (231) cubic inches.

(d) Seller shall maintain storage facilities at, or in the vicinity of, its Lake Charles Refinery to accommodate at least four hundred eighty thousand (480,000) barrels of 100-Octane aviation gasoline.

(e) In accumulating said Storage, Seller may store gasoline of the specifications last ordered by Buyer unless Buyer otherwise

2

directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline in storage; provided, however, that on Buyer's request and if Seller can do so without extra cost, or if Seller can do so at extra cost and Buyer shall agree to assume such extra cost, Seller shall change the gasoline in storage to meet other specifications covered in Exhibit A hereof.

(f)  Seller shall sell and deliver and Buyer shall buy and receive at the end of the original term of this contract or any extension thereof the 100-Octane aviation gasoline stored at that time in the facilities referred to in Section II (d) hereof to the extent of not more than four hundred eighty thousand (480,000) barrels.

III.  Optional Gasoline.

(a)  Buyer shall have the option from time to time and at any time to purchase from Seller hereunder all or any part of the aviation gasoline which Seller may produce at its Lake Charles Refinery between the date of execution of this contract and the date of receipt of the notification referred to in Section II (a) hereof to the extent that such gasoline is in excess of quantities which Seller has, prior to receipt by Seller of notification of exercise of such option, contracted to sell to parties other than Buyer.  Upon the exercise of such option Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

(b)  Buyer shall also have the option from time to time and at any time to purchase from Seller hereunder all or any part of the aviation gasoline which Seller may produce at its Lake Charles Refinery between the date of receipt by Buyer of the notification referred to in Section II (a) hereof and the expiration of the original term of this contract, to the extent that such gasoline is in excess of the sum of (a) the quantity to be purchased by Buyer under Section II (a) hereof and (b) the quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer.  Upon the exercise of such option Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

3

IV. Price and Payment.                                    •

(a) The base price of 100-Octane aviation gasoline speci-
fied as Item 1 of Exhibit A hereof, shall be ten and three-quarter cents
($0.1075) per gallon f.o.b. Seller's refinery at Lake Charles, Louisiana.
The base price of 100-Octane aviation gasoline specified as Item 2 of Ex-
hibit A hereof shall be ten and one-half cents ($0.1050) per gallon f.o.b.
Seller's refinery at Lake Charles, Louisiana.

(b) Seller represents that there has not been included in
its computation of such prices any allowance for depreciation, amortiza-
tion and obsolescence in excess of ten percent (10%) per annum of that
portion of the original estimated cost of the refining facilities used
in the manufacture of said 100-Octane aviation gasoline which is properly
allocable to such manufacture. Nothing in the preceding sentence shall
preclude Seller from using a different rate or rates for tax and account-
ing purposes.

(c) Buyer shall pay promptly, but not later than the
twentieth (20th) day of each calendar month, all money due for gasoline
delivered to it by Seller during the preceding calendar month. On or be-
fore the tenth (10th) day of each month in which such payments are to be
made, Seller shall render to Buyer a statement setting forth the quantity
of aviation gasoline delivered during the preceding month, the price per
gallon, and the total amount to be paid therefor. Copies of the certifi-
cates of inspection referred to in Section IX hereof shall accompany the
aforesaid monthly statements.

V. Price Escalation.

The prices of 100-Octane aviation gasoline purchased hereunder
shall be subject to adjustment as follows:

(a) The said prices are based on a price of One Dollar and
Twenty-five Cents ($1.25) per barrel for thirty-eight to thirty-eight and
nine-tenths degree (38-38.9°) A.P.I. East Texas crude deliverable to Seller
or Seller's affiliated companies in the East Texas Field. The said prices
shall be increased or decreased by a percentage equal to one-half the per-
centage increase or decrease in the average price paid for such crude over
or under One Dollar and Twenty-five Cents ($1.25) per barrel by the three

189262
190269

(3) largest purchasers of such crude in the East Texas field. The prices posted for such crude in the East Texas Field shall constitute prima facie evidence of the prices paid by such purchasers.

(b) The said prices shall also be increased or decreased by a percentage equal to one-half the percentage increase or decrease in the final monthly wholesale price Index Number for "All Commodities other than Farm Products and Foods," as now published by the Bureau of Labor Statistics, United States Department of Labor, over or under the index figure of ninety-five and two-tenths (95.2). The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number. If said index shall cease to be issued, the parties shall use such other index that may most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(c) The prices hereinabove set forth are based upon present normal methods of transporting petroleum raw materials to the Lake Charles area, and upon a normal operation of refineries in that area in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100-Octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to Seller's Lake Charles Refinery by other than said present normal methods, **thereby incurring additional costs of transportation, or if through an ab**-normal reduction of available markets for motor fuel and petroleum products other than 100-Octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any portion of the 100-Octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100-Octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a) and (b), Seller may give notice to Buyer that the delivery of 100-Octane aviation gasoline will be

5

reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for 100-Octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, Buyer may give notice to Seller that it desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase if any, within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of 100-Octane aviation gasoline by the refinery affected may be reduced as above provided.

(d)  If at the request of Buyer or other agency of the United States Government, Seller acquires from other refiners some of the components of 100-Octane aviation gasoline and moves the same to its refineries for blending with other stocks for the production of 100-Octane aviation gasoline, it shall be entitled to compensation for any increase in costs thereby incurred by increasing the price of the 100-Octane aviation gasoline so produced by an amount which will equal the difference between the purchase price of such components and the cost of manufacturing the same or similar components at its own refineries, plus transportation and other costs of any kind or character involved in the delivery of the components to the refinery where the blending occurs. If Seller and Buyer are unable to agree upon the amount of such additional compensation, the question shall be submitted to arbitration in the manner provided in Section XI hereof.

(e)  In making adjustments under this Section V, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

6

189262

### VI. Duration of Contract.

The original term of this contract shall expire at midnight on the last day of the thirty-sixth (36th) consecutive calendar month after Buyer's receipt of the notification referred to in Section II (a) hereof but not later in any event than January 31, 1947.   Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension, and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension. Upon such extension the obligations to purchase and receive shall be in accordance with Section II (a) hereof, and the price to be paid shall be fixed by agreement between the parties hereto during the ninety (90) day period prior to each extension.  All other provisions of this contract, except those not then applicable, shall be in full force and effect.

### VII.   (Section Omitted)

### VIII.   Damages.

(a)   In the event that Seller shall fail to sell and deliver or Buyer shall fail to take and pay for 100-Octane aviation gasoline in accordance with Section II (a) hereof, the amount of the damages, if any, to which Buyer or Seller, as the case may be, shall be entitled for such failure shall be determined by agreement or, failing agreement, by arbitration in accordance with Section XI hereof; provided, however, that Seller shall not be entitled to damages for failure by Buyer to take and pay for 100-Octane aviation gasoline unless the storage facilities referred to in Section II (d) hereof are full of 100-Octane aviation gasoline, leaded or unleaded; provided further that Seller shall be entitled to damages for failure by Buyer to take and pay for 100-Octane aviation gasoline only to the extent that the amount taken and paid for is less than (1) the amount specified in Section II (a) hereof or (2) Seller's average productive capacity per calendar day for 100-Octane aviation gasoline (of current specifications) over the period for which damages are to be determined, whichever quantity is the lesser; and provided further that Buyer's right to damages under this Section VIII shall be subject to Seller's rights under Sections II (e) and V (c) hereof.

7

(b) Damages under this contract shall be limited to those arising proximately from a breach of contract.

IX. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract.

(b) Buyer shall take delivery of said gasoline in tankers, barges, tank cars, or tank trucks (tank truck deliveries to be not in excess of available tank truck loading facilities for 100-Octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (1) of this Section IX) at its own cost and expense, at Seller's Lake Charles Refinery in quantities approximating the current rate of production.

(c) Each vessel delivery shall be made and title and risk of loss shall pass at the intake pipe of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each vessel and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d) Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.

(e) Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f) On shipments made from refineries and any other points where licensed inspectors are regularly available, Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall conform to usual industry practice. The certificates of inspection shall be issued in quadruplicate, one set of which shall accompany

8

139262

the relative shipment, a second set of which shall be forwarded forthwith to Buyer, a third set of which shall be submitted to Buyer with the monthly statement required by Section IV hereof, and a fourth set of which shall forthwith be delivered to Seller. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(g)  Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60° F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of deliveries into tank trucks in which case no adjustment shall be made.

(h)  Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product as shipped shall conform as to quality with the specifications set forth in Exhibit A hereof.

(i)  The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j)  The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment and all other purposes of this contract.

(k) · Should any such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may accept delivery of the product and claim an adjustment for such deficiency, provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

189262

(1)  Notwithstanding the preceding provisions of this Section IX and at the request of Buyer, Seller shall utilize its existing and available facilities (other than tankers and barges) for handling, metering and delivering the gasoline purchased by Buyer to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States served by Seller, such service to be at the expense of Buyer and at Buyer's risk. In the event of loss Seller shall make its records available to Buyer to prove the extent and value of such loss.

X.  Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of the Government or of any governmental officer or agent purporting to act under authority, floods, fires, epi- demics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery of any product, serv- ice or material necessary in the construction of the facilities contem- plated by Section I hereof or in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw mate- rials, ingredients and lead tetraethyl.

XI.  Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such dis- agreement to their mutual satisfaction.  If such effort be unsuccessful, then either party may cause such disagreement to be submitted for de- termination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice.  Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after

10

the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Fifth Circuit acting in his individual capacity, upon application therefor by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

XII. Taxes.

(a) Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

11.

189262

(b)  Buyer shall also pay in addition to the prices as established in Sections IV and V hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption.  Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section IV hereof are based.

(c)  If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption.  Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

XIII.  Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for whom intended at the address of such party as specified above.  A notice personally delivered to either party must be personally delivered to an officer or manager thereof.  Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery.  Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram.  Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.

XIV.  Entirety of Contract.

This instrument contains the entire agreement between the parties in respect to the subject matter and there are no oral conditions,

12

189262

warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.

XV. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties hereto, provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Governmental agency, department, instrumentality or wholly Government-owned corporation, in which event Buyer shall remain liable, and except that Seller may assign this agreement in connection with and as a part of the merger, consolidation, or reorganization of Seller, in which event Seller shall remain liable.

XVI. Statutory Compliance.

(a). In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable federal laws and further agrees to require such compliances, representations and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any worker because of race, creed, color or national origin.

(b) Seller is a corporation and this contract is made with it for its general benefit and no Member of, or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.

(c) If any statute now in existence or hereafter enacted, or any present or future governmental ruling or order, or the action of any governmental department, agency or instrumentality shall reduce any price payable to Seller, as provided for in this contract, or shall prevent or prohibit the Seller from receiving from Buyer the prices provided

13

139262

for in this contract, then Seller and Buyer agree that this shall, for the purpose of this contract, be deemed to be and shall constitute a breach by Buyer of its obligation to accept and pay for aviation gasoline at the prices provided for in this contract, and thereupon the Seller shall have the option upon thirty (30) days' written notice to Buyer to elect to continue to make the deliveries provided for in this contract at the maximum price fixed by any such ruling, order or action, or to consider this contract terminated, unless within said thirty (30) days said ruling or order shall be rescinded or changed so as not to reduce the price payable to Seller, or otherwise changed in a manner satisfactory to Seller.

XVII. Right to Terminate.

Seller shall have the right to terminate this contract within ninety (90) days of the date thereof, unless within said ninety (90) days it shall receive all Governmental assistance which is available or necessary for performing this contract and for the prompt completion of the facilities which Seller will construct hereunder, including, without limitation, priorities and allocations necessary for obtaining materials, equipment, supplies and crude petroleum, and such certificates as may be necessary to permit it to invoke the provisions of Section 124, Internal Revenue Code.

IN WITNESS WHEREOF the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By _____
                    President

ATTEST:
_____
        Acting Secretary

CITIES SERVICE REFINING CORPORATION

By _____
                    President

ATTEST:
_____
        Asst. Secretary

14

189262

## EXHIBIT "A"

Item 1.  ...................................price, 10.75 cents per gallon,
                                    f.o.b. Seller's refinery at
                                    Lake Charles, Louisiana.

U. S. ARMY - NAVY SUPPLY

AN-VV-F-781          Sept. 26, 1940

Amendment No. 3      June    6, 1941

Knock Test Method    AN-VV-F-746

                100-Octane Number by Method AN-VV-F-746

                Lead Limit 3.0 cc/Gal.


Item 2.  ...................................price, 10.5 cents per gallon,
                                    f.o.b. Seller's refinery at
                                    Lake Charles, Louisiana.

U. S. ARMY - NAVY SUPPLY

Same as above with Amendment No. 4     Nov. 24, 1941

                Lead Limit 4.0 cc/Gal.

15

189262

## GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to Cities Service Refining Corporation to enter into said contract, Reconstruction Finance Corporation does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of June 16., 1942.

RECONSTRUCTION FINANCE CORPORATION

By _AJKlozaner_

Vice· Chairman

ATTEST:

ASSISTANT Acting Secretary

16

189262

## GUARANTEE BY CITIES SERVICE COMPANY

In consideration of the execution of the within contract and as an inducement to Defense Supplies Corporation to enter into said contract, CITIES SERVICE COMPANY, a Delaware corporation, does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of CITIES SERVICE REFINING CORPORATION (a subsidiary of CITIES SERVICE COMPANY) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, CITIES SERVICE COMPANY has caused this Guarantee to be executed by its officers thereunto duly authorized as of June 16, 1942.

CITIES SERVICE COMPANY

By _____
         -President

ATTEST:

_____ Secretary

17

189262

ADDENDUM #1                         Cities Service Refining Corporation

                                    New York, New York

         All material ordered hereunder is for Defense Supplies Corporation, a corporation created by Reconstruction Finance Corporation pursuant to Section 5d of the Reconstruction Finance Corporation Act, as amended, and in accepting this contract, Cities Service Refining Corporation, a Delaware corporation, (hereinafter designated as "Contractor") agrees:

I.   (a)   The Contractor is the manufacturer of or a regular dealer in the materials, supplies, articles, or equipment to be manufactured or used in the performance of the contract.

     (b)   All persons employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles or equipment used in the performance of the contract will be paid, without subsequent deduction or rebate on any account, not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are·to be manufactured or furnished under the contract; PROVIDED, however, that this stipulation with respect to minimum wages shall apply only to purchases or contracts relating to such industries as have been the subject matter of a determination by the Secretary of Labor.

     (c)   No person employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of the contract shall be permitted to work in excess of eight (8) hours in any one day or in excess of forty (40) hours in any one week, unless such person is paid such applicable overtime rate as has been set by the Secretary·of Labor.

     (d)   No male person under 16 years of age and no female person under 18 years of age and no convict labor will be employed by the Contractor in the manufacture or production or furnishing of any of the materials, supplies, articles, or equipment included in the contract.

     (e)   No part of the contract will be performed nor will any of the materials, supplies, articles, or equipment to be manufactured or furnished under said contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of the contract.  Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part thereof is to be performed shall be prima-facie evidence of compliance with this subsection.

     (f)   Any breach or violation of any of the foregoing representations and stipulations shall render the party responsible therefor liable to the United States of America for liquidated damages, in addition to damages for any other breach of the contract, in the sum of ten dollars ($10.00) per day for each male person under 16 years of age or each female person under 18 years of age, or each convict laborer knowingly employed in the performance of the contract, and a sum equal to the amount of any deductions, rebates, refunds or underpayment of wages due to any employee engaged in the performance of the contract; and, in addition, the agency of the United States entering into the contract shall have the right to cancel same and to make open-market purchases or enter into other contracts for the completion of the original contract, charging any additional cost to the original Contractor.  Any sums of money due to the United States of America by reason of any violation of any of the representations and stipulations of the contract as set forth herein may be withheld

18

Addendum #1                                                                189262

from any amounts due on the contract or may be recovered in a suit brought in the name of the United States of America by the Attorney General thereof. All sums withheld or recovered as deductions, rebates, refunds, or underpayments of wages shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employees who have been paid less than minimum rates of pay as set forth in such contracts and on whose account such sums were withheld or recovered; PROVIDED, That no claims by employees for such payments shall be entertained unless made within one year from the date of actual notice to the Contractor of the withholding or recovery of such sums by the United States of America.

(g)  The Contractor shall post a copy of the stipulations in a prominent and readily accessible place at the site of the contract work and shall keep such employment records as are required in the Regulations under the Act available for inspection by authorized representatives of the Secretary of Labor.

(h)  The foregoing stipulation shall be deemed inoperative if this contract is for a definite amount not in excess of $10,000.00.

This Addendum #1 is hereby made a part of the contract between Defense Supplies Corporation and the undersigned dated as of June _____16_____, 1942.

CITIES SERVICE REFINING CORPORATION

By:  _J. W. Tutwiler_
                        President

19

*Supp. No. 4*

75482

CONFORMED COPY

AMENDING CONTRACT #1

between

DEFENSE SUPPLIES CORPORATION

and

CITIES SERVICE REFINING CORPORATION

(Lake Charles Refinery)

100 OCTANE AVIATION GASOLINE

May 1, 1944

CONFORMED COPY

75482

Exhibit "A"

Strike out the original Exhibit "A" and insert in lieu thereof the Exhibit "A" reading as follows:

EXHIBIT "A"

Item 1.

U. S. ARMY - NAVY SUPPLY

AN-VV-F-781            September 26, 1940

Amendment No. 3       June 6, 1941

Knock Test Method    AN-VV-F-746

100-Octane Number by Method AN-VV-F-746

Lead Limit 3.0 cc/Gal.

Item 2.

U. S. ARMY - NAVY SUPPLY

Same as above with Amendment No. 4

Nov. 24, 1941

Lead Limit 4.0 cc/Gal.

Item 3.

U. S. ARMY - NAVY SUPPLY

AN-F-28              December 23, 1942

Amendment No. 1       March 23, 1943

100 Octane Number by Method AN-VV-F-746, as amended November 5, 1940, or

99 Octane Number by Method ASTM-D-357-41T

S + 1.25 CC. tetraethyl lead by Method

AN-VV-F-748a, Amendment 1, March 23, 1943

Tetraethyl Lead Limit - 4.0cc. per gallon

It is understood that the specifications identified as Items 1 and 2 above are included only insofar as they are relevant in respect to Section I of said within contract and shall be of no further significance herein.

9

75482

Exhibit "B"

Attach to and make a part of the said Contract made as of the 16th day of June 1942, the Exhibit "B" reading as follows:

EXHIBIT "B"

I. (A). Seller represents that the base prices for 100 octane aviation gasoline set forth in Section IV of the foregoing contract each includes a certain "alkylation royalty sum" representing patent royalties which Seller is obligated to pay to its licensor for a certain sulfuric acid alkylation process employed by Seller in the manufacture of said aviation gasoline; that said "alkylation royalty sum" is calculated in the cost computations at the rate of $0.15 per barrel of aviation alkylate blended as a constituent of said aviation gasoline and amounts to $0.0013 per gallon of 100 octane aviation gasoline.

I. (B). In the event that during the term of the foregoing contract the running royalties per barrel of aviation alkylate that Seller has obligated itself to its licensor to pay for such alkylation process, shall be reduced below $0.15 per barrel with respect to the 100 octane aviation gasoline manufactured by Seller and delivered under the foregoing contract, then the base prices as set forth in Section IV of the foregoing contract for 100 octane aviation gasoline manufactured by Seller and delivered thereunder, and as to which gasoline Seller's royalty payments to its said licensor are in accordance with said reduced royalty rate, shall be reduced in accordance herewith. The amount of said reduction in each base price of said gasoline shall be the difference between the "alkylation royalty sum" applicable thereto as set forth in Section I (A) of this Exhibit B, and an amount equal to such "alkylation royalty sum" multiplied by the factor $\frac{A}{B}$ where A equals the reduced running royalty that Seller is obligated to pay per barrel of aviation alkylate blended as a constituent of said aviation gasoline, and B equals fifteen cents ($0.15). As to any of said gasoline delivered to and paid for by Buyer under the foregoing contract at prices including said "alkylation royalty sum", and as to which gasoline the base

10

75482

price is subject to reduction hereunder, Seller, within sixty (60) days of receipt by it of such payment from Buyer, shall refund to Buyer, without interest, an amount of money equal to the total number of gallons of said gasoline subject to the aforesaid reduced royalties, multiplied by an amount equal to the said difference  by which said "alkylation royalty sum" has been reduced.

II. (A).  Seller further represents that the base prices for 100 octane aviation gasoline set forth in Section IV of the foregoing contract each includes a certain "isomerization royalty sum" representing patent royalties which Seller is obligated to pay to its licensor for a certain isomerization process employed by Seller in the manufacture of said aviation gasoline; that said "isomerization royalty sum" is calculated at the rate of $0.05 per barrel of isobutane produced by said process and used in the manufacture of said aviation gasoline, and amounts to $0.0001 per gallon of 100 octane aviation gasoline.

II. (B).  In the event that during the term of said contract the running royalties per barrel that Seller has obligated itself to its licensor to pay for such isomerization process shall be reduced with respect to the 100 octane aviation gasoline manufactured by Seller and delivered under the foregoing contract, then the base prices of 100 octane aviation gasoline, as set forth in Section IV of said contract, manufactured by Seller and delivered thereunder, and as to which gasoline Seller's royalty payments to its said licensor are in accordance with said reduced royalty rate, shall be reduced in accordance herewith.  The amount of said reduction in each base price of said gasoline shall be the difference between the "isomerization royalty sum" applicable thereto, as set forth in Section II (A) of this Exhibit B, and an amount equal to such "isomerization royalty sum" multiplied by the factor $\frac{C}{D}$ where C equals the reduced running royalty per barrel that Seller is obligated to pay, and D equals five cents ($0.05).  As to any of said gasoline delivered to and

11

75482

paid for by Buyer under said contract at prices including said "isomerization royalty sum", and as to which gasoline the base price is subject to reduction hereunder, Seller, within sixty (60) days of receipt by it of such payment from Buyer, shall refund to Buyer, without interest, an amount of money equal to the total number of gallons of said gasoline subject to the aforesaid reduced royalties, multiplied by an amount equal to the said difference by which said "isomerization royalty sum" has been reduced.

III. (A). In the event that any base price of said aviation gasoline is reduced under the provisions of this Exhibit B, and in the event that at any time prior to six (6) years following the date of termination, cancellation or expiration of the foregoing contract, a claim or claims, suit or suits for infringement with respect to the aforesaid alkylation process or the products thereof, or with respect to the aforesaid isomerization process or the products thereof, shall be made or brought, against Seller, and if such suit or suits so brought or any suit or suits brought on any such claim or claims so made, shall result in final adjudication or settlement which shall establish an obligation to be paid by Seller in satisfaction thereof, Buyer shall make payment to Seller as follows: The amount so payable by Buyer to Seller in each case shall in no event exceed whatever amount is the lesser of (1) the amount whereby Buyer's price for the total quantity of gasoline purchased under this contract and involved in such claim or suit was reduced under this Exhibit B, or (2) the amount required to be paid in settlement or satisfaction of such claim or suit, above any portion thereof for which Seller is reimbursed by its licensor; it being expressly understood that all payments by Buyer to Seller (under this paragraph) shall be solely for the purpose of paying damages or other moneys applicable to the case, it being expressly understood that Seller's said obligation, as the term is used herein, shall not include any expenses of settlement (as distinguished from actual payments to the party or parties with whom settlement is made) or costs of litigation; provided, however, that with respect to such settlement no payment shall be made by Buyer to Seller unless Buyer shall

12

75482

first have given in writing its approval to such settlement; Buyer hereby agreeing that it will give its approval to any such settlement which, under the circumstances, appears to be reasonable.

III. (B). With respect to such claim or claims, suit or suits for infringement referred to in Section III (A) hereof, Seller agrees that promptly upon receipt of notice by Seller of the making or institution of each such claim or suit, Seller will notify Buyer thereof. Under Seller's present licenses covering said alkylation process and said isomerization process, respectively, Seller's licensors have certain rights and obligations concerning handling of such claims or suits. Subject to the approval of its respective licensors and to the extent that Seller has the right under its said licenses to do so, Buyer shall be permitted at its election to be represented in any such suit by counsel of its own choice and at its own expense and subject to such conditions and restrictions, if any, as Seller's licensors may specify.

III. (C). If an adjudication adverse to Seller has been made in any such suit by the court of record having primary jurisdiction thereof, and if no settlement approved by Buyer has been effected previously, and if election is made not to appeal from such adverse adjudication or to continue the defense of such suit, then Seller agrees that upon receiving notice, from its licensors or otherwise, of such events and decisions, it will promptly give notice thereof to Buyer; and Seller further agrees that, subject to the same conditions as those hereinabove specified in paragraph III (B) hereof, Buyer at its election and at its own expense may continue the defense of such suit, file and perfect appeals to courts of higher jurisdiction, and do such other things as Buyer believes necessary or desirable to obtain a final adjudication or settlement of such suit, and in such event and subject to the same conditions, Seller agrees that Buyer may use Seller's name for all proper purposes connected with the continuance of such suits and that it will cooperate fully with Buyer in any proper and

13

75482

legal manner necessary to aid Buyer in the furtherance of the defense of such suits; all of same, however, to be at Buyer's expense; it being further agreed that in the event Buyer elects to do any of the things covered by this paragraph III (C), Buyer will indemnify and hold harmless Seller, its officers, agents and representatives from and against any and all liability, costs, damages, claims, judgements and obligations decreed by the court resulting therefrom over and above those to which Seller would have been liable had such actions and elections not been taken by Buyer.

V.   Seller also represents that there have not been included in its computation of the base prices set forth in Section IV of the foregoing contract any patent royalties for processes employed by Seller in the manufacture of aviation gasoline hereunder other than those set forth in Sections I, and II of this Exhibit B.

VI.   Seller covenants that any "alkylation royalty sum" and any "isomerization royalty sum" paid by it and included within the base prices set forth in Section IV of the foregoing contract, shall be paid in good faith only to a third party or parties who, in Seller's judgment, are entitled to receive such royalties and to license the respective processes covered thereby.

IN WITNESS WHEREOF the parties hereto have executed this Amending Contract #1 as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

ATTEST:

By (Sgd) H. A. Mulligan
                President

(Sgd) George H. Hubert
            Secretary

CITIES SERVICE REFINING CORPORATION

(SEAL)

By (Sgd) E. H. Johnston
                Vice President

ATTEST:

(Sgd) E. McWhiney
        Ass't. Secretary

(SEAL)

14

75482

## GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within Amending
Contract #1 and as an inducement to Cities Service Refining Cor-
poration to enter into said Contract, Reconstruction Finance
Corporation does hereby guarantee the full and complete perfor-
mance of all of the terms and conditions of said Contract on
the part of Defense Supplies Corporation (a subsidiary of
Reconstruction Finance Corporation) to be performed at the time
and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation
has caused this Guarantee to be executed by its officers there-
unto duly authorized as of May 1, 1944.

                              RECONSTRUCTION FINANCE CORPORATION

                              By (Sgd) Charles B. Henderson
                                          Chairman

ATTEST:

(Sgd) A. T. Hobson
      Secretary

(SEAL)

15

75482

## GUARANTEE BY CITIES SERVICE COMPANY

In consideration of the execution of the within Amending Contract #1 and as an inducement to Defense Supplies Corporation to enter into said Contract, CITIES SERVICE COMPANY, a Delaware corporation, does hereby guarantee the full and complete performance of all of the terms and conditions of said Contract on the part of CITIES SERVICE REFINING CORPORATION (a subsidiary of CITIES SERVICE COMPANY) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, CITIES SERVICE COMPANY has caused this Guarantee to be executed by its officers thereunto duly authorized as of May 1, 1944.

CITIES SERVICE COMPANY

By (Sgd) Henry L. O'Brien
President

ATTEST:

(Sgd) G. H. Maurer
Asst. Secretary

(SEAL)

16

# Exhibit 1-142

CONFORMED COPY

191792

C O N T R A C T

between

DEFENSE SUPPLIES CORPORATION

and

GULF OIL CORPORATION


100-OCTANE AVIATION GASOLINE


August 10, 1942.

DECLASSIFIED
Authority NND730014

191659                                          Revised June 29, 1942.

### DEFENSE SUPPLIES – GULF CONTRACT

(Present and Two Additional Facilities)

CONTRACT made as of August 10,1942, between GULF OIL CORPORA-
TION, a Pennsylvania corporation, having its principal place of business
at Gulf Building, Pittsburgh, Pennsylvania, hereinafter called Seller,
and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruc-
tion Finance Corporation, pursuant to Section 5 (d) of the Reconstruc-
tion Finance Corporation Act as amended, having its principal place of
business at Washington, D. C., hereinafter called Buyer.

In consideration of the mutual agreements herein contained the
parties agree as follows:

1. Expansion of Seller's Refining Facilities.

(a)  Seller has existing facilities for the production at
its Port Arthur, Texas, refinery, of approximately two thousand sixteen
(2,016) barrels per calendar day of 100-Octane aviation gasoline in ac-
cordance with Item 1 of Exhibit A attached hereto and made a part hereof,
or approximately two thousand three hundred eleven (2,311) barrels per
calendar day of 100-Octane aviation gasoline in accordance with Item 2
of said Exhibit A, and is currently expanding its facilities, at an esti-
mated cost of approximately Eight Million Dollars ($8,000,000.00), to a
degree which it is estimated will enable Seller to produce at its Port
Arthur Refinery approximately four thousand eight hundred thirty-six
(4,836) barrels per calendar day of 100-Octane aviation gasoline in ac-
cordance with Item 1 of said Exhibit A or approximately five thousand  –
six hundred sixty-seven (5,667) barrels per calendar day of 100-Octane
aviation gasoline in accordance with Item 2 of said Exhibit A.  Seller
shall use its best efforts to so expand said facilities, to maintain work
on the expansion day and night in so far as the requisite labor and ma-
terials are available, and to complete such expansion as soon as possible
and not later than January 1, 1943.

(b)  Seller is willing to construct additional facilities
at an estimated cost of approximately Five Million One Hundred Thousand
Dollars ($5,100,000.00) which will enable Seller to produce at its Port
Arthur, Texas refinery, a total of approximately eight thousand seven





DECLASSIFIED
Authority UND730014

191659

hundred thirty-nine (8,739) barrels per calendar day of 100-Octane avia-
tion gasoline in accordance with Item 1 of Exhibit A hereof, or approxi-
mately nine thousand nine hundred sixty-nine (9,969) barrels per calendar
day of 100-Octane aviation gasoline in accordance with Item 2 of Exhibit
A hereof. Seller shall use its best efforts to construct said additional
facilities, to maintain work on said construction day and night in so far
as the requisite labor and materials are available, and to complete such
construction as soon as possible and not later than June 1, 1943.

(c) The force majeure provisions set forth in Section X
hereof shall apply in all respects to said expansions and construction
of additional facilities as well as to the sale of gasoline and all other
obligations of Seller.

II.  Sale and Storage of Products.

(a) When the aforesaid expansion of Seller's facilities
referred to in Section I (a) hereof shall be completed and ready for op-
eration, Seller shall promptly notify Buyer, and when the construction
of the additional facilities referred to in Section I (b) hereof shall
be completed and ready for operation, Seller shall again promptly notify
Buyer. From and after the effective date of the first of the above-men-
tioned notifications, Seller shall sell and deliver and the Buyer shall buy
and receive 100-Octane aviation gasoline which shall be in accordance
with the alternate specifications set forth in Exhibit A attached hereto
and made a part hereof or any other specification which by mutual agree-
ment shall be attached as an Addendum to Exhibit A.

(b) From and after the effective date of the first noti-
fication referred to in paragraph (a) of this Section II until the end
of the original term of this contract and during any extension thereof,
the quantity of said gasoline shall be such quantity as, together with
all other sales by Seller to the United States Government of said gasoline
produced at Seller's Port Arthur Refinery, shall equal Seller's pro-rata
share of the entire requirements of the United States Government, as here-
inafter defined, but not less than the following minimum quantities:

(1) From and after the effective date of said first no-
tification until the effective date of the second noti-
fication referred to in paragraph (a) of this Section II,

DECLASSIFIED
Authority NND730014


2

191659
191792

Seller shall sell and deliver and Buyer shall buy and re-
ceive hereunder a minimum quantity of two thousand eight
hundred twenty (2,820) barrels per day of 100-Octane avia-
tion gasoline in accordance with Item 1 of Exhibit A hereof,
or three thousand three hundred fifty six (3,356) barrels
per day of 100-Octane aviation gasoline in accordance with.
Item 2 of Exhibit A hereof, or a corresponding quantity of
100-Octane aviation gasoline of any other specifications
as shall be mutually agreed upon as provided in paragraph
(e) of this Section II.  (2)  From and after the effective
date of said second notification until midnight on the last
day of the last of thirty-six (36) consecutive calendar
months after the effective date of said first notification,
but not later, in any event, than December 31, 1945, Seller
shall sell and deliver and Buyer shall buy and receive
hereunder a minimum quantity of six thousand seven hundred
twenty-three (6,723) barrels per day of 100-Octane aviation
gasoline in accordance with Item 1 of Exhibit A hereof, or
seven thousand six hundred fifty-eight (7,658) barrels of
100-Octane aviation gasoline in accordance with Item 2 of
Exhibit A hereof, or a corresponding quantity of 100-Octane
aviation gasoline of any other specifications as shall be
mutually agreed upon as provided in paragraph (e) of this
Section II.

(3)  From midnight on the last day of the last of thirty-
six (36) consecutive calendar months after the effective
date of said first notification, but not later, in any
event, than December 31, 1945, until the end of the orig-
inal term of this contract, Seller shall sell and deliver
and Buyer shall buy and receive hereunder a minimum quan-
tity of three thousand nine hundred three (3,903) barrels
per day of 100-Octane aviation gasoline in accordance
with Item 1 of Exhibit A hereof, or four thousand three
hundred two (4,302) barrels per calendar day of 100-Octane
aviation gasoline in accordance with Item 2 of Exhibit A
hereof, or a corresponding quantity of 100-Octane avia-
tion gasoline of any other specification as shall be
mutually agreed upon as provided in paragraph (e) of this
Section II.

DECLASSIFIED
Authority ND730014

3

191659
191792

(c)  Wherever in this contract provision is made for the sale and delivery to Buyer of a stated quantity of gasoline, such quantity is an aggregate quantity of the various grades of gasoline specified in Exhibit A collectively considered.

(d)  Buyer may apportion the above aggregate quantities among the various grades of gasoline specified in Exhibit A hereof, and the quantities shall be adjusted to correspond to the grades required by Buyer.

(e)  Buyer on giving reasonable notice to Seller may require the delivery hereunder of aviation gasoline of specifications other than those originally set forth in Exhibit A which is capable of being produced with the same refining facilities and the same raw materials as are used in producing 100-Octane aviation gasoline in accordance with the specifications originally set forth in Exhibit A.  The prices, specifications and quantities of such products shall be determined by negotiation between the parties, and Seller shall not be required to deliver such products unless and until an agreement has been reached.  Such agreement shall be reduced to writing as an amendment to this contract and shall constitute a part thereof.

(f)  The damages, if any, for a breach of the foregoing provisions of this Section II shall be in accordance with Section VII and VIII hereof.

(g)  The term "United States Government", whenever used in this contract, shall include the War Department, the Navy Department, any other department, agency or instrumentality of the United States Government, and any corporation wholly owned by the United States.

(h)  The term "Seller's pro-rata share of the entire requirements of the United States Government" shall mean that quantity which bears the same ratio to the entire requirements of the United States Government of 100-Octane aviation gasoline as the total refining capacity for 100-Octane aviation gasoline at Seller's Port Arthur Refinery, less the quantity of Seller's sales of 100-Octane aviation gasoline from said refinery to customers other than the United States Government, bears to the total refining capacity for 100-Octane aviation gasoline of all refiners in the United States and Lago Oil & Transport Company, Ltd., in Aruba, Netherlands West Indies, less the quantity of said refiners' sales to customers other than the United States Government.  Buyer shall use its best efforts to furnish the data necessary for the calculation of such pro-rata share.

DECLASSIFIED
Authority NND730014

4

191659

(i) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons and a gallon is a United States gallon of two hundred and thirty-one (231) cubic inches.

(j) Seller shall maintain storage facilities at, or in the vicinity of, its Port Arthur Refinery to accommodate at least two hundred forty thousand (240,000) barrels of 100-Octane aviation gasoline, or components thereof ready for blending, said storage facilities to be available by the effective date of the first notification referred to in Paragraph (a) of this Section II, and at least four hundred thousand (400,000) barrels of said storage facilities to be available by the effective date of the second notification referred to in paragraph (a) of this Section II.

(k) Whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchases and removal the amount of gasoline in storage. If such full storage condition exists, Seller shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100-Octane aviation gasoline which was produced during such full storage condition or which would have been produced except for such full storage condition; but Buyer shall not thereby be relieved of its obligation to take delivery of the quantity specified in paragraph (b) of this Section II, or any obligation undertaken under Section III hereof. If, however, Seller shall produce during any such period of full storage any additional 100-Octane aviation gasoline of the kind covered by this contract, then such additional aviation gasoline shall be treated as covered by Section III hereof, provided that Buyer shall arrange for the prompt removal from Seller's storage facilities of all such additional gasoline which Buyer may elect to purchase.

(l) In accumulating said storage, Seller may store gasoline of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline in storage; provided, however, that on Buyer's request and if Seller can do so without extra cost, or if Seller can do so at extra cost and Buyer shall agree to assume such extra cost, Seller shall change the gasoline in storage to meet other specifications covered in Exhibit A hereof.

DECLASSIFIED
Authority NND730014

5

191659

(m) Seller shall sell and deliver and Buyer shall buy and receive at the end of the original term of this contract or any extension thereof the 100-Octane aviation gasoline stored at that time (as such, or as components thereof ready for blending) in the facilities referred to in Section II (j) hereof to the extent of not more than four hundred thousand (400,000) barrels.

III. Optional Gasoline.

(a) Buyer shall have the option from time to time and at any time to purchase from Seller hereunder all or any part of the aviation gasoline which Seller may produce at its Port Arthur refinery between the date of execution of this contract and the effective date of the first notification referred to in Section II (a) hereof to the extent that such gasoline is in excess of quantities which Seller has, prior to receipt by Seller of notification of the exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

(b) Buyer shall also have the option from time to time and at any time to purchase from Seller hereunder all or any part of the aviation gasoline which Seller may produce at its Port Arthur refinery between the effective date of the first notification referred to in Section II (a) hereof and the expiration of the original term of this contract, to the extent that such gasoline is in excess of the sum of (a) the quantity to be purchased by Buyer under the provisions of Section II (a) and (b) hereof and (b) the quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

IV. Price and Payment.

(a) Subject as hereinafter provided, the base prices per gallon of 100-Octane aviation gasoline delivered under this contract, in accordance with Items 1 and 2, respectively, of Exhibit A hereof, f.o.b. Seller's refinery at Port Arthur, Texas, shall be as follows:


DECLASSIFIED
Authority NND730014

6

191659
191792
192205

| | Prior to July, 1943 | | On and after July 1, 1943 | |
|---|---|---|---|---|
| | Item 1 | Item 2 | Item 1 | Item 2 |
| (1) FIRST PERIOD: deliveries prior to effective date of first notification: | $0.1270 | $0.1245 | $0.1265 | $0.1240 |
| (2) SECOND PERIOD: deliveries on and after effective date of first notification and prior to effective date of second notification: | $0.1260 | $0.1235 | $0.1255 | $.1230 |
| (3) THIRD PERIOD: deliveries on and after effective date of second notification: | $0.1055 | $0.1030 | $0.1050 | $0.1025 |

E.J.K.
H.A.M.
D.H.D.
G.S.

(In the foregoing schedule, the terms "first notification" and "second notification" refer to the first and second notifications, respectively, referred to in Section II (a) hereof.)

(b)  Seller represents that there has not been included in its computation of the above prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of  the original cost of its existing refining facilities used in the manufacture of said 100-Octane aviation gasoline which is properly allocable to such manufacture plus ten percent (10%) per annum of that portion of the original estimated cost of its proposed additional refining facilities to be used in the manufacture of said 100-Octane aviation gasoline which is properly allocable to such manufacture.  Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.

(c)  Subject to the provisions of Section VII (d) hereof, Buyer shall pay promptly, but not later than the twentieth (20th) day of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month.  On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor.  Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.

DECLASSIFIED
Authority NND730014

7

## V.  Price Escalation.

The above base prices of 100-Octane aviation gasoline purchased hereunder shall be subject to adjustment first, as provided in Exhibit B attached hereto and made a part hereof, and, secondly, as follows:

(a)  The said prices are based on a price of One Dollar and Twenty-five Cents ($1.25) per barrel for East Texas crude deliverable to Seller in the East Texas Field.  The said prices shall be increased or decreased at the rate of four tenths of one percent (0.4%) for each one cent ($0.01) advance or decrease in the average price paid for such crude over or under One Dollar and Twenty-five Cents ($1.25) per barrel by the three (3) largest purchasers of such crude in the East Texas Field.  The prices posted for such crude in the East Texas Field shall constitute prima facie evidence of the prices paid by such purchasers.

(b)  The said prices shall also be increased or decreased at the rate of five hundred twenty-five thousandths of one percent (0.525%) for each one point increase or decrease in the final monthly wholesale price Index Number of "All Commodities other than Farm Products and Foods", as now published by the Bureau of Labor Statistics, United States Department of Labor, over or under said Index Number for March, 1942, which is ninety-five and two-tenths (95.2).  The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number.  If said index shall cease to be issued, the parties shall use such other index as may most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(c)  The prices hereinabove set forth are based upon present normal methods of transporting petroleum raw materials to Seller's refinery at Port Arthur, Texas, and upon a normal operation of that refinery in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100-Octane aviation gasoline.  If it becomes necessary to transport petroleum raw materials to said refinery by other than present normal methods thereby incurring additional costs of transportation, or if


DECLASSIFIED
Authority NND730014

8

191659
192205

through an abnormal reduction of available markets for motor fuel and
petroleum products other than 100-Octane aviation gasoline, or if by
reason of any cause or condition (whether or not of the same class or kind)
resulting directly or indirectly  from the existence of a state of
war, the normal functioning of the refinery at which any portion of the
100-Octane aviation gasoline supplied hereunder is manufactured will be
interfered with to such an extent that in the opinion of Seller the cost
of refining 100-Octane aviation gasoline is increased in respects other
than those corrected by adjustment of the base price under the above
paragraphs (a) and (b), Seller may give notice to Buyer that the de-
livery of 100-Octane aviation gasoline will be reduced in an amount
sufficient in the judgment of Seller to offset the added cost of refin-
ing unless Buyer shall agree with Seller to increase the price paid for
100-Octane aviation gasoline by an amount sufficient to offset such in-
creased cost.  If within ten (10) days after the date of mailing such
notice Buyer advises Seller that it does not elect to take such reduced
output and Buyer and Seller are unable to agree upon the amount of such
increase in price within ten (10) days thereafter, either Buyer or Seller
may give notice to the other that it desires to have the amount of such
increase fixed by arbitration in accordance with Section XI hereof.  The
arbitrators to be chosen in this instance shall be persons who have had at
least ten (10) years' experience in the petroleum business and who are not
connected with either of the parties hereto.  The arbitrators shall be
directed to make their findings as to the amount and effective date of such
price increase, if any, within fifteen (15) days after the appointment of
the last-appointed arbitrator and if no decision is reached by the arbitra-
tors within such period, the production of 100-Octane aviation gasoline
by the refinery affected may be reduced as above provided.

(d)  If at the request of Buyer or other agency of the
United States Government, Seller acquires from other refiners some of
the components of 100-Octane aviation gasoline and moves the same to its
refineries for blending with other stocks for the production of 100-Octane
aviation gasoline, it shall be entitled to compensation for any increase
in costs thereby incurred by increasing the price of the 100-Octane avia-
tion gasoline so produced by an amount which will equal the difference

DECLASSIFIED
Authority NND730014

191659

between the purchase price of such components and the cost of manufacturing the same or similar components at its own refineries, plus transportation and other costs of any kind or character involved in the delivery of the components to the refinery where the blending occurs. If Seller and Buyer are unable to agree upon the amount of such additional compensation, the question shall be submitted to arbitration in the manner provided in Section XI hereof.

(e)  In making adjustments under this Section V, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustments shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

VI.  Duration of Contract.

The original term of this contract shall expire at midnight on the last day of the last of thirty-six (36) consecutive calendar months after Buyer's receipt of the second notification referred to in Section II (a) hereof, but not later, in any event, than May 31, 1946. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension. Upon such extension the obligations to purchase and receive shall be in accordance with Section II (b) hereof and the prices to be paid shall be fixed by agreement between the parties hereto during the ninety (90) day period prior to each such extension. All of the other provisions of this contract except those not then applicable shall be in full force and effect.

VII.  Advance on Account of Purchase of Gasoline.

(a)  Buyer shall make an advance payment to Seller, on account of the purchase hereunder of 100-Octane aviation gasoline, in an aggregate amount equal to seventy-five percent (75%) of the cost of said expansion of Seller's facilities, but in no event to exceed a total of Nine Million Eight Hundred Twenty-five Thousand Dollars ($9,825,000), which shall be paid to Seller promptly as the expansions and additional construction of


DECLASSIFIED
Authority UUD730014

191659

said facilities progresses. The first installment shall be paid immediately following the expiration of ninety (90) days from the date of this contract, or immediately following notice from Seller to Buyer of Seller's waiver of its right to terminate this contract under Section XVII hereof, whichever shall first occur. Seller shall furnish Buyer with satisfactory evidence of the total expenditures it has then made or firmly committed itself to make within the succeeding thirty (30) days on account of the expansions and construction of said facilities, and Buyer shall thereupon pay to Seller seventy-five percent (75%) of said total expenditures, but not to exceed Nine Million Eight Hundred Twenty-five Thousand Dollars ($9,825,000). All subsequent installments shall be paid to Seller in amounts of approximately Five Hundred Thousand Dollars ($500,000.00) each, upon Seller's request and upon Seller furnishing Buyer with satisfactory evidence that it has expended or firmly committed itself to expend on account of the construction of said expanded facilities all the funds theretofore advanced to it by Buyer, and in addition has so expended or firmly committed itself to expend from its own funds, within the succeeding thirty (30) days, not less than thirty-three and one-third percent (33-1/3%) of the aggregate of such installments advanced by Buyer, including the installment for which request is then being made.

(b) Said advance payment shall bear interest at the rate of two percent (2%) per annum on the outstanding balance thereof, until fully liquidated.

(c) Seller obligates itself to liquidate the principal amount of said advance payment in thirty-six (36) monthly installments, either by deliveries of aviation gasoline hereunder to Buyer, or by repayment, or by both deliveries and repayment, plus interest accrued to the date of each such monthly credit for such deliveries made during said month and/or repayment, beginning the twentieth (20th) day of the month following the month in which Seller has received said total advance payment from Buyer, and ending not later than the twentieth (20th) day of the month following the expiration date of the original term of this contract.

(d) From the amount due to Seller for deliveries to Buyer of 100-Octane aviation gasoline hereunder for each of said monthly periods, Buyer shall retain and credit to Seller's account one thirty-sixth (1/36) of the principal amount of said advance payment, plus interest


DECLASSIFIED
Authority NND730014

191659

on the outstanding balance thereof; provided that if Seller's deliveries hereunder for any such month do not equal in value at prices hereunder said one thirty-sixth (1/36) of the said principal plus interest on the outstanding balance, then Seller shall promptly make payment to Buyer of the difference.

(e) It is expressly understood and agreed, however, that Seller shall have the right to accelerate liquidation of said advance payment (which right may be exercised by Seller on any said monthly installment date during this contract) by instructing Buyer to accept and apply such larger credits against said advance payment, plus interest on the remaining balance, (1) as are based on the value at prices hereunder of deliveries of aviation gasoline to Buyer in excess of said one thirty-sixth (1/36) of said principal plus interest on any outstanding balance of said advance payment, or (2) as are based on repayments which Seller may otherwise make to Buyer in excess of said one thirty-sixth (1/36) of said advance payment plus interest on any outstanding balance. Buyer agrees on receipt of such instructions from Seller to accept and apply such larger credits in the manner so requested by Seller.

(f) It is expressly provided, however, that if Buyer shall breach its obligation to pay to Seller all or any part of the advance payment in accordance with this Section VII, or shall breach its obligation to purchase and receive the quantities of 100-Octane aviation gasoline called for by Section II hereof, then Seller shall not be obligated to any further performance hereunder after such breach, and shall be entitled to retain, without further interest, such part or all of the unliquidated portion of said advance payment, pending determination by agreement or arbitration of Buyer's liability, if any, for such breach. Upon such determination, Seller shall only be obligated to Buyer for the unliquidated portion of said advance payment plus interest accrued to date of breach, less damages, if any, sustained by Seller.

VIII. Damages.

(a) In the event that Seller shall fail to sell and deliver or Buyer shall fail to take and pay for 100-Octane aviation gasoline in accordance with Section II hereof, the amount of damages, if



DECLASSIFIED
Authority NND730014

12



191659

any, to which Buyer or Seller, as the case may be, shall be entitled for such failure shall be determined by agreement or, failing agreement, by arbitration in accordance with Section XI hereof; provided, however, that Seller shall not be entitled to damages for failure by Buyer to take and pay for 100-Octane aviation gasoline unless the storage facilities referred to in Section II (j) hereof are full of 100-Octane aviation gasoline, leaded or unleaded; provided further that Seller shall be entitled to damages for failure by Buyer to take and pay for 100-Octane aviation gasoline only to the extent that the amount taken and paid for is less than (1) the amount called for in Section II (b) hereof or (2) Seller's average productive capacity per calendar day for 100-Octane aviation gasoline (of current specifications) which Seller otherwise could have produced over the period for which damages are to be determined, whichever quantity is the lesser; and provided further that Buyer's right to damages under this Section VIII shall be subject to Seller's rights under Sections II (k) and V (c) hereof.

(b)  Damages under this contract shall be limited to those arising proximately from a breach of contract.

IX.  Deliveries and Inspections.

(a)  Seller warrants full and unencumbered title to all gasoline delivered under this contract.

(b)  Buyer shall take delivery of said gasoline in tankers, barges, tank cars, or tank trucks (tank truck deliveries to be not in excess of available tank truck loading facilities for 100-Octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (1) of this Section IX) at its own cost and expense, at Seller's refinery in quantities approximating the current rate of production.

(c)  Each vessel delivery shall be made and title and risk of loss shall pass at the intake pipe of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each vessel and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on


DECLASSIFIED
Authority NND730014

13

191659

board.  Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d)  Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.

(e)  Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f)  On shipments made from refineries and any other points where licensed inspectors are regularly available, Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline.  The inspection procedure and the form of the certificate shall conform to usual industry practice.  The certificates of inspection shall be issued in quadruplicate, one set of which shall accompany the relative shipment, a second set of which shall be forwarded forthwith to Buyer, a third set of which shall be submitted to Buyer with the monthly statement required by Section IV hereof, and a fourth set of which shall forthwith be delivered to Seller.  Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(g)  Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in shore tanks from which delivery is made immediately before and immediately after loading.  Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade.  Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of deliveries into tank trucks in which case no adjustment shall be made.



DECLASSIFIED
Authority NND730014

191659
192205

(h) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product as shipped shall conform as to quality with the specifications set forth in Exhibit A hereof.

(i) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(k) Should any such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may accept delivery of the product and claim an adjustment for such deficiency, provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

(1) Notwithstanding the preceding provisions of this Section IX and at the request of Buyer, Seller shall utilize such of its existing facilities as may be available to it (other than tankers and barges) for handling, metering and delivering the gasoline purchased by Buyer to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States served by Seller, such service to be at the expense of Buyer and at Buyer's risk. In the event of loss Seller shall make its records available to Buyer to prove the extent and value of such loss.

X. Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of the Government or of any governmental officer or agent purporting to act under authority, floods, fires, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery of any product, service or

15


DECLASSIFIED
Authority NND730014



191659

material necessary in the construction of the facilities contemplated by Section I hereof or in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

## XI. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction. If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Fifth Circuit acting in his individual capacity, upon application therefor by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller


DECLASSIFIED
Authority NND730014

16

191659

to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

XII.  Taxes.

(a)  Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder.  Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

(b)  Buyer shall also pay in addition to the prices as established in Sections IV and V hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from any such tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption.  Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section IV hereof are based.

(c)  If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption.  Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

XIII.  Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for


DECLASSIFIED
Authority UUD730014

17

191659

whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.

XIV.  Entirety of Contract.

          This instrument contains the entire agreement between the parties in respect to the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.

XV.  Assignability.

          This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties hereto, provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Governmental agency, department, instrumentality or wholly Government-owned corporation, in which event Buyer shall remain liable.

XVI.  Statutory Compliance.

          (a)  In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable federal laws and further agrees to require such compliances, representations and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable federal laws; and notwithstanding the generality


DECLASSIFIED
Authority NND730014

18

191659

of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any worker because of race, creed, color or national origin.

(b) Seller is a corporation and this contract is made with it for its general benefit and no Member of or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.

(c) If any statute now in existence or hereafter enacted, or any present or future governmental ruling or order, or the action of any governmental department, agency or instrumentality shall reduce any price payable to Seller, as provided for in this contract, or shall prevent or prohibit Seller from receiving from Buyer the prices provided for in this contract, then Seller and Buyer agree that this shall, for the purpose of this contract, be deemed to be and shall constitute a breach by Buyer of its obligation to accept and pay for aviation gasoline at the prices provided for in this contract, and thereupon Seller shall have the option upon thirty (30) days' written notice to Buyer to elect to continue to make the deliveries provided for in this contract at the maximum price fixed by any such ruling, order or action, or to consider this contract terminated, unless within said thirty (30) days said ruling or order shall be rescinded or changed so as not to reduce the price payable to Seller, or otherwise changed in a manner satisfactory to Seller. In the event Seller considers this contract terminated, then the provisions of Section VII (f) hereof, shall become applicable.

XVII. Right to Terminate.

Seller shall have the right to terminate this contract within ninety (90) days of the date hereof, unless within said ninety (90) days it shall receive all governmental assistance which is available or necessary for performing this contract and for the prompt completion of the expanded facilities which Seller will construct hereunder, including, without limitation, priorities and allocations necessary for obtaining materials, equipment, supplies and crude petroleum, such certificates as may be necessary to permit it to invoke the provisions of Section 124, Internal

DECLASSIFIED
Authority NND730014

191659
192205

Revenue Code, and assurances from the Treasury Department, in the form of a closing agreement, that the advance payment of Nine Million Eight Hundred Twenty-Five Thousand Dollars ($9,825,000) herein provided for, or any part thereof, will not be treated as taxable income upon receipt by Seller but that the ratable portions thereof will be treated as amounts received for products supplied, when and as such ratable portions are credited for that purpose hereunder.

XVIII.  War Risk Insurance.

Buyer shall pay in addition to the price as established in Sections IV and V hereof, an amount sufficient to reimburse Seller for any premium allocable to the period of this contract paid for "War Damage Insurance" underwritten by the War Damage Corporation, covering the facilities referred to in Section I hereof.

IN WITNESS WHEREOF the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By  (Sgd) H. A. Mulligan
             President.

ATTEST:

  (Sgd) Dudley H. Digges
        Acting Secretary.

(SEAL)

GULF OIL CORPORATION

By  (Sgd) H. Henderson
             Vice President.

ATTEST:

  (Sgd) David Proctor
        Secretary.

(SEAL)

DECLASSIFIED
Authority

20

191659

## EXHIBIT "A"

Item 1.

U. S. ARMY – NAVY SUPPLY

AN-VV-F781          Sept. 26, 1940

Amendment No. 3       June   6, 1941

Knock Test Method    AN-VV-F-746

          100-Octane Number by Method AN-VV-F-746

 Tetraethyl      Lead Limit 3.0 cc/Gal. /

Item 2.

U. S. ARMY – NAVY SUPPLY

Same as above with Amendment No. 4        Nov. 24, 1941

 Tetraethyl        Lead Limit 4.0 cc/Gal. /

DECLASSIFIED
Authority UUD730014

191659
191873

## EXHIBIT B

I (A)     Seller represents:

(1)   That the base prices set forth in Section IV (a) of the foregoing contract include certain "catalytic cracking royalty sums", as follows:

|  | Prior to July 1, 1943 | | On and After July 1, 1943 | |
|---|---|---|---|---|
|  | Item 1 | Item 2 | Item 1 | Item 2 |
| FIRST PERIOD: | none | none | none | none |
| SECOND PERIOD: | $0.00221 | $0.00189 | $0.00221 | $0.00189 |
| THIRD PERIOD: | $0.00327 | $0.00286 | $0.00327 | $0.00286 |

(2)   That, notwithstanding the fact that Seller has obligated itself to its licensor to pay royalties for catalytic cracking on a paid-up basis, and, in acquiring a license from said licensor covering the operation of the additional facilities referred to in Section I (b) of the foregoing contract, will do so also on a paid-up royalty basis, and said paid-up royalties, if capitalized as a part of Seller's plant investment costs in the same manner as Seller's other investment costs have been capitalized in arriving at said base prices, would result in sums larger than those set forth above, the aforesaid "catalytic cracking royalty sums" have been calculated, in the interest of Buyer, on a basis of a running royalty of $0.05 per barrel of fresh stock charged to Seller's catalytic cracking operation.

I (B)     In the event that Seller's licensor, at any time during the term of the foregoing contract, shall issue to any third party a license covering catalytic cracking operations of the type licensed by said licensor to Seller, at a running royalty rate lower than $0.05 per barrel of fresh stock charged to said third party's catalytic cracking operation, then as between Buyer and Seller, the first receiving such information shall notify the other, and the base prices of all aviation gasoline thereafter delivered under the foregoing contract shall be adjusted by subtracting from each of the base prices set forth in Section IV (a) of the foregoing contract, an amount equal to the respective "catalytic cracking royalty sum"


DECLASSIFIED
Authority JJD73OO14

22

191659

applicable thereto multiplied by a factor equal to $\frac{A}{B}$, where A equals the difference between $0.05 and said lower running royalty rate payable by said third party, and B equals the sum of $0.05; and Seller shall, within sixty (60) days after the date of said notification by Buyer or Seller to the other, refund to Buyer an amount equal to the total number of gallons of aviation gasoline delivered under the foregoing contract between the date such lower running royalty rate becomes payable by said third party or the effective date of the first notification referred to in Section II (a) hereof, whichever date shall be the later, and said date of notification by the Buyer or Seller to the other, multiplied (a) by an amount equal to the respective "catalytic cracking royalty sum" applicable to said base price and (b) by said factor $\frac{A}{B}$.

II (A)    Seller represents:

(1)  That the base prices set forth in Section IV (a) of the foregoing contract also include certain "hydrogenation royalty sums" representing patent royalties which Seller is obligated to pay to third parties covering the manufacture of certain hydrogenated constituents amounting to $0.105 per barrel, said "hydrogenation royalty sums" being as follows:

|  | Prior to July 1, 1943 | | On and After July 1, 1943 | |
|---|---|---|---|---|
|  | Item 1 | Item 2 | Item 1 | Item 2 |
| FIRST PERIOD: | $0.00046 | $0.00040 | $0.00046 | $0.00040 |
| SECOND PERIOD: | $0.00019 | $0.00016 | $0.00019 | $0.00016 |
| THIRD PERIOD: | $0.00010 | $0.00009 | $0.00010 | $0.00009 |

II (B)    In the event that during the term of the foregoing contract Seller's aforesaid running royalty obligation shall be reduced, Seller shall so advise Buyer, and the base prices of all aviation gasoline delivered under the foregoing contract after the date Seller advises Buyer of such reduction shall be adjusted by subtracting from each of the base prices set forth in Section IV (a) of the foregoing contract an amount equal to the respective "hydrogenation royalty sum" applicable thereto multiplied by a factor equal to $\frac{C}{D}$, where C equals the amount by which Seller's said running royalty obligation is reduced, and D equals the sum of $0.105; and Seller shall, within sixty (60) days after it advises Buyer of such reduction, refund to Buyer an amount equal to the total number of gallons of

DECLASSIFIED
Authority NND730014

23

aviation gasoline delivered under the foregoing contract after the effective date of such reduction and prior to the date Seller advises Buyer of such reduction under each base price, multiplied (a) by an amount equal to the respective "hydrogenation royalty sum" applicable to said base price and (b) by said factor $\frac{C}{D}$.

III (A)  Seller further represents:

(1)  That the base prices of aviation gasoline set forth in Section IV (a) of the foregoing contract also include certain "contingent sums", as follows:

|  | Prior to July 1, 1943 | | On and After July 1, 1943 | |
|---|---|---|---|---|
|  | Item 1 | Item 2 | Item 1 | Item 2 |
| FIRST PERIOD: | $0.00247 | $0.00215 | $0.00177 | $0.00154 |
| SECOND PERIOD: | $0.00233 | $0.00199 | $0.00166 | $0.00142 |
| THIRD PERIOD: | $0.00189 | $0.00166 | $0.00135 | $0.00119 |

E.J.K.
H.A.M.
D.H.D.
G.S.

(2)  That said "contingent sums" represent patent royalties which Seller may or may not be obligated to pay to third parties with respect to the manufacture of certain "alkylate" constituents of aviation gasoline covered by the foregoing contract, according to a certain process to be employed by Seller.  Said "contingent sums" have been calculated at the rate of $0.21 per barrel of total alkylate manufactured prior to July 1, 1943 and $0.15 per barrel of total alkylate manufactured after July 1, 1943.

III (B)  If, at any time, prior to one year after the termination of the Present Emergency, Seller shall in good faith become obligated to pay patent royalties to third parties having an established sulfuric acid alkylation patent licensing position on its total alkylate at rates lower than those set forth hereinabove, Seller shall so advise Buyer, and the base prices of all aviation gasoline, if any, delivered under the foregoing contract after the date Seller becomes so obligated shall be adjusted by subtracting from each of the base prices set forth in Section IV (a) of the foregoing contract, an amount equal to the respective "contingent sum" applicable thereto, multiplied by a factor equal to $\frac{E}{F}$, where E equals the difference between $0.21 or $0.15, as the case may be, and the rate which Seller becomes obligated to pay to said third parties, and F equals $0.21 or $0.15, as the case may be; and Seller shall, within sixty (60) days after becoming so obligated, refund to Buyer an amount equal to the total number of gallons of aviation gasoline delivered under the foregoing contract prior to the date Seller becomes so obligated under each base price, multiplied (a) by an amount equal to the respective "contingent sum" applicable to the said base price and (b) by said factor $\frac{E}{F}$.

24

DECLASSIFIED
Authority NND760014

191659
191792

III (C)    If any suit for infringement with respect to said "alkylate" constituents or the manufacture thereof is pending against Seller at the expiration of one year after the termination of the Present Emergency, no refund shall be made by Seller until final adjudication or settlement of such suit in good faith, but within sixty (60) days after such final adjudication or settlement, if the same establishes an obligation on the part of Seller to pay damages or other moneys at a rate lower than the royalty rate set forth hereinabove, Seller shall refund to Buyer an amount equal to the total number of gallons of aviation gasoline sold to Buyer under the foregoing contract under each base price multiplied (a) by the respective "contingent sum" and (b) by a factor equal to $\frac{G}{H}$, where G equals the difference between $0.21 or $0.15 as the case may be, and the rate which Seller becomes obligated to pay under such final adjudication or settlement, and H equals $0.21 or $0.15 as the case may be, it being expressly understood that Seller's said obligation, as the term is used herein, shall not include any expenses of settlement (as distinguished from actual payments to the party or parties with whom settlement is made) or costs of litigation.

III (D)    In the event that no suit for infringement is brought against Seller and Seller itself undertakes no obligation to pay any patent royalties to others with respect to said "alkylate" constituents or the manufacture thereof, prior to the expiration of one year after the termination of the Present Emergency, Seller shall, within sixty (60) days after the expiration of said one-year period, refund to Buyer an amount equal to the total number of gallons of aviation gasoline sold to Buyer under this contract at each base price multiplied by the respective "contingent sum" applicable to said base price.

III (E)    In determining the effect of this Section III of this Exhibit B with respect to any obligation on the part of Seller to pay royalty on a paid-up or commuted basis, such royalty shall be considered as amortized at a rate not to exceed 10% per annum.

III (F)    In determining the effect of this Section III of this Exhibit B with respect to any payment by Seller for past infringement, only that portion of such payment shall be considered which is ratably attributable to aviation gasoline sold under the foregoing contract.


DECLASSIFIED
Authority JUD730014

191659

III (G)    As used in this Section III of this Exhibit B, the term "Present Emergency" shall mean the period that the United States is at war or the period of the existing National Emergency as declared by the President to exist in his proclamation dated May 27, 1941, whichever period is the longer.

IV    Seller further represents that no patent royalties other than those set forth in Sections I, II and III of this Exhibit B have knowingly been included in the base prices set forth in Section IV of the foregoing contract.



DECLASSIFIED
Authority NND730014

191659

## GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to Gulf Oil Corporation to enter into said contract, Reconstruction Finance Corporation does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of August 10, 1942.

<div style="text-align:right">

RECONSTRUCTION FINANCE CORPORATION

By   (Sgd) Charles B. Henderson
               Chairman.

</div>

ATTEST:

   (Sgd) Leo. Nielson
        Acting Secretary.

(SEAL)



DECLASSIFIED
Authority NND730014

191659

**ADDENDUM #1**                                                    Gulf Oil Corporation
                                                             Pittsburgh, Pennsylvania

All material ordered hereunder is for Defense Supplies Corporation, a corporation created by Reconstruction Finance Corporation pursuant to Section 5d of the Reconstruction Finance Corporation Act, as amended, and in accepting this contract Gulf Oil Corporation a Pennsylvania corporation, (hereinafter designated as "Contractor") agrees, subject to subsequent changes in applicable federal laws, that:

1.  (a)  Contractor is the manufacturer of or a regular dealer in the materials, supplies, articles, or equipment to be manufactured or used in the performance of the contract.

    (b)  All persons employed by Contractor in the manufacture or furnishing of the materials, supplies, articles or equipment used in the performance of the contract will be paid, without subsequent deduction or rebate on any account, not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under the contract; PROVIDED, however, that this stipulation with respect to minimum wages shall apply only to purchases or contracts relating to such industries as have been the subject matter of a determination by the Secretary of Labor.

    (c)  No person employed by Contractor in the manufacture of furnishing of the materials, supplies, articles, or equipment used in the performance of the contract shall be permitted to work in excess of eight (8) hours in any one day or in excess of forty (40) hours in any one week, unless such person is paid such applicable overtime rate as has been set by the Secretary of Labor.

    (d)  No male person under 16 years of age and no female person under 18 years of age and no convict labor will be employed by Contractor in the manufacture or production or furnishing of any of the materials, supplies, articles, or equipment included in the contract.

    (e)  No part of the contract will be performed nor will any of the materials, supplies, articles, or equipment to be manufactured or furnished under said contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of the contract. Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part thereof is to be performed shall be prima-facie evidence of compliance with this subsection.

    (f)  Any breach or violation of any of the foregoing representations and stipulations shall render the party responsible therefor liable to the United States of America for liquidated damages, in addition to damages for any other breach of the contract, in the sum of ten dollars ($10.00) per day for each male person under 16 years of age or each female person under 18 years of age, or each convict laborer knowingly employed in the performance of the contract, and a sum equal to the amount of any deductions, rebates, refunds or underpayment of wages due to any employee engaged in the performance of the contract; and, in addition, the agency of the United States entering into the contract shall have the right to cancel same and to make open-market purchases or enter into other contracts for the completion of the original contract, charging any additional cost to the original Contractor. Any sums of money due to the United States of America by reason of


DECLASSIFIED
Authority NND730014

191659

Addendum #1

any violation of any of the representations and stipulations of the contract as set forth herein may be withheld from any amounts due on the contract or may be recovered in a suit brought in the name of the United States of America by the Attorney General thereof. All sums withheld or recovered as deductions, rebates, refunds, or underpayments of wages shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employees who have been paid less than minimum rates of pay as set forth in such contracts and on whose account such sums were withheld or recovered; PROVIDED, That no claims by employees for such payments shall be entertained unless made within one year from the date of actual notice to the Contractor of the withholding or recovery of such sums by United States of America.

(g)  Contractor shall post a copy of the stipulations in a prominent and readily accessible place at the site of the contract work and shall keep such employment records as are required in the Regulations under the Act available for inspection by authorized representatives of the Secretary of Labor.

(h)  The foregoing stipulation shall be deemed inoperative if this contract is for a definite amount not in excess of $10,000.00.

This Addendum #1 is hereby made a part of the contract between Defense Supplies Corporation and the undersigned dated as August 10, 1942.

                              GULF OIL CORPORATION


                              By: (Sgd) H. Henderson
                                      Vice President.


DECLASSIFIED
Authority UUD730014

# Exhibit 1-143

CONFORMED COPY

58896

April 9, 1943.

# C O N T R A C T

between

DEFENSE SUPPLIES CORPORATION

and

HUMBLE OIL & REFINING COMPANY

100—OCTANE AVIATION GASOLINE

as of

February 4, 1942.

58896

## DEFENSE SUPPLIES – HUMBLE CONTRACT

Revised April 9, 1943.

THIS CONTRACT made as of February 4, 1942, by and between DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation pursuant to Section 5d of the Reconstruction Finance Corporation Act, as amended, (hereinafter referred to as "Buyer"), and HUMBLE OIL & REFINING COMPANY, a Texas corporation, (hereinafter referred to as "Seller").

## W I T N E S S E T H:

In consideration of the mutual undertakings herein contained, it is agreed as follows:

I. Expansion of Seller's Refining Facilities.

Seller is engaged in supplying 100 octane aviation gasoline to the United States Government and to others, which gasoline is manufactured by Seller at its refinery at Baytown, Texas. Seller has a contract with Standard Oil Company of New Jersey, a Delaware corporation, hereinafter referred to as "Standard", under which it will sell to Standard and Standard will purchase Seller's production of 100 octane aviation gasoline in excess of that sold hereunder. Seller presently produces 100 octane aviation gasoline at Baytown, Texas and is currently enlarging its refinery so as to enable it to further increase its production of 100 octane aviation gasoline. Such an enlargement in capacity is being undertaken by Seller in order that it may supply the United States Government directly with additional quantities of 100 octane aviation gasoline, and also that it may supply Standard with additional quantities thereof under the existing sales contract with Standard so that Standard may be in a position to sell and deliver such gasoline to Buyer under that certain contract dated as of January 13, 1942 entered into between Standard and Buyer.

In that certain contract between Buyer and Standard above referred to, it has been provided that Standard shall use its best efforts to the end that the new facilities mentioned in said contract shall be completed at the earliest possible moment and to the end that work on the construction of such new facilities shall continue day and night in so far as same, in Standard's best judgment, will substantially expedite the completion thereof, and in such contract Standard has agreed to make or arrange to make certain bonus

payments required to expedite the earlier deli ery of material, or overtime
or bonus payments as in its judgement will substantially expedite the com-
pletion of the facilities, and Buyer has agreed to pay Standard the amount
by which the actual cost of construction including such bonus payments exceeds
whichever is the greater of (a) the actual cost of construction excluding
all bonus payments, and (b) Fifty Million Dollars ($50,000,000.00).

Seller, in the construction of the facilities provided for here-
under, will use its best efforts to the end that such construction shall
continue day and night in so far as the same will, in Seller's best judg-
ment, expedite the completion thereof; and Seller will look only to Stand-
ard for the payment of additional expenses incurred by it as bonus payments,
and will not be entitled to collect from Buyer any sum on such account, or
in excess of the agreed price of the 100 octane aviation gasoline delivered
hereunder.

II. Sale of Products.

(a) During the period from January 1, 1943 to February 28,
1946, Seller shall sell and deliver and Buyer shall buy and receive such
quantity of 100 octane aviation gasoline as Buyer may require from Seller
for intrastate delivery in the State of Texas and for occasional interstate
deliveries outside of the State of Texas. Such 100 octane aviation gas-
oline shall be in accordance with the specifications set forth in Exhibit A
attached hereto and made a part hereof or any other specifications which by
mutual agreement shall be attached as an addendum to Exhibit A.

(b) Buyer on giving reasonable notice to Seller may require
the delivery hereunder of 100 octane aviation gasoline of specifications
other than those originally set forth in Exhibit A which are capable of being
produced with the same refining facilities and the same raw materials as are
used in producing 100 octane aviation gasoline in accordance with the speci-
fications originally set forth in Exhibit A. The prices and specifications
of such products shall be determined by negotiation between the parties, and
Seller shall not be required to deliver such products unless and until an
agreement has been reached. Such agreement shall be reduced to writing as
an addendum to Exhibit A and shall become a part thereof.

(c) The term "United States Government" shall include the
War Department, the Navy Department, any other department, agency or

58896

instrumentality of the United States, and any corporation wholly owned by the United States.

(d) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons. The term "gallon" means a United States gallon of two hundred and thirty-one (231) cubic inches.

(e) Working storage facilities to accomodate at least twenty-five (25) days' full capacity production of 100 octane aviation gasoline are available at Seller's Baytown refinery, and Buyer shall schedule deliveries within the limits of such working storage. Subject to Section VI hereof, Buyer shall order and take deliveries under this contract and of 100 octane aviation gasoline purchased by Standard for delivery from Seller's Baytown Refinery to Buyer under the aforesaid contract between Standard and Buyer in such quantities as Buyer may determine; provided, however, that whenever the above-specified storage facilities for said 100 octane aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage conditions exists, Seller shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100 octane aviation gasoline which was produced during such full storage condition or which would have been produced except for such full storage condition.

III. (Section Eliminated, Not a part hereof.)

IV. Price and Payment.

(a) The base price of 100 octane aviation gasoline specified as Item 1 of Exhibit A hereof purchased hereunder shall be thirteen cents ($0.13) per gallon during the period from the date of this agreement to February 29, 1944 and the base prices of other kinds of 100 octane aviation gasoline shall be as specified in Exhibit A hereof. During the period from March 1, 1944 to February 28, 1946 the base price of aviation gasoline specified as Item 1 of Exhibit A shall be twelve cents ($0.12) per gallon and the base prices of other kinds of 100 octane aviation gasoline shall be as specified in Exhibit A hereof. These

prices are for tanker or barge lots f.o.b. Seller's Baytown refinery, subject to adjustment as hereinafter set forth.

(b)  Deliveries shall be made into tank cars or tank trucks furnished by Buyer f.o.b. Seller's Baytown refinery at an additional charge of fifteen-hundredths of a cent ($0.0015) per gallon.

(c)  Seller represents that in arriving at such base prices it has not knowingly made any allowance for depreciation, amortization and obsolescence in excess of 10 percent (10%) per annum of the original estimated cost of the refining facilities to be used in the manufacture of 100 octane aviation gasoline, except in the case of that portion of the facilities representing an investment of its pro-rata share of the sum of approximately Fourteen Million Four Hundred Thousand Dollars ($14,400,000), set forth in Section IV of that certain contract between Buyer and Standard above referred to, as to which portion allowance for depreciation, amortization and obsolescence has been made over a three-year period in recognition of the particular risks inherent in this portion of the investment which in Seller's opinion make such an allowance normal.  It is expressly recognized that the statements herein made with respect to depreciation, amortization and obsolescence are not inconsistent with the application of higher or lower rates to all or any part of the investment for book or tax purposes, or both or with the application of Section 124 or any other provision of the Internal Revenue Code as now or hereafter constituted.

(d)  In Section IV of the contract between Buyer and Standard above referred to, it is provided that if during the original term thereof Buyer shall purchase and pay for more than forty million five hundred thousand (40,500,000) barrels of 100 octane aviation gasoline, the base prices of such gasoline sold in excess of forty million five hundred thousand (40,500,000) barrels shall be reduced as therein set forth.  It is therefore agreed that when and if Buyer shall purchase and pay for forty million five hundred thousand (40,500,000) barrels of 100 octane aviation gasoline (including that purchased hereunder) from Standard and its Suppliers as provided in said contract between Buyer and Standard, the base prices to be paid by Buyer to Seller hereunder for aviation gasolines having the specifications set forth in Items 1, 2, and 3 of

Exhibit A hereof, subject to adjustment in accordance with the provisions of Section V hereof, shall thereafter be:

> Item 1 — $0.114 per gallon
>
> Item 2 — $0.112 per gallon
>
> Item 3 — $0.106 per gallon

Such prices shall be applicable only to deliveries of aviation gasoline hereunder made after Buyer shall have purchased and paid for said forty million five hundred thousand (40,500,000) barrels of 100 octane aviation gasoline (including that purchased hereunder) from Standard and its Suppliers as above set forth.

(e) Buyer shall pay promptly, but not later than the twentieth (20th) day of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.

V. Price Escalation.

The prices of 100 octane aviation gasoline specified in Exhibit A hereof shall be subject to adjustment as follows:

(a) The aforesaid base prices are based on the following currently posted crude prices:

|  | Per 42-Gallon Barrel at the Well |
|---|---|
| East Texas, 39-39.9° A. P. I. | $1.25 |
| West Texas, 32-32.9° A. P. I. | .96 |
| Gulf Coast, 28-28.9° A. P. I. | 1.24 |
| Average Price | 1.15 |

The actual price for 100 octane aviation gasoline delivered hereunder shall vary above or below the base price by an amount calculated at the rate of fifty-two thousandths of a cent ($0.00052) per gallon for each increase or decrease respectively of one cent ($0.01) or fraction thereof per barrel in the average of the field prices for three (3) grades of crude set forth in the above tabulation. The field prices for each grade of crude

shall be the average of the field prices paid by the three (3) largest purchasers in the respective fields for the three (3) types of crude set forth in the above tabulation.  The prices posted for such crudes by such purchasers shall constitute prima facie evidence of the prices paid by such purchasers.

(b)  The said prices shall also be increased or decreased by sixty-four thousandths of a cent ($0.00064) per gallon for each full point increase or decrease, respectively, over or under 93, in the figure obtained by averaging the so-called final monthly index numbers of "Wholesale Prices of All Commodities" and "Wholesale Price of All Commodities Other than Farm Products and Foods", as such indices are now published by the Bureau of Labor Statistics, United States Department of Labor.  No adjustment shall be made for changes of less than one point in such average figure.  The effective date of a change in price due to a change in the average index number shall be the date of publication by the Bureau of Labor Statistics of the later of such final monthly index numbers.  If publication of either of such index numbers shall be discontinued, the parties shall use such other index as may closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

Seller represents that its existing labor contracts commit it to take into consideration increases or decreases in cost of living in determining wage adjustments, such consideration being guided by the "1935-1939 All U.S.A. Cost of Living Index" published by the Bureau of Labor Statistics of the United States Department of Labor, which includes food prices as an element thereof.

(c)  The prices hereinabove set forth are based upon present normal methods of transporting petroleum raw materials to the refinery involved in the manufacture of 100 octane gasoline hereunder and upon a normal operation of said refinery in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100 octane aviation gasoline.  If it becomes necessary to

transport petroleum raw materials to said refinery by other than present normal methods, thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100 octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of the refinery at which the 100 octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100 octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under paragraphs (a) and (b) of this Section V, Seller may give notice to Buyer that the delivery of 100 octane aviation gasoline from the refinery so affected will, on or before a specified date not less than ten (10) days thereafter, be reduced in an amount sufficient in the judgement of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for 100 octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days after such advice to Seller, Buyer may give notice to Seller that it desires to have the amount of such increase in cost fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such increase, if any, within fifteen (15) days after the appointment of the last appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of 100 octane aviation gasoline by the refinery affected may be reduced as above provided.

(d) In making adjustments under this Section V the prices to be adjusted shall be those prices in effect immediately prior to the adjustment, and the adjustments shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

58896

VI. Duration of Contract.

The original term of this contract shall expire at midnight on February 28, 1946. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days' prior to the end of the original term for the first yearly extension and at least ninety (90) days' prior to the end of the first yearly extension for the second yearly extension. Upon such extension the price to be paid shall be fixed by agreement of the parties hereto during the ninety (90) day period prior to each such extension. All of the other provisions of this contract except those not then applicable shall be in full force and effect.

VII. (Section Eliminated, Not a part hereof.)

VIII. (Section Eliminated, Not a part hereof.)

IX. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract. Title to said gasoline, and risk of loss in respect thereof, shall pass from Seller to Buyer upon delivery of the gasoline at the point of manufacture.

(b) Buyer shall take delivery of said gasoline in tankers, barges, tank cars, or tank trucks (tank truck deliveries to be not in excess of available tank truck loading facilities for 100 octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (1) of this Section) at its own cost and expense, at Seller's refinery in quantities approximating the volumes to be delivered currently to Buyer hereunder.

(c) Each vessel delivery shall be made and title and risk of loss shall pass at the intake pipe of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each barge or tank vessel and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on board. Deliveries shall be

made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d) Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.

(e) Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f) On shipment made from Seller's Baytown refinery and any other points where licensed inspectors are regularly available, Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall conform with usual industry practice. The certificates of inspection shall be issued in five counterparts, one set of which shall accompany the relative shipment, one of which shall be forwarded forthwith to Buyer, a third submitted to Buyer with the monthly statement required by Section IV (c) hereof, a fourth set of which shall be delivered forthwith to Seller, and a fifth set of which shall be delivered forthwith to the authorized officer or employee of the War Department or Navy Department referred to in paragraph (m) of this Section IX. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of deliveries made at points where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(g) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in the shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tanks cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of each delivery of a quantity of less than four thousand (4,000) gallons into a tank truck or motor transport in which case no adjustment shall be made.

(h) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product shall conform as to quality with the specifications set forth in Exhibit A hereof.

(i) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(k) Should any such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may nevertheless accept such product and claim an adjustment for such deficiency, provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

(l) Notwithstanding the preceding provisions of this Section IX and at the request of Buyer, Seller shall utilize its existing and available facilities (other than tankers) for handling, metering and delivering the gasoline purchased by Buyer to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States served by Seller, where such gasoline is to be used, such service to be at the expense of Buyer and at Buyer's risk. Such expense shall be Seller's cost for such service. In the event of loss Seller shall make its records available to Buyer to prove the extent and value of such loss.

(m) Until further notice from Buyer to Seller, for the purposes of this Section IX any officer or employee of the War Department or Navy Department who is properly authorized to accept deliveries of gasoline for his Department is hereby nominated as agent for Buyer and authorized to take delivery of aviation gasoline hereunder, to waive the aforesaid requirements of inspection by a licensed inspector, and to receipt on behalf of Buyer, in a manner approved by Buyer, for deliveries of such gasoline from Seller to Buyer.

## X.  Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, act of God or of the public enemy, acts or requests of any governmental authority, floods, fires, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery, of any product, service or material necessary in the expansion of the facilities contemplated by Section I hereof or in the manufacture and delivery of aviation gasoline, deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

## XI.  Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction.  If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice.  Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed; provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone.  If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Fifth (5th) Circuit acting in his individual capacity, upon application therefor by either of the parties.  The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the

sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expense of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be divided. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

XII.  Taxes.

(a) Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

(b) It is understood that Buyer's obligation under this Section XII shall include all presently existing taxes not now assessed or deemed applicable but which may later be assessed or held to apply to the commodities delivered hereunder, or any raw or component material or ingredients thereof. It is understood that Buyer does not deem sales taxes or excise taxes in the nature of sales taxes to be applicable.

(c) If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

XIII.  Notices.-

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for whom intended at the address of such party as specified herein. Any such notice to be sent to Buyer hereunder shall be addressed to Defense Supplies Corporation, 811 Vermont Avenue, N.W., Washington, D. C., and any notice to Seller hereunder shall be addressed to Humble Oil & Refining Company, P. O. Box 2180, Houston, Texas, attention of Mr. Hines H. Baker, Vice President. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.

XIV.  Entirety of Contract.

This instrument contains the entire aggreement between the parties in respect of the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.

XV.  Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties hereto; provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Governmental agency, department, instrumentality or wholly Government-owned corporation.

XVI.  Statutory Compliance.

(a)  In carrying out this contract Seller agrees to comply with and give all stipulations and representations required by applicable

federal laws and further agrees to require such compliances, representations and stipulations with respect to any contract entered into by it with others incidental to or in connection with this agreement as may be required by applicable federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this agreement it will not discriminate against any worker because of race, creed, color or national origin.

(b)  No Member of or Delegate to the Congress of the United States of America shall be admitted to any share or part of this contract or to any benefit arising therefrom.

(c)  Seller shall comply with requirements of the Walsh-Healy Act (41 USCA Sections 35-45) insofar as such Act is applicable to this transaction.

IN WITNESS WHEREOF the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By (Sgd) H. A. Mulligan
                President

ATTEST:

(Sgd) Merle A. Crandall
        Assistant Secretary

(SEAL)

HUMBLE OIL & REFINING COMPANY

By (Sgd) Hines H. Baker
            Vice-President

ATTEST:

(Sgd) H. K Arnold
        Secretary

(SEAL)

14

EXHIBIT A

### Contract between Defense Supplies Corporation and Humble Oil and Refining Company Dated as of February 4, 1942

**Item 1**

PRODUCT   - 100-Octane aviation motor fuel complying with Army-Navy Aeronautical Specification AN-VV-F-781 of September 26, 1940 with Amendment 3. Lead limit 3.0 cc/gal.

PRICE   - Base price during the period from January 13, 1942 to February 29, 1944 shall be thirteen cents ($0.13) and during the period from March 1, 1944 to February 28, 1946 shall be twelve cents ($0.12) per U. S. Standard gallon subject to adjustment and all other provisions of said agreement.

QUANTITY - As agreed upon from time to time.

**Item 2**

PRODUCT   - 100-Octane aviation motor fuel complying with Army-Navy Aeronautical Specification AN-VV-F-781 of September 26, 1940 with Amendment 4 of November 24, 1941.

PRICE   - Base price during the period from January 13, 1942 to February 29, 1944 shall be twelve and sixty-five hundredths cents ($0.1265) and during the period from March 1, 1944 to February 28, 1946 shall be eleven and eight-tenths cents ($0.118) per U. S. Standard gallon subject to adjustment and all other provisions of said agreement.

QUANTITY - As agreed upon from time to time.

**Item 3**

PRODUCT   - High-octane unleaded motor fuel in accordance with "Army-Navy Aeronautical Specification AN-VV-F-781 of September 26, 1940 with Amendment 3 of June 6, 1941, Fuel; Aircraft-Engine, Grade 100" with the following changes and additions (reference being to corresponding paragraph numbers in such specifications):

A-1a    Add:   AN-VV-F-748 Fuel; Aircraft-Engine, General Specification (Method for Supercharged Knock Test).

58896

Item 3 - Continued

E-6  Color:  The color of the fuel shall be not darker than plus 25 Saybolt.

E-8  Knock Ratings:

(a)  The knock rating of the fuel (after the addition of not more than 4.0 milliliters of tetraethyl lead per U. S. gallon) shall be not less than 100-Octane number by the method prescribed in Specification AN-VV-F-746.

(b)  The rich mixture knock rating of the fuel (after the addition of not more than 4.0 milliliters of tetraethyl lead per U. S. gallon) by the method prescribed in Specification AN-VV-F-748 shall be not less than that of isooctane (certified 2,2,4 trimethylpentane) to which has been added 1.25 milliliters of tetraethyl lead per U. S. gallon. The rating shall be obtained at a fuel-air ratio 1.7 times the fuel-air ratio at the minimum boost point of isooctane to which has been added 1.25 milliliters of tetraethyl lead per U. S. gallon.

E-10d  The percentage of fuel evaporated at 75°C (167°F.) shall not exceed 30%.

E-12  Lead Content. - The fuel shall contain no tetraethyl lead. The concentration of tetraethyl lead which must be added to the fuel to obtain the required knock ratings shall not exceed 4.0 milliliters per U. S. gallon.

E-5c  The knock ratings of the fuel shall be determined by the methods given in Specifications AN-VV-F-746 and in AN-VV-F-748 (Proposed Tentative CFR Supercharged Method AFD3-C).

PRICE  - Base price during the period January 13, 1942 to February 29, 1944 shall be twelve and two-tenths cents ($0.122) and during the period from March 1, 1944 to February 28, 1946 shall be eleven and two-tenths cents ($0.112) per U. S. Standard gallon subject to adjustment and all other provisions of said agreement.

QUANTITY - As agreed upon from time to time.

58896

## GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to Humble Oil & Refining Company to enter into said contract, RECONSTRUCTION FINANCE CORPORATION does hereby guarantee the full and complete performance of all of the terms and conditions of the said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of February 4, 1942.

RECONSTRUCTION FINANCE CORPORATION

By  (Sgd) Charles B. Henderson
Chairman

ATTEST:

(Sgd) A. T. Hobson
Acting Secretary

(SEAL)

# Exhibit 1-144

172657

CONFORMED COPY

# A G R E E M E N T

between

DEFENSE SUPPLIES CORPORATION

and

MAGNOLIA PETROLEUM COMPANY

100-OCTANE AVIATION GASOLINE

January 13, 1942.

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

172657

January 13, 1942.

## DEFENSE SUPPLIES – MAGNOLIA AGREEMENT

CONTRACT made as of January 13, 1942, between MAGNOLIA PETROLEUM COMPANY, a Texas corporation, having its principal place of business at Dallas, Texas, hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of mutual agreements herein contained the parties agree as follows:

I. Expansion of Seller's Refining Facilities.

Seller is now able to produce about three thousand (3,000) barrels daily of 100-Octane aviation gasoline at its Beaumont, Texas refinery and is expanding its facilities to a degree which it is estimated, but not guaranteed, will enable Seller to produce at Beaumont, Texas approximately twelve thousand (12,000) barrels per calendar day of 100-Octane aviation gasoline. Said expanded facilities shall include, without limitation, an expansion of pipe line facilities of a subsidiary of Seller extending approximately two hundred fifty (250) miles and required to supply the necessary crude oil. Seller shall use all reasonable efforts to expand said facilities and shall endeavor to maintain work on the expansion day and night in so far as the requisite labor and materials are available. Seller shall use its best efforts to complete such expansion as rapidly as possible and estimates, but does not guarantee, that it should be completed by March 1, 1943 provided labor and materials are currently available. Seller shall not be obligated to have work done under conditions which will require overtime or bonus payments except at Buyer's request, in which case Buyer shall pay Seller the amount by which such labor charges exceed prevailing rates calculated without overtime or bonus, but such payment shall not be greater than the amount by which the actual expenditure on said expanded facilities exclusive of said pipe line facilities exceeds the estimated cost of Twelve Million Dollars ($12,000,000.00) plus the amount by which the actual expenditure on said pipe line facilities exceeds the estimated cost of Three Million Dollars ($3,000,000.00). Such payment

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

172657

shall be made by distributing same as an addition to price over the first three million two hundred eighty-five thousand (3,285,000) barrels purchased after the completion of said expansion, and if Buyer fails to purchase said quantity within twelve (12) months after said completion, then Buyer shall, at the end of said twelve (12) month period, pay Seller the difference between the total amount to be paid and so much as shall have been paid by addition to the price. The force majeure provisions set forth in Section X. hereof shall apply in all respects to the expansion of facilities as well as to the sale of gasoline and all other obligations of Seller.

II. Sale and Storage of Products.

(a) When the aforesaid expansion of Seller's facilities shall be completed and ready for operation, Seller shall promptly notify Buyer; and from and after receipt of such notification Seller shall sell and deliver and Buyer shall buy and receive, in accordance with provisions of this contract nine thousand (9,000) barrels per calendar day of 100-Octane aviation gasoline which shall be in accordance with the specifications set forth in Exhibit A attached hereto and made a part hereof or any other specification which by mutual agreement shall be attached as an addendum to Exhibit A. Wherever in this contract provision is made for the sale and delivery to Buyer of a stated quantity of gasoline such quantity is an aggregate quantity of the various kinds of gasoline specified in Exhibit A collectively considered. Buyer may apportion such aggregate quantity among the various kinds of gasoline.

(b) Buyer on giving reasonable notice to Seller may require the delivery hereunder of 100-Octane aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with the same refining facilities and the same raw materials as are used in producing 100-Octane aviation gasoline in accordance with the specifications originally set forth in Exhibit A. The prices, specifications and quantities of such products shall be determined by negotiation between the parties, and Seller shall not be required to deliver such products unless and until an agreement has been reached. Such agreement shall be reduced to writing as an addendum to Exhibit A.

2

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

172657

(c) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons and a gallon is a United States gallon of two hundred and thirty-one (231) cubic inches.

(d) Seller shall maintain storage facilities at, or in the vicinity of, Beaumont, Texas, to accommodate at least sixty (60) days' production (at nine thousand (9,000) barrels per day) of 100-Octane aviation gasoline. Subject to Section VIII hereof, Buyer shall order and take deliveries in such quantities as it may determine; provided, however, that whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage condition exists, Seller shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100-Octane aviation gasoline which was produced during such full storage condition or which would have been produced except for such full storage condition. If, however, Seller shall produce during any such period of full storage any additional 100-Octane aviation gasoline of the kind covered by this contract, then such additional aviation gasoline shall be treated as covered by Section III hereof. In accumulating said storage, Seller may store gasoline of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline storage; provided, however, that on Buyer's request and if Seller can so do without extra cost, Seller shall change the gasoline in storage to meet other specifications covered in Exhibit A hereof.

III. Optional Gasoline.

Buyer shall have the option from time to time and at any time to purchase from Seller all or any part of the 100-Octane aviation gasoline which Seller may produce between the execution of this contract and the date of receipt by Buyer of notification of the completion of the expansion of said facilities to the extent that such gasoline is in excess of quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon

3

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

the exercise of such option Seller shall, subject to Section V (c) hereof, operate the facilities at full capacity or at least to an extent sufficient to satisfy Buyer's indicated requirements.

Buyer shall also have the option from time to time or at any time to purchase all or any part of the 100-Octane aviation gasoline which Seller may produce between said receipt by Buyer of notification of completion and the expiration of this contract to the extent that such gasoline is in excess of the sum of (a) the quantity to be purchased by Buyer under Section II hereof and (b) the quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall, subject to Section V (c) hereof, operate the facilities at full capacity or at least to an extent sufficient to satisfy Buyer's indicated requirements.

The options granted in this Section shall terminate on any termination of this contract.

If Buyer does not take delivery of gasoline in respect of which it has exercised an option, the gasoline shall be placed in said storage facilities and treated as covered by Section II (d) hereof.

IV. Price and Payment.

The base price of 100-Octane aviation gasoline, as now specified in Exhibit A hereof, shall be thirteen cents ($0.13) per gallon, prior to addition of taxes, if any. The base prices of other kinds of 100-Octane aviation gasoline shall be as specified by addenda to Exhibit A hereof. Seller represents that there has not been included in its computation of such price any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original estimated cost of the refining facilities used in the manufacture of said 100-Octane aviation gasoline which is properly allocable to such manufacture, and no more than five percent (5%) per annum of that portion of the original estimated cost of any pipe line facilities contemplated by Section I hereof, which is properly allocable to the manufacture of said 100-Octane aviation gasoline. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.

4

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

Buyer shall pay promptly, but not later than the twentieth (20th) day after the end of each half calendar month, all money due for gasoline delivered to it by Seller during said half month. On or before the tenth (10th) day after the end of each half month, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding half month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid semi-monthly statements.

V. Price Escalation.

The prices of all kinds of 100-Octane aviation gasoline now and hereafter specified in Exhibit A hereof shall be subject to adjustment as follows:

(a) The said prices are based on a price of One Dollar and Twenty-five Cents ($1.25) per barrel for East Texas crude deliverable to Seller in the East Texas field. The price shall be increased or decreased fifty-two thousandths of one cent ($0.00052) per gallon for each one cent ($0.01) advance or decrease in the weighted average price paid for East Texas crude over or under One Dollar and Twenty-five Cents ($1.25) per barrel by the three (3) largest purchasers of such crude in the East Texas field. The prices posted for such crude in the East Texas field by such purchasers shall constitute prima facie evidence of the prices paid by such purchasers.

(b) The said prices shall also be increased or decreased by sixty-nine thousandths of one cent ($0.00069) per gallon for each one point increase or decrease in the wholesale price Index Number for "All Commodities other than Farm Products and Foods", as now published by the Bureau of Labor Statistics, United States Department of Labor, which index figure is now ninety-three and five-tenths (93.5) using 1926 as par. The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number. If said index shall cease to be issued, the parties shall use such other index as may most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

5

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

(c)  The prices herein above set forth are based upon
present normal methods of transporting crude oil and other materials and
ingredients to Seller's refinery at Beaumont, Texas and to the refineries
of Socony-Vacuum Oil Company, Incorporated, at East River, New York, and
Paulsboro, New Jersey, and upon normal operation of said refineries at
full capacity, in which operations substantial quantities of motor fuel
and other products must necessarily be produced and sold in connection
with the production of 100-Octane aviation gasoline.  If it becomes nec-
essary to transport crude oils and other materials and ingredients to
said refineries by other than present normal methods thereby incurring
additional costs of transportation, or if through an abnormal reduction
in the sale of motor fuel and petroleum products (other than 100-Octane
aviation gasoline), of the quality these refineries will be able to make,
or if by reason of any cause or condition (whether or not of the same
class or kind) resulting directly or indirectly from the existence of a
state of war, the normal functioning of any refinery at which any portion
of the 100-Octane aviation gasoline supplied hereunder is manufactured
shall be interfered with to such an extent that in the opinion of Seller
the cost of refining 100-Octane aviation gasoline is increased in re-
spects other than those corrected by adjustment of the base price under
Section V hereof, Seller may at any time give notice to Buyer that on a
specified date not later than ten (10) days after giving the notice, the
delivery of 100-Octane aviation gasoline will be reduced in an amount suf-
ficient in the judgment of Seller to offset the added cost of refining
unless Buyer shall agree with Seller to increase the price paid for 100-
Octane aviation gasoline by an amount sufficient to offset such increased
cost.  If within ten (10) days after the date of mailing such notice
Buyer advises Seller that it does not elect to take such reduced output
and Buyer and Seller are unable to agree upon the amount of such increase
in price within ten (10) days thereafter, Buyer may give notice to Seller
that it desires to have the amount of such increase fixed by arbitration
in accordance with Section XI hereof.  The arbitrators to be chosen in
this instance shall be persons who have had at least ten (10) years' ex-
perience in the petroleum business and who are not connected with either

6

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such increase, if any, within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of 100-Octane aviation gasoline may be reduced as above provided.

In making adjustments under this Section, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

VI.   Duration of Contract.

The original term of this contract shall expire at midnight on December 31, 1945. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension. During such extension or extensions all of the provisions of this contract except those not then applicable shall be in full force and effect.

Notwithstanding the preceding paragraph this contract shall terminate upon the termination of the war.

VII.   Advance on Account of Purchase of Gasoline.

Buyer shall make an advance payment to Seller on account of the purchase of 100-Octane aviation gasoline in the amount of Four Million Five Hundred Thousand Dollars ($4,500,000.00) which shall be disbursed in monthly installments as the construction of the expanded facilities progresses. The first installment shall be disbursed in the amount of one-twelfth (1/12) of said Four Million Five Hundred Thousand Dollars ($4,500,000.00) immediately following the expiration of ninety (90) days from the date of this contract or immediately following receipt of notice by Buyer from Seller of Seller's waiver of its right to terminate this contract under Section XVII hereof, whichever event shall first occur. The remaining installments shall be disbursed when Seller shall deliver

7

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

to Buyer sworn statements, showing only principal items, to certify that it has expended on account of the construction of the expanded facilities all of the funds theretofore advanced to it by Buyer and in addition has so expended from its own funds not less than two hundred thirty-three percent (233%) of the aggregate of such installments advanced by Buyer. Buyer shall have the privilege of examining Seller's books to verify said statements, but such verification shall not be a condition of payments by Buyer. If such examination shall lead to any disagreement, it shall be settled by arbitration under Section XI hereof.

One-twelfth (1/12th) of the above advance payment together with interest thereon at the rate of two percent (2%) per annum on the outstanding balance thereof shall be considered as payment for the first purchases by Buyer in each of the first twelve (12) monthly periods following receipt by Buyer of Seller's notification of completion of said expanded facilities. From the amount due to the Seller for deliveries of 100-Octane aviation gasoline for each of the aforesaid twelve (12) monthly periods Buyer shall deduct and retain one-twelfth (1/12th) of the principal amount of the advance payment plus interest at the rate of two percent (2%) per annum on the outstanding balance thereof.

If this contract shall terminate by virtue of termination of the war within twelve (12) months after receipt of notification of completion of Seller's facilities, then Seller shall have the right, at its option:

1) to repay immediately to Buyer any portion of the advance payment including interest provided for in this Section which shall not have been used in the purchase of 100-Octane aviation gasoline, or

2) to require Buyer to recover said portion of said advance payment as provided for in this Section exactly as though this contract had not so terminated.

Notwithstanding the provisions of the above paragraph, if, by reason of delay in the completion of said expanded facilities, said notification of completion shall not be received at least twelve (12) months prior to the expiration or termination of this contract, then Seller shall, on expiration or termination of this contract return to Buyer so much of said advance payment plus interest as shall not have been used in the purchase of 100-Octane aviation gasoline.

8

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

In the event of Seller's failure to deliver sufficient 100-Octane aviation gasoline hereunder, following such notification of completion, to permit Buyer to recoup said one-twelfth (1/12th) of said advance payment plus interest in any month, due to reasons other than the force majeure reasons referred to in Section X hereof, the unrecouped portion of such total sum shall be repaid immediately by Seller to Buyer in cash; but if such failure was due to such force majeure reason then the twelve (12) month period provided above in this Section VII shall be extended one month for each month in which such failure due to such force majeure reason occurred.

VIII.  Liquidated Damages and Limitation of Liability.

The parties mutually agree that the Seller would be seriously damaged in the event that Buyer should breach its obligation to take that minimum quantity of gasoline herein agreed upon and that the liquidated damages herein provided for are not in the nature of penalty or forfeiture and that they reflect allowance for the possible cessation of war prior to the expiration of the original term of the contract.  If Buyer shall fail to purchase sufficient 100-Octane aviation gasoline per month to liquidate one-twelfth (1/12th) of the principal amount of the advance payment plus interest as provided in Section VII hereof, then for each month in which Buyer so fails to purchase said sufficient amount, Seller shall be entitled to retain the monthly installment of the advance payment as liquidated damages in full settlement for Buyer's failure to purchase and in no event shall Buyer be liable for damages for such failure to purchase in excess of such monthly installment or installments.  It is understood that the foregoing liquidated damages relate solely to a default by Buyer in not purchasing the stipulated quantities.  Damages for any other default by Buyer and for any default by Seller shall be determined by arbitration.

In no event shall the aggregate of all damages payable by Seller exceed One Million Dollars ($1,000,000.00) in addition to the return to Buyer of so much of the Four Million Five Hundred Thousand Dollars ($4,500,000.00) stipulated in Section VII hereof as shall not have been used in the purchase of gasoline by reason of a default by Buyer.

9

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

IX. <u>Deliveries</u> <u>and</u> <u>Inspections</u>.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract. Title to said gasoline, and risk of loss in respect thereof, shall pass from Seller to Buyer upon delivery of the gasoline at the intake pipe of the means of transportation, f.o.b. Seller's refinery at Beaumont, Texas.

(b) Buyer shall take delivery of said gasoline in tank cars, barges, tank vessels, or tank trucks (tank truck deliveries to be not in excess of fifteen thousand (15,000) barrels in any one week and tank car deliveries not to be in excess of fifty thousand (50,000) barrels in any one week) all to be supplied by Buyer at its own cost and expense.

(c) Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each barge or tank vessel and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on board. Deliveries shall be made in accordance with the delivery conditions set forth in Exhibit B hereof. Any loss or damage during loading caused by the vessel's fault shall be at the Buyer's risk.

(d) Seller shall furnish certificates of inspection, by a licensed inspector satisfactory to the parties which shall set forth the quantity and quality of each shipment of gasoline. Inspection shall be based on samples taken from Seller's storage tanks from which the product is delivered. The certificates of inspection shall be issued in quadruplicate, one set of which shall accompany the relative shipment, one of which shall forthwith be delivered to Buyer, and a third submitted to Buyer with the monthly statement required by Section IV hereof. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, in which event Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(e) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in the shore tanks from which delivery is made immediately before

10

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit ($60^{\circ}$F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery except in case of deliveries into tank trucks, in which case no adjustment shall be made.

(f) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials, wherever applicable, and the product shall conform as to quality with the specifications set forth in Exhibit A hereof.

(g) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(h) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(i) Should any such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may nevertheless accept such product and claim an adjustment for such deficiency; provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

(j) Upon request by Buyer, Seller shall make deliveries of 100-Octane aviation gasoline under this contract in appropriate limited quantities to airports or aeroplane manufacturing plants where Seller may be currently engaged in making deliveries of aviation gasoline in the ordinary course of its business. The delivery costs shall be paid by Buyer and are to be mutually agreed upon.

(k) Seller shall not be obligated to procure the 100-Octane aviation gasoline to be delivered hereunder from any source other than its Beaumont, Texas refinery.

11

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

172657

X. <u>Force Majeure</u>.

Seller shall not be liable for delays or defaults in its perform-
ance under this contract due to causes beyond its control and without its
fault or negligence, including, but not restricted to, acts of God or of
the public enemy, acts or requests of the Government, or any Governmental
officer or agent purporting to act under color of authority, floods, fires,
epidemics, quarantine restrictions, strikes, freight embargoes and fail-
ures, exhaustion or unavailability, or delays in delivery, of any product,
service or material necessary in the expansion of the facilities contem-
plated by Section 1 hereof or in the manufacture and delivery of aviation
gasoline deliverable hereunder, including crude oil, supplies, raw mate-
rials, ingredients and lead tetraethyl.

XI. <u>Arbitration</u>.

In case of any disagreement between Buyer and Seller as to any
right, obligation, term, or provision of this contract, including any dis-
agreement as to the price to be paid for gasoline to be delivered hereun-
der, the parties shall make an earnest effort to settle such disagreement
to their mutual satisfaction.  If such effort be unsuccessful, then either
party may cause such disagreement to be submitted for determination by ar-
bitrators by giving to the other party a notice in writing or by telegraph
to that effect and giving the name of the arbitrator chosen by the party
giving the notice.  Within five (5) days receipt of such notice of arbi-
tration, the other party shall, in writing or by telegraph, name the arbi-
trator chosen by such party, and within five (5) days after the appointment
of the second arbitrator, an additional arbitrator shall be selected by
the two (2) arbitrators theretofore appointed, provided, however, if one
of the parties shall have failed to appoint an arbitrator as hereinbefore
provided, the sole arbitrator shall arbitrate the disagreement alone.  If
two (2) arbitrators shall have been appointed as aforesaid and shall have
failed to select an additional arbitrator within the above stated time, the
additional arbitrator shall be appointed by the person who at the time is
the Senior Judge of the United States Circuit Court of Appeals for the

12

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

Fifth Circuit, acting in his individual and not judicial capacity, upon application therefor by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

XII. Taxes.

Buyer shall pay to Seller, in addition to the prices established in Sections IV and V hereof, any new or additional taxes, fees, or charges (or proper proportion thereof) other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder.

It is understood that Buyer's obligation under this Section shall include, without limitation, all presently existing taxes not now deemed applicable by Buyer, but which may later be held to apply to the commodities delivered hereunder.

Buyer's obligation shall also include, without limitation, (to the extent such taxes increase the cost to Seller) any increased tax levied on the transportation of crude oil whether or not paid directly by Seller.

If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized

13

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

172657

governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency. If paid to Seller, Buyer shall thereafter semi-annually also pay to Seller, until the final determination of the question involved, amounts equal to statutory interest and penalties on the tax. If paid to Seller, Seller shall hold such amounts pending final and authoritative determination of the question. If such determination is favorable to Buyer, Seller shall pay Buyer the amounts so held. If such determination be not made within ten (10) years after receipt by Seller of the amounts so held, Buyer shall have no further claims on such amounts and they shall belong to Seller subject only to Seller's obligation to turn same over to the appropriate tax collection agency. Seller shall be under no obligation to file any claim or institute any proceeding at its expense in connection with any such tax determination but Seller shall, at the request of Buyer, file claim and institute such proceeding provided Buyer shall furnish counsel and pay all necessary expenses. The provisions contained in this paragraph shall be controlling over the last sentence of Section XI hereof.

### XIII.  Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or registered mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.

### XIV.  Entirety of Contract.

This instrument contains the entire agreement between the parties in respect of the subject matter and there are no conditions, warranties, representations or stipulations relating thereto which are not merged herein.

14

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

172657

The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question. No modification shall be binding unless in writing and signed by officers of the parties. Authorization or ratification by the boards of directors of the parties shall not be required in respect of modifications.

XV.  Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties hereto, provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Governmental Agency, department, instrumentality or wholly Government-owned corporation in which event Buyer shall remain liable.

XVI.  Statutory Compliance.

In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable Federal laws and further agrees to require such compliances, representations, and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable Federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any worker because of race, creed, color or national origin.

No member of or Delegate to the Congress of the United States of America shall be admitted to any share or part of this contract or to any benefit arising therefrom other than as a possible stockholder.

If any statute now in existence or hereafter enacted, or any present or future governmental ruling or order, or the action of any governmental department, agency or instrumentality shall reduce the price payable to Seller as provided for in this contract, Seller shall have the option at any time thereafter to terminate this contract by thirty (30) days written notice to Buyer. On such termination Seller shall elect by written notice to Buyer either (1) to allow Buyer to purchase said 100-Octane aviation gasoline after termination in a quantity

15

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

which at the governmentally controlled price will exhaust so much of the advance payment as shall not have been used in the purchase of gasoline, or (2) to return to Buyer so much of said advance payment as shall not have been so used.

XVII. Right to Terminate.

Seller shall have the right to terminate this contract within ninety (90) days of the date thereof, unless within said ninety (90) days it shall receive all Governmental assistance which is available or necessary for the prompt completion of the expanded facilities which Seller will erect and install hereunder, including, without limitation, priorities and allocations necessary for obtaining materials, equipment, supplies and crude petroleum, and assurances from the Treasury Department, in the form of closing agreements, that the advance payment of Four Million Five Hundred Thousand Dollars ($4,500,00.00) herein provided for, or any part thereof, will not be treated as taxable income upon receipt by Seller, but that the ratable portions thereof will be treated as amounts received for products supplied, when and as such ratable portions are credited for that purpose hereunder. Failure so to terminate shall not constitute a waiver of any other rights of Seller.

IN WITNESS WHEREOF the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION


By_____H. A. Mulligan_____
                President

ATTEST:


_Dudley H. Digges_____
  Acting Secretary

(Seal)

MAGNOLIA PETROLEUM COMPANY


By_____D. A. Little_____
                President

ATTEST:


__W. H. Holmes_____
  Asst. Secretary

(Seal)

16

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

172657

## GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to Magnolia Petroleum Company to enter into said contract, RECONSTRUCTION FINANCE CORPORATION does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized this   13th   day of January, 1942.

RECONSTRUCTION FINANCE CORPORATION

By_____Charles B. Henderson_____
Chairman

ATTEST:

_____A. T. Hobson_____
Acting Secretary

(Seal)

17

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

## GUARANTEE BY SOCONY-VACUUM CO., INC.

In consideration of the execution of the within contract and as an inducement to Defense Supplies Corporation to enter into said contract, SOCONY-VACUUM OIL COMPANY, INCORPORATED, a New York corporation, does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Magnolia Petroleum Company (a subsidiary of Socony-Vacuum Oil Company, Incorporated) to be performed at the time and in the manner therein provided.

The aggregate liability of Magnolia Petroleum Company and Socony-Vacuum Oil Company, Incorporated shall not exceed that specified for Magnolia Petroleum Company in Section VIII of said Contract.

IN WITNESS WHEREOF Socony-Vacuum Oil Company, Incorporated has caused this Guarantee to be executed by its officers thereunto duly authorized this   14th   day of January, 1942.

SOCONY-VACUUM OIL COMPANY, INCORPORATED

By_____J. A. Brown_____
                          President

ATTEST:

___W. D. Bickham___
        Secretary

(Seal)

18

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

172657

Exhibit "A"

<u>Item 1</u>. ................................... price, 13 cents per gallon

U. S. ARMY - NAVY SUPPLY

AN-VV-F-781          Sept. 26, 1940

Amendment - 3          June    6, 1941

Knock Test Method    AN-VV-F-746

                100-Octane Number by Method AN-VV-F-746

                Lead Limit 3.0 cc/Gal.

<u>Item 2</u>. ................................... price, 13 cents per gallon

BRITISH SUPPLY

AN-VV-F-781          Sept. 26, 1940

Amendment - 3          June    6, 1941

Letters F. B. Kauffman    Aug. 30, 1941, Sept. 6, 1941, Sept. 19, 1941

Bureau of Aeronautics

                100-Octane Number by Method AN-VV-F-746

                Iso. Oct. + 1.25 cc "      " AN-VV-F-748

                Lead Limit 3.3 cc/Gal.

<u>Item 3</u>. ................................... price, 13 cents per gallon

U. S. ARMY - NAVY

Same as above with Amendment - 4    Nov. 24, 1941

                Lead Limit 4.0 cc/Gal.

<u>Item 4</u>. ................................... price, 13 cents per gallon

BRITISH SUPPLY

Same as above with Amendment - 4    Nov. 24, 1941

                Lead Limit 4.0 cc/Gal.

19

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

172657

EXHIBIT "B"

In no event shall Seller be obliged to furnish berth for a vessel having draft in excess of 30 feet (brackish water).

For loading barges, Seller shall be allowed one hour for each 2,000 barrels. For loading deep sea tankers, Seller shall be allowed one hour for each 10,000 barrels. Sundays, holidays and Saturday half-holidays shall be excluded unless used by Seller. Lay time shall commence six hours after Seller's receipt of notice of vessel's readiness to load, if berth is available. If such notice is received between 7 a.m. and 4 p.m. (local standard time), the six-hour period shall be continuous hours, but if such notice is received after 4 p.m. and before 7 a.m., the six hours shall be daylight hours, daylight being between sunrise and sunset. Demurrage arising from Seller's failure to load within the time above provided for shall be payable in accordance with the Schedule attached below and made a part hereof, provided, however, that if the delay be due to a breakdown of loading machinery of Seller and such breakdown is not due to Seller's negligence or fault, there shall be no demurrage. If the regulations of the owner of the vessel or the port authority prohibit night loading, time so lost shall not count as lay time.

All tonnage is deadweight.

Hours are running hours.

Deep Sea Tankers.

10,999 tons and under, $55 per hour

11,000 tons and over, $65 per hour

Towed Barges

4,999 barrels and under, $4 per hour

5,000 barrels to 9,999 barrels, $5 per hour

10,000 barrels to 11,999 barrels, $6 per hour

12,000 barrels to 14,999 barrels, $7 per hour

15,000 barrels to 17,999 barrels, $8 per hour

18,000 barrels to 25,000 barrels, $12 per hour

20

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

172657

<u>Self-Propelled Barges</u>

999 barrels and under, $3 per hour

1,000 barrels to 3,999 barrels, $6 per hour

4,000 barrels to 7,499 barrels, $12 per hour

7,500 barrels to 14,999 barrels, $20 per hour

15,000 barrels to 22,000 barrels, $30 per hour


<u>Tugs</u>

Local harbor tugs, $21 per hour

Voyage chartered tugs, $18 per hour

21

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

# Exhibit 1-145

*Mr. Bruce Brown*
*6676*

# Contract

BETWEEN

PAN AMERICAN REFINING CORPORATION,

*Seller,*

AND

DEFENSE SUPPLIES CORPORATION,

*Buyer.*

100-OCTANE AVIATION GASOLINE

DATED, FEBRUARY 11, 1942.

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

Reproduced from the Unclassified / Declassified Holdings of the National Archives

## DEFENSE SUPPLIES—PAN AMERICAN CONTRACT

### 100-Octane Aviation Gasoline

Contract made as of February 11, 1942 between Pan American Refining Corporation, a Delaware corporation, having its principal place of business at Texas City, Texas, hereinafter called Seller, and Defense Supplies Corporation, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of mutual agreements herein contained the parties agree as follows:

I. *Expansion of Seller's Refining Facilities.*

Seller is willing to expand its refining and related facilities at Texas City, Texas, having a present capacity of 100,000 barrels of crude per day, to a degree which it is estimated will enable Seller to produce:

(a) Four thousand eight hundred (4,800) barrels per calendar day of finished 100-Octane aviation gasoline, giving good rich mixture performance, with not more than 3cc. of lead (Item 1 of Exhibit A attached hereto). Seller can produce as a byproduct in this operation one thousand five hundred (1,500) barrels per calendar day of 81-Octane base stock which with 4cc. of lead would give 94-Octane base stock for making additional 100-Octane aviation gasoline.

### Or, At Buyer's Option,

(b) Five thousand three hundred (5,300) barrels per calendar day of finished 100-Octane aviation gasoline, giving good rich mixture performance, with not more than 4cc. of lead (Item 2 of Exhibit A attached hereto). Seller can produce as a byproduct in this operation one thousand (1,000) barrels

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

2

per calendar day of 81-Octane base stock which with 4cc. of lead would give 94-Octane base stock for making additional 100-Octane aviation gasoline.

Deliveries of 100-Octane aviation gasoline will commence on or about:

(a) January 1, 1943, when it is estimated the alkylation portion of the new plant will be in operation, to the extent of one thousand eight hundred (1,800) barrels per day, and

(b) May 1, 1943, when it is estimated the catalytic cracking unit and other accessory facilities will be in operation, as to the balance of the 100-Octane aviation gasoline.

Seller shall use all reasonable efforts to expand said facilities and shall endeavor to maintain work on the expansion day and night in so far as the requisite labor and materials are available. Seller shall use its best efforts to complete such expansion as rapidly as possible and estimates, but does not guarantee, that it should be completed and in operation on the dates indicated above provided labor and materials are currently available. Seller represents that there has not been included in the estimated expenditure of approximately Fourteen Million Three Hundred Thousand Dollars, any allowance for premium payments to secure earlier delivery of material, overtime, or bonus payments (all of which are herein called "bonus payments"). Seller shall not be obligated to have work done under conditions which will require overtime or bonus payments except at Buyer's request, in which case Buyer shall pay Seller the amount by which such labor charges exceed prevailing rates calculated without overtime or bonus, but such payment shall not be greater than the amount by which the actual expenditure on said expanded facilities exceeds the estimated cost of Fourteen Million Three Hundred Thousand Dollars ($14,-300,000.00). Such payment shall be made by distributing same as an addition to price over the first one million two hundred thousand (1,200,000) barrels purchased after the completion of said expansion, and if Buyer fails to purchase said quantity within twelve (12) months

3

after said completion, then Buyer shall, at the end of said twelve (12) month period, pay Seller the difference between the total amount to be paid for such overtime and bonuses and so much as shall have been paid by addition to the price. The force majeure provisions set forth in Section X hereof shall apply in all respects to the expansion of facilities as well as to the sale of gasoline and all other obligations of Seller.

II. *Sale and Storage of Products.*

(a) When the aforesaid expansion of Seller's facilities shall be completed and ready for operation, Seller shall promptly notify Buyer; and from and after receipt of such notification Seller shall sell and deliver and Buyer shall buy and receive, in accordance with provisions of this contract, a minimum of four thousand eight hundred (4,800) barrels per calendar day (said minimum being subject to a 10% increase to the extent that Buyer purchases gasoline specified in Item 2 of Exhibit A hereof) of 100-Octane aviation gasoline which shall be in accordance with the alternate specifications set forth in Exhibit A attached hereto and made a part hereof or any other specification which by mutual agreement shall be attached as an addendum to Exhibit A. Wherever in this contract provision is made for the sale and delivery to Buyer of a stated quantity of gasoline, such quantity is an aggregate quantity of the various kinds of gasoline specified in Exhibit A collectively considered. Buyer may apportion such aggregate quantity among the various kinds of gasoline upon giving Seller reasonable notice thereof.

(b) Buyer on giving reasonable notice to Seller may require the delivery hereunder of aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with the same refining facilities and the same raw materials as are used in producing 100-Octane aviation gasoline in accordance with the specifications originally set forth in Exhibit A. The prices, specifications and quantities of such products shall be determined by negotiation between the parties, and Seller shall not be required to

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

4

deliver such products unless and until an agreement has been reached. Such agreement shall be reduced to writing as an addendum to Exhibit A and shall become a part thereof.

(c) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons and a gallon is a United States gallon of two hundred and thirty-one (231) cubic inches.

(d) Seller shall build and thereafter maintain storage facilities at, or in the vicinity of, Texas City, Texas, to accommodate at least sixty (60) days' production of 100-Octane aviation gasoline at four thousand eight hundred (4,800) barrels per day. Subject to Section V (c) hereof, Buyer shall order and take deliveries in the quantities herein provided; provided, however, that whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled (as the term is customarily used in the industry), Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. Until such full storage condition shall have been substantially reduced, Seller shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100-Octane aviation gasoline which was produced during such storage condition or which would have been produced except for such storage condition. If, however, Seller shall produce during any such period of full storage any additional 100-Octane aviation gasoline of the kind covered by this contract, then such additional aviation gasoline shall be treated as covered by Section III hereof. In accumulating said storage, Seller may store gasoline of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline in storage; provided, however, that on Buyer's request and if Seller can so do without extra cost, or if Seller can do so at extra cost and Buyer shall agree to assume such extra cost, Seller shall change the gasoline in storage to meet other specifications covered in Exhibit A hereof. Seller shall sell and deliver and Buyer shall buy and receive

5

at the end of the original term of this contract or any extension thereof the 100-Octane aviation gasoline stored at the time in the storage facilities referred to herein to the extent of not more than two hundred eighty-eight thousand (288,000) barrels.

III. *Optional Gasoline.*

Buyer shall have the option from time to time and at any time to purchase from Seller all or any part of any 100-Octane aviation gasoline which Seller may produce between the execution of this contract and the date of receipt by Buyer of the notification referred to in Section II (a) hereof to the extent that such gasoline is in excess of quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at such lesser capacity as will satisfy Buyer's indicated requirements.

Buyer shall also have the option from time to time and at any time to purchase all or any part of any 100-Octane aviation gasoline which Seller may produce between the date of receipt by Buyer of the notification referred to in Section II (a) hereof and the expiration of this contract specified in Section VI hereof to the extent that such gasoline is in excess of the sum of (a) the quantity to be purchased by Buyer under Section II hereof and (b) the quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall, subject to Section V (c) hereof, operate the facilities at full capacity or at such lesser capacity as will satisfy Buyer's indicated requirements.

If Buyer does not take delivery of gasoline in respect of which it has exercised an option, the gasoline shall be placed in said storage facilities and treated as covered by Section II (d) hereof.

IV. *Price and Payment.*

The base price of 100-Octane aviation gasoline, specified as Item I of Exhibit A hereof, hereunder, shall be thirteen and four-tenths cents

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

6

($0.134) per gallon. The base prices of other kinds of aviation gasoline shall be as specified in Exhibit A hereof.

Seller represents that there has not been included in its computation of such prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original estimated cost of the refining facilities used in the manufacture of said 100-Octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax, accounting or other purposes.

Buyer shall pay promptly, but not later than the twentieth (20th) day of each calendar month, for all gasoline delivered to it by Seller during the preceding calendar month. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.

## V. *Price Escalation.*

The prices of all kinds of 100-Octane aviation gasoline specified in Exhibit A hereof shall be subject to adjustment as follows:

(a) The said prices are based on a price of One Dollar and Twenty-five Cents ($1.25) per barrel for East Texas crude deliverable to Seller in the East Texas field. The price shall be increased or decreased five hundred thirty-six ten-thousandths of one cent ($0.000536) per gallon for each one cent ($0.01) advance or decrease in the average price paid for East Texas crude over or under One Dollar and Twenty-five Cents ($1.25) per barrel by the three (3) largest purchasers of such crude in the East Texas field. The prices posted for such crude in the East Texas field by such purchasers shall constitute prima facie evidence of the prices paid by such purchasers.

7

(b) The said prices shall also be increased or decreased by seven hundred seventeen ten-thousandths of one cent ($0.000717) per gallon for each one point increase or decrease in the wholesale price Index Number for "All Commodities other than Farm Products and Foods", as now published by the Bureau of Labor Statistics, United States Department of Labor, which index figure is now ninety-three and five-tenths (93.5). The effective date of a change in price due to a change in index number shall be the date of publication by the Bureau of Labor Statistics of the final monthly index number. If said index shall cease to be issued, the parties shall use such other index as may closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(c) The prices herein set forth are based upon present normal methods of transporting petroleum raw materials to Seller's refinery at Texas City, Texas, and upon a normal operation of that refinery, in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100-Octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refinery by other than present normal methods thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products of the kinds Seller's refinery will be able to make other than 100-Octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of the refinery at which the 100-Octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100-Octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under Section V (a) and V (b) hereof, Seller may give notice to Buyer that the delivery of 100-Octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

8

agree with Seller to increase the price paid for 100-Octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, Buyer may give notice to Seller that it desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase, if any, within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of 100-Octane aviation gasoline by the refinery affected may be reduced as above provided.

In making adjustments under this Section, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

## VI. Duration of Contract.

The original term of this contract shall expire at midnight on the last day of the last of thirty-six (36) consecutive calendar months after Buyer's receipt of the notification referred to in Section II (a) hereof, but not later for any reason than August 31, 1946. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension. During such extension or extensions all the provisions of this contract except those not then applicable shall be in full force and effect.

9

## VII. Loan to Seller.

Buyer shall loan to Seller Nine Million Six Hundred Thousand Dollars ($9,600,000.00) which shall be disbursed by Buyer to Seller in installments as the construction of the facilities referred to in Section I hereof progresses. The first installment shall be disbursed in the amount of one-twelfth (1/12) of said Nine Million Six Hundred Thousand Dollars ($9,600,000.00) immediately following the expiration of ninety (90) days from the date of this contract or immediately following receipt of notice by Buyer of Seller's waiver of its right to terminate this contract under Section XVII hereof, whichever event shall first occur. The remaining installments shall be disbursed when Seller shall request and deliver to Buyer satisfactory evidence that it has expended or firmly committed itself to expend within the succeeding thirty (30) days on account of the construction of the facilities all of the sums theretofore advanced to it by Buyer, and in addition has so expended or firmly committed itself to expend within the succeeding thirty (30) days from its own funds not less than fifty per cent (50%) of the aggregate of such installments advanced by Buyer.

Such loan shall bear interest at the rate of two per cent (2%) per annum on the outstanding balance thereof until repaid. Seller has the right to prepay all or any part of said loan, with interest on the amount so prepaid to date, at any time.

Beginning on the twentieth (20th) day of the month following the month in which Buyer receives the notification referred to in Section II(a) hereof and ending on the twentieth (20th) day of the thirty-sixth consecutive calendar month thereafter, Seller shall repay to Buyer the principal amount of the aforementioned loan in equal, as nearly as can be determined, monthly installments plus interest at two percent (2%) per annum on the amount repaid, accrued to the time of each such repayment; provided, however, that if Buyer shall breach its obligation to disburse the installments of said loan in accordance with this contract or to take, accept and pay for 100-Octane aviation gasoline in accordance with the provisions of this contract, then Seller may withhold such part or all of the unrepaid

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

10

portion of said loan, including interest thereon, as shall not exceed the amount of damages claimed by Seller to result from such breach, until the amount of Seller's damages arising therefrom has been finally determined and paid.

## VIII. *Damages.*

In the event that Seller shall fail to sell and deliver, or Buyer shall fail to accept and pay for 100-Octane aviation gasoline or Buyer shall fail to disburse the installments of the loan, in accordance with the provisions of this contract, the amount of damages, if any, to which Buyer or Seller, as the case may be, shall be entitled for such failure or breach shall be determined by agreement, or, failing agreement, the party damaged may bring suit therefor in any court having jurisdiction. During any period of time when the storage facilities built and maintained for Buyer hereunder are not full (as the term is customarily used in the industry) failure of Buyer to lift 100-Octane aviation gasoline shall not be considered a breach of Buyer's agreement to take such gasoline under this contract. Seller shall be entitled to damages for failure by Buyer to take and pay for 100-Octane aviation gasoline only to the extent that the amount taken and paid for is less than (1) the amount called for in Section II hereof, or (2) Seller's average productive capacity per calendar day of 100-Octane aviation gasoline (of current specifications) over the period in question, whichever quantity is the lesser. Buyer's right to damages under this Section VIII shall be subject to Seller's rights under Section II (d) hereunder. Damages under this contract shall be limited to those arising proximately from a breach of contract.

## IX. *Deliveries and Inspections.*

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract. Title to said gasoline, and risk of loss in respect thereof, shall pass from Seller to Buyer upon delivery of the gasoline f. o. b. Seller's refinery at Texas City, Texas. After any default by Buyer hereunder, no physical tender hereunder shall be necessary and written notice of Seller's readiness and willingness to perform shall be sufficient.

11

(b) Buyer shall take delivery of said gasoline in tankers, barges, tank trucks or tank cars (deliveries in tank cars or tank trucks not to exceed available loading facilities, if any), to be supplied by Buyer at its own cost and expense, at refineries in quantities approximating the current rate of production. Nothing herein contained shall require Seller to build any new loading facilities or to expand any existing loading facilities unless Buyer shall pay the cost thereof.

(c) Each vessel delivery shall be made and title and risk of loss shall pass at the intake pipe of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each barge or tank vessel and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d) Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad. Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(e) On shipments made from refineries and any other points where licensed inspectors are regularly available, Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall conform with usual industry practice. The certificates of inspection shall be issued in quadruplicate, one set of which shall accompany the relative shipment, one of which shall be forwarded forthwith to Buyer, and a third submitted to Buyer with the monthly statement required by Section IV hereof. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event,

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

12

and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(f) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in the shore tanks from which delivery is made immediately before and immediately after unloading. Inspection as to quantity of delivery into tank cars shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of deliveries into tank trucks in which case no adjustment shall be made.

(g) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product shall conform as to quality with the specifications set forth in Exhibit A hereof.

(h) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(i) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(j) Should any such certificate indicate a failure of the product shipped to conform, completely to the specifications of quality, Buyer may accept delivery of the product and claim an adjustment for such deficiency, provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

13

(k) While Seller now has no existing facilities for handling, metering or delivering aviation gasoline, nevertheless as to any such facilities which Seller may hereafter acquire or which may be made available to Seller and notwithstanding the preceding provisions of this Section IX and at the request of Buyer, Seller shall utilize such facilities (other than tankers and barges) as may be hereafter acquired or made available to Seller, to handle, meter or deliver the aviation gasoline purchased by Buyer to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States served by Seller, such service to be at the expense of Buyer and at Buyer's risk. In the event of loss Seller shall make its records available to Buyer to prove the extent and value of such loss.

## X. *Force Majeure.*

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of any governmental authority, storms, floods, fires, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery, of any product, service or material necessary in the expansion of the facilities contemplated by Section I hereof or in the manufacture and delivery of aviation gasoline deliverable hereunder, including but not restricted to, crude oil, supplies, raw materials, ingredients and lead tetraethyl.

## XI. *Arbitration.*

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction. If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators (who are not connected with either

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

14

of the parties hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional aribtrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Second Circuit acting in his individual capacity, upon application therefor by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due. This Section XI shall not apply to any matter for which provision is made in Section VIII hereof.

## XII. *Taxes.*

Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which

15

Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

Buyer shall also pay in addition to the prices as established in Sections IV and V hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption. Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section IV hereof are based.

If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

## XIII. *Notices.*

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

16

mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter. An additional copy of every notice to Seller shall be sent to its office at 122 East 42nd Street, New York, N. Y. but failure to send such an additional copy shall not be considered a breach of this contract.

XIV. *Entirety of Contract.*

This instrument contains the entire agreement between the parties in respect of the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.

XV. *Assignability.*

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties hereto, provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Governmental Agency, department, instrumentality or wholly Government-owned corporation in which event Buyer shall remain liable.

XVI. *Statutory Compliance.*

In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable Federal laws and further agrees to require such compliances, representations, and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may

17

be required by applicable Federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any worker because of race, creed, color or national origin.

Seller is a corporation and this contract is made with it for its general benefit and no Member of, or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.

If any statute now in existence or hereafter enacted, or any present or future governmental ruling or order, or the action of any governmental department, agency or instrumentality shall reduce any price payable to Seller, as provided for in this contract, or shall prevent or prohibit the Seller from receiving from Buyer the prices provided for in this contract, then Seller and Buyer agree that this shall, for the purpose of this contract, be deemed to be and shall constitute a breach by Buyer of its obligation to accept and pay for 100-Octane aviation gasoline at the prices provided for in this contract, and thereupon the Seller shall have the option upon thirty (30) days' written notice to Buyer to elect to continue to make deliveries provided for in this contract at the maximum price fixed by any such ruling, order or action, or to consider this contract terminated as a result of said breach.

XVII. *Right to Terminate.*

Seller shall have the right to terminate this contract unless within ninety (90) days of the date hereof it shall receive all Governmental assistance which is necessary for performing this contract and for the prompt completion of the expanded facilities which Seller will erect and install hereunder, including, without limitation, priorities and allocations necessary for obtaining materials, equipment and supplies and such certificate or certificates as may be necessary to permit Seller to invoke the provisions of Section 124, Internal Revenue Code.

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

18

IN WITNESS WHEREOF the parties hereto have executed this contract in Washington, D. C., as of the day and year first above written.

DEFENSE SUPPLIES CORPORATION

CORPORATE SEAL

By          H. A. MULLIGAN
                    President

ATTEST:

DUDLEY H. DIGGES
    Acting Secretary

CORPORATE SEAL

PAN AMERICAN REFINING CORPORATION

By          ROBERT E. WILSON
                    President

ATTEST:

L. M. WILSON
            Secretary

19

## EXHIBIT "A"

*Item 1.* ........................................................................ price, $0.134 per gallon

U. S. ARMY-NAVY SUPPLY

AN-VV-F-781          Sept.  26, 1940

Amendment-3          June    6, 1941

Knock Test Method      AN-VV-F-746

100-Octane Number by Method AN-VV-F-746

Lead Limit 3.0 cc/Gal.

*Item 2.* ........................................................................ price, $0.1315 per gallon

U. S. ARMY-NAVY SUPPLY

Same as above with Amendment-4      Nov. 24, 1941

Lead Limit 4.0 cc/Gal.

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

20

## ADDENDUM #1

All material ordered hereunder is for Defense Supplies Corporation, a corporation created by Reconstruction Finance Corporation pursuant to Section 5d of the Reconstruction Finance Corporation Act, as amended, and in accepting this contract Pan American Refining Corporation (hereinafter designated as "Contractor") agrees:

I. (a) The Contractor is the manufacturer of or a regular dealer in the materials, supplies, articles, or equipment to be manufactured or used in the performance of the contract.

(b) All persons employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles or equipment used in the performance of the contract will be paid, without subsequent deduction or rebate on any account, not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under the contract; PROVIDED, however, that this stipulation with respect to minimum wages shall apply only to purchases or contracts relating to such industries as have been the subject matter of a determination by the Secretary of Labor.

(c) No person employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of the contract shall be permitted to work in excess of eight (8) hours in any one day or in excess of forty (40) hours in any one week, unless such person is paid such applicable overtime rate as has been set by the Secretary of Labor.

(d) No male person under 16 years of age and no female person under 18 years of age and no convict labor will be employed by the Contractor in the manufacture or production or furnishing of any

21

of the materials, supplies, articles, or equipment included in the contract.

(e) No part of the contract will be performed nor will any of the materials, supplies, articles, or equipment to be manufactured or furnished under said contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of the contract. Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part thereof is to be performed shall be prima-facie evidence of compliance with this subsection.

(f) Any breach or violation of any of the foregoing representations and stipulations shall render the party responsible therefor liable to the United States of America for liquidated damages, in addition to damages for any other breach of the contract, in the sum of ten dollars ($10.00) per day for each male person under 16 years of age or each female person under 18 years of age, or each convict laborer knowingly employed in the performance of the contract, and a sum equal to the amount of any deductions, rebates, refunds or underpayment of wages due to any employee engaged in the performance of the contract; and, in addition, the agency of the United States entering into the contract shall have the right to cancel same and to make open-market purchases or enter into other contracts for the completion of the original contract, charging any additional cost to the original Contractor. Any sums of money due to the United States of America by reason of any violation of any of the representations and stipulations of the contract as set forth herein may be withheld from any amounts due on the contract or may be recovered in a suit brought in the name of the United States of America by the Attorney General thereof. All sums withheld or recovered as deductions, rebates, refunds, or underpayments of wages shall be held in a special deposit account

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

22

and shall be paid, on order of the Secretary of Labor, directly to the employees who have been paid less than minimum rates of pay as set forth in such contracts and on whose account such sums were withheld or recovered; PROVIDED, That no claims by employees for such payments shall be entertained unless made within one year from the date of actual notice to the Contractor of the withholding or recovery of such sums by the United States of America.

(g) The Contractor shall post a copy of the stipulations in a prominent and readily accessible place at the site of the contract work and shall keep such employment records as are required in the Regulations under the Act available for inspection by authorized representatives of the Secretary of Labor.

(h) The foregoing stipulation shall be deemed inoperative if this contract is for a definite amount not in excess of $10,000.00.

This Addendum #1 is hereby made a part of the contract between Defense Supplies Corporation and the undersigned dated February 11, 1942.

PAN AMERICAN REFINING CORPORATION

by        ROBERT E. WILSON
                        President

23

GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to PAN AMERICAN REFINING CORPORATION to enter into said contract, RECONSTRUCTION FINANCE CORPORATION does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized this 11th day of February, 1942.

CORPORATE SEAL

RECONSTRUCTION FINANCE CORPORATION

By          CHARLES B. HENDERSON
                      Chairman

ATTEST:

A. T. HOBSON
   Acting Secretary

NARA - CP
RG 253 PI 31 E 75 Box 873

Reproduced from the Unclassified / Declassified Holdings of the National Archives

24

GUARANTEE BY PAN AMERICAN PETROLEUM & TRANSPORT COMPANY

In consideration of the execution of the within contract and as an inducement to Defense Supplies Corporation to enter into said contract, PAN AMERICAN PETROLEUM & TRANSPORT COMPANY, a Delaware corporation, does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of PAN AMERICAN REFINING CORPORATION (a subsidiary of Pan American Petroleum & Transport Company) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF PAN AMERICAN PETROLEUM & TRANSPORT COMPANY has caused this Guarantee to be executed in Washington, D. C., by its officers thereunto duly authorized this 11th day of February, 1942.

CORPORATE SEAL

PAN AMERICAN PETROLEUM & TRANSPORT COMPANY

By          ROBERT E. WILSON
                 President

ATTEST:

L. M. WILSON
          Secretary

NARA - CP
RG 253 PI 31 E 75 Box 873

# Exhibit 1-146

# C O N T E N T S

| 1. | Supply Contract | - | July 20, 1942 |
| 2. | Amended Contract | - | April 15, 1944 |
| 3. | Letter Agreement | - | February 3, 1944 |
| 4. | Letter Agreement | - | June 21, 1944 |
| 5. | Letter Agreement | - | September 5, 1944 |
| 6. | Letter Agreement | - | January 6, 1945 |
| 7. | Letter Agreement | - | February 26, 1945 |

CROSS-REFERENCE NOTE:

See the Defense Plant Facilities files,

under Pure Oil Company, for alkylate production.

CONFORMED COPY

51801

C O N T R A C T

between

DEFENSE SUPPLIES CORPORATION

and

THE PURE OIL COMPANY

100 OCTANE AVIATION GASOLINE

July 20, 1942.

Reproduced from the Unclassified / Declassified Holdings of the National Archives

DEFENSE SUPPLIES - PURE CONTRACT

(Smiths Bluff, Texas Refinery)

July 17, 1942.

CONTRACT made as of July 20, 1942, between THE PURE OIL COMPANY, an Ohio corporation, having its principal place of business as 35 East Wacker Drive, Chicago, Illinois, hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

W I T N E S S E T H:

WHEREAS, under date of February 27, 1942, a certain written Lease Agreement was made and entered into between Defense Plant Corporation, a corporation likewise created by Reconstruction Finance Corporation pursuant to Section 5(d) of the Reconstruction Finance Corporation Act, as amended, referred to therein as "Lessor", and said The Pure Oil Company, referred to therein as "Lessee", under the terms of which The Pure Oil Company agreed to construct and operate as Lessee certain plant facilities (to be owned by Defense Plant Corporation) on a site owned by Defense Plant Corporation adjacent to The Pure Oil Company's refinery at Smiths Bluff, Texas, for the manufacture of aviation alkylate, originally estimated to have a calendar day productivity of nine hundred (900) barrels of aviation alkylate and now estimated to have a calendar day productivity of twelve hundred (1,200) barrels of aviation alkylate when operated in conjunction with The Pure Oil Company's refinery at Smiths Bluff, Texas; and

WHEREAS, under date of February 27, 1942, a certain written Supply Contract was made and entered into between Defense Supplies Corporation, referred to therein as "Buyer", and said The Pure Oil Company, referred to therein as "Seller", covering the purchase and sale of the aviation alkylate to be manufactured in the aforesaid plant; and

WHEREAS, the aviation alkylate produced in the aforesaid aviation alkylate plant may, at the option of the Buyer, be supplied to and used by Seller in the manufacture of the aviation gasoline covered by this contract

Reproduced from the Unclassified / Declassified Holdings of the National Archives

NOW, THEREFORE, in consideration of the mutual covenants herein contained, it is agreed by and between the parties hereto as follows:

I.  Construction of Seller's Refining Facilities.

Seller is willing to construct facilities at its refinery at Smiths Bluff, Texas at an estimated cost of approximately Two Million Three Hundred Thousand Dollars ($2,300,000) which will enable Seller to produce approximately two thousand (2,000) barrels per calendar day of aviation gasoline base stock which when blended with the aforementioned alkylate and tetraethyl lead will produce approximately three thousand two hundred (3,200) barrels per calendar day of 100-Octane aviation gasoline.  Seller shall use its best efforts to complete said facilities as soon as possible and not later than March 1, 1943, and shall maintain work on the construction day and night insofar as the requisite labor and materials are available.  The force majeure provisions set forth in Section X hereof shall apply in all respects to the construction of facilities as well as to the sale of gasoline and all other obligations of Seller.

II.  Sale and Storage of Products.

(a) When the aforesaid construction of Seller's facilities shall be completed and the facilities are ready for operation, Seller shall promptly notify Buyer, and from and after receipt of such notification Seller shall sell and deliver and Buyer shall buy and receive, until the end of the original term of this contract, in accordance with the provisions of this contract, Seller's production of thirty two hundred (3,200) barrels per calendar day of 100-Octane aviation gasoline or such lesser quantity of 100-Octane aviation gasoline as may be produced from the actual production of the aforementioned alkylate, should said alkylate production be less than twelve hundred (1,200) barrels per calendar day, which 100-Octane aviation gasoline shall be in accordance with any of the alternate specifications set forth in Exhibit A attached hereto and made a part hereof or a correspondingly adjusted quantity of 100-Octane aviation gasoline which shall be in accordance with any other specification which by mutual agreement shall be attached as an addendum to Exhibit A.  Whenever in this contract provision is made for the sale and delivery to Buyer of a stated quantity of gasoline, such quantity is an aggregate quantity of the various kinds of gasoline specified in Exhibit A collectively considered.  Buyer may apportion such aggregate quantity among the various kinds of gasoline.  The damages, if any, for a breach of this Section II (a) shall be in accordance with Section VIII hereof.

Reproduced from the Unclassified / Declassified Holdings of the National Archives

50493

(b) Buyer on giving reasonable notice to Seller may re-quire the delivery hereunder of aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with the same refining facilities and the same raw mate-rials as are used in producing aviation gasoline in accordance with the specifications originally set forth in Exhibit A. The prices and specifications of such products shall be determined by negotiation be-tween the parties, and Seller shall not be required to deliver such products unless and until an agreement has been reached. Such agreement shall be reduced to writing as an addendum to Exhibit A and shall con-stitute a part thereof.

(c) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons and a gallon is a United States gallon of two hundred and thirty-one (231) cubic inches.

(d) Seller shall maintain storage facilities at, or in the vicinity of, its Smiths Bluff, Texas, Refinery to accommodate at least sixty (60) days' full capacity production of 100-Octane aviation gasoline.

(e) Whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage condition exists, Seller shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100-Octane aviation gasoline which was produced during such full storage condition or which would have been produced except for such full storage condition. If, however, Seller shall produce during any such period of full storage any additional 100-Octane aviation gasoline of the kind covered by this contract, then such additional aviation gasoline shall be treated as covered by Section III hereof.

(f) In accumulating said Storage, Seller may store gaso-line of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline in storage; provided, however, that on Buyer's request and if Seller can do so without extra cost, or if Seller can do so

Reproduced from the Unclassified / Declassified Holdings of the National Archives

at extra cost and Buyer shall agree to assume such extra cost, Seller shall change the gasoline in storage to meet other specifications covered in Exhibit A hereof.

(g) Seller shall sell and deliver and Buyer shall buy and receive at the end of the original term of this contract or any extension thereof the 100-Octane aviation gasoline stored at that time in the facilities referred to in Section II (d) hereof to the extent of not more than one hundred twenty thousand (120,000) barrels.

(h) Seller shall, on Buyer's authorization, without cost to Buyer, deliver into the receiving or blending tanks of Seller at the refining facilities referred to in Section II hereof aviation alkylate produced in the aforesaid alkylate plant in such amounts as may be required by Seller from time to time in the manufacture of the 100-Octane aviation gasoline covered by this contract. Said aviation alkylate shall meet the specifications set forth in the aforesaid Supply Contract dated February 27, 1942; shall be tested for quality before being delivered into Seller's receiving or blending tanks; and shall be measured for quantity after being delivered into Seller's receiving or blending tanks. Seller shall, in the manufacture of the 100-Octane aviation gasoline under this contract, blend such aviation alkylate delivered as aforesaid with the aviation base stock produced by Seller in the refining facilities referred to in Section II hereof.

III. Optional Gasoline.

(a) Buyer shall have the option from time to time and at any time to purchase from Seller hereunder all or any part of the aviation gasoline which Seller may produce at its Smiths Bluff Refinery between the date of execution of this contract and the date of receipt of the notification referred to in Section II (a) hereof to the extent that such gasoline is in excess of quantities which Seller has, prior to receipt by Seller of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

Reproduced from the Unclassified / Declassified Holdings of the National Archives

(b) Buyer shall also have the option from time to time and at any time to purchase from Seller hereunder all or any part of the aviation gasoline which Seller may produce at its Smiths Bluff Refinery between the date of receipt by Buyer of the notification referred to in Section II (a) hereof and the expiration of the original term of this contract, to the extent that such gasoline is in excess of the sum of (a) the quantity to be purchased by Buyer under Section II (a) hereof and (b) the quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

(c) Buyer shall have the option from time to time and at any time, upon written notice to Seller and after removing all aviation gasoline manufactured for Buyer and held in storage by Seller, to discontinue supplying aviation alkylate to Seller for blending into aviation gasoline and be relieved from purchasing the aviation gasoline as provided herein, but in such event Buyer shall be obligated to purchase and receive from Seller, and Seller shall be obligated to sell and deliver to Buyer approximately two thousand (2,000) barrels per calendar day of aviation base stock in accordance with the specifications set forth in Exhibit A-1 attached hereto and made a part hereof, or any other specification which by mutual agreement shall be attached as an addendum to Exhibit A-1. In event Buyer exercises the option to so purchase aviation base stock instead of aviation gasoline, then the terms "100-Octane aviation gasoline", "aviation gasoline", or "gasoline" wherever used in this agreement shall be construed to mean and include aviation base stock in quantities of approximately two thousand (2,000) barrels per calendar day.

IV. Price and Payment.

(a) The base price of 100-Octane aviation gasoline specified in Exhibit A hereof shall be eight and six-tenths cents ($0.086) per gallon f.o.b. Seller's refinery at Smiths Bluff, Texas, computed on that portion of aviation base stock used by Seller in the blending of such 100-Octane aviation gasoline. In addition to such base price, Buyer shall pay to Seller the sum of two cents ($0.02) per barrel for each barrel of 100-Octane

5

Reproduced from the Unclassified / Declassified Holdings of the National Archives

aviation gasoline delivered, which additional sum shall cover the blending of base stock and alkylate (and tetraethyl lead if added) into 100-Octane aviation gasoline. Where Seller is permitted under the specifications for 100-Octane aviation gasoline to add tetraethyl lead thereto, then Buyer shall also pay to Seller, in addition to the base price and blending price, the actual cost to Seller of the tetraethyl lead added to said gasoline.

(b) The base price of aviation base stock specified in Exhibit A-1 hereof, delivered to Buyer and which has not been blended into aviation gasoline shall be eight and six-tenths cents ($0.086) per gallon f.o.b. Seller's refinery at Smiths Bluff, Texas, without tetraethyl lead. Where Seller is permitted under the specifications for aviation base stock to add tetraethyl lead thereto and/or if Buyer requests the delivery of aviation base stock containing tetraethyl lead, then Buyer shall in addition pay to Seller the actual cost to Seller of the tetraethyl lead added to said base stock plus Seller's actual cost for adding the tetraethyl lead thereto.

(c) Seller represents that there has not been included in its computation of such prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original estimated cost of the refining facilities used in the manufacture of said aviation base stock which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.

(d) Buyer shall pay promptly, but not later than the twentieth (20th) day of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.

V. Price Escalation.

The base price of 100-Octane aviation gasoline and aviation base stock purchased hereunder shall be subject to adjustment first, as provided in Exhibit B attached hereto and made a part hereof, and, secondly, as follows:

4

Reproduced from the Unclassified / Declassified Holdings of the National Archives

(a) The said base prices are based on a price of One Dollar and Twenty-five Cents ($1.25) per barrel for crude deliverable to Seller in the East Texas Field. The prices shall be increased or decreased three hundred forty-four ten-thousandths of one cent ($0.000344) per gallon for each one cent ($0.01) advance or decrease in the average price paid for such crude over or under One Dollar and Twenty-five Cents ($1.25) per barrel by the three (3) largest purchasers of such crude in the East Texas Field. The prices posted for such crude in the East Texas Field shall constitute prima facie evidence of the prices paid by such purchasers.

(b) The said prices shall also be increased or decreased by four hundred forty-nine ten-thousandths of one cent ($0.000449) per gallon for each one point increase or decrease in the final monthly wholesale price Index Number for "All Commodities other than Farm Products and Foods", as now published by the Bureau of Labor Statistics, United States Department of Labor, over or under ninety-five and seven-tenths (95.7). The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number. If said index shall cease to be issued, the parties shall use such other index as may most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(c) The prices hereinabove set forth are based upon present normal methods of transporting petroleum raw materials to Seller's refinery at Smiths Bluff, Texas, and upon a normal operation of that refinery in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of aviation base stock. If it becomes necessary to transport petroleum raw materials to said refinery by other than present normal methods, thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than aviation base stock, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of the refinery at which the aviation base stock supplied hereunder is manufactured

7

Reproduced from the Unclassified / Declassified Holdings of the National Archives

shall be interfered with to such an extent that in the opinion of Seller the cost of manufacturing aviation base stock is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a) and (b), Seller may give notice to Buyer that the delivery of 100-Octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of manufacturing unless Buyer shall agree with Seller to increase the price paid for 100-Octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, Buyer or Seller may give notice to the other that it desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase if any, within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of aviation base stock by the refinery affected may be reduced as above provided.

(d) If at the request of Buyer or other agency of the United States Government, Seller acquires from other refiners some of the components of 100-Octane aviation gasoline and moves the same to its refineries for blending with other stocks for the production of 100-Octane aviation gasoline, it shall be entitled to compensation for any increase in costs thereby incurred by increasing the price of the 100-Octane aviation gasoline so produced by an amount which will equal the difference between the purchase price of such components and the cost of manufacturing the same or similar components at its own refineries, plus transportation and other costs of any kind or character involved in the delivery of the components to the refinery where the blending occurs. If Seller and Buyer are unable to agree upon the amount of such additional compensation, the question shall be submitted to arbitration in the manner provided in Section XI hereof.

Reproduced from the Unclassified / Declassified Holdings of the National Archives

50493

(e)  In making adjustments under this Section V, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

VI.  Duration of Contract.

The original term of this contract shall expire at midnight on February 28, 1946.  Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension, and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension.  Upon such extension the obligations to purchase and receive shall be in accordance with Section II (a) hereof, and the price to be paid shall be fixed by agreement between the parties hereto during the ninety (90) day period prior to such extension. All other provisions of this contract, except those not then applicable, shall be in full force and effect.

VII.  (Section VII Omitted).

VIII.  Damages.

(a)  In the event that Seller shall fail to sell and deliver or Buyer shall fail to take and pay for 100-Octane aviation gasoline in accordance with Section II (a) hereof, the amount of the damages, if any, to which Buyer or Seller, as the case may be, shall be entitled for such failure shall be determined by agreement or, failing agreement, by arbitration in accordance with Section XI hereof; provided, however, that Seller shall not be entitled to damages for failure by Buyer to take and pay for 100-Octane Aviation gasoline unless the storage facilities referred to in Section II (d) hereof are full of 100-Octane aviation gasoline, leaded or unleaded; provided further that Seller shall be entitled to damages for failure by Buyer to take and pay for 100-Octane aviation gasoline only to the extent that the amount taken and paid for is less than (1) three thousand two hundred (3,200) barrels per day or (2) Seller's average productive capacity per calendar day for 100-Octane aviation gasoline (of current specifications) over the period in question, whichever quantity is the lesser; and provided further that Buyer's right to damages under this Section VIII shall be subject to Seller's rights under Sections II (e) and V (e) hereof.

9

Reproduced from the Unclassified / Declassified Holdings of the National Archives

(b)  Damages under this contract shall be limited to those arising proximately from a breach of contract.

IX.  Deliveries and Inspections.

(a)  Seller warrants full and unencumbered title to all gasoline delivered under this contract.

(b)  Buyer shall take delivery of said gasoline in tankers, barges, tank cars, or tank trucks (tank truck deliveries to be not in excess of available tank truck loading facilities for 100-Octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (1) of this Section IX) at its own cost and expense, at Seller's refinery in quantities approximating the current rate of production.

(c)  Each vessel delivery shall be made and title and risk of loss shall pass at the intake pipe of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each vessel and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d)  Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.

(e)  Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f)  On shipments made from refineries and any other points where licensed inspectors are regularly available, Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall conform to usual industry practice. The certificates of inspection shall be issued in quadruplicate, one set of which shall accompany

19

Reproduced from the Unclassified / Declassified Holdings of the National Archives

the relative shipment, a second set of which shall be forwarded forthwith to Buyer, a third set of which shall be submitted to Buyer with the monthly statement required by Section IV hereof, and a fourth set of which shall forthwith be delivered to Seller. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(g) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60° F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of deliveries into tank trucks in which case no adjustment shall be made.

(h) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product as shipped shall conform as to quality with the specifications set forth in Exhibit A hereof.

(i) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment and all other purposes of this contract.

(k) Should any such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may accept delivery of the product and claim an adjustment for such deficiency, provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

11

Reproduced from the Unclassified / Declassified Holdings of the National Archives

50493

(1) Notwithstanding the preceding provisions of this Section IX and at the request of Buyer, Seller shall utilize its existing and available facilities (other than tankers and barges) for handling, metering and delivering the gasoline purchased by Buyer to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States served by Seller, such service to be at the expense of Buyer and at Buyer's risk. In the event of loss Seller shall make its records available to Buyer to prove the extent and value of such loss.

X. Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of the Government or of any governmental officer or agent purporting to act under authority, floods, fires, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery of any product, service or material necessary in the construction of the facilities contemplated by Section I hereof or in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

XI. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction. If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after

Reproduced from the Unclassified / Declassified Holdings of the National Archives

the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Fifth Circuit acting in his individual capacity, upon application therefor by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

XII. Taxes.

(a) Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

Reproduced from the Unclassified / Declassified Holdings of the National Archives

(b) Buyer shall also pay in addition to the prices as established in Sections IV and V hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption. Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section IV hereof are based.

(c) If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

XIII. Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegram or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.

XIV. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect to the subject matter and there are no oral conditions,

Reproduced from the Unclassified / Declassified Holdings of the National Archives

warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.

XV.  Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties hereto, provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer amy assign to any other Governmental agency, department, instrumentality or wholly Government-owned corporation, in which event Buyer shall remain liable.

XVI.  Statutory Compliance.

(a)  In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable federal laws and further agrees to require such compliances, representations and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any worker because of race, creed, color or national origin.

(b)  Seller is a corporation and this contract is made with if for its general benefit and no Member of, or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.

(c)  If any statute now in existence or hereafter enacted, or any present or future governmental ruling or order, or the action of any governmental department, agency or instrumentality shall reduce any price payable to Seller, as provided for in this contract, or shall prevent or prohibit the Seller from receiving from Buyer the prices provided

Reproduced from the Unclassified / Declassified Holdings of the National Archives

for in this contract, then Seller and Buyer agree that this shall, for the purpose of this contract, be deemed to be and shall constitute a breach by Buyer of its obligation to accept and pay for aviation gasoline at the prices provided for in this contract, and thereupon the Seller shall have the option upon thirty (30) days' written notice to Buyer to elect to continue to make the deliveries provided for in this contract at the maximum price fixed by any such ruling, order or action, or to consider this contract terminated, unless within said thirty (30) days said ruling or order shall be rescinded or changed so as not to reduce the price payable to Seller, or otherwise changed in a manner satisfactory to Seller.

XVII. Right to Terminate.

Seller shall have the right to terminate this contract within ninety (90) days of the date thereof, unless within said ninety (90) days it shall receive all Governmental assistance which is available or necessary for performing this contract and for the prompt completion of the facilities which Seller will construct hereunder, including, without limitation, priorities and allocations necessary for obtaining materials, equipment, supplies and crude petroleum, and such certificates as may be necessary to permit it to invoke the provisions of Section 124, Internal Revenue Code.

IN WITNESS WHEREOF the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By (Sgd)  H. A. Mulligan
                              President

ATTEST:

(Sgd)  Dudley H. Digges
          Acting Secretary

(SEAL)

THE PURE OIL COMPANY

By (Sgd)  C. B. Watson
                          Vice President

ATTEST:

(Sgd)  W. V. Keeley
        Asst. Secretary.

(SEAL)

16

Reproduced from the Unclassified / Declassified Holdings of the National Archives

50493

EXHIBIT "A"

Item 1.

U. S. ARMY – NAVY SUPPLY

AN–VV–F–781          Sept. 26, 1940

Amendment No. 3         June   6, 1941

Knock Test Method       AN–VV–F–746

                 100–Octane Number by Method AN–VV–F–746

                 Lead Limit 3.0 cc/Gal.

Item 2.

U. S. ARMY – NAVY SUPPLY

Same as above with Amendment No. 4       Nov. 24, 1941

                 Lead Limit 4.0 cc/Gal.

Item 3.

U. S. ARMY – NAVY SUPPLY

Same as above with Amendment No. 5       May  13, 1942
    (S–2 + 1 cc. T.E.L.)

                 Lead Limit 4.0 cc/Gal.

17

Reproduced from the Unclassified / Declassified Holdings of the National Archives

51909

EXHIBIT A-1

AVIATION BASE STOCK

Distillation:

    10% – 140° F. Max.
    50% – 221° F. Max.
    90% – 275° F. Max.
    E.P. – 325° F. Max.
R.V.P. – 7# Max.

Octane No. (A.F.D.-1-C) Clear – 78 Min.
                        3 cc. lead – 94 Min.
                        4 cc. lead – 96 Min.

18

Reproduced from the Unclassified / Declassified Holdings of the National Archives

## EXHIBIT B

I. (A). Seller represents that the base prices for 100-Octane aviation gasoline and aviation base stock set forth in Section IV (a) and (b) of the foregoing contract include a certain "catalytic cracking royalty sum", representing patent royalty which Seller expects to pay to a third party or parties, amounting to $0.0042 per gallon of aviation base stock calculated at a running royalty rate of $0.05 per barrel of fresh stock charged to Seller's catalytic cracking operation.

I. (B). In the event that at any time during the term of the foregoing contract, there shall issue to any third party a patent license covering catalytic cracking operations of the type employed by Seller, at a running royalty rate lower than $0.05 per barrel of fresh stock charged to said third party's catalytic cracking operation, then as between Buyer and Seller, the first receiving such information shall notify the other, and the base prices of all aviation gasoline and all aviation base stock thereafter delivered under the foregoing contract shall be adjusted by subtracting from each of the said base prices, an amount equal to the "catalytic cracking royalty sum" applicable thereto multiplied by a factor equal to $\frac{A}{B}$, where A equals the difference between $0.05 and said lower running royalty rate payable by said third party, and B equals the sum of $0.05; and Seller shall within sixty (60) days after the date of said notification by Buyer or Seller to the other, refund to Buyer an amount equal to the total number of gallons of aviation base stock delivered under the foregoing contract, either as such or as a component of 100-Octane aviation gasoline, between the date such running royalty rate becomes payable by said third party and said date of notification, multiplied by (a) the amount of the "catalytic cracking royalty sum" and (b) by said factor $\frac{A}{B}$.

I. (C). In the event that during the term of the foregoing contract Seller does not pay to any third party or parties the "catalytic cracking royalty sum" aforesaid, or any part thereof, then within sixty (60) days following the date of termination, cancellation or expiration of the foregoing contract, Seller shall refund to Buyer an amount of money equal to the total number of gallons of aviation base stock sold to Buyer under the foregoing contract either as such or as a component of 100-Octane aviation gasoline, at a price including said "catalytic cracking royalty sum", multiplied by said "catalytic cracking

19

royalty sum; provided however, in the event that at any time during the term of the foregoing contract, it shall be finally determined that Seller will not be required to pay said "catalytic cracking royalty sum", then Seller shall promptly notify Buyer and within sixty (60) days after the date of such notification, Seller shall refund to Buyer an amount of money equal to the total number of gallons of aviation base stock so sold to Buyer under the foregoing contract at a price including said "catalytic cracking royalty sum", multiplied by said "catalytic cracking royalty sum".

II.   Seller further represents that no patent royalty other than said "catalytic cracking royalty sum" has knowingly been included in said base prices.

III.   Seller covenants that any "catalytic cracking royalty sum" paid by it and included within said base prices shall be paid in good faith only to a third party or parties having an established right to license the catalytic cracking process of the type employed by Seller.

Reproduced from the Unclassified / Declassified Holdings of the National Archives

GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to The Pure Oil Company to enter into said contract, Reconstruction Finance Corporation does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of July 20, 1942.

RECONSTRUCTION FINANCE CORPORATION

By (Sgd) Charles B. Henderson
Chairman

ATTEST:

(Sgd) A. T. Hobson
Secretary

(SEAL)

Reproduced from the Unclassified / Declassified Holdings of the National Archives

50493

ADDENDUM #1

<span style="float:right">The Pure Oil Company</span>

<span style="float:right">Chicago, Illinois</span>

All material ordered hereunder is for Defense Supplies Corporation, a corporation created by Reconstruction Finance Corporation pursuant to Section 5d of the Reconstruction Finance Corporation Act, as amended, and in accepting this contract, The Pure Oil Company, an Ohio corporation. (hereinafter designated as "Contractor") agrees:

I. (a) The Contractor is the manufacturer of or a regular dealer in the materials, supplies, articles, or equipment to be manufactured or used in the performance of the contract.

(b) All persons employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles or equipment used in the performance of the contract will be paid, without subsequent deduction or rebate on any account, not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under the contract; PROVIDED, however, that this stipulation with respect to minimum wages shall apply only to purchases or contracts relating to such industries as have been the subject matter of a determination by the Secretary of Labor.

(c) No person employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of the contract shall be permitted to work in excess of eight (8) hours in any one day or in excess of forty (40) hours in any one week, unless such person is paid such applicable overtime rate as has been set by the Secretary of Labor.

(d) No male person under 16 years of age and no female person under 18 years of age and no convict labor will be employed by the Contractor in the manufacture or production or furnishing of any of the materials, supplies, articles, or equipment included in the contract.

(e) No part of the contract will be performed nor will any of the materials, supplies, articles, or equipment to be manufactured or furnished under said contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of the contract. Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part thereof is to be performed shall be prima-facie evidence of compliance with this subsection.

(f) Any breach or violation of any of the foregoing representations and stipulations shall render the party responsible therefor liable to the United States of America for liquidated damages, in addition to damages for any other breach of the contract, in the sum of ten dollars ($10.00) per day for each male person under 16 years of age or each female person under 18 years of age, or each convict laborer knowingly employed in the performance of the contract, and a sum equal to the amount of any deductions, rebates, refunds or underpayment of wages due to any employee engaged in the performance of the contract; and, in addition, the agency of the United States entering into the contract shall have the right to cancel same and to make open-market purchases or enter into other contracts for the completion of the original contract, charging any additional cost to the original Contractor. Any sums of money due to the United States of America by reason of any violation of any of the representations and stipulations of the contract as set forth herein may be withheld

Reproduced from the Unclassified / Declassified Holdings of the National Archives

Addendum #1

from any amounts due on the contract or may be recovered in a suit brought in the name of the United States of America by the Attorney General thereof. All sums withheld or recovered as deductions, rebates, refunds, or underpayments of wages shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employees who have been paid less than minimum rates of pay as set forth in such contracts and on whose account such sums were withheld or recovered; PROVIDED, That no claims by employees for such payments shall be entertained unless made within one year from the date of actual notice to the Contractor of the withholding or recovery of such sums by the United States of America.

(g) The Contractor shall post a copy of the stipulations in a prominent and readily accessible place at the site of the contract work and shall keep such employment records as are required in the Regulations under the Act available for inspection by authorized representatives of the Secretary of Labor.

(h) The foregoing stipulation shall be deemed inoperative if this contract is for a definite amount not in excess of $10,000.00.

This Addendum #1 is hereby made a part of the contract between Defense Supplies Corporation and the undersigned dated as of July 20, 1942.

THE PURE OIL COMPANY

By: (Sgd) C. B. Watson
Vice President

Reproduced from the Unclassified / Declassified Holdings of the National Archives





100 OCTANE AVIATION GASOLINE
COST ANALYSIS AND BREAKDOWN

XIX.  THE PURE OIL COMPANY
(Smiths Bluff, Texas Refinery)


FINAL NEGOTIATED PRICES:

(Basis Aviation Base Stock Component of Aviation Gasoline)

Aviation Base Stock

3.6¢*
*When base stock is blended with alkylate from Defense
Plant and tetraethyl lead to make 100-Octane aviation
gasoline, Pure shall also receive its actual cost for
lead and 2¢ per barrel to cover cost of blending.

EARLIER NEGOTIATED PRICES:

This plant was approved primarily for purpose of supplying butylenes
to Port Neches butadiene project.  Negotiated prices were based on an
approved price of 9.5¢ per gallon of butylenes to Port Neches.  This price
being credited as a product value for the Pure plant.  Pure originally
asked 5¢ per barrel of aviation gasoline to cover blending of base stock
with alkylate and lead, but this change was reduced to 2¢ per barrel through
negotiation with representatives of this Office.

COMPETITIVE BIDDING PRICES:

No competitive bidding prices for aviation base stock are available
for purposes of comparison with above prices.

REFINER'S COST ANALYSIS:

See pages XIX – 2 to XIX – 10

O.P.C.'s COST ANALYSIS:

See pages XIX – 11 to XIX –13

O.P.C.'s FORMAL RECOMMENDATION:

See pages XIX – 14 to XIX – 21

DIGEST OF CONTRACT:

See pages XIX – 22 to XIX – 23

Reproduced from the Unclassified / Declassified Holdings of the National Archives

THE PURE OIL COMPANY

General Offices, 35 East Wacker Drive, Chicago

July 15, 1942

Mr. Dustin W. Wilson, Director
Refining Division, District No. 1
Office of Petroleum Coordinator
Washington, D. C.

Dear Mr. Wilson:

In line with our conversations of the last several days regarding proposed installation of a thermofor unit at our Smiths Bluff refinery, I am submitting, as per your request, Form 176098 filled out with figures in accordance with my understanding of your suggestions.

It is to be noted that these figures are prepared on a basis of Pure's producing 2,000 barrels per day of aviation base stock, which base when blended with 1,200 barrels per day of alkylate of the characteristics and quantity anticipated from Pure's alkylation plant will produce 3,200 barrels of 100 octane aviation grade gasoline with the addition of 3 c.c's. of T.E.L. These figures are broken down showing Petroleum Material Cost of 5.88¢ per gallon of aviation base; Operating Cost, 2.32¢; Facilities Charge, .80¢, Contingencies, .1¢, Management & Profit, .40¢, making a total price per gallon of aviation base of 9.5¢.

As is contemplated in this project, we would undertake to blend the aviation gasoline from the base stock and the alkylate produced at the alkylation plant with a blending charge of 5¢ per barrel of all aviation gasoline blended. It is further our understanding that the base price, as supported by figures herein, of 9.5¢ per gallon will fluctuate up and down .25¢ per gallon for each 5¢ in the posted field price for East Texas crude, which at the present time is $1.25 per barrel.

Possibly it would be well to once again point out that the operating cost shown in the attached form of 2.32¢ includes the charge for 3 c.c's. of lead in a blend of base stock and alkylate to produce 100 octane aviation gasoline when the base stock and alkylate are blended in the ratio of 2,000 barrels of base and 1200 barrels of alkylate.

Under date of April 22 with my letter covering the general proposals of this operation to Mr. Gary, I attached copy of proposed flow sheets covering the operation and type of equipment we propose to install. In the event further flow sheets of this type are required or requested, we shall

Reproduced from the Unclassified / Declassified Holdings of the National Archives

52605

Mr. Dustin W. Wilson — 2 — July 15, 1942

be very happy indeed to furnish them to you.

I believe that this covers the information you desired in support of the price basis being considered for the base stock produced under the facilities we desire to proceed to install. In the event further information is desired, please advise us.

Yours very truly,

THE PURE OIL COMPANY

J. P. Langfitt

cc: Mr. Wright Gary

Reproduced from the Unclassified / Declassified Holdings of the National Archives

_____1942.

COMPANY__Pure Oil Co._____

REFINERY__Smiths Bluff, Texas_____

### ELEMENTS OF COST TO GOVERNMENT OF AVIATION GASOLINE BASE STOCK

ESTIMATED PRODUCTION OF (3CC TEL/GAL.) BASE STOCK

| Components | Bbl./C D | $ |
|---|---|---|
| | 2000 | |
| | | |
| | | |
| | | |

Total:

ESTIMATED NEW INVESTMENT COST – (ATTACH SCHEDULE G)

    Total .................................................. $2,300,000____

    Per B/C D 100 Octane Gasoline ..................... $_____

COST BREAK UP

| | | $/C D | ¢/Gal. BASE STOCK |
|---|---|---|---|
| A. | NET PETROLEUM MATERIALS COST (ATTACH SCHEDULE A) | | 5.88 |
| B. | OPERATING COST (ATTACH SCHEDULE B) | | 2.32 |
| C. | FACILITIES CHARGE (ATTACH SCHEDULE C) | | .80 |
| D. | CAPITAL CHARGE (ATTACH SCHEDULE D) | | |
| E. | CONTINGENCIES (ATTACH SCHEDULE E) | | .10 |
| F. | MANAGEMENT & PROFIT (ATTACH SCHEDULE F) | | .40 |
| | | | 9.50 |

TOTAL ESTIMATED PRODUCTION COST:

A.   Operating cost covers 3cc's of T.E.L. for blend of 2000 Bbls/Day Base above with 1200 Bbls/Day Aviation Alkylate producing 100 Octane Aviation on 3c.c. basis.

Reproduced from the Unclassified / Declassified Holdings of the National Archives

COMPANY  Pure Oil Co.

REFINERY  Smiths Bluff

## SCHEDULE A

### PETROLEUM MATERIALS COST

| ITEM | B/CD | GALS/CD | ¢/GAL.* | $/CD | ¢/GAL. 100 OCTANE GASOLINE |
|---|---|---|---|---|---|
| WITHOUT NEW FACILITIES | | (NET) | | | |
| 1) CHARGES AND PRODUCTIONS | | | | | |
| ** CRUDE | 40000 | | | | |
| a) H. B. Gasoline | 19168 | 805056 | 5.27 | 42427.45 | |
| rubber | | | | | |
| vmp | | | | | |
| b) Naphthas ⌐ stod | 800 | 33600 | 6.373 | 2141.32 | |
| c) Kerosine | 2668 | 112056 | 4.226 | 4735.49 | |
| d) Tractor Dist. | 100 | 4200 | 4.650 | 195.30 | |
| e) *2 F.O. | 3332 | 139944 | 3.961 | 5543.18 | |
| f) Polymers | 20 | 840 | 3.174 | 25.66 | |
| g) HYY. Fuel | 11784 | 494928 | 1.924 | 9522.42 | |
| h) Gas. | 1728 | 72576 | 1.350 | 979.78 | |
| Total: | | | | 65570.60 | |
| 2) WITH NEW FACILITIES | | | | | |
| ** CRUDE | 40000 | | | | |
| a) H. B. Gasoline | 15776 | 662592 | 5.27 | 34918.60 | |
| b) Butene 1 & 2 | 640 | 26880 | 9.50 | 2553.60 | |
| rubber | | | | | |
| vmp | | | | | |
| c) Naphtha ⌐ stod | 800 | 33600 | 6.373 | 2141.32 | |
| d) Kerosine | 2668 | 112056 | 4.226 | 4735.49 | |
| e) Tractor Dist. | 100 | 4200 | 4.650 | 195.30 | |
| f) *2 F.O. | 3332 | 139944 | 3.961 | 5543.18 | |
| g) Polymers | 20 | 840 | 3.174 | 25.66 | |
| h) HYY. Fuel | 10060 | 422520 | 1.924 | 8129.18 | |
| i) Gas | 4204 | 176568 | 1.350 | 2383.66 | |
| Total: | | | | 60625.99 | |
| 3) NET PETROLEUM MATERIALS COST | 2000 | 84000 | | 4944.61 | |
| (Charges Less Credits) | | | | | 5.886 |

Notes:  *Give basis for each value used.

Give specific description for each charge or product involved.
For gasolines give octane rating, vapor pressure, and boiling
range. For naphthas and kerosines give API gravity, and boil-
ing range. For gas oils, give gravity - boiling range and if
necessary Diesel Index.

For heavier stocks give gravity - viscosity, etc.

This schedule is to be supported by detailed substantiation of
each item.

**Crude   Chg.   Bosco Gueyden  16.08%
              Creole          2.17
              E. Texas       52.17
              Evangeline     10.00   } $1.3609
              Sweet Lake      5.92
              Van Zandt      13.66
                            100.00%

All prices are
Refinery Net-Backs.

Reproduced from the Unclassified / Declassified Holdings of the National Archives

_____1942.

COMPANY _Pure Oil Co._____

REFINERY _Smiths Bluff_____

<div style="text-align:center">SCHEDULE B      Cents/Bbl. crude chg<br>
                    With & Without Equipment<br>
OPERATING COSTS   for aviation base</div>

<div style="text-align:center">(Including Non-petroleum Materials)</div>

| ITEM | UNIT | UNIT COST WITH | UNIT COST WITHOUT | $/CD DIFF | ¢/GAL.- BASE STOCK |
|---|---|---|---|---|---|
| 1) Labor | Man hours | 8.11 | 7.60 | +.51 | +.24 |
| 2) SUPERVISION | Man days | | | | |
| 3) MAINTENANCE | | | | | |
|   a) Labor | | | | | |
|   b) Material | | 3.45 | 2.80 | +.65 | +.30 |
| 4) STEAM | 1000 lbs. | | | | |
| 5) ELECTRICITY PURCHASED SERVICES | K. W. H. | 1.46 | 1.20 | +.26 | +.12 |
| 6) WATER | | | | | |
|   a) Cooling | 1000 Gal. | | | | |
|   b) | | | | | |
| 7) FUEL | M M BTU | 4.25 | 4.30 | -.05 | -.02 |
| 8) LABORATORY | | | | | |
|   a) Labor | | | | | |
|   b) Material | | | | | |
| 9) CATALYSTS (List Separately) | | | | | |
|   a) | | | | | |
|   b) | | | | | |
|   c) | | | | | |
|   d) | | | | | |
| 10) CHEMICALS (List Separately) INCLUDES CATALYST | | | | | |
|   a) | | 2.25 | .85 | +1.40 | +.66 |
|   b) | | | | | |
|   c) | | | | | |
|   d) | | | | | |
|   Operating tools, etc. | | .86 | .80 | +.08 | +.03 |
| 11) T.E.L. | | | | | |
|   a) Aviation Gasoline For Blending 2000 Bbl. Base | cc | 1.35 | 2.10 | -.75 | -.35 |
| A*   b) & 1200 Bbl. Alkylate | cc | | | | .90 |
| *12) TAXES | | | | | |
| *13) INSURANCE | | | | | |
| 14) MISCELLANEOUS REFINERY EXPENSES | | | | | |
| 15) ROYALTIES (List Separately) | | | | | |
|   a) | | .90 | 0.00 | +.90 | +.42 |
|   b) | | | | | |
|   c) | | | | | |
|   d) | | | | | |
| 16) ADMINISTRATIVE & OVERHEAD | | | | | |
|   a) Acctg., Steno., Clerical | | | | | |
|   b) Office Rent, T & T, Postage, Office Supplies & Expenses | | | | | |
|   c) Gen'l. & Administrative Salaries & Expenses (Prorata) | | 8.35 | 8.35 | 0.00 | |
|   **Taxes & Ins. | | | | | |
| 17) TOTAL OPERATING COST: | | 31.00 | 28.00 | | 2.32 |

See instructions for filling out this schedule.

This schedule is to be supported by detailed substantiation of each item.

2/13/42

A* See Note A Page 1

Reproduced from the Unclassified / Declassified Holdings of the National Archives

_____1942.

COMPANY_____

REFINERY_____

## SCHEDULE B¹

### DISTRIBUTION OF OPERATING REQUIREMENTS

| ITEM | UNIT | UNIT | UNIT | UNIT | UNIT | TOTAL |
|---|---|---|---|---|---|---|
| 4* STEAM, 1000 lbs./H | | | | | | |
| 5* ELECTRICITY, K W H | | | | | | |
| 6* WATER, G P M | | | | | | |
|    a) Cooling | | | | | | |
|    b) | | | | | | |
| 7* FUEL, M M B T U/H | | | | | | |
| 8* CATALYSTS | | | | | | |
|    a) | | | | | | |
|    b) | | | | | | |
|    c) | | | | | | |
|    d) | | | | | | |
|    e) | | | | | | |
|    f) | | | | | | |
| 9* CHEMICALS | | | | | | |
|    a) | | | | | | |
|    b) | | | | | | |
|    c) | | | | | | |
|    d) | | | | | | |
|    e) | | | | | | |
|    f) | | | | | | |

NOTE:  *Give on'stream day basis and note ratio of calendar day over stream day rates. List all other items on calendar day basis.

Reproduced from the Unclassified / Declassified Holdings of the National Archives

                                              _____1942.

COMPANY___Pure Oil Co._____

   REFINERY____Smiths Bluff_____

## SCHEDULE C

## FACILITIES CHARGE

| | FACILITY | NEW CAPITAL INVESTED | PERCENTAGE PER ANNUM | $/CD |
|---|---|---|---|---|
| 1) | T. C. C. Cracking | 2,300,000 | 10% | |
| 2) | | | | |
| 3) | | | | |
| 4) | | | | |
| 5) | | | | |
| 6) | | | | |

Total:

Note:  This schedule covers depreciation, obsolescence, and amortization, which shall not exceed 10% per annum on refining facilities and 5% per annum on pipe lines.

## SCHEDULE D

## CAPITAL CHARGE

| | SOURCE OF CAPITAL | NEW CAPITAL INVESTED | PERCENTAGE PER ANNUM | $/CD |
|---|---|---|---|---|
| 1) | | | | |
| 2) | | | | |
| 3) | | | | |
| 4) | | | | |
| 5) | | | | |
| 6) | | | | |

Total:

Note:  This schedule covers interest on new capital invested.  In the case of a plant built under lease from Defense Plant Corporation schedules C plus D shall be the rental charge.

Reproduced from the Unclassified / Declassified Holdings of the National Archives

_____1942.

COMPANY_____

  REFINERY_____

## SCHEDULE E

## CONTINGENCIES

Refiner should list the various known contingencies which may arise in the proposed operations and submit justification for their inclusion.

## SCHEDULE F

## MANAGEMENT AND PROFIT

Refiner should provide discussion justifying this item.

Reproduced from the Unclassified / Declassified Holdings of the National Archives

52605                                          XIX - 10

_____1942.

COMPANY_____

  REFINERY_____

## SCHEDULE G

### BREAKUP OF ESTIMATED NEW INVESTMENT COST

UNIT                                           COST

1)_____    _____
2)_____    _____
3)_____    _____
4)_____    _____
5)_____    _____
6)_____    _____
7)_____    _____
8)_____    _____
9)_____    _____
10)_____    _____
11)_____    _____
12)_____    _____
13)_____    _____
14)_____    _____
15)_____    _____
16)_____    _____
17)_____    _____
18)_____    _____
19)_____    _____
20)_____    _____
21)_____    _____
22)_____    _____
23)_____    _____
24)_____    _____

  Total                            _____

Note:  Itemize by units, both operating and non-operating.

Reproduced from the Unclassified / Declassified Holdings of the National Archives

OFFICE OF PETROLEUM COORDINATOR FOR WAR

INTEROFFICE COMMUNICATION

From:  D. W. Wilson                Date:  September 29, 1942

To:    Mr. P. M. Robinson          Subject:  100 Octane Gasoline Manufacture
       Acting Director of Refining           Contract Between Defense Supplies
                                             Corporation and The Pure Oil
                                             Company, Smiths Bluff, Texas.

### Reasonableness Of Price Quoted

The Pure Oil Company at Smiths Bluff, Texas is presently engaged in the construction, for the account of Defense Plant Corporation, of facilities for the manufacture of aviation alkylate as a part of the 100 octane aviation gasoline program. Pure will operate the plant under the usual form of Lease Agreement for Defense Plant Corporation, and a Supply Contract has also been entered into with Defense Supplies Corporation for the purchase of the alkylate to be produced from this plant. The production from this plant is estimated to be about 1200 barrels of aviation alkylate per calendar day, and it is expected that these facilities will be completed about March 1, 1943.

Pure is also one of the companies which is to supply butylenes to the Neches project and in this connection have submitted a proposal for installing additional facilities, including two Thermofor units to be attached to their existing heaters, at Smiths Bluff which, incidental to the production of butylene for the Neches project, are also expected to produce about 2,000 barrels per calendar day of aviation base stock. Pure proposes to privately finance these additional facilities and is proposing to sell the base stock production to Defense Supplies Corporation, either for blending with alkylate to be produced from its Defense Plant to produce 100 octane aviation gasoline or for other disposition by Defense Supplies. In this connection, Pure has submitted to us, under date of July 15, 1942, details of their manufacturing and capital costs for these additional facilities. These figures have been summarized by this Office in the table attached to this memorandum.

As in other cases, all base prices are subject to escalation in accordance with a formula approved by War, Navy, Defense Supplies and O. P. C. We believer it is reasonable. These base prices are also subject to change by agreement or by arbitration as the result of unusual conditions which might be created by the war. We believe this to be a practicable and fair method of handling a difficult situation.

As to the base price itself, we believe that in order for this price to be reasonable and acceptable it is necessary that it meet two separate standards of measurement (1) it must be intrinsically low enough to be economical for use under the prevailing circumstances and (2) however high

Reproduced from the Unclassified / Declassified Holdings of the National Archives

or low it may be it must be established to our satisfaction that it does not contain any abnormal profit element nor any improper amortization factor.

The raw materials figure of 5.88 cents per gallon has been arrived at, essentially on the basis of realization values for housebrand gasoline and other products. After a careful review by this Office of the methods used by Pure in arriving at these items of cost and after comparing them with similar charges made by other refiners in the same area, we feel that these raw material values are fair and we recommend acceptance of them.

Operating costs of 2.32 cents per gallon, as shown in the attached table, include direct labor, supplies, utilities, maintenance, chemicals, patent royalties, fuel, insurance, taxes, indirect expenses, administrative expenses and tetrethyl lead (3 cc. per gallon). The item for tetraethyl lead amounted to 0.9 cents per gallon including leading costs. However, since this will not be required unless Pure is asked to supply finished 100 octane gasoline, it was decided to eliminate this item from the cost of the base stock, with the understanding that if Defense Supplies exercised its option (given in the contract) to purchase 100 octane gasoline or a leaded base stock, the actual cost of lead would then be added, together with a charge of 2 cents per barrel of aviation gasoline to cover leading and blending costs. This latter figure was reduced from 5 cents per barrel originally requested by Pure. We have carefully examined the other items of cost making up the operating costs and we believe them to be fair and reasonable. We recommend their acceptance.

The item for depreciation is based on an amortization rate for the new facilities of 10 per cent per annum, which is in accordance with our usual practice and therefore, we recommend acceptance of this item.

Although Pure is privately financing the entire investment, which is estimated at $2,300,000, Pure has declined to make an interest charge for this investment. This, of course, results in some decrease in cost to Government for Pure's production and is certainly commendable.

The contingency item is set by Pure at 0.1 cent per gallon which is quite low in comparison with other projects and we recommend acceptance of this item.

The profit allowance of 0.4 cents per gallon amounts to a return of about 5.33 percent on the entire new investment. This figure is well in line with other allowances we have approved and lower than many. We believe it to be reasonable and recommended its acceptance.

On the basis of an early estimated cost to Defense Supplies Corporation of 17.6¢ per gallon for the alkylate from Pure's Defense Plant, it is estimated that the final cost of 100 octane aviation gasoline, including the base stock at the negotiated price of 8.6¢ per gallon plus the cost of lead, leading and blending, will be approximately 12.6¢ per gallon. However,.

2

Reproduced from the Unclassified / Declassified Holdings of the National Archives

a more recent estimate places the cost of the alkylate at about 16¢ per gallon which would give a 100 octane gasoline price of about 12.25¢ per gallon. Each of these prices is a lower figure than has been obtained for Government in most Defense Supplies contracts and therefore, will be a substantial saving to Government for the quantity of 100 octane aviation gasoline produced from the combined facilities at this refinery. Accordingly, we believe the base price negotiated to be reasonable and recommend acceptance of it.

Geo Z Parkhurst

D. W. Wilson

R. M. Comfort

R. Wul

3

Reproduced from the Unclassified / Declassified Holdings of the National Archives

THE PURE OIL COMPANY
SMITHS BLUFF, TEXAS


ESTIMATED PRODUCTION COST OF AVIATION BASE STOCK


|  | Per Gallon |
|---|---|
| Raw Materials (Petroleum Products) . . . . . . . . . . . . . . . . . . . | $5.88 |
| Operating Costs (Including Labor, Catalysts, Fuel, Operating Materials, Insurance, Taxes, Royalties, Contract Maintenance, Indirect Expenses, Administrative Expenses, and Tetraethyl Lead). . . . . . . . . . . . . . | 2.32 |
| Depreciation – 10% per annum . . . . . . . . . . . . . . . . . . . . . . | .80 |
| Contingencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | .10 |
| Profit – (5.33% on total new investment) . . . . . . . . . . . . . . . . | .40 |
| TOTAL PRICE (Including lead) . . . . . . . . . . . . . . . . . . . . . . | 9.50 |
| Quoted Price (Ex. lead). . . . . . . . . . . . . . . . . . . . . . . . . | 8.60 |
| Amount of Investment . . . . . . . . . . . . . . . . . . . . $2,300,000 | |
| Daily Barrels Production . . . . . . . . . . . . . . . . 2,000 barrels | |

Reproduced from the Unclassified / Declassified Holdings of the National Archives

OFFICE OF
PETROLEUM COORDINATOR FOR WAR
Washington

Deputy Coordinator                                      July 23, 1942

                            Re:  100 Octane Aviation Gasoline
                                 Proposed Expansion
                                 Pure Oil Company
                                 Smiths Bluff, Texas

My dear Mr. Secretary:

     Rubber Reserve Company has requested that we recommend to
Defense Supplies Corporation that it purchase additional 100
octane aviation gasoline from Pure Oil Company.  This additional
100 octane aviation gasoline will be produced as a by-product of
the manufacture of raw materials for the Port Neches butadiene
project.  In view of recent changes in the technical plans for this
butadiene plant, we agree that the installation by Pure of the
equipment necessary to produce raw materials for butadiene manu-
facture and 100 octane by-product is sound.  Accordingly we are
recommending to the War Production Board that the installation
be accommodated in the 100 octane aviation gasoline program.  A
copy of a supporting memorandum from our New Facilities Section
is enclosed.

     A contract has been negotiated between Defense Supplies
Corporation and Pure Oil Company providing for the installation
of equipment to supply not only feed stock for the Port Neches
butadiene project but also approximately 3,200 barrels per calen-
der day of 100 octane aviation gasoline (4 cc. tetraethyl lead).

     The cost of the new facilities involved in this contract is
to be financed entirely privately by Pure Oil Company without a
Government loan.  It is also to be noted that Pure Oil Company
has made no interest charge on this investment in the price it
receives for the gasoline, and has also not included any charge
for its existing facilities which will necessarily be employed
with the new facilities.  The result is that the price of gaso-
line to Government is lower than from most other sources.  At the
same time the price charged for butylenes to the Port Neches proj-
ect is held at 9.5 cents per gallon, which is the same price as
had been previously approved by representatives of Rubber Reserve

Reproduced from the Unclassified / Declassified Holdings of the National Archives

Company and Defense Supplies Corporation in the case of Gulf Oil
Corporation, which is also supplying butylenes to the Port Neches
project in an analgous situation.

We have carefully considered the technical features of the
Pure project and they have our approval, particularly in view of
Rubber Reserve Company's urgent request that this project go for-
ward.  It should be noted also that this project will result in a
substantial reduction in the quantity of motor gasoline in the Gulf
Coast area with only a comparatively minor reduction in the quantity
of fuel oil.

It is the recommendation of this Office that the proposed con-
tract between Defense Supplies Corporation and Pure Oil Company be
executed by Defense Supplies Corporation and guaranteed by Recon-
struction Finance Corporation.  It is my understanding that this
contract has been discussed with Mr. George H. Hill, Jr., and Mr.
George Stoner of Defense Supplies Corporation, and that the patent
royalty features have been reviewed by Mr. Reuben T. Carlson,
Special Patent Counsel for Reconstruction Finance Corporation and
that these gentlemen have approved the matter.

Sincerely yours,


Ralph K. Davies,
Deputy Petroleum Coordinator.

Hon. Jesse Jones,
        Secretary of Commerce,
                Reconstruction Finance Corporation,
                        Washington, D. C.


cc:  Mr. Geo. H. Hill, Jr.,
                Defense Supplies Corporation,
                        Washington, D. C.

     Mr. Richard J. Dearborn,
                Rubber Reserve Company,
                        Washington, D. C.

     Brig. Gen. Walter B. Pyron
     Mr. George Stoner

     Mr. Bruce K. Brown
     Mr. Wright W. Gary
     Mr. Dustin W. Wilson

RW:dlb
7-23-42


2

Reproduced from the Unclassified / Declassified Holdings of the National Archives

OFFICE OF
PETROLEUM COORDINATOR FOR WAR
Washington

July 23, 1942.

Re:   100 Octane Aviation Gasoline
       Proposed Expansion
       Pure Oil Company
       Smiths Bluff, Texas

MEMORANDUM OF RECOMMENDATION

Pure Oil Company at Smiths Bluff, Texas is presently engaged in the
construction, for the account of Defense Plant Corporation, of facilities
for the manufacture of aviation alkylate as a part of the 100 octane avia-
tion gasoline program.  Pure will operate the plant under the usual form
of Lease Agreement for Defense Plant Corporation, and a Supply Contract has
also been entered into with Defense Supplies Corporation for the purchase
of the alkylate to be produced from this plant.  These facilities are ex-
pected to be completed about January 1, 1943.  The original estimate of
production from this plant was 900 barrels of aviation alkylate per calen-
dar day but a restudy of the facilities has indicated that the production
will be approximately 1,200 barrels of alkylate per calendar day, thereby
resulting in a substantial decrease in unit cost and, of course, a substan-
tial increase in the ultimate quantity of 100 octane aviation gasoline made
from this alkylate.

Pure is one of the five refining companies involved in the Port Neches
project which is expected to make 100,000 tons per year of butadiene.  This
butadiene project will use butenes, supplied by the five owner companies,
as charging stocks, thereby eliminating the expensive and relatively un-
proven first stage dehydrogenation step which would otherwise be necessary
in order to make butenes from butane.

Butenes will be supplied in part from existing equipment of the owner
companies, viz, Gulf, Atlantic, Texas, Magnolia and Pure, and additional
quantities will be supplied by catalytic crackers which are being installed
by Texas, Atlantic and Magnolia in connection with 100 octane aviation gas-
oline projects approved some time ago.  However, the total amount of butenes
available in the vicinity of the Port Neches butadiene plant will be insuf-
ficient to supply the necessary amount of charge stock.  Both Gulf and Pure
have proposed to supplement the available charge stock by installing addi-
tional catalytic crackers of a type which will be very economical, both in
terms of dollars and in terms of critical construction materials, and which
will produce additional 100 octane aviation gasoline as a by-product.  We
have recently recommended the Gulf installation to the War Production Board
and Defense Supplies Corporation.

Reproduced from the Unclassified / Declassified Holdings of the National Archives

A survey made jointly by representatives of Rubber Reserve Company and this Office indicates that the installation of the equipment proposed by Gulf and Pure together with other expedients which do not involve any large amount of new construction, will suffice to furnish the necessary charge stock for butadiene manufacture at Port Neches.

Essentially the proposed Pure installation involves construction of two Thermofor catalytic crackers and the necessary auxiliary equipment. These catalytic crackers will be constructed by the conversion of existing thermal cracking facilities, thus saving a very substantial amount of critical construction materials. Pure proposes to privately finance the cost of these added facilities and does not require the customary loan.

These new catalytic cracking facilities will produce about 640 barrels per day of normal butenes, about 15% of the total needed to produce 100,000 tons per year of butadiene. At the same time Pure will produce from the new facilities about 2,000 barrels per day of aviation base stock which when blended with the expected production of 1,200 barrels per day of alkylate will produce approximately 3,200 barrels per day of 100 octane aviation gasoline with 4 cc. of lead which will meet the specifications currently in force. The product should, in our opinion, meet the proposed 1943 specification (S + 1.25 "rich mixture") with little or no loss in yield.

We have previously carried the Pure Oil alkylation plant in our reports to the War Production Board on the basis of 3,000 barrels per calendar day of product meeting the proposed 1943 specifications (S + 1.25) in view of the fact that it was planned to include in the production a blending material produced by Pure Oil at Toledo, Ohio. This blending material will not now be needed by Pure but can be used to advantage at other points. It is very difficult to estimate with accuracy the effect of the presently proposed installation on the total 100 octane capacity of the country, but we have estimated this effect at approximately 1,000 barrels per calendar day. On this basis the new investment per barrel of new 100 octane production is well in line with typical installations previously authorized. The principal advantage, however, of the plant now proposed is not its contribution to the 100 octane aviation gasoline program but rather its function as a means of supplying charging stock to the Port Neches butadiene project.

It is estimated that the new catalytic cracking facilities will be completed about March 1, 1943.

Although the new facilities are designed to produce primarily butenes for the butadiene project and aviation base stock, in order to maintain as nearly as possible the usual form of supply contract for the purchase of aviation gasoline, the contract negotiated with Pure provides for the purchase of 100 octane aviation gasoline to be made from the base stock produced in the new facilities and the alkylate produced in the Defense Plant, which is to be supplied to Pure at the new facilities by Defense Supplies Corporation. The price negotiated was based on the quantity of aviation base stock included in the 100 octane aviation gasoline. A price of 8.6¢

2

Reproduced from the Unclassified / Declassified Holdings of the National Archives

per gallon has been approved by this Office after a careful review of the elements of cost by representatives. Another feature of the contract gives Defense Supplies the option to purchase aviation base stock, as such, at the price of 8.6¢ per gallon. It is not expected that Defense Supplies will exercise this option and Defense Supplies will, therefore, purchase aviation gasoline in accordance with its normal practice.

Where 100 octane aviation gasoline is purchased Defense Supplies will also pay Pure its actual cost for lead and a charge of 2¢ per barrel for blending the alkylate, base stock and lead. This charge of 2¢ per barrel for blending was substantially reduced from Pure's original estimate of 5¢ per barrel.

It is estimated that on the basis of a cost to Defense Supplies Corporation of approximately 16¢ per gallon for the alkylate, the final cost of aviation gasoline under the provisions of the new contract will be approximately 12.25¢ per gallon which is a lower figure than has been obtained for Government in most Defense Supplies contracts and there will therefore be a substantial saving to Government for the quantity of 100 octane aviation gasoline produced from the combined facilities at this refinery.

In arriving at the price for aviation base stock, a price of 9.5¢ per gallon was set for the butenes to be supplied to the Neches project. This price (which constitutes a credit applicable to the price of 100 octane aviation gasoline) appears to be quite in line for butenes in this area. The same price was approved by representatives of Rubber Reserve Company and Defense Supplies Corporation in the case of Gulf Oil Corporation, which is entirely analogous to the present situation.

Since the negotiated prices of aviation gasoline and aviation base stock in this contract include a cost item for patent royalties, provision has been made in the contract, in Exhibit A thereof, for repayment to Defense Supplies Corporation of all or any portion of these royalties, which for any reason Pure does not actually pay out to its licensors.

The allowance for depreciation, amortization and obsolescence is 10% and Pure has made the usual representation in this regard. Pure's profit expectancy is modest, approximately 5% on the new investment. In computing its costs Pure made no charge for its existing facilities used in connection with the new installation and no interest or other capital charge.

Another important consideration is that it is estimated that the new facilities will be completed at a very early date - not later than March 1, 1943 - sufficiently early to assure feed stock to the Neches butadiene project even if that project is completed more rapidly than is presently contemplated.

A further advantage of this project is that it decreases the motor gasoline production on the Gulf Coast without increasing crude run and without a corresponding decrease in fuel oil production.

3

Reproduced from the Unclassified / Declassified Holdings of the National Archives

It is believed that this project would be justified on the basis of butadiene manufacture alone. However, it also provides an additional supply of 100 octane aviation gasoline which will meet the new specifications. However, since Pure is unwilling to make the investment without a contract covering the purchase of the base stock, as such or as 100 octane aviation gasoline, by Defense Supplies Corporation, we are recommending that this project be approved not only as a butadiene feed plant but also from the 100 octane aviation gasoline standpoint.

Rubber Reserve Company has particularly urged us to seek approval for this project, and hence joins in the recommendation.

Geo. L. Parkhurst
Chief, New Facilities Section
Refining Division

4

Reproduced from the Unclassified / Declassified Holdings of the National Archives

OFFICE OF
PETROLEUM COORDINATOR FOR WAR
Washington

Deputy Coordinator                                    July 23, 1942

                                    RE: 100 Octane Aviation Gasoline
                                        Proposed Expansion
                                        Pure Oil Company
                                        Smiths Bluff, Texas
                                        _____

My dear Mr. Nelson:

        Pure Oil Company proposes to install two catalytic cracking
units at Smiths Bluff, Texas for the primary purpose of supplying
charging stocks for the manufacture of butadiene at Port Neches.
These units will utilize a large amount of existing equipment and
in the light of the present design of the butadiene project we be-
lieve their installation is entirely sound. It has been strongly
recommended by Rubber Reserve Company. In this connection we are
attaching a copy of a letter dated July 14, 1942 from Mr. Crossland
of Rubber Reserve to Mr. Gary of this Office.

        The Pure units will produce 2,000 barrels per calendar day of
base stock for blending with alkylate to make 100 octane aviation
gasoline. It is contemplated that this base stock will be used with
alkylate produced from an alkylation plant now under construction by
Pure at the same point. It is estimated that this alkylation plant
will produce 1,200 barrels per calendar day of alkylate. This 1,200
barrels together with the 2,000 barrels per calendar day of base
stock will produce 3,200 barrels per calendar day of 100 octane
aviation gasoline. This product will meet current specifications and
we believe it will meet the proposed 1943 specifications with little
or no loss in quantity.

        The installation can be completed very rapidly, the estimate
being six to ten months.

        We are recommending to Defense Supplies Corporation that it
contract to purchase this increased 100 octane output. Before
executing this contract, however, we believe that Defense Supplies
Corporation and this Office should have the approval of the War
Production Board on the inclusion of this project in the 100 octane
program.

Reproduced from the Unclassified / Declassified Holdings of the National Archives

The attached memorandum from our New Facilities Section gives
detailed information concerning the proposed new Pure facilities.

Sincerely yours,


Ralph K. Davies,
Deputy Petroleum Coordinator.

Hon. Donald M. Nelson, Chairman,
        War Production Board,
            Washington, D. C.

cc:  Hon. Jesse Jones
     Mr. E. A. Locke, Jr.
     Mr. Geo. H. Hill, Jr.
     Mr. Richard Dearborn
     Mr. Edward E. Robbins
     Brig. Gen. Walter B. Pyron
     Mr. Geo. Stoner

     Mr. B. K. Brown
     Mr. W. W. Gary
     Mr. D. W. Wilson

RW:dlb
7-23-42

Reproduced from the Unclassified / Declassified Holdings of the National Archives

DEFENSE SUPPLIES - PURE CONTRACT

Signed as of July 20, 1942

Productive Capacity, Bbls./Day

|  | Aviation Alkylate | Aviation Gasoline 4 cc. lead |
|---|---|---|
|  | 2000* | 3200* |

* This base stock when blended with 1200 bbls./day
  of alkylate to be produced from the Pure Defense
  Plant will produce 3200 bbls./day of 100 Octane
  gasoline.

Raw Materials

Gas Oil

Operation

Catalytic cracking by Thermofor process

New Investment

Estimated $2,300,000

New Investment per barrel

Estimated $1,150

Base Prices (Subject to Escalation)

8.6¢ (Plus actual cost of T.E.L. and 2¢ per barrel of
aviation gasoline to cover leading and blending
costs, when the base stock is to be blended into
aviation gasoline.)

Cost Breakdown (From data supplied by Pure)

| Raw Materials (Petroleum Costs) | $0.0588 |
|---|---|
| Operating Costs | .0142 |
| Depreciation - 10% | .0080 |
| Contingencies | .0010 |
| Profit - 5.33% | .0040 |
| Total Price | $0.0860 |

Probable Completion Date

March 1, 1943

Reproduced from the Unclassified / Declassified Holdings of the National Archives

<u>Control Provisions</u>:

    Defense Supplies agrees to purchase not more than 3,200 barrels per
day of 100 octane gasoline to be made from the 2,000 barrels of base stock
produced from the new facilities and 1,200 barrels per day of alkylate
produced from the Pure Defense Plant, or such lesser quantity as will be
equivalent to the quantity of alkylate produced from the Defense Plant,
if this quantity is less than 1,200 barrels per day.  Contract period ex-
tends to February 28, 1946, unless extended at option of Defense Supplies.
Damages for failure to purchase contract quantities are subject to arbitra-
tion.

    Defense Supplies has option to purchase either base stock, as such,
or 100 octane gasoline consisting of the base stock and the Defense Plant
alkylate.  Defense Supplies also has option to purchase any gasoline or
base stock produced before completion date and all overages, thereafter in
excess of prior commitments.

<u>Financing</u>

    Privately financed.  No interest charge made to Government in the
price of base stock or aviation gasoline.

Reproduced from the Unclassified / Declassified Holdings of the National Archives.

100 OCTANE AVIATION GASOLINE
COST ANALYSIS AND BREAKDOWN

XIX-A   THE PURE OIL COMPANY
(Smiths Bluff, Texas Refinery)
(Amendment Covers Aviation Base Stock Only)

This cost docket summarizes the Amended Contract between Defense Supplies Corporation and Pure Oil Company, Smiths Bluff, Texas.

FINAL NEGOTIATED PRICES:

See Cost Docket XIX

REFINERS COST ANALYSIS:

See Cost Docket XIX

PAW'S COST ANALYSIS:

See Cost Docket XIX

PAW'S FORMAL RECOMMENDATION:

See pages XIX-A-2 to XIX-A-3

DIGEST OF CONTRACT:

See pages XIX-A-4

Reproduced from the Unclassified / Declassified Holdings of the National Archives

PETROLEUM ADMINISTRATION FOR WAR

Washington 25, D. C.

July 17, 1944.

Mr. George H. Hill, Jr.
Executive Vice President
Defense Supplies Corporation
Lafayette Building
Washington, D. C.

> Re:  100 Octane Aviation Gasoline
>      The Pure Oil Company
>      Smith's Bluff Texas Refinery
>      Amendment of Contract of July 20, 1942

Dear Mr. Hill:

Defense Supplies Corporation has an existing contract, dated July 20, 1942, with The Pure Oil Company covering the purchase of 100 octane aviation gasoline of the then current specifications to be manufactured by blending aviation base stock produced by Pure in its privately-owned facilities with aviation alkylate produced by Pure in Defense Plant facilities and sold to Defense Supplies Corporation under a cost-plus Supply Contract, dated February 21, 1942.

Under the contract of July 20, 1942, Pure supplied its own base stock at a firm price negotiated by this office and since the alkylate was the property of Defense Supplies Corporation, having been purchased under the contract of February 27, 1942, no charge was made for this material but provision was made for a small charge for blending the two materials into 100 octane gasoline and for Pure's actual cost for the tetraethyl lead required.

In view of the changes in specifications of aviation gasoline and in the interest of making maximum production at all points, we have negotiated with Pure an amendment to the Supply Contract of July 20, 1942, under which Pure agrees to purchase components from third parties at the request and direction of Defense Supplies Corporation for incorporation in the 100 octane gasoline to be delivered under the Amended Contract. Prices of such purchased components are to be approved by your Corporation. The originally negotiated price for Pure's base stock and the original blending charge based on this material and the Defense Plant alkylate remain unchanged in the Amended Contract.

The Amended Contract is analogous to the various "blending" contracts now in effect between Defense Supplies Corporation and Sun Oil

Reproduced from the Unclassified / Declassified Holdings of the National Archives

Company and Socony-Vacuum Oil Company but differs somewhat in form therefrom. The principal provisions of the Amended Contract are as follows:

1. Amendment of Section III – Optional Gasoline – to provide for the purchase by Pure of components from third parties at the request and direction of Buyer and for the purchase of the resulting 100 octane gasoline from Pure by Buyer.

2. Amendment of Section IV – Price and Payment – to provide a formula for establishing a tentative billing price at which Pure will currently invoice Defense Supplies Corporation. Provision is also made for quarterly adjustment of the billing price to an actual price which is subject to post-audit.

3. Amendment of Section V – Price Escalation – to provide for adjustment of the firm price for Pure's base stock in accordance with Exhibit B in the event of a change in royalties payable by Pure. Exhibit B has been added and is of a form similar to that used in other contracts and covers refunds of royalties included in the contract price, if not actually paid by Pure.

4. Deletion of Section V (d) in order to eliminate any inconsistency between this provision and the provisions of the Amended Contract.

5. Amendment of Section XVI – Statutory Compliance – to include the present anti-discrimination provision; to incorporate by reference the provisions of the Walsh-Healey Act; and to make the Amended Contract subject to the Renegotiation Act.

6. A new Exhibit A, setting forth the specification for the current grade of 100 octane aviation gasoline, namely, AN-F-28, Amendment 2, has been substituted for the original Exhibit A.

We believe the Amended Contract to be necessary and advantageous to Government. Accordingly, we recommend its execution by Defense Supplies Corporation and execution of the Guarantee attached thereto by Reconstruction Finance Corporation.

Sincerely yours,

(Sgd) George L. Parkhurst

G. L. Parkhurst
Assistant Director of Refining

cc: Mr. Geo. Stoner, Vice President
Defense Supplies Corporation.

2

Reproduced from the Unclassified / Declassified Holdings of the National Archives

DEFENSE SUPPLIES - PURE CONTRACT
Signed as of April 15, 1944


For Productive Capacity, Raw Materials, Operation, New Investment, Base Prices, and Cost Breakdown see cost docket XIX.

CONTRACT PROVISIONS:

See page XIX-A-3

Reproduced from the Unclassified / Declassified Holdings of the National Archives

CONFORMED

74517

A M E N D E D   C O N T R A C T

between

DEFENSE SUPPLIES CORPORATION

and

THE PURE OIL COMPANY
(Smiths Bluff, Texas)

100 OCTANE AVIATION GASOLINE

April 15, 1944

Reproduced from the Unclassified / Declassified Holdings of the National Archives

74517

DEFENSE SUPPLIES - PURE CONTRACT

(Smiths Bluff, Texas Refinery)
(Amendment)

July 6, 1944.

THIS AMENDED CONTRACT made as of April 15, 1944, between THE PURE OIL COMPANY, an Ohio corporation, having its principal place of business as 35 East Wacker Drive, Chicago, Illinois, hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

WITNESSETH:

WHEREAS, as of July 20, 1942, a certain Supply Contract was made and entered into between Buyer and Seller under the terms of which Seller agreed to construct at its Smiths Bluff, Texas refinery certain facilities for the manufacture of aviation base stock for sale as such to Buyer or for sale to Buyer as 100-Octane aviation gasoline when blended with tetraethyl lead and with aviation alkylate produced by Seller in certain Defense Plant Facilities located adjacent to Seller's Smiths Bluff refinery and leased to Seller under a certain Lease Agreement, dated February 27, 1942, between Seller and Defense Plant Corporation; and

WHEREAS, the parties hereto wish to provide for the manufacture of 100-Octane aviation gasoline by Seller for sale to Buyer by the blending of said aviation base stock not only with said aviation alkylate produced by Seller in said Defense Plant Facilities but also with aviation alkylate and/or other aviation gasoline components to be purchased by Seller at the direction and request of Buyer;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, it is agreed by and between the parties hereto that the aforesaid Supply Contract, executed as of July 20, 1942, shall be and the same is hereby amended as follows:

ONE: Insert the following paragraph (d) in Section III - Optional Gasoline:

(d) Upon the request and at the direction of Buyer, Seller shall purchase aviation alkylate and/or other components of aviation gasoline in quantities, at prices and from sources designated from time to time by Buyer and shall blend same with Seller's aviation base stock and with tetraethyl lead for the manufacture of 100-Octane aviation gasoline conforming to the specifications set forth in Exhibit A hereof for sale and delivery to Buyer and Buyer shall buy such aviation gasoline so produced at its request and direction; provided, however, Seller

Reproduced from the Unclassified / Declassified Holdings of the National Archives

shall not be required to purchase any such aviation alkylate and/or other components of aviation gasoline if when requested by Seller the party from whom Seller purchases fails to warrant to Seller the full and unencumbered title thereto, or if such party fails to accept Seller's standard purchase order provisions governing tank car outage losses, and provided further, that any aviation alkylate and/or other components of aviation gasoline so purchased shall be of suitable quality and shall meet Seller's requirements so as to permit the use thereof in the blending of aviation gasoline conforming to the specifications of Exhibit A.

TWO: Delete Section IV, Price and Payment, and substitute therefor the following:

IV. Price and Payment.

(a) The base price of aviation base stock specified in Exhibit A-1 hereof, delivered to Buyer and which has not been blended into aviation gasoline shall be eight and six-tenths cents ($0.086) per gallon f.o.b. Seller's refinery at Smiths Bluff, Texas, without tetraethyl lead. Where Seller is permitted under the specifications for aviation base stock to add tetraethyl lead thereto and/or if Buyer requests the delivery of aviation base stock containing tetraethyl lead, then Buyer shall in addition pay to Seller the actual cost to Seller of the tetraethyl lead added to said base stock plus Seller's actual cost for adding the tetraethyl lead thereto.

(b) Where Seller is requested by Buyer to furnish 100-Octane aviation gasoline specified in Exhibit A hereof, and such gasoline is produced by blending the aviation alkylate manufactured by Seller in the Defense Plant Facilities hereinabove referred to with the aviation base stock produced by Seller in its refinery at Smiths Bluff, Texas, the base price for such gasoline shall be eight and six-tenths cents ($0.086) per gallon f.o.b. Seller's refinery at Smiths Bluff, Texas, computed on that portion of such aviation base stock used by Seller in the blending of such 100-Octane aviation gasoline. In addition to such base price, Buyer shall pay to Seller the sum of two cents ($0.02) per barrel (converted to cents per gallon) for each barrel of such 100-Octane aviation gasoline delivered, which additional sum shall cover the blending of base stock and alkylate (and tetraethyl lead if added) into 100-Octane aviation gasoline. Where Seller is permitted under the specifications for 100-Octane aviation gasoline to add tetraethyl lead thereto, then Buyer shall also pay to Seller, in addition to the base price and blending price, the actual cost to Seller of the tetraethyl lead added to said gasoline.

2

Reproduced from the Unclassified / Declassified Holdings of the National Archives

(c) Where Seller is requested by Buyer to furnish 100-Octane aviation gasoline specified in Exhibit A hereof, and such gasoline is produced by blending aviation alkylate and/or other aviation gasoline components purchased by Seller at the direction and request of Buyer with the aviation base stock produced by Seller in its refinery at Smiths Bluff, Texas, the base price, in cents per gallon, f.o.b. Seller's refinery at Smiths Bluff, Texas, for such gasoline shall consist of the following elements:

(i) Seller's aviation base stock: at the price provided in paragraph (a) of this Section IV;

(ii) Aviation alkylate and/or other aviation gasoline components purchased by Seller from third parties at the direction and request of Buyer: at the billing price in cents per gallon actually paid or to be paid by Seller, which billing price shall be approved by Buyer;

(iii) Any transportation charges, and tank car rentals, in cents per gallon, required to be paid by Seller on such aviation alkylate and/or aviation gasoline components purchased by Seller from third parties at the direction and request of Buyer;

(iv) Seller's actual cost, in cents per gallon, for tetraethyl lead, if any, added to such 100-Octane aviation gasoline;

(v) The following costs and expenses, in cents per gallon, to cover blending, handling, shipping and miscellaneous expenses in connection with the blending of such 100-Octane aviation gasoline. The costs and expenses referred to in this subparagraph (v) of paragraph (c) of this Section IV are hereby fixed and agreed to be as follows:

1. For that portion of the 100-Octane aviation gasoline which consists of Seller's aviation base stock and aviation alkylate produced by Seller in the aforesaid Defense Plant Facilities, a charge of two cents ($0.02) per barrel (converted to cents per gallon) to cover all the costs set forth in subparagraph (v) of Section IV hereof.

2. For the balance of the 100-Octane aviation gasoline which consists of aviation alkylate and/or any other aviation gasoline component purchased by Seller at the request

3

Reproduced from the Unclassified / Declassified Holdings of the National Archives

74517

and direction of Buyer, a throughput charge of 0.20 cent per gallon if shipped in tanker or barge and 0.25 cent per gallon if shipped in tank cars; a charge of 0.08 cent per gallon to cover leading and blending; a charge of 0.10 cent per gallon to cover Seller's miscellaneous expenses; an allowance for handling losses equal in cost to 0.50% of the volume of said balance of 100-Octane aviation gasoline; an allowance to cover evaporation loss of any purchased stock included in said balance of 100-Octane aviation gasoline having a Reid vapor pressure of 7 pounds and up to and including 11 pounds equal in cost to .25% of the volume of such purchased stock. If isopentane is the component in question the loss due to evaporation is to be equal to .35% of the volume received. Such allowances of .25%, .35% and .50% shall be applicable until such time as Seller may demonstrate that its losses are greater than these allowances, at which time proper adjustments will be made.

Buyer shall not be required to install any equipment, after the date of this amendment, for the purposes of receiving, storing and blending any aviation gasoline components purchased at the request of Buyer, unless and until Buyer and Seller have made mutually satisfactory arrangements for appropriate reimbursement to Seller of Seller's investment therein.

On or before the first day of each calendar month Seller and Buyer will mutually agree upon and fix (for billing purposes) the prices provided for in subparagraph (c) of this Section IV, to be charged by Seller to Buyer for the aviation alkylate and/or other aviation gasoline components estimated to be purchased by Seller and blended with aviation base stock during such calendar month, which prices will be used by Seller in rendering monthly statements to Buyer as provided in paragraph (e) of this Section IV. Within thirty (30) days following each three (3) month period during the term of this contract, Seller shall furnish Buyer with a certified statement as to the actual blends of the components listed in subparagraph (c) of this Section IV included in the 100-Octane aviation gasoline sold hereunder, the specifications to which said components conform as ascertained by Seller in accordance with its usual practice, and the actual costs of purchased aviation alkylate and/or other aviation gasoline components, and tetraethyl lead,

4

Reproduced from the Unclassified / Declassified Holdings of the National Archives

which were blended in the 100-Octane aviation gasoline sold hereunder. Within ten (10) days after receipt of the aforementioned certified statement Seller shall pay to Buyer or Buyer shall pay to Seller as the case may be, (subject to further adjustment and correction as provided in paragraph (f) of this Section IV) a sum sufficient to adjust the billing price set forth herein to a figure based on the actual blends and Seller's actual costs for purchased aviation alkylate and/or other components of aviation gasoline, including actual transportation costs plus the allowances as set forth above in this paragraph (c) of this Section IV.

(d) Seller represents that there has not been included in its computation of such prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original estimated cost of the refining facilities used in the manufacture of said aviation base stock which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.

(e) Buyer shall pay promptly, but not later than the twentieth (20th) day of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.

(f) All payments hereunder, as well as the calculation and statements upon which such payments are based shall be subject to adjustment and correction within ten (10) days after Buyer's post audit, which Buyer shall have a right to make within one (1) year after receipt of the certified statement filed under Paragraph (c) of this Section IV.

THREE: Delete the unlettered paragraph at the beginning of Section V, Price Escalation, and substitute therefor the following:

The base prices set forth in paragraphs (a) and (b) of Section IV hereof for 100-Octane aviation gasoline and aviation base stock purchased by Buyer hereunder shall be subject to adjustment first, as provided in Exhibit B attached hereto and made a part hereof, and, secondly, as follows:

FOUR: Delete paragraph (d) of Section V.

5

Reproduced from the Unclassified / Declassified Holdings of the National Archives

FIVE:  Delete Section XVI, Statutory Compliance, and substitute therefor the following:

XVI.  Statutory Compliance.

(a)  In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by, applicable federal laws and further agrees to require such compliances, representations and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable federal laws; and notwithstanding the generality of the foregoing, Seller agrees further that in the performance of this contract, it will not discriminate against any employee or applicant for employment because of race, creed, color or national origin, and will include a similar provision in all subcontracts entered into by it with others in connection with such performance.

(b)  Seller is a corporation and this contract is made with it for its general benefit and no member of, or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.

(c)  Except for renegotiation as provided for in paragraph (e) of this Section XVI, and repricing as provided for in Section 801 and 802 of the Revenue Act of 1943, it is agreed that if any statute now in existence or hereafter enacted, or any present or future governmental ruling or order, or the action of any governmental department, agency or instrumentality shall reduce any price payable to Seller, as provided for in this contract, or shall prevent or prohibit the Seller from receiving from Buyer the prices provided for in this contract, then Seller and Buyer agree that this shall, for the purpose of this contract, be deemed to be and shall constitute a breach by Buyer of its obligation to accept and pay for aviation base  stock and/or aviation gasoline at the prices provided for in this contract, and thereupon the Seller shall have the option upon thirty (30) days' written notice to Buyer to elect to continue to make the deliveries provided for in this contract at the maximum price fixed by any such ruling, order or action, or to consider this contract terminated, unless within said thirty (30) days said ruling or order shall be rescinded or changed so as not to reduce the price payable to Seller, or otherwise changed in a manner satisfactory to Seller.

(d)  Seller shall comply with requirements of the Walsh-Healey Act (41 USCA Sections 35-45) insofar as such Act is applicable to this transaction.

6

Reproduced from the Unclassified / Declassified Holdings of the National Archives

74517

(e) This contract shall be deemed to contain all of the provisions required by subsection (b) of the Renegotiation Act, as amended by Section 701 of the Revenue Act of 1943 (Public Law 235, 78th Congress), enacted February 25, 1944; and in compliance with that subsection the Contractor shall insert, in each subcontract (as that term is defined in said act) entered into by the Contractor, a provision that: "This contract shall be deemed to contain all of the provisions required by subsection (b) of the Renegotiation Act as amended."

SIX: Delete Exhibit "A" and substitute therefor the Exhibit "A" attached hereto.

SEVEN: Delete Addendum No. 1.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement Amending Supply Contract as of the day and year first above written.

DEFENSE SUPPLIES CORPORATION

ATTEST:

By (Sgd) H. A. Mulligan
President

(Sgd) George H. Hubert
Secretary

THE PURE OIL COMPANY

(SEAL)

By (Sgd) C. B. Watson
Vice President

ATTEST:

(Sgd) L. S. Wescoat
Secretary

(SEAL)

7

Reproduced from the Unclassified / Declassified Holdings of the National Archives

74517

EXHIBIT "A"

Item 1.

U. S. ARMY – NAVY SUPPLY

AN-F-26        December 23, 1942

Amendment No. 2   October 2, 1943

·   100 Octane Number by Method AN-VV-F-746, as amended November 5, 1940, or

99 Octane Number by Method ASTM-D-357-43T

S + 1.25 cc. tetraethyl lead by Method AN-VV-F-748a-Amendment No 1, March 23, 1943

Tetraethyl Lead Limit – 4.6 cc. per gallon.

8

Reproduced from the Unclassified / Declassified Holdings of the National Archives

74517

## GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to The Pure Oil Company to enter into said contract, Reconstruction Finance Corporation does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of 31st day of August, 1944.

RECONSTRUCTION FINANCE CORPORATION

By (Sgd)   Charles B. Henderson
                    Chairman

ATTEST:

(Sgd) A. T. Hobson
              Secretary

(SEAL)

9

Reproduced from the Unclassified / Declassified Holdings of the National Archives







## DEFENSE SUPPLIES CORPORATION
### WASHINGTON 25, D. C.

February 3, 1944

Mr. J. Porter Langfitt, Vice President      Contract No.
Pure Oil Company      12-P-53
35 Wacker Drive (East)      Amended
Chicago, Illinois

               Re:   Temperature Correction
                  100 Octane Aviation Gasoline

Dear Mr. Langfitt:

The Army-Navy Petroleum Board has requested Defense Supplies Corporation to amend immediately its aviation fuel contracts to provide for temperature correction to 60° Fahrenheit on all shipments of 3500 gallons or more, in accordance with the Supplement to National Bureau of Standards Bulletin C-410, issued April 20, 1937. We therefore propose to amend all outstanding aviation fuel contracts accordingly.

Under this arrangement, any truck or truck-trailer shipment of the same fuel, consigned to one consignee, will be considered one shipment, and will be subject to temperature correction if consisting of 3500 gallons or more.

If this proposal is satisfactory to you, please indicate your acceptance thereof, effective February 10, 1944, by signing and returning the enclosed carbon copy of this letter, which shall constitute an amendment or modification to all outstanding aviation fuel contracts between your company and this Corporation.

                    Very truly yours,

                    /s/ George Stoner
                    George Stoner
                    Vice President

A C C E P T E D:

Pure Oil Company
      (Company)

By    J. P. Langfitt
     (Signature)

Ass't. to VP Chg. Refining
      (Title)

Reproduced from the Unclassified / Declassified Holdings of the National Archives







**DEFENSE SUPPLIES CORPORATION**
WASHINGTON 25, D. C.

June 21, 1944

Re: 100 Octane Aviation Gasoline
Federal Excise Tax

Gentlemen:

Section 307 (a) (5) of the Revenue Act of 1943 removed the previously granted Governmental exemption from the Federal Excise Tax imposed by Section 3412 of the Internal Revenue code, as amended, on gasoline sold by producers or importers thereof under contracts entered into after June 1, 1944.

In this connection, effective July 1, 1944, Defense Supplies Corporation will, in connection with all 100 Octane Aviation Gasoline purchased by it, whether under contracts entered into prior to June 1, 1944, or under contracts entered into thereafter, pay the Federal Gasoline Excise Tax to the Refiner in lieu of furnishing an exemption certificate covering the payment of the tax as has been the practice heretofore. This action is being taken by us at the request of the Army and Navy, to whom substantially all 100 Octane Aviation Gasoline purchased by this Corporation is ultimately sold, who desire uniformity of treatment of purchases of 100 Octane Aviation Gasoline as concerns the payment of the Federal Excise Tax for administrative reasons.

Accordingly, until further notice, you are instructed, commencing with deliveries made on July 1, 1944, to invoice Defense Supplies Corporation for 100 Octane Aviation Gasoline sold to this Corporation under contracts between your Company and this Corporation at the price or prices specified in the contract as the purchase price plus one and one-half cents ($1\frac{1}{2}$¢) per gallon to cover the Federal Gasoline Excise Tax, which latter amount shall be paid by your Company to the Bureau of Internal Revenue pursuant to Section 3412 of the Internal Revenue code, as amended.

In those cases, during the three month period beginning July 1, 1944, where it is necessary for 100 Octane Aviation Gasoline which has been sold to Defense Supplies Corporation by a Refiner to be sold back to the original Vendor-Refiner or to another Refiner or to other eligible purchasers, the resale price therefor payable to this

Reproduced from the Unclassified / Declassified Holdings of the National Archives

Corporation shall be sixteen cents (16¢) per gallon, established by my letter of May 27, 1944 plus the amount of the Federal Gasoline Excise Tax of one and one-half cents (1½¢) per gallon, making a total price of seventeen and one-half cents (17½¢) per gallon.

Prices announced by Defense Supplies Corporation for subsequent quarterly periods, beginning October 1, 1944 will include the Federal Gasoline Excise Tax and accordingly it will not be necessary for you to add such tax to the announced quarterly selling prices from and after October 1, 1944, as provided for in the preceding paragraph.

Will you please acknowledge receipt of this letter by signing the enclosed copy thereof and returning it to us.

Very truly yours,

George Stoner
Vice President

Enclosure

Received:

_____
Name of Company

_____
Signature and Title

Reproduced from the Unclassified / Declassified Holdings of the National Archives

*Mr. Phelps* 5251



## DEFENSE SUPPLIES CORPORATION
WASHINGTON 25, D. C.

September 5, 1944

Pure Oil Company
35 East Wacker Drive
Chicago, Illinois

Re: 100 Octane Aviation Gasoline
Amendment of Contract of July 20, 1942

Gentlemen:

Enclosed is a copy of a contract dated as of April 15, 1944 amending the supply contract dated as of July 20, 1942 between Defense Supplies Corporation and the Pure Oil Company covering the purchase and sale of 100 octane aviation gasoline.

The following changes have been made in the contract as originally submitted to us by you and the delivery of the contract as executed by us is conditional upon acceptance by the Pure Oil Company of such changes.

1. The first word in the 11th line from the top of page 3 of the proposed contract has been changed to "components".

2. After the words "Section XVI" in the 18th line from the bottom of page 6 of the proposed contract we have inserted the words "and repricing as provided for in Sections 801 and 802 of the Revenue Act of 1943,". This addition is necessary inasmuch as this Corporation is charged with the responsibility under the aforementioned Sections of the Revenue Act of 1943 of repricing contracts under which it is deemed that the contract price is unreasonable and unfair. Obviously, it would be against public policy for this Corporation to enter into a contract by the terms of which the exercise by the Corporation of a statutory obligation would constitute a breach of the contract. In this connection, we do not feel, and we think that you will agree, that the provisions of the contract as originally written were designed to cover the exercise of authority or the discharge of a responsibility by this Corporation under such a statute as the aforementioned "repricing statute".

If the foregoing meets with your approval will you please indicate your acceptance thereof by signing the enclosed carbon copy of this letter and returning it to us.

Very truly yours,

ACCEPTED                (Signed) George H. Hill, Jr.
PURE OIL COMPANY

By /s/ J Porter Langfitt       George H. Hill, Jr.
Title Asst. to V. P. chg.       Executive Vice President
            Refining     and General Counsel
Date   9-12-44

Reproduced from the Unclassified / Declassified Holdings of the National Archives



**DEFENSE SUPPLIES CORPORATION**
WASHINGTON 25, D. C.

January 6, 1945

Pure Oil Company
35 East Wacker Drive
Chicago, Illinois

       Attention:  Mr. J. Porter Langfitt

       Re:  100 Octane Aviation Gasoline

Gentlemen:

       Reference is made to the letter of December 19, 1944, addressed to you by Mr. George L. Parkhurst, Assistant Director of Refining of the Petroleum Administration for War, with respect to 371,547 gallons of gasoline base stock produced by retreating in your Thermofor Catalytic Treating Unit at Smiths Bluff, Texas, 603,331 gallons of first-pass catalytically cracked gasoline purchased from Cities Service Refining Corporation, Lake Charles, Louisiana.  On the basis of data submitted by you the Petroleum Administration for War has approved a price for this material of 12.165¢ per gallon as including all the actual costs incurred by you in producing and furnishing this base stock, less appropriate credits for all by-products resulting from the processing operations. We understand that you have already billed to us the 371,547 gallons produced from the material purchased from Cities Service as if it were your own base stock.  In order that our records may be accurate, we will appreciate your advising us as to the invoice in which the billing for that material was contained.

       The Petroleum Administration for War stated in its letter that it was recommending to this Corporation that these costs be recovered by your billing us, in your December, 1944 invoice, at 12.165¢ per gallon plus 2¢ per barrel for leading and blending costs, for 371,547 gallons of your own base stock, which would normally be priced, under the contract dated July 20, 1942, as amended, between the Pure Oil Company and Defense Supplies Corporation, at 8.6¢ per gallon plus 2¢ per barrel for leading and blending costs.

       Under the circumstances we would prefer to have this item included in your December, 1944 invoice as an actual expense incurred in the processing of the 371,547 gallons of base stock from Cities Service gasoline.  Since you have already recovered 8.6¢ per gallon of this cost and 2¢ per barrel for leading and blending, your billing should be in the amount of 3.565¢ per gallon.

       If the foregoing is agreeable to you, will you please indicate your acceptance by signing and returning the enclosed carbon copy of this letter.

<div style="margin-left:50%;">

Very truly yours,

(Signed)  George Stoner

George Stoner

Vice President

</div>

ACCEPTED:
PURE OIL COMPANY
By  /s/ J. Porter Langfitt
Title  Asst. to VP Chg. Refining
Date  1-9-45

Reproduced from the Unclassified / Declassified Holdings of the National Archives



# DEFENSE SUPPLIES CORPORATION
### WASHINGTON 25, D. C.

February 14, 1945

The Pure Oil Company
35 East Wacker Drive
Chicago, Illinois

                    Re:  100 Octane Aviation Gasoline
                         Smith's Bluff, Texas, Refinery.

Gentlemen:

        The Amended Contract dated as of April 15, 1944 between
Defense Supplies Corporation and The Pure Oil Company (Smith's
Bluff, Texas, Refinery) provides for the purchase by The Pure Oil
Company at the request or direction of this Corporation of aviation
alkylate and/or other components from sources designated by this
Corporation and the blending of such components with aviation base
stock produced by The Pure Oil Company at its refinery at Smith's
Bluff, Texas.  No provision is made for the payment by this Corpor-
ation of the cost of inspection at source of the components so
purchased.

        In order that this cost may be properly provided for in
the contract, on recommendation of the Petroleum Administration
for War we propose that the Amended Contract be amended by adding
the words "charges for inspection at source" after the words "trans-
portation charges" in subparagraph (iii) of paragraph (c) of Section
IV.

        Will you please indicate your acceptance of this amendment
by causing the enclosed carbon copy of this letter to be executed
by a duly authorized official of The Pure Oil Company and returning
it to us.

                            Very truly yours,

                        (Signed)  George Stoner

                            George Stoner
                            Vice President


ACCEPTED:

THE PURE OIL COMPANY

By  /s/  J. P. Langfitt

Title  Asst. to V.P. Chg. Refining

Date   2 - 26 - 45

Reproduced from the Unclassified / Declassified Holdings of the National Archives

# Exhibit 1-147

54741

CONFORMED COPY

Revised October 9, 1942.

C O N T R A C T

between

DEFENSE SUPPLIES CORPORATION

and

SHELL OIL COMPANY, INCORPORATED.
(Houston and Norco Refineries)

100 OCTANE AVIATION GASOLINE

October 15, 1942.

B. K. B. NOTED

DEC 3 1942



DECLASSIFIED
Authority NND730014

NARA CP
RG 253
Entry 72
Box 817
F:/Shell Oil Company, Inc (Houston and Norco Refineries)

52991

DEFENSE SUPPLIES – SHELL CONTRACT

(Houston and Norco Refineries)

Revised October 9, 1942.

CONTRACT made as of October 15, 1942, between SHELL OIL COMPANY, INCORPORATED, a Virginia corporation, having its principal place of business at 50 West 50th Street, New York, New York, hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of the mutual agreements herein contained the parties agree as follows:

I.   Expansion of Seller's Refining Facilities.

Seller has existing facilities at its Houston, Texas and Norco, Louisiana refineries for producing an aggregate of approximately nine thousand (9000) barrels per calendar day of the types of 100 octane aviation gasoline specified as Items 2 and 3 of Exhibit A attached hereto and made a part hereof, having expanded said facilities at its own expense to increase production from two thousand nine hundred (2900) barrels per calendar day of the type of 100 octane aviation gasoline specified as Item 1 of Exhibit A hereof. The production at the Norco, Louisiana refinery comprises aviation alkylate and cumene only, which are normally transported to the Houston, Texas refinery and are blended there with other aviation gasoline components produced at Houston to make said aggregate production of nine thousand (9000) barrels per calendar day.

II.   Sale and Storage of Products.

(a)  Beginning January 1, 1943, Seller shall sell and deliver and Buyer shall buy and receive 100-Octane aviation gasoline which shall be in accordance with the alternate specifications set forth in Exhibit A attached hereto and made a part hereof or any other specification which by mutual agreement shall be attached as an addendum to Exhibit A.

(b)  The quantity of said gasoline shall be such quantity as, together with all other sales by Seller to the United States Government of said gasoline produced at Seller's Houston and Norco Refineries, shall


DECLASSIFIED
Authority NND730014

52991

equal Seller's pro rata share of the entire requirements of the United States Government, as hereinafter defined. Wherever in this contract provision is made for the sale and delivery to Buyer of a stated quantity of gasoline, such quantity is an aggregate quantity of the various grades of gasoline specified in Exhibit A collectively considered. Buyer may apportion such aggregate quantity among the various grades of gasoline. It is contemplated, however, that Buyer shall not require production and delivery by Seller of more than one grade of gasoline specified in Exhibit A at any one time unless Buyer can do so with his available facilities. The damages, if any, for a breach of the foregoing provisions of paragraphs (a) and (b) of this Section II shall be in accordance with Section VIII hereof.

(c) Buyer on giving reasonable notice to Seller may require the delivery hereunder of aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with the same refinery facilities and the same raw materials as are used in producing 100-Octane aviation gasoline in accordance with the specifications originally set forth in Exhibit A. The prices and specifications of such products shall be determined by negotiation between the parties, and Seller shall not be required to deliver such products unless and until an agreement has been reached. Such agreement shall be reduced to writing as an addendum to Exhibit A and shall constitute a part thereof.

(d) The term "United States Government", whenever used in this contract, shall include the War Department, the Navy Department, any other department, agency or instrumentality of the United States Government, and any corporation wholly owned by the United States.

(e) The term "Seller's pro-rata share of the entire requirements of the United States Government" shall mean that quantity which bears the same ratio to the entire requirements of the United States Government of 100-Octane aviation gasoline as the total refining capacity for 100-Octane aviation gasoline at Seller's Houston and Norco Refineries, less the quantity of Seller's sales of 100-Octane aviation gasoline from said refineries to customers other than the United States Government, bears to

DECLASSIFIED
Authority NND7-30014

2

52991

the total refining capacity for 100-Octane aviation gasoline of all refiners in the United States and Lago Oil & Transport Company, Ltd., in Aruba, Netherlands West Indies, less the quantity of said refiners' sales to customers other than the United States Government. Buyer shall use its best efforts to furnish the data necessary for the calculation of such pro-rata share.

(f)  The term "barrel" as used in this contract means a barrel of forty-two (42) gallons and a gallon is a United States gallon of two hundred and thirty-one (231) cubic inches.

(g)  Seller shall maintain storage facilities at, or in the vicinity of, its Houston and Norco Refineries to accommodate at least sixty (60) days' production, at nine thousand (9000) barrels per day, of 100-Octane aviation gasoline or components thereof ready for blending.

(h)  Whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage condition exists, Seller shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100-Octane aviation gasoline which was produced during such full storage condition or which would have been produced except for such full storage condition; but Buyer shall not thereby be relieved of its oglibation to take delivery of the quantity specified in paragraph (b) of this Section II. If, however, Seller shall produce during any such period of full storage any additional 100-Octane aviation gasoline of the kind covered by this contract, then such additional aviation gasoline shall be treated as covered by Section III hereof.

(i)  In accumulating said storage, Seller may store gasoline of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline in storage; provided, however, that on Buyer's request and if Seller can do so without extra cost, or if Seller can do so at extra cost and Buyer shall agree to assume such extra cost, Seller shall change the gasoline in storage to meet other specifications covered in Exhibit A hereof.

DECLASSIFIED
Authority NND T300 14

3

52991

(j) Seller shall sell and deliver and Buyer shall buy and receive at the end of the original term of this contract or any extension thereof the 100-Octane aviation gasoline stored at that time in the facilities referred to in Section II (g) hereof to the extent of either (a) the difference between the quantity of aviation gasoline which Buyer is required to buy and receive and Seller to sell and deliver in accordance with Section II (b) hereof during the period of the contract, and the quantity actually purchased by Buyer and delivered by Seller during said period, or (b) five hundred and forty thousand (540,000) barrels, whichever is the lesser.

III. Optional Gasoline.

Buyer shall have the option from time to time and at any time to purchase all or any part of the aviation gasoline which Seller may produce at its Houston and Norco Refineries between January 1, 1943 and the expiration of the original term of this contract, to the extent that such gasoline is in excess of the sum of (a) the quantity to be purchased by Buyer under the provisions of paragraphs (a) and (b) of Section II hereof and (b) the quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

IV. Price and Payment.

(a) The base price of 100-Octane aviation gasoline specified as Items 2 and 3 of Exhibit A hereof, shall be thirteen and one-half cents ($0.135) per gallon, f.o.b. Seller's refinery at Houston, Texas, and Seller shall be required to deliver such aviation gasoline only from its Houston, Texas refinery.

(b) Seller represents that there has not been included in its computation of the above base price any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original cost of its refining facilities used in the manufacture of said 100-Octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.



4

52991

(c)  Seller further represents that there has not been included in its computation of the above base price any allowance for patent royalties for any process employed by it in the manufacture of said 100-Octane aviation gasoline.

(d)  Buyer shall pay promptly, but not later than the twentieth (20th) day of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month.  On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor.  Copies of the certificate of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.

(e)  Seller represents that there has been included in its computation of the above prices an allowance for the cost of transporting alkylate and cumene from Norco to Houston.  Accordingly, for all alkylate  and/or cumene which shall be delivered to Buyer at Norco, Louisiana, there shall be subtracted from Seller's charges for 100-Octane aviation gasoline delivered in each calendar month an amount equal to the cost to Seller of transporting from Norco to Houston an equivalent quantity of the alkylate and/or cumene.  The charge for such transportation shall be the prevailing contract carrier rate, if any be published and then in existence, and in the absence of such rate Seller's own costs for such transportation shall be used.

V.  Price Escalation.

The price of 100-Octane aviation gasoline purchased hereunder shall be subject to adjustment as follows:

(a)  The said price is based on a price of One Dollar and Twenty-five Cents ($1,25) per barrel for thirty-eight to thirty-eight and nine-tenths degree (38-38.9°) A.P.I. East Texas crude deliverable to Seller or Seller's affiliated companies in the East Texas Field.  The said price shall be increased or decreased by a percentage equal to one-half the percentage increase or decrease in the average price paid for such crude over or under One Dollar and Twenty-five Cents ($1.25) per barrel by the three



DECLASSIFIED
Authority NND T300 14

52991

(3) largest purchasers of such crude in the East Texas Field. The prices posted for such crude in the East Texas Field shall constitute prima facie evidence of the prices paid by such purchasers.

(b)  The said price shall also be increased or decreased by a percentage equal to one-half the percentage increase or decrease in the final monthly wholesale price Index Number for "All Commodities other than Farm Products and Foods," as now published by the Bureau of Labor Statistics, United States Department of Labor, over or under the index figure of ninety-five and six-tenths (95.6). The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number. If said index shall cease to be issued, the parties shall use such other index as may most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(c)  The price hereinabove set forth is based upon present normal methods of transporting petroleum raw materials to Seller's refineries at Houston, Texas and Norco, Louisiana, and upon a normal operation of these refineries in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100-Octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refineries by other than present normal methods thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100-Octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any portion of the 100-Octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100-Octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a) and (b), Seller may give notice to Buyer that the delivery of 100-Octane aviation

DECLASSIFIED
Authority NND 730014

6

52991

gasoline will be reduced in an amount sufficient in the judgement of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for 100-Octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, Buyer may give notice to Seller that it desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase, if any, within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of 100-Octane aviation gasoline by the refinery affected may be reduced as above provided.

(d)  If at the request of Buyer or other agency of the United States Government, Seller acquires from other refiners some of the components of 100-Octane aviation gasoline and moves the same to its refineries for blending with other stocks for the production of 100-Octane aviation gasoline, it shall be entitled to compensation for any increase in costs thereby incurred by increasing the price of the 100-Octane aviation gasoline so produced by an amount which will equal the difference between the purchase price of such components and the cost of manufacturing the same or similar components at its own refineries, plus transportation and other costs of any kind or character involved in the delivery of the components to the refinery where the blending occurs. If Seller and Buyer are unable to agree upon the amount of such additional compensation, the question shall be submitted to arbitration in the manner provided in Section XI hereof.

(e)  The base price for aviation gasoline set forth in Section IV hereof is based in part upon the ceiling price for benzol applicable to Seller as established by the Office of the Price Administrator and it is agreed that in the event such ceiling price be changed during the term of this contract said base price shall be subject to renegotiation.

7


DECLASSIFIED
Authority NND730014

52991

(f)  In making adjustments under this Section V, the price
to be adjusted shall be that price in effect immediately prior to the ad-
justment and such adjustment shall be made regardless of what Seller's
crude inventory may be at the time of such adjustment.

VI.  Duration of Contract.

The original term of this contract shall expire at midnight on
June 30, 1945.  Buyer shall have the option to extend this contract for
two (2) successive yearly periods beyond the original term by giving no-
tice in writing to Seller of the exercise of such option at least ninety
(90) days prior to the end of the original term for the first yearly ex-
tension and at least ninety (90) days prior to the end of the first yearly
extension for the second yearly extension.  Upon such extension the obli-
gations to purchase and receive shall be in accordance with Section II (b)
hereof and the prices to be paid shall be fixed by agreement of the parties
hereto during the ninety (90) day period prior to each such extension.  All
of the other provisions of this contract except those not then applicable
shall be in full force and effect.

VII.  (Section omitted.)

VIII.  Damages.

(a)  In the event that Seller shall fail to sell and deliver
or Buyer shall fail to take and pay for 100-Octane aviation gasoline in
accordance with Sections II (a) and II (b) hereof, the amount of damages,
if any, to which Buyer or Seller as the case may be, shall be entitled for
such failure shall be determined by agreement or, failing agreement, by
arbitration in accordance with Section XI hereof; provided, however, that
Seller shall not be entitled to damages for failure by Buyer to take and
pay for 100-Octane aviation gasoline unless the storage facilities referred
to in Section II (g) hereof are full of 100-Octane aviation gasoline,
leaded or unleaded; provided further that Seller shall be entitled to dam-
ages for failure by Buyer to take and pay for 100-Octane aviation gasoline
only to the extent that the amount taken and paid for is less than (1) the
amount called for in Section II (b) hereof or (2) Seller's average produc-
tive capacity per calendar day for 100-Octane aviation gasoline (of current
specifications) over the period for which damages are to be computed,


DECLASSIFIED
Authority NND763014

8

52991

whichever quantity is the lesser; and provided further that Buyer's right to damages under this Section VIII shall be subject to Seller's rights under Sections II (h) and V (c) hereof.

(b)   Damages under this contract shall be limited to those arising proximately from a breach of contract.

IX.  Deliveries and Inspections.

(a)   Seller warrants full and unencumbered title to all gasoline delivered under this contract.

(b)   Buyer shall take delivery of said gasoline in tankers, barges, tank cars, or tank trucks, (tank truck deliveries to be not in excess of available tank truck loading facilities for 100-Octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (1) of this Section IX) at its own cost and expense.

(c)   Each tanker or barge delivery shall be made and title and risk of loss shall pass at the intake pipe of the tanker or barge. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each tanker or barge and of the quantity of and specifications of the gasoline to be loaded.  Seller shall furnish without cost to Buyer berth at which each tanker or barge may safely lie afloat together with all connections and facilities for loading, and shall load the product on board.  Deliveries shall be made in accordance with the delivery conditions at Seller's loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d)   Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.

(e)   Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f)   On shipments made from refineries and any other points where licensed inspectors are regularly available, Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline.  The inspection procedure and the form of the certificate shall conform to usual industry practice.  The certificates of inspection shall



DECLASSIFIED Authority NND T3001Y

9

52991

be issued in quadruplicate, one set of which shall accompany the relative shipment, a second set of which shall be forwarded forthwith to Buyer, a third set of which shall be submitted to Buyer with the monthly statement required by Section IV hereof, and a fourth set of which shall forthwith be delivered to Seller. Buyer may, at its option, waive the requirement of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(g)  Inspection as to quantity of delivery into tanker or barges shall be made by taking the temperature and measuring and gauging the product in shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit ($60^\circ F$) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of deliveries into tank trucks in which case no adjustment shall be made.

(h)  Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product shall conform as to quality with the specifications set forth in Exhibit A hereof.

(i)  The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j)  The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(k)  Should any such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may accept delivery of the product and claim an adjustment for such deficiency, provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

DECLASSIFIED
Authority NND T3 00 14

10

52991

(1)  Notwithstanding the preceding provisions of this Section IX and at the request of Buyer, Seller shall utilize its existing and available facilities for handling, metering and delivering the gasoline purchased by Buyer to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States within which Seller customarily delivers aviation gasoline from its Houston Refinery, such service to be at the expense of Buyer and at Buyer's risk.  In the event of loss during the performance of such service, Seller shall make available to Buyer all information and records necessary to prove the extent and value of such loss.

(m)  As recited above, a portion of the cumene and the alkylate for the 100-Octane aviation gasoline to be delivered hereunder will come from Seller's refinery at Norco and will normally be transported to Houston by barge.  In lieu of taking 100-Octane aviation gasoline in its finished form at Houston, Buyer may from time to time on reasonable notice to Seller elect to take by tank car, tank truck, or barge (to be supplied by Buyer), f.o.b. Seller's refinery at Norco, such quantity of alkylate and/or cumene as Seller shall have available at Norco for use in making the 100-Octane aviation gasoline.  With such exercise of this option, Buyer shall take at Houston, substantially concurrently with the deliveries of alkylate and/or cumene from Norco, the complementary materials and ingredients which, if blended by Buyer with those taken at Norco will constitute the 100-Octane aviation gasoline, excepting, however, lead, unless Buyer elects to take leaded materials and ingredients at Houston.  Materials and ingredients so taken separately shall, to the extent of their aggregate volume, be considered as part of the total quantity to be delivered hereunder and shall be subject to all applicable provisions of this contract, including those relating to price (it being agreed that for price purposes such materials and ingredients shall be considered as the finished product) except that (1) the price for each Norco delivery shall be that which would apply to the finished product for a delivery at the same time at Houston less transportation costs from Norco to Houston as provided in Section IV (e) hereof, and (2) the prices for each Houston delivery shall be reduced by the actual cost for lead if Buyer in exercising its option shall elect to take unleaded materials and ingredients from Houston.

DECLASSIFIED
Authority NND 730014

11

52991

X.  Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of the Government or of any governmental officer or agent purporting to act under authority, floods, fires, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery, of any product, service or material necessary in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, gas oil, sulphuric acid, alumina, silica, lead tetraethyl and other supplies, raw materials and ingredients.

XI.  Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction.  If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice.  Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone.  If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Fifth Circuit acting in his individual capacity, upon application therefor by either of the parties.  The decision of a majority of the arbitrators so appointed, or if



DECLASSIFIED
Authority NND73001y

either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expense of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

XII.  Taxes.

(a)  Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder.  Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

(b)  Buyer shall also pay in addition to the prices as established in Sections IV and V hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption.  Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section IV hereof are based.

13

DECLASSIFIED
Authority NND 730014

52991

(c) If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

XIII. Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.

XIV. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect of the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.

XV. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties hereto, provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer



DECLASSIFIED
Authority NND 783014

14

52991

may assign to any other Governmental agency, department, instrumentality or wholly Government-owned corporation in which event Buyer shall remain liable.

XVI. **Statutory Compliance.**

        (a) In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable Federal laws and further agrees to require such compliances, representations, and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable Federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any worker because of race, creed, color or national origin.

        (b) Seller is a corporation and this contract is made with it for its general benefit and no Member of, or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.

        IN WITNESS WHEREOF the parties hereto have executed this contract as of the date and year first above written.

<div style="text-align:center">DEFENSE SUPPLIES CORPORATION</div>

By  (Sgd)  **H. A. Mulligan**
              President

ATTEST:

(Sgd)  **Dudley H. Diggs**
         Secretary

(Seal)

<div style="text-align:center">SHELL OIL COMPANY, INCORPORATED</div>

By  (Sgd)  **Alexander Fraser**
             President

ATTEST:

(Sgd)  **C. S. Gentry**
       Secretary

(Seal)



DECLASSIFIED
Authority NND730014

15

52991

## EXHIBIT A

Item 1

U. S. ARMY – NAVY SUPPLY

AN-VV-F-781    –    September 26, 1940

Amendment No. 3 – June 6, 1941

Knock Test Method – AN-VV-F-746

> 100 Octane Number by Method AN-VV-F-746
>
> Tetraethyl Lead Limit 3.0 cc./Gal.

Item 2

U. S. ARMY – NAVY SUPPLY

Same as above with Amendment No. 4       November 24, 1941

> 100-Octane Number by Method AN-VV-F-746
>
> Tetraethyl Lead Limit   4.0 cc./Gal.

Item 3

U. S. ARMY  –  NAVY SUPPLY

Same as above with Amendment No. 5       May 13, 1942
( S + 1 cc. T.E.L.)

> Tetraethyl Lead Limit      4.0 cc./Gal.



DECLASSIFIED
Authority NND730014

16

## GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to Shell Oil Company, Incorporated to enter into said contract, Reconstruction Finance Corporation does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of October 15, 1942.

RECONSTRUCTION FINANCE CORPORATION

By  (Sgd)  H. J. Klossner
        Vice Chairman

ATTEST:

(Sgd)  A. T. Hobson
        Secretary

(Seal)

17

## GUARANTEE BY SHELL UNION OIL CORPORATION

In consideration of the execution of the within contract and as an inducement to Defense Supplies Corporation to enter into said contract, Shell Union Oil Corporation, a Delaware corporation, does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Shell Oil Company, Incorporated (a subsidiary of Shell Union Oil Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Shell Union Oil Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of October 15, 1942.

SHELL UNION OIL CORPORATION

By (Sgd)    S. W. Duhig
                Vice President

ATTEST:

(Sgd)    F. W. Woods
            Secretary

(Seal)



DECLASSIFIED
Authority NND7300/4

18

ADDENDUM #1                                     Shell Oil Company, Incorporated

                                               New York, New York.

   All material ordered hereunder is for Defense Supplies Corporation, a corporation created by Reconstruction Finance Corporation pursuant to Section 5d
of the Reconstruction Finance Corporation Act, as amended, and in accepting this
contract Shell Oil Company, Incorporated, a Virginia corporation, (hereinafter
designated as "Contractor") agrees:

I.  (a)  The Contractor is the manufacturer of or a regular dealer in the
         materials, supplies, articles, or equipment to be manufactured or
         used in the performance of the contract.

    (b)  All persons employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles or equipment used in the
         performance of the contract will be paid, without subsequent deduction
         or rebate on any account, not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages
         for persons employed on similar work or in the particular or similar
         industries or groups of industries currently operating in the locality
         in which the materials, supplies, articles, or equipment are to be
         manufactured or furnished under the contract; PROVIDED, however, that
         this stipulation with respect to minimum wages shall apply only to
         purchases or contracts relating to such industries as have been the
         subject matter of a determination by the Secretary of Labor.

    (c)  No person employed by the Contractor in the manufacture of furnishing
         of the materials, supplies, articles, or equipment used in the performance of the contract shall be permitted to work in excess of
         eight (8) hours in any one day or in excess of forty (40) hours in
         any one week, unless such person is paid such applicable overtime
         rate as has been set by the Secretary of Labor.

    (d)  No male person under 16 years of age and no female person under 18
         years of age and no convict labor will be employed by the Contractor
         in the manufacture or production or furnishing of any of the materials,
         supplies, articles, or equipment included in the contract.

    (c)  No part of the contract will be performed nor will any of the materials,
         supplies, articles, or equipment to be manufactured or furnished under
         said contract be manufactured or fabricated in any plants, factories,
         buildings, or surroundings or under working conditions which are
         unsanitary or hazardous or dangerous to the health and safety of
         employees engaged in the performance of the contract. Compliance with
         the safety, sanitary, and factory inspection laws of the State in which
         the work or part thereof is to be performed shall be prima-facie
         evidence of compliance with this subsection.

    (f)  Any breach or violation of any of the foregoing representations and
         stipulations shall render the party responsible therefor liable to
         the United States of America for liquidated damages, in addition to
         damages for any other breach of the contract, in the sum of ten
         dollars ($10.00) per day for each male person under 16 years of age
         or each female person under 18 years of age, or each convict
         laborer knowingly employed in the performance of the contract, and a
         sum equal to the amount of any deductions, rebates, refunds or underpayment of wages due to any employee engaged in the performance of
         the contract; and, in addition, the agency of the United States entering into the contract shall have the right to cancel same and to make
         open-market purchases or enter into other contracts for the completion
         of the original contract, charging any additional cost to the original
         Contractor. Any sums of money due to the United States of America by
         reason of any violation of any of the representations and stipulations
         of the contract as set forth herein may be withheld from any amounts

DECLASSIFIED
Authority NND 763014

19

Addendum #1

due on the contract or may be recovered in a suit brought in the name of the United States of America by the Attorney General thereof. All sums withheld or recovered as deductions, rebates, refunds, or underpayments of wages shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employees who have been paid less than minimum rates of pay as set forth in such contracts and on whose account such sums were withheld or recovered; PROVIDED, That no claims by employees for such payments shall be entertained unless made within one year from the date of actual notice to the Contractor of the withholding or recovery of such sums by the United States of America.

(g)   The Contractor shall post a copy of the stipulations in a prominent and readily accessible place at the site of the contract work and shall keep such employment records as are required in the Regulations under the Act available for inspection by authorized representatives of the Secretary of Labor.

(h)   The foregoing stipulation shall be deemed inoperative if this contract is for a definite amount not in excess of $10,000.00.

This Addendum #1 is hereby made a part of the contract between Defense Supplies Corporation and the undersigned dated as of October 15, 1942.

SHELL OIL COMPANY, INCORPORATED


By:   (Sgd)   Alexander Fraser
                    President


DECLASSIFIED
Authority NND 730014

20

# Exhibit 1-148

176607

CONFORMED COPY

Revised February 3, 1942.

# C O N T R A C T

### between

## DEFENSE SUPPLIES CORPORATION

### and

## SINCLAIR REFINING COMPANY

### (Houston Refinery)

## 100–OCTANE AVIATION GASOLINE

### February 3, 1942.

NARA - CP
RG 253 PI 31 E 75 Box 874

Reproduced from the Unclassified / Declassified Holdings of the National Archives

176607

DEFENSE SUPPLIES - SINCLAIR CONTRACT

(Houston Refinery)

Revised
February 3, 1942

CONTRACT made as of February 3, 1942, between SINCLAIR RE-
FINING COMPANY, a Maine corporation, having its principal business office
at 630 Fifth Avenue, New York, N. Y., hereinafter called Seller, and
DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction
Finance Corporation, pursuant to Section 5 (d) of the Reconstruction
Finance Corporation Act as amended, having its principal place of busi-
ness at Washington, D. C., hereinafter called Buyer.

In consideration of the mutual agreements herein contained the
parties agree as follows:

I.  Expansion of Seller's Refining Facilities.

Seller is constructing facilities at its refinery at Houston,
Texas, at an estimated cost of approximately Eight Million Dollars
($8,000,000.00) which it is estimated will enable Seller to produce at
said refinery approximately three thousand four hundred (3,400) barrels
per calendar day of 100-Octane aviation gasoline.  Seller shall use its
best efforts to complete said facilities as soon as possible and not
later than April 1, 1943, and shall endeavor to maintain work on said
facilities day and night in so far as the requisite labor and materials
are available.  The force majeure provisions set forth in Section X
hereof shall apply in all respects to the expansion of facilities as well
as the sale of gasoline and all other obligations of Seller.

II.  Sale and Storage of Products.

(a)  When the aforesaid expansion of Seller's facilities
shall be completed and ready for operation, Seller shall promptly notify
Buyer; and from and after receipt of such notification Seller shall sell
and deliver and Buyer shall buy and receive, in accordance with provisions
of this contract, seventy-five thousand (75,000) barrels per calendar
month of 100-Octane aviation gasoline which shall be in accordance with
the specifications set forth in Exhibit A attached hereto and made a part
hereof or any other specification which by mutual agreement shall be at-
tached as an addendum to Exhibit A.  Wherever in this contract provision

NARA - CP
RG 253 PI 31 E 75 Box 874

Reproduced from the Unclassified / Declassified Holdings of the National Archives

is made for the sale and delivery to Buyer of a stated quantity of gasoline such quantity is an aggregate quantity of the various kinds of gasoline specified in Exhibit A collectively considered. Buyer may apportion such aggregate quantity among the various kinds of gasoline.

(b)  Buyer on giving reasonable notice to Seller may require the delivery hereunder of 100-Octane aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with the same refining facilities and the same raw materials as are used in producing 100-Octane aviation gasoline in accordance with the specifications originally set forth in Exhibit A.  The prices, specifications and quantities of such products shall be determined by negotiation between the parties, and Seller shall not be required to deliver such products unless and until an agreement has been reached.  Such agreement shall be reduced to writing as an addendum to Exhibit A.

(c)  The term "barrel" as used in this contract means a barrel of forty-two (42) gallons and a gallon is a United States gallon of two hundred and thirty-one (231) cubic inches.

(d)  Seller shall maintain storage facilities at, or in the vicinity of, Houston, Texas, to accommodate at least one hundred fifty  thousand (150,000) barrels of 100-Octane aviation gasoline.  Subject to Section VIII hereof, Buyer shall order and take deliveries in such quantities as it may determine; provided, however, that whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage.  If such full storage condition exists, Seller shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100-Octane aviation gasoline which was produced during such full storage condition or which would have been produced except for such full storage condition.  If, however, Seller shall produce during any such period of full storage any additional 100-Octane aviation gasoline of the kind covered by this contract, then such

2

NARA - CP
RG 253 PI 31 E 75 Box 874

Reproduced from the Unclassified / Declassified Holdings of the National Archives

additional aviation gasoline shall be treated as covered by Section III hereof. In accumulating said storage, Seller may store gasoline of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline storage, provided, however, that on Buyer's request and if Seller can so do without extra cost, Seller shall change the gasoline in storage to meet other specifications covered in Exhibit A hereof.

III. Optional Gasoline.

Buyer shall have the option from time to time and at any time to purchase from Seller all or any part of any 100-Octane aviation gasoline which Seller may produce at its Houston, Texas, refinery between the execution of this contract and the date of receipt by Buyer of notification of the completion of the expansion of said facilities to the extent that such gasoline is in excess of quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall, subject to Section V (c) hereof, operate the facilities at full capacity or at least to an extent sufficient to satisfy Buyer's indicated requirements.

Buyer shall also have the option from time to time and at any time to purchase all or any part of the 100-Octane aviation gasoline which Seller may produce between said receipt by Buyer of notification of completion and the expiration of this contract. Upon the exercise of such option Seller shall, subject to Section V (c) hereof, operate the facilities at full capacity or at least to an extent sufficient to satisfy Buyer's indicated requirements.

The option granted in this Section III shall terminate on any termination of this contract.

IV. Price and Payment.

The base price of 100-Octane aviation gasoline specified as Item 1 of Exhibit A hereof, shall be thirteen and three-quarter cents ($0.1375) per gallon f.o.b. Seller's refinery at Houston, Texas. The base price of 100-Octane aviation gasoline specified as Item 2 of Exhibit A hereof, shall be thirteen and one-half cents ($0.135) per gallon

NARA - CP
RG 253 PI 31 E 75 Box 874

3

Reproduced from the Unclassified / Declassified Holdings of the National Archives

176607

f.o.b. Seller's refinery at Houston, Texas. The base prices of other kinds of 100-Octane aviation gasoline shall be as specified by addenda to Exhibit A hereof. Seller represents that there has not been included in its computation of such prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original estimated cost of the refining facilities used in the manufacture of said 100-Octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.

Buyer shall pay promptly, but not later than the twentieth (20th) day after the end of each calendar month, all money due for gasoline delivered to it by Seller during said month. On or before the tenth (10th) day of each calendar month, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.

V. Price Escalation.

The prices of 100-Octane aviation gasoline purchased hereunder shall be subject to adjustment as follows:

(a) The said prices are based on a price of One Dollar and Twenty-five Cents ($1.25) per barrel for East Texas crude deliverable to Seller in the East Texas field. These prices shall be increased or decreased five hundred fifty ten-thousandths of one cent ($0.000550) per gallon for each one cent ($0.01) advance or decrease in the average price paid for East Texas crude over or under One Dollar and Twenty-five Cents ($1.25) per barrel by the three (3) largest purchasers of such crude in the East Texas field. The prices posted for such crude in the East Texas field by such purchasers shall constitute prima facie evidence of the prices paid by such purchasers.

(b) The said prices shall also be increased or decreased by seven hundred thirty-five ten-thousandths of one cent ($0.000735) per gallon for each one point increase or decrease in the wholesale price Index Number for "All Commodities other than Farm Products and Foods", as now published by

4

NARA - CP
RG 253 PI 31 E 75 Box 874

Reproduced from the Unclassified / Declassified Holdings of the National Archives

176607

the Bureau of Labor Statistics, United States Department of Labor, which index figure is now ninety-three and five-tenths (93.5). The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number, regardless of what Seller's crude inventory may be at the time of such change. If said index shall cease to be issued, the parties shall use such other index as may most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(c)  The prices hereinabove set forth are based upon present normal methods of transporting petroleum raw materials to Seller's refinery at Houston, Texas, and upon a normal operation of that refinery, in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100-Octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refinery by other than present normal methods thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100-Octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any portion of the 100-Octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100-Octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a) and (b), Seller may give notice to Buyer that the delivery of 100-Octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for 100-Octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced output and Buyer

5

NARA - CP
RG 253 PI 31 E 75 Box 874

Reproduced from the Unclassified / Declassified Holdings of the National Archives

and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, Buyer may give notice to Seller that it desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of 100-Octane aviation gasoline by the refinery affected may be reduced as above provided.

In making adjustments under this Section V, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

VI. Duration of Contract.

The original term of this contract shall expire at midnight on the last day of the last of thirty-six (36) consecutive calendar months after Buyer's receipt of the notification referred to in Section II (a) hereof, but not later, in any event, than March 31, 1946. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension. During such extension or extensions all of the provisions of this contract except those not then applicable shall be in full force and effect.

VII. Advance on Account of Purchase of Gasoline.

(a) Buyer shall make an advance payment to Seller on account of the purchase of 100-Octane aviation gasoline in the amount of Six Million Dollars ($6,000,000.00) which shall be disbursed in monthly installments as the construction of the expanded facilities progresses. The first installment shall be disbursed in the amount of one-twelfth

6

NARA - CP
RG 253 PI 31 E 75 Box 874

Reproduced from the Unclassified / Declassified Holdings of the National Archives

176607

(1/12th) of said Six Million Dollars ($6,000,000.00) immediately following the expiration of ninety (90) days from the date of this contract or immediately following receipt of notice by Buyer from Seller of Seller's waiver of its right to terminate this contract under Section XVII hereof, whichever event shall first occur. The remaining installments shall be disbursed when Seller shall deliver to Buyer statements, showing only principal items, to certify that it has expended, or firmly committed itself to expend, on account of the construction of the facilities all of the funds theretofore advanced to it by Buyer and in addition has so expended, or firmly committed itself to expend, from its own funds not less than thirty-three and one-third per cent (33-1/3%) of the aggregate of such installments advanced by Buyer. Buyer shall have the privilege of examining Seller's books to verify said statements, but such verification shall not be a condition of payments by Buyer. If such examination shall lead to any disagreement, it shall be settled by arbitration under Section XI hereof.

(b)  From the amount due Seller for deliveries of 100-Octane aviation gasoline for each of the first thirty-six (36) full calendar months following receipt by Buyer of Seller's notification of completion of the expanded facilities referred to in Section I hereof, Buyer shall deduct and retain one thirty-sixth (1/36th) of the sum of:

(1)  the above advance payment, and

(2)  Interest at the rate of two percent (2%) per annum on outstanding balances of such advance payment accruing subsequent to the date of receipt by Buyer of Seller's notification of completion of said expanded facilities;

provided that Buyer shall also deduct and retain, with respect to each of the first twelve (12) full calendar months after the date of receipt of such notification of completions the sum of:

(1)  one-twelfth (1/12th) of the amount of interest at the rate of two percent (2%) per annum on the outstanding balances of such advance payment accrued prior to and including the date of receipt by Buyer of Seller's

7

NARA - CP
RG 253 PI 31 E 75 Box 874

Reproduced from the Unclassified / Declassified Holdings of the National Archives

176607

notification of completion of said ex-

panded facilities; and

(2)   one-twelfth (1/12th) of the amount of the

credit, if any, referred to in paragraph

(c) of this Section VII.

The above deductions shall be considered as payment for the first pur-

chases by Buyer in each of the first thirty-six (36) full calendar months

following receipt by Buyer of Seller's notification of completion of said

expanded facilities.

(c)   If, by reason of delay in the completion of the ex-

panded facilities, the notification of completion referred to in Section II

hereof shall not be received at least thirty-six (36) months prior to

March 31, 1946, then  Seller shall repay to Buyer one thirty-sixth (1/36th)

of the principal amount of the advance payment for each month or fraction

thereof by which receipt of said notification of completion is delayed

after April 1, 1943, such repayment to be credited against any purchases

by Buyer of 100-Octane aviation gasoline hereunder delivered during each

of the twelve (12) full calendar months following receipt of said notifica-

tion of completion; provided, however, that not more than one-twelfth

(1/12th) of such credit shall be taken in each of said twelve (12) full

calendar months; and provided further that any such repayment not made as

provided above or in paragraph (d) of this Section VII shall be made by

Seller to Buyer in cash on March 31, 1946.

(d)   In the event of Seller's failure to deliver sufficient

100-Octane aviation gasoline hereunder following such notification of com-

pletion, due to reasons other than the force majeure reasons referred to

in Section X hereof, to permit Buyer to recoup in any month the monthly

repayment installment as provided in paragraph (b) of this Section VII,

the unrecouped portion of the monthly repayment installment as aforesaid

shall be repaid immediately by Seller to Buyer in cash; but if such fail-

ure was due to such force majeure reason then the repayment period pro-

vided in paragraphs (b) and (c) of this Section VII shall be extended one

month for each month in which such failure due to such force majeure rea-

son occurred.

8

NARA - CP
RG 253 PI 31 E 75 Box 874

Reproduced from the Unclassified / Declassified Holdings of the National Archives

176607

VIII.  Liquidated Damages and Limitation of Liability.

The parties mutually agree that the Seller would be seriously damaged in the event that Buyer should breach its obligation to take that minimum quantity of gasoline herein agreed upon and that the liquidated damages herein provided for are not in the nature of penalty or forfeiture and that they reflect allowance for the possible cessation of war prior to the expiration of the original term of the contract.  If Buyer shall fail to purchase sufficient 100-Octane aviation gasoline in any one full calendar month following receipt by Buyer of Seller's notification of completion of said expanded facilities to liquidate the monthly repayment installment (determined as provided in paragraphs (b) and (c) of Section VII hereof), Buyer shall have the privilege to deduct and retain from amounts owing to Seller for purchases of 100-Octane aviation gasoline during the next succeeding month, over and above amounts sufficient to liquidate the regular monthly repayment installment for such month, an amount up to the unrecouped portion of the monthly repayment installment for the preceding month.  If Buyer so fails to make recoupment, as aforesaid, during such succeeding month, then Seller shall, upon the expiration of such month, be entitled to retain as liquidated damages such unrecouped amount plus interest at the rate of two percent (2%) per annum on such unrecouped amount computed from the first (1st) day of the preceding month.

The liquidated damages provided for in this Section VIII shall be in full settlement for Buyer's failure to purchase under Section II hereof and in no event shall Buyer be liable for damages for such failure to purchase except as provided in this Section VIII.

It is understood that the foregoing liquidated damages relate solely to a default by Buyer in not purchasing the stipulated quantities. Damages for any other default by Buyer and for any default by Seller shall be determined by arbitration.

IX.  Deliveries and Inspections.

(a)  Seller warrants full and unencumbered title to all gasoline delivered under this contract.  Title to said gasoline, and risk of loss in respect thereof, shall pass from Seller to Buyer upon delivery of the gasoline at the intake pipe of the means of transportation, f.o.b. Seller's refinery at Houston, Texas.

9

NARA - CP
RG 253 PI 31 E 75 Box 874

Reproduced from the Unclassified / Declassified Holdings of the National Archives

(b)  Buyer shall take delivery of said gasoline in tankers, barges, tank cars, or tank trucks (tank truck deliveries to be not in excess of Seller's loading facilities for tank trucks in any one week and tank car deliveries not to be in excess of two thousand (2,000) barrels in any one day) all to be supplied by Buyer at its own cost and expense.

(c)  Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each tanker or barge and of the quantity of and specifications of the gasoline to be loaded.  Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on board.  Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d)  Seller shall furnish certificates of inspection, by a licensed inspector satisfactory to the parties which shall set forth the quantity and quality of each shipment of gasoline.  Inspection shall be based on samples taken from Seller's storage tanks from which the product is delivered.  The certificates of inspection shall be issued in quadruplicate, one set of which shall accompany the relative shipment, one of which shall forthwith be delivered to Buyer, and a third submitted to Buyer with the monthly statement required by Section IV hereof. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, in which event Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(e)  Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in the shore tanks from which delivery is made immediately before and immediately after loading.  Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade.  Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery except in case of deliveries into tank trucks, in which case no adjustment shall be made.

10

NARA - CP
RG 253 PI 31 E 75 Box 874

Reproduced from the Unclassified / Declassified Holdings of the National Archives

(f)  Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials, wherever applicable, and the product shall conform as to quality with the specifications set forth in Exhibit A hereof.

(g)  The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(h)  The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(i)  Should any such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may nevertheless accept such product and claim an adjustment for such deficiency; provided, that in the event that such claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

(j)  Upon request by Buyer, Seller shall make deliveries of 100-Octane aviation gasoline under this contract in appropriate limited quantities to points where Seller may be currently engaged in making deliveries of aviation gasoline in the ordinary course of its business.  The delivery costs shall be paid by Buyer and are to be mutually agreed upon.

(k)  Seller shall not be obligated to procure the 100-Octane aviation gasoline to be delivered hereunder from any source other than its Houston, Texas, refinery.

X.  Force Majeure.

Seller shall not be liable for delays or defaults in its performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts or requests of the Government, or of any governmental officer or agent purporting to act under authority, floods, fires, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery, of any product, service or material necessary in the construction of the facilities contemplated by Section I hereof

11

NARA - CP
RG 253 PI 31 E 75 Box 874

Reproduced from the Unclassified / Declassified Holdings of the National Archives

or in the manufacture and delivery of aviation gasoline deliverable here-under, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

XI.  Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered here-under, the parties shall make an earnest effort to settle such disagree-ment to their mutual satisfaction.  If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice.  Within five (5) days after receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, how-ever, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagree-ment alone.  If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the person who at the time is the Senior Judge of the United States Circuit Court of Appeals for the Fifth Circuit, acting in his individual and not judicial capacity, upon application therefor by either of the parties.  The deci-sion of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes.  Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitra-tion, including the cost and expenses of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned.  Pending such de-termination of every disagreement as to the price to be paid for gasoline

12

NARA - CP
RG 253 PI 31 E 75 Box 874

Reproduced from the Unclassified / Declassified Holdings of the National Archives

176607

delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

XII.  Taxes.

Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder.  Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

Buyer shall also pay in addition to the prices as established in Sections IV and V hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption.  Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section IV hereof are based.

If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax, fee, or charge by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption.  Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

13

NARA - CP
RG 253 PI 31 E 75 Box 874

Reproduced from the Unclassified / Declassified Holdings of the National Archives

176607

Any addition of taxes to the prices as established in Sections IV and V hereof shall not be considered in arriving at the value of the gasoline delivered hereunder in connection with those portions of the contract referring to liquidated damages, repayment of advance or recoupment of advance, and such taxes shall be shown separately and be in addition to the price.

XIII.  Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or registered mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram.  Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail.  Either party may by notice as aforesaid change its address for notices thereafter.

XIV.  Entirety of Contract.

This instrument contains the entire agreement between the parties in respect of the subject matter and there are no conditions, warranties, representations or stipulations relating thereto which are not merged herein.  The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.  No modification shall be binding unless in writing and signed by officers of the parties.  Authorization or ratification by the boards of directors of the parties shall not be required in respect of modifications.

XV.  Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties hereto;

14

NARA - CP
RG 253 PI 31 E 75 Box 874

Reproduced from the Unclassified / Declassified Holdings of the National Archives

provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Governmental Agency, department, instrumentality or wholly Government owned corporation in which event Buyer shall remain liable.

XVI.   Statutory Compliance.

In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable Federal laws and further agrees to require such compliances, representations, and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable Federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any worker because of race, creed, color or national origin.

Seller is a corporation and this contract is made with it for its general benefit and no Member of, or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.

XVII.   Right to Terminate.

Seller shall have the right to terminate this contract within ninety (90) days of the date thereof, unless within said ninety (90) days it shall receive all Governmental assistance which is available or necessary for the prompt completion of the facilities which Seller will erect and install hereunder, including, without limitation, priorities and allocations necessary for obtaining materials, equipment, supplies and crude petroleum, and assurances from the Treasury Department, in the form of closing agreements, that the advance payment provided for in Section VIII hereof, or any part thereof, will not be treated as taxable income upon receipt by Seller, but that the ratable portions thereof will be treated as amounts received for products supplied, when and as such ratable portions are credited for that purpose hereunder. Failure so to terminate shall not constitute a waiver of any other rights of Seller.

15

NARA - CP
RG 253 PI 31 E 75 Box 874

Reproduced from the Unclassified / Declassified Holdings of the National Archives

176607

IN WITNESS WHEREOF, the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By      H. A. Mulligan
                President

ATTEST:

      Dudley H. Digges
          Acting Secretary

(SEAL)

SINCLAIR REFINING COMPANY

By      E. W. Isom
              Vice-President

ATTEST:

      J. R. Murray
        Assistant Secretary

(SEAL)

16

NARA - CP
RG 253 PI 31 E 75 Box 874

Reproduced from the Unclassified / Declassified Holdings of the National Archives

176607

## EXHIBIT "A"

Item 1.....................................................price, 13.75 cents per
gallon f.o.b. Seller's
refinery at Houston,
Texas.

U. S. ARMY – NAVY SUPPLY

AN–VV–F–781              Sept. 26, 1940

Amendment No. 3         June   6, 1941

Knock Test Method       AN–VV–F–746

    100–Octane Number by Method AN–VV–F–746

    Lead Limit 3.0 cc/Gal.


Item 2.....................................................price, 13.5  cents per
gallon f.o.b. Seller's
refinery at Houston,
Texas.

U. S. ARMY – NAVY SUPPLY

Same as above with Amendment No. 4  Nov. 24, 1941

    Lead Limit 4.0 cc/Gal.

17

NARA - CP
RG 253 PI 31 E 75 Box 874

Reproduced from the Unclassified / Declassified Holdings of the National Archives

## GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to Sinclair Refining Company to enter into said contract, RECONSTRUCTION FINANCE CORPORATION does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized this 3rd day of February, 1942.

RECONSTRUCTION FINANCE CORPORATION

By   Charles B. Henderson
           Chairman

ATTEST:

   A. T. Hobson
   Acting Secretary

(SEAL)

18

NARA - CP
RG 253 PI 31 E 75 Box 874

Reproduced from the Unclassified / Declassified Holdings of the National Archives

176607

## GUARANTEE BY CONSOLIDATED OIL CORPORATION

In consideration of the execution of the within contract and as an inducement to Defense Supplies Corporation to enter into said contract, CONSOLIDATED OIL CORPORATION, a New York corporation, does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Sinclair Refining Company (a subsidiary of Consolidated Oil Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF Consolidated Oil Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized this 3rd day of February, 1942.

                              CONSOLIDATED OIL CORPORATION

                              By____H. F. Sinclair____
                                        President

ATTEST:

____O. M. Gerstung____
        Secretary

(SEAL)

19

NARA - CP
RG 253 PI 31 E 75 Box 874

Reproduced from the Unclassified / Declassified Holdings of the National Archives

# Exhibit 1-149

CONFORMED COPY

# A G R E E M E N T

### between

### DEFENSE SUPPLIES CORPORATION

### and

### STANDARD OIL COMPANY OF NEW JERSEY

### 100—OCTANE AVIATION GASOLINE

### January 13, 1942.

REPRODUCED AT THE NATIONAL ARCHIVES

DEFENSE SUPPLIES - STANDARD OF NEW JERSEY CONTRACT

CONTRACT made as of the 13th day of January, 1942 between DE-FENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation pursuant to Section 5d of the Reconstruction Finance Corporation Act, as amended, (hereinafter referred to as "Buyer"), and STANDARD OIL COMPANY OF NEW JERSEY, a Delaware corporation, (hereinafter referred to as "Seller").

W I T N E S S E T H:

In consideration of the mutual undertakings herein contained, it is agreed as follows:

I.  Expansion of Seller's Refining Facilities.

Seller is engaged in supplying 100-Octane aviation gasoline to the United States Government and to airplane manufacturers and others, which gasoline is manufactured in part by Seller and is acquired in part under contract with Humble Oil & Refining Company, a Texas corporation, and in part under contracts or arrangements with Standard Oil Company of Louisiana, a Louisiana corporation, Lago Oil & Transport Company, Ltd., a Canadian corporation, and Colonial Beacon Oil Company, a Massachusetts corporation, all of which companies are herein collectively referred to as Seller's "Suppliers".  Seller's Suppliers are also engaged in supplying 100-Octane aviation gasoline to the United States Government and to others, and Seller has contracts or arrangements under which it will purchase during the term hereof the production of 100-Octane aviation gasoline of such Suppliers to the extent it is not required for delivery under contracts or commitments now existing or hereafter made by them. Seller and its Suppliers have a present production of approximately thirteen thousand (13,000) barrels per day of 100-Octane aviation gasoline, which production capacity is in process of being increased to approximately sixteen thousand (16,000) barrels per day through the completion of new facilities planned or under way. Seller and its Suppliers in addition have applications for project priorities now pending, and additional applications in course of preparation for submission, involving an estimated expenditure of approximately Fifty Million Dollars ($50,000,000.00) which it is estimated will provide additional refining

REPRODUCED AT THE NATIONAL ARCHIVES

capacity of approximately twenty-one thousand (21,000) barrels of 100-Octane aviation gasoline per day and which facilities it is estimated will be available on or before March 1, 1943 thereby raising the total refining capacity of Seller and its Suppliers to approximately thirty-seven thousand (37,000) barrels per day of 100-Octane aviation gasoline. All of the above estimated productive capacities are predicated upon continued normal and unrestricted operation of refineries and the estimated additional productive capacities are predicated upon the successful expeditious construction and operation of the new facilities. Seller shall use its best efforts to the end that all such new facilities shall be completed at the earliest possible moment and to the end that work on the construction of such new facilities shall continue day and night insofar as such day and night work will, in Seller's best judgment, substantially expedite the completion of the new facilities. Seller estimates that these new facilities should be completed by March 1, 1943 providing the necessary labor and materials are available, but Seller shall have no liability if such new facilities are not completed due to any circumstance beyond the control of Seller and its Suppliers or if the estimated production capacities are not reached and maintained due to any such circumstance.

Seller represents that there has not been included in the estimated expenditure of approximately Fifty Million Dollars ($50,000,000.00) any allowance for premium payments to secure earlier delivery of material, overtime, or bonus payments (all of which are herein called "bonus payments"). Seller will make or arrange for such bonus payments as will in its judgment substantially expedite the completion of the new facilities, and full and complete records of such payments shall be maintained and made available to Buyer. Buyer shall pay Seller the amount by which the actual cost of construction including all such bonus payments exceeds whichever is the greater of (a) the actual cost of construction excluding all bonus payments, and (b) Fifty Million Dollars ($50,000,000.00).

The amount of bonus payments for which Seller is entitled to payment hereunder shall bear interest at the rate of two percent (2%) per annum which shall be calculated as follows:

(1) No interest shall be payable until the total expenditure including bonus payments shall exceed Fifty Million Dollars ($50,000,000.00).

2

REPRODUCED AT THE NATIONAL ARCHIVES

(2)    During the course of construction the amount on which interest shall be paid shall be the difference between the total cost of construction including bonus payments and Fifty Million Dollars ($50,000,000.00) until the total cost of construction excluding bonus payments exceeds Fifty Million Dollars ($50,000,000.00), after which the total amount of the bonus payments shall bear interest.

(3)    Subject to the preceding paragraphs, interest shall run from the first day of the month following the month in which any bonus payment, as to which Seller is entitled to reimbursement, was made, until repayment is made as herein provided.

Such repayment of bonus payments with interest shall be made by distributing the same as an addition to the unit price of the first ten million (10,000,000) barrels of 100-Octane aviation gasoline purchased after March 1, 1943.  If Buyer fails to purchase said quantity of ten million (10,000,000) barrels at such increased price on or before February 29, 1944, Buyer shall on or before March 31, 1944 pay to Seller the unpaid balance of such bonus payments with interest, which shall be treated as an advance payment of a portion of the purchase price of the remainder of the ten million (10,000,000) barrels at the time the purchase of such remaining quantity is made at the increased price.

If Buyer shall notify Seller at any time that it does not desire that additional expenditures for bonus payments shall be incurred or that such additional expenditures should be limited in a specified way or to a specified amount, Seller shall endeavor to arrange for the termination of any contracts or commitments for such bonus payments to the extent indicated in such notice so as to reduce the liability of Buyer hereunder.

As used above, the term "bonus payments" shall include any charges for Social Security, Unemployment Compensation and Workmen's Compensation which must be expended by reason of such bonus payments.

3

REPRODUCED AT THE NATIONAL ARCHIVES

II.  Sale of Products.

(a)  Buyer shall purchase and receive and Seller shall deliver in interstate or foreign commerce all of its own production of 100-Octane aviation gasoline during the period from March 1, 1943 to February 29, 1944 and all of such gasoline purchased from its Suppliers during the same period.  During said period Seller shall, on request of Buyer, purchase from Seller's Suppliers, for delivery to Buyer in interstate or foreign commerce, their entire production of 100-Octane aviation gasoline, excepting only such quantity as is sold and delivered by such Suppliers to Buyer under separate contracts entered into with Buyer, so that Buyer may obtain under such contracts and hereunder the full capacity of 100-Octane aviation gasoline which Seller and its suppliers are able to produce.

(b)  During the period from March 1, 1944 to February 28, 1946, Buyer shall purchase and receive and Seller shall deliver in interstate or foreign commerce a quantity of 100-Octane aviation gasoline equal to the pro-rata share of the entire requirements of the United States Government during such period, as hereinafter defined.

(c)  Seller agrees to make intrastate deliveries from refineries owned by it on request of Buyer.

(d)  The term 100-Octane aviation gasoline as used herein refers to gasoline in accordance with any of the alternate specifications set forth in Exhibit A attached hereto and made a part hereof or any other specification which by mutual agreement shall be attached as an addendum to Exhibit A.  Wherever in this contract provision is made for the sale and delivery to Buyer of a stated quantity of gasoline, such quantity is an aggregate quantity of the various kinds of gasoline specified in Exhibit A collectively considered.  Buyer may apportion such aggregate quantity among the various kinds of gasoline.

4

REPRODUCED AT THE NATIONAL ARCHIVES

(e)  Buyer on giving reasonable notice to Seller may require the delivery hereunder of 100-Octane aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with the same refining facilities and the same raw materials as are used in producing 100-Octane aviation gasoline in accordance with the specifications originally set forth in Exhibit A.  The prices, specifications and quantities of such products shall be determined by negotiation between the parties, and Seller shall not be required to deliver such products unless and until an agreement has been reached.  Such agreement shall be reduced to writing as an addendum to Exhibit A.

(f)  The term "United States Government" shall include the War Department, the Navy Department, any other department, agency or instrumentality of the United States Government, and any corporation wholly owned by the United States.

(g)  The term "pro-rata share of the entire requirements of the United States Government" shall mean a quantity equal to the proportion of the entire requirements of the United States Government for 100-Octane aviation gasoline during the period which the then total refining capacity for 100-Octane aviation gasoline of Seller and its Suppliers less the quantity of their sales to customers other than the United States Government, bears to the total refining capacity for 100-Octane aviation gasoline of all refiners in the United States and Lago Oil & Transport Company, Ltd. in Aruba, Netherlands West Indies, less the quantity of their sales to customers other than the United States Government.  Such calculation shall be made as of March 1, June 1, September 1, and December 1 in each year for the preceding three (3) months and shall be effective for the following three (3) months' period.  Buyer shall use its best efforts to furnish the data necessary for such calculation.

REPRODUCED AT THE NATIONAL ARCHIVES

(h) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons and a gallon is a United States gallon of two hundred and thirty-one (231) cubic inches.

(i) Working storage facilities to accommodate at least twenty-five (25) days' full capacity production of 100-Octane aviation gasoline are available at each refinery and Buyer shall schedule deliveries within the limits of such working storage. Subject to Section VIII hereof, Buyer shall order and take deliveries in such quantities as it may determine; provided, however, that whenever the above-specified storage facilities for said 100-Octane aviation gasoline shall be filled, Seller shall not be obligated to produce or purchase any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage condition exists, Seller shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100-Octane aviation gasoline which was produced during such full storage condition or which would have been produced except for such full storage condition.

III. Optional Gasoline.

Buyer shall have the option from time to time and at any time to purchase and receive from Seller and Seller shall deliver in interstate or foreign commerce all or any part of the 100-Octane aviation gasoline which Seller may produce and which it may purchase from its suppliers between the execution of this contract and March 1, 1943 to the extent that such gasoline is in excess of quantities which Seller and its Suppliers have, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate its facilities and shall use its best efforts to induce its Suppliers to operate their facilities, for the manufacture of 100-Octane aviation gasoline at full capacity or at such lesser capacity as will satisfy Buyer's indicated requirements; and Seller shall purchase from its Suppliers all of the 100-Octane aviation gasoline which they have available for sale to Seller or that portion thereof necessary to satisfy such indicated requirements.

6

REPRODUCED AT THE NATIONAL ARCHIVES

180068

Seller agrees to make intrastate deliveries from refineries owned by it on request of Buyer.

IV.   Price and Payment.

The base price of 100-Octane aviation gasoline specified as Item 1 of Exhibit A hereof purchased hereunder shall be thirteen cents ($0.13) per gallon during the period from the date of this agreement to February 29, 1944 and the base prices of other kinds of 100-Octane aviation gasoline shall be as specified in Exhibit A hereof.   During the period from March 1, 1944 to February 28, 1946 the base price of aviation gasoline specified as Item 1 of Exhibit A shall be twelve cents ($0.12) per gallon and the base prices of other kinds of 100-Octane aviation gasoline shall be as specified in Exhibit A hereof. These prices are for tanker or barge lots f.o.b. Aruba, Netherlands West Indies, or any United States Gulf or East Coast Port designated by Seller, subject to adjustment as hereinafter set forth.   On deliveries made at manufacturing points other than United States Gulf ports and Aruba the base price shall be increased by an amount equal to the then current tanker rates for moving gasoline from the United States Gulf to the point of delivery plus one-quarter cent ($0.0025) per gallon.   Deliveries shall be made into tank cars or tank trucks furnished by Buyer f.o.b. point of manufacture at an additional charge of fifteen-hundredths of a cent ($0.0015) per gallon.

Seller represents that in arriving at such base prices it has not knowingly made any allowance for depreciation, amortization, and obsolescence in excess of ten percent (10%) per annum of the original estimated cost of the refining facilities to be used in the manufacture of 100-Octane aviation gasoline except in the case of that portion of the facilities representing an investment of approximately Fourteen Million Four Hundred Thousand Dollars ($14,400,000) as to which allowance for depreciation, amortization, and obsolescence has been made over a three-year period in recognition of the particular risks inherent in this portion of the investment which in Seller's opinion make such an allowance normal.

7

REPRODUCED AT THE NATIONAL ARCHIVES

180068

With respect to such investment of Fourteen Million Four Hundred Thousand Dollars ($14,400,000) the average yearly allowance made by Seller for depreciation, amortization, and obsolescence will not exceed ten per cent (10%) per year unless more than twenty-four million five hundred thousand (24,500,000) barrels are sold and delivered hereunder during the original term of this contract as herein defined. If Buyer does not exercise the right of termination contained in Section VIII hereof, and if Buyer's purchases hereunder during such period amount to more than twenty-four million five hundred thousand (24,500,000) barrels Seller shall accumulate in a suspense account the sum of one and forty-nine hundredths cents ($0.0149) per gallon on the quantity in excess of twenty-four million five hundred thousand (24,500,000) barrels, but not in excess of forty million five hundred thousand (40,500,000) barrels, so sold. Within sixty (60) days after February 28, 1946 Seller shall advise Buyer of the total amount accumulated in such suspense account. Within sixty (60) days after the last day of February in the years 1947, 1948, and 1949 Seller shall account for one-third (1/3) of the amount of such suspense account as follows:

(1) The quantity of 100-Octane aviation gasoline sold and delivered by Seller and its Suppliers during the twelve (12) month period prior to March 1 in each such year shall be determined and if such quantity is less than an average of twenty-two thousand (22,000) barrels per day during such period then Buyer shall not be entitled to any portion of the one-third (1/3) of such suspense account set up for that period and such amount shall become the property of Seller.

(2) If, however, Seller and its Suppliers have sold and delivered a quantity of 100-Octane aviation gasoline in excess of an average of twenty-two thousand (22,000) barrels per day during such twelve (12) month period

8

REPRODUCED AT THE NATIONAL ARCHIVES

180068

then Buyer shall be entitled to be paid an amount, up to but not exceeding one-third (1/3) of the amount of such suspense account, calculated by (a) subtracting five million eight hundred forty thousand (5,840,000) from the total number of barrels sold during such period, and (b) multiplying the resulting difference converted to gallons by the weighted average per gallon price received by Seller and its Suppliers for 100-Octane aviation gasoline sold and delivered f.o.b. vessel at refinery in the United States Gulf or Aruba, Netherlands West Indies during such twelve (12) month period less a price which shall be obtained by adjusting in accordance with Section V hereof a base price of ten and eighty-eight hundredths cents ($0.1088) per gallon, and (c) subtracting therefrom the sum of One Million Four Hundred Forty Thousand Dollars ($1,440,000).

If during the original period of this contract Buyer shall purchase and pay for more than forty million five hundred thousand (40,500,000) barrels of 100-Octane aviation gasoline, the base prices of such gasolines sold in excess of forty million five hundred thousand (40,500,000) barrels hereunder having the specifications set forth in Items 1, 2, and 3 of Exhibit A, subject to adjustment by the application of Section V hereof, shall thereafter be:

Item 1    —    $0.114 per gallon

Item 2    —    $0.112 per gallon

Item 3    —    $0.106 per gallon

If other items are added to Exhibit A the appropriate price to be added to this paragraph with respect to such additional items shall be agreed to as part of the addendum to Exhibit A.

It is expressly recognized that the statements herein made with respect to depreciation, amortization, and obsolescence are not inconsistent with the application of higher or lower rates to all or any part of the investment for book or tax purposes, or both, or with the application of Section 124 or any other provision of the Internal Revenue Code as now or hereafter constituted.

9

REPRODUCED AT THE NATIONAL ARCHIVES

Buyer shall pay promptly, but not later than the twentieth (20th) of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements. If, due to delay in transmission, certificates covering inspections at Aruba are not available at the time said monthly statement is prepared such certificates shall be forwarded to Buyer when received and payment for the gasoline covered by such certificates shall be made within ten (10) days after receipt of such certificates by Buyer.

V. Price Escalation.

The prices of all kinds of 100-Octane aviation gasoline specified in Exhibit A hereof shall be subject to adjustment as follows:

(a) The aforesaid prices are based on the following currently posted crude prices:

|  | Per 42-Gallon Barrel at the Well |
|---|---|
| East Texas | $1.25 |
| West Texas, 32-32.9°A.P.I. | .96 |
| Gulf Coast, 28-28.9°A.P.I. | 1.24 |
| Average Price | 1.15 |

The actual price for 100-Octane aviation gasoline delivered hereunder shall vary above or below the base price by an amount calculated at the rate of fifty-two thousandths of a cent ($0.00052) per gallon for each increase or decrease respectively of one cent ($0.01) or fraction thereof per barrel in the average (for the three (3) above fields) of the average prices paid by the three (3) largest purchasers in the respective fields for the three (3) types of crude set forth in the above tabulation. The prices posted for such crudes by such purchasers shall constitute prima facie evidence of the prices paid by such purchasers.

10

REPRODUCED AT THE NATIONAL ARCHIVES

180068

(b)   The said prices shall also be increased or decreased by sixty-four thousandths of a cent ($0.00064) per gallon for each full point increase or decrease respectively in the figure obtained by averaging the so-called final index numbers of "Wholesale Prices of All Commodities" (which index number is 92.5) and "Wholesale Prices of All Commodities Other than Farm Products and Foods" (which index number is 93.5), as such indices are now published by the Bureau of Labor Statistics, United States Department of Labor.   No adjustment shall be made for changes of less than one point in such average figure.   The effective date of a change in price due to a change in the average index number shall be the date of publication by the Bureau of Labor Statistics of the later of such final monthly index numbers.   If publication of either of such index numbers shall be discontinued, the parties shall use such other index as may closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

Seller represents that its existing labor contracts commit it to take into consideration increases or decreases in cost of living in determining wage adjustments, such consideration being guided by the "1935-1939 All U. S. A. Cost of Living Index" published by the Bureau of Labor Statistics of the United States Department of Labor, which includes food prices as an element thereof.

(c)   The prices hereinabove set forth are based upon present normal methods of transporting petroleum raw materials to the refineries involved in the manufacture of 100-Octane gasoline hereunder and upon a normal operation of said refineries in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100-Octane aviation gasoline.   If it becomes necessary to transport petroleum raw materials to said refineries by

11

REPRODUCED AT THE NATIONAL ARCHIVES

180068

other than present normal methods, thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100-Octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any

portion of the 100-Octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100-Octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under paragraphs (a) and (b) of this Section V, Seller may give notice to Buyer that the delivery of 100-Octane aviation gasoline from any refinery so affected will, on or before a specified date not less than ten (10) days thereafter, be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for 100-Octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days after such advice to Seller, Buyer may give notice to Seller that it desires to have the amount of such increase in cost fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such increase, if any, within fifteen (15) days after the appointment of the last appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of 100-Octane aviation gasoline by the refinery affected may be reduced as above provided. Reduction of refinery production under this paragraph (c) shall be deemed to be due to a force majeure reason for purposes of the last paragraph of Section VII.

12

REPRODUCED AT THE NATIONAL ARCHIVES

In making adjustments under this section the prices to be adjusted shall be those prices in effect immediately prior to the adjustment, and the adjustments shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

VI.  Duration of Contract.

The original term of this contract shall expire at midnight on February 28, 1946.  Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension.  Upon such extension the obligations to purchase and receive shall be in accordance with Section II (b) hereof and the price to be paid shall be fixed by agreement of the parties hereto during the ninety (90) day period prior to each such extension.  All of the other provisions of this contract except those not then applicable shall be in full force and effect.

VII.  Advance on Account of Purchase of Gasoline.

Buyer shall make an advance payment to Seller on account of the purchase of 100-Octane aviation gasoline in the amount of Fourteen Million Four Hundred Thousand Dollars ($14,400,000.00) as follows:  On the last day of the month in which this contract is signed and on the last day of each month following (until the entire amount has been paid) Seller shall be entitled to receive from Buyer a sum equal to twenty-eight and eight-tenths per cent (28.8%) of the total amount of expenditures, firm commitments or contracts for the construction of refining facilities for 100-Octane aviation gasoline to be delivered hereunder, upon furnishing a sworn statement itemized as to principal items and subject to verification by Buyer on request, showing the amount of such expenditures and commitments.  If on the last day of the twelfth (12th) month after the date hereof, there remains any unpaid balance of said sum of Fourteen Million Four Hundred Thousand Dollars ($14,400,000.00)

13

REPRODUCED AT THE NATIONAL ARCHIVES

180068

Seller shall be entitled to receive the entire balance without regard to the amount of such total commitments upon furnishing copies of receipted bills or certificates from contractors and materialmen (subject to verification by Buyer on request) showing that Seller and its Suppliers have made expenditures in excess of Fourteen Million Four Hundred Thousand Dollars ($14,400,000.00) in connection with such construction program.

The installment payments above provided for shall be made to Seller on demand at any time after they become due and interest shall accrue at the rate of two per cent (2%) per annum from the date of payment until repayment is made to Buyer by means of the credits herein provided for, or otherwise, or until said payments and interest become the property of Seller as liquidated damages.

On the last day of each month during the twelve (12) month period beginning March 1, 1943 Buyer shall be entitled to a credit at the rate of Two Dollars ($2.00) per barrel up to the amount of One Million Two Hundred Thousand Dollars ($1,200,000.00) and accrued interest against purchases from Seller and its Suppliers under this contract, or otherwise, of 100-Octane aviation gasoline in excess of four hundred and eighty thousand (480,000) barrels made by any and all purchasers in that month. Buyer shall be entitled to carry over said credit for any deficiency in purchases into succeeding months of said twelve (12) month period.

In the event of the failure of Seller and its Suppliers to deliver sufficient 100-Octane aviation gasoline under this contract or otherwise to permit Buyer to recoup the sum of One Million  Two Hundred Thousand Dollars ($1,200,000.00) and interest in any month, due to reasons other than the force majeure reasons referred to in Section X hereof, the unrecouped portion of such total sum shall not be carried over as a credit as provided above but shall be repaid immediately by Seller to Buyer in cash; but if failure was due to such force majeure reason then the unrecouped portion of such credit shall be carried over and the

14

REPRODUCED AT THE NATIONAL ARCHIVES

twelve (12) month period provided above in this Section VII shall be extended to such extent as may be necessary to allow Buyer to recoup that part of the outstanding balance of the advance payment, with interest, not recouped by reason of such force majeure, at a rate not in excess of One Million Two Hundred Thousand Dollars ($1,200,000.00) per month, in the manner set forth above.

VIII.    Termination and Damages.

Buyer shall have the option on sixty (60) days' prior written notice which may be given at any time, to terminate its obligation to purchase 100-Octane aviation gasoline hereunder during the period from March 1, 1943 to February 29, 1944, and after the effective date of such notice Buyer shall be obligated during such period to purchase hereunder only the pro-rata share of the entire requirements of the United States Government, as above defined, and shall be entitled to apply credits against such purchase during such period to the extent above provided.

In the event of such termination Seller and its Suppliers will sustain certain damages the amount of which will be difficult to ascertain, and the parties hereto therefore agree that any balance of the payment of Fourteen Million Four Hundred Thousand Dollars ($14,400,000.00) and interest herein provided for, which is not credited to Buyer and used in payment of gasoline or otherwise repaid to Buyer as herein provided, shall become the sole property of Seller and its Suppliers as liquidated damages sustained by reason of such termination, but if Seller and its Suppliers shall between the effective date of such termination and March 1, 1946 sell an average of more than nine hundred and fifty thousand (950,000) barrels per month of 100-Octane aviation gasoline at average prices as favorable to Seller and its Suppliers as the prices provided for in this Contract, then Seller shall reimburse Buyer, in mitigation of damages, in an amount equal to Two Dollars ($2.00) per barrel sold between the effective termination date and March 1, 1946 in excess of a monthly average of four hundred and eighty thousand (480,000) barrels, but such reimbursement shall not exceed the amount of such liquidated damages including interest. Liquidated damages provided for herein shall be in full settlement.

15

REPRODUCED AT THE NATIONAL ARCHIVES

180068

Damages under this contract shall be limited to those damages arising proximately from a breach of contract.

IX. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract. Title to said gasoline, and risk of loss in respect thereof, shall pass from Seller to Buyer upon delivery of the gasoline at the point of manufacture.

(b) Buyer shall take delivery of said gasoline in tank cars, barges, tank vessels, or tank trucks (tank truck deliveries to be not in excess of available tank truck loading facilities for 100-Octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (1) of this Section) at its own cost and expense, at refineries in quantities approximating the current rate of production.

(c) Each vessel delivery shall be made and title and risk of loss shall pass at the intake pipe of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each barge or tank vessel and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d) Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.

(e) Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f) On shipments made from refineries and any other points where licensed inspectors are regularly available, Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall

16

REPRODUCED AT THE NATIONAL ARCHIVES

180068

conform with usual industry practice. The certificates of inspection shall be issued in quadruplicate, one set of which shall accompany the relative shipment, one of which shall be forwarded forthwith to Buyer, and a third submitted to Buyer with the monthly statement required by Section IV hereof. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(g) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in the shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of deliveries into tank trucks in which case no adjustment shall be made.

(h) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product shall conform as to quality with the specifications set forth in Exhibit A hereof.

(i) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(k) Should any such certificate indicate a failure of the product shipped to conform, completely, to the specifications of quality, Buyer may nevertheless accept such product and claim an adjustment for such deficiency, provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

17

REPRODUCED AT THE NATIONAL ARCHIVES

(1) Notwithstanding the preceding provisions of this Section and at the request of Buyer, Seller shall utilize its existing and available facilities (other than tankers) for handling, metering and delivering the gasoline purchased by Buyer to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States served by Seller, where such gasoline is to be used, such service to be at the expense of Buyer and at Buyer's risk. In the event of loss Seller shall make its records available to Buyer to prove the extent and value of such loss.

(m) Seller shall advise Buyer as soon as feasible of the quantities of 100-Octane aviation gasoline which it estimates will be supplied hereunder during the period March 1, 1943 to February 29, 1944. At least sixty (60) days prior to the twelve (12) month periods beginning March 1, 1944 and March 1, 1945 respectively, Buyer shall advise Seller the quantities which it estimates it will take during such periods in accordance with the terms hereof.

## X. Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of any governmental authority, floods, fires, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery, of any product, service or material necessary in the expansion of the facilities contemplated by Section I hereof or in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl. Seller shall not be liable for delays or defaults due to failure of Seller's Suppliers to make deliveries to Seller by reason of any such cause of force majeure.

## XI. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered

18

REPRODUCED AT THE NATIONAL ARCHIVES

hereunder, the parties shall make an earnest effort to settle such dis-
agreement to their mutual satisfaction. If such effort be unsuccessful,
then either party may cause such disagreement to be submitted for de-
termination by arbitrators (none of whom shall be connected with either
party hereto) by giving to the other party a notice in writing or by
telegraph to that effect and giving the name of the arbitrator chosen by
the party giving the notice. Within five (5) days of receipt of such
notice of arbitration, the other party shall, in writing or by telegraph,
name the arbitrator chosen by such party, and within five (5) days after
the appointment of the second arbitrator, an additional arbitrator shall
be selected by the two (2) arbitrators theretofore appointed, provided,
however, if one of the parties shall have failed to appoint an arbitrator
as hereinbefore provided, the sole arbitrator shall arbitrate the dis-
agreement alone. If two (2) arbitrators shall have been appointed as
aforesaid and shall have failed to select an additional arbitrator within
the above stated time, the additional arbitrator shall be appointed by
the Senior Judge of the United States Circuit Court of Appeals for the
Second Circuit acting in his individual capacity, upon application
therefor by either of the parties. The decision of a majority of the
arbitrators so appointed, or if either party shall have failed to ap-
point its arbitrator as aforesaid, the decision of the sole arbitrator
shall be final and binding on the parties for all purposes. Each party
shall pay the cost and expenses of the arbitrator appointed by such
party, and the other costs and expenses of the arbitration, including
the cost and expense of the additional arbitrator, shall be paid by
the party to the arbitration whose claim is not sustained or if par-
tially sustained the costs shall be divided. Pending such determina-
tion of every disagreement as to the price to be paid for gasoline de-
livered hereunder, Buyer shall, upon contesting any price claimed by
Seller to be due, pay the price which Buyer alleges to be due and shall
immediately upon such determination pay any balance found by mutual
agreement or by said arbitrators to be due.

REPRODUCED AT THE NATIONAL ARCHIVES

XII.  Taxes.

Buyer shall pay in addition to the price as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller or its Suppliers may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder.  Buyer shall also pay any such taxes on crude petroleum to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

XIII. Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for whom intended at the address of such party as specified above.  A notice personally delivered to either party must be personally delivered to an officer or manager thereof.  Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery.  Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram.  Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.

XIV.  Entirety of Contract.

This instrument contains the entire agreement between the parties in respect of the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein.  The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.

20

REPRODUCED AT THE NATIONAL ARCHIVES

XV.  Assignability.

(a)  This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties hereto; provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Governmental Agency, department, instrumentality  or wholly Government-owned corporation.

(b)  Seller may enter into agreements with any of its Suppliers referred to herein, or their successors, to perform any of the obligations on the part of Seller or its Suppliers to be performed hereunder, and may provide that such Suppliers or their successors receive directly payments or other benefits due from Buyer hereunder; and in furtherance hereof may, notwithstanding the provisions of Section XV (a) hereof, assign any portion of this contract to any such Supplier or its successors for the more convenient performance of the obligations of this contract.  Such agreements and assignments under this Section XV (b) shall not relieve Seller of any of its obligations under this contract without Buyer's written consent.

XVI.  Statutory Compliance.

In carrying out this agreement Seller agrees to comply with, and give all stipulations and representations required by applicable federal laws and further agrees to require such compliances, representations and stipulations with respect to any contract entered into by it with others incidental to or in connection with this agreement as may be required by applicable federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this agreement it will not discriminate against any worker because of race, creed, color or national origin.  No member of or delegate to the Congress of the United States of America shall be admitted to any share or part of this agreement or to any benefit arising  therefrom.

21

REPRODUCED AT THE NATIONAL ARCHIVES

IN WITNESS WHEREOF the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION


By___H. A. Mulligan_____
                President

(SEAL)

ATTEST:


_____Dudley H. Digges_____
        Acting Secretary


STANDARD OIL COMPANY OF NEW JERSEY


(SEAL)

By___Chester F. Smith_____
                President

ATTEST:


_____W. F. Quick_____
        Asst. Secretary

R.H.S.
H.S.B. Jr.

22

REPRODUCED AT THE NATIONAL ARCHIVES

## GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to Standard Oil Company of New Jersey to enter into said contract, RECONSTRUCTION FINANCE CORPORATION does hereby guarantee the full and complete performance of all of the terms and conditions of the said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized this 13th day of January, 1942.

RECONSTRUCTION FINANCE CORPORATION

By        Charles B. Henderson
                    Chairman

(SEAL)

ATTEST:

        A. T. Hobson
    Acting Secretary

23

REPRODUCED AT THE NATIONAL ARCHIVES

EXHIBIT A

Contract between Defense Supplies Corporation and
Standard Oil Company of New Jersey
Dated January 13, 1942

Item 1

PRODUCT    – 100-Octane aviation motor fuel complying with Army-Navy

Aeronautical Specification AN-VV-F-781 of September 26, 1940

with Amendment 3.  Lead limit 3.0 cc/gal.

PRICE    – Base price during the period from January 13, 1942 to February

29, 1944 shall be thirteen cents ($0.13) and during the

period from March 1, 1944 to February 28, 1946 shall be

twelve cents ($0.12) per U. S. Standard gallon subject to

adjustment and all other provisions of said agreement.

QUANTITY    – As agreed upon from time to time.

Item 2

PRODUCT    – 100-Octane aviation motor fuel complying with Army-Navy

Aeronautical Specification AN-VV-F-781 of September 26, 1940

with Amendment 4 of November 24, 1941.

PRICE    – Base price during the period from January 13, 1942 to February

29, 1944 shall be twelve and sixty-five hundredths cents

($0.1265) and during the period from March 1, 1944 to February

28, 1946 shall be eleven and eight-tenths cents ($0.118) per

U. S. Standard gallon subject to adjustment and all other pro-

visions of said agreement.

QUANTITY    – As agreed upon from time to time.

Item 3

PRODUCT    – High-octane unleaded motor fuel in accordance with "Army-Navy

Aeronautical Specification AN-VV-F-781 of September 26, 1940

with Amendment 3 of June 6, 1941, Fuel; Aircraft-Engine, Grade

100" with the following changes and additions (reference being

to corresponding paragraph numbers in such specifications):

A-1a    Add:  AN-VV-F-748 Fuel; Aircraft-Engine, General
Specification (Method for Supercharged Knock
Test).

24

REPRODUCED AT THE NATIONAL ARCHIVES

180068

Item 3 - Continued

E-6  Color:  The color of the fuel shall be not darker than plus 25 Saybolt.

E-8  Knock Ratings:

(a)  The knock rating of the fuel (after the addition of not more than 4.0 milliliters of tetraethyl lead per U. S. gallon) shall be not less than 100-Octane number by the method prescribed in Specification AN-VV-F-746.

(b)  The rich mixture knock rating of the fuel (after the addition of not more than 4.0 milliliters of tetraethyl lead per U. S. gallon) by the method prescribed in Specification AN-VV-F-748 shall be not less than that of isooctane (certified 2,2,4 trimethylpentane) to which has been added 1.25 milliliters of tetraethyl lead per U. S. gallon. The rating shall be obtained at a fuel-air ratio 1.7 times the fuel-air ratio at the minimum boost point of isooctane to which has been added 1.25 milliliters of tetraethyl lead per U. S. gallon.

E-10d  The percentage of fuel evaporated at 75°C (167°F.) shall not exceed 30%.

E-12  Lead Content. - The fuel shall contain no tetraethyl lead. The concentration of tetraethyl lead which must be added to the fuel to obtain the required knock ratings shall not exceed 4.0 milliliters per U. S. gallon.

E-5c  The knock ratings of the fuel shall be determined by the methods given in Specifications AN-VV-F-746 and in AN-VV-F-748 (Proposed Tentative CFR Supercharged Method AFD3-C).

PRICE  - Base price during the period  January 13, 1942 to February 29, 1944 shall be twelve and two-tenths cents ($0.122) and during the period from March 1, 1944 to February 28, 1946 shall be eleven and two-tenths cents ($0.112) per U. S. Standard gallon subject to adjustment and all other provisions of said agreement.

QUANTITY- As agreed upon from time to time.

25

REPRODUCED AT THE NATIONAL ARCHIVES

176793                                                          I - 13

UNITED STATES
DEPARTMENT OF THE INTERIOR
Office of Petroleum Coordinator
for National Defense
Washington

January 14, 1942.

My dear Mr. Secretary:

Standard Oil Company of New Jersey and its affiliates and sub-
sidiaries, including Humble Oil and Refining Company, Standard Oil
Company of Louisiana, Lago Oil and Transport Company, and Colonial
Beacon Oil Company currently manufacture about thirteen thousand
barrels per day of 100-octane aviation gasoline, are now completing
facilities which will increase this figure to about sixteen thousand
barrels per day, and propose to make certain new investments, estimated
at fifty million dollars, in additional refinery equipment which will
permit the production of an estimated additional twenty-one thousand
barrels per day.  These figures, totaling thirty-seven thousand barrels
per day, are on the basis of the old Army Navy specifications
(AN-VV-F-781-Amendment No. 3) for a product containing 3 c.c. of
tetraethyl lead and the base price quoted is for this product.
Actually, so long as the present shortage of 100-octane aviation
gasoline prevails, Jersey (like all other suppliers) will produce
a somewhat larger quantity of gasoline containing 4 c.c. of tetra-
ethyl lead, and in the case of Jersey this product will be available
at a slightly lower base price.

The Office of the Petroleum Coordinator has reviewed Jersey's
proposal with great care.  In our opinion Jersey is capable of
executing such a plan.  It has available satisfactory supplies of
raw materials.  It proposes to use processes which we believe to be
feasible and operable.  The use of such processes will necessitate
the erection of new equipment which will require large quantities
of steel, equipment, and instruments but we know of no more economical
a way in which to attain this capacity and hence we have recommended
the granting of priorities with respect to such construction.

The proposed contract will cover all 100-octane aviation gasoline
produced by Jersey from the date of signature until February 28, 1946;
subject to an acknowledgment by Defense Supplies of the provisions of
certain short-term contracts now existent, and the contract also con-
tains an option to Defense Supplies to renew for a longer period.
The best estimates available indicate that the twenty-one thousand

REPRODUCED AT THE NATIONAL ARCHIVES

176793                                                        I - 14

daily barrels of additional capacity should be in operation in the
spring of 1943.

Representatives of this office have participated with repre-
sentatives of Defense Supplies, Army, and Navy in the negotiation
of the present contract draft.  The draft of January 5 as subse-
quently modified by negotiations between Jersey and the various
agencies of government appears to us to be a proper basis for
contract which is fair and equitable to both Defense Supplies and
the oil company.  We recommend it.  If desired the main contract
between Defense Supplies and Jersey may be supported by collateral
agreements between Defense Supplies and Jersey's subsidiaries and
affiliates.  We have been advised by representatives of Humble and
Standard of Louisiana that these companies are willing to enter into
such contracts if desired by government.

The Jersey contract provides a base price of 13 cents per gallon
f.o.b. Gulf Coast until February 28, 1944 and twelve cents thereafter.
This applies to the product containing 3 c.c. of tetraethyl lead and
the price for the product containing more lead is somewhat less.
These prices may move upward and downward in accordance with an
escalation clause which we believe will fairly reflect the cost of
manufacture.  Provisions are also made for fairly adjusting the
changes in refining operations due to the war.  Delivery charges
for points other than the Gulf Coast and for tank car loadings are
also provided.

In our opinion the base prices of 13 cents, and later 12 cents,
over the anticipated life of the contract are intrinsically low and
are proper.  Our study of the cost of manufacturing 100-octane
aviation gasoline, including a study of cost estimates provided us
by Jersey and by other oil refiners, indicates that the basic costs,
-i.e.-raw material costs and operating costs-for this product are in
excess of 10 cents per gallon.  The spread between this base estimate
and the quoted price is not sufficient in our opinion to permit any
abnormal amortization after considering the various contingent elements
including the hope of profit.  Defense Supplies is not obligated to
buy from Jersey more than a pro rata share of government's requirements
after February 28, 1944, and while it does obligate itself to purchase
Jersey's output during the year preceding that date, Jersey has no
recourse in the event of Defense Supplies' failure to perform except
to retain, out of the prepayment to it of $14,400,000, the sum of
$2.00 per barrel for the goods not purchased.

2

REPRODUCED AT THE NATIONAL ARCHIVES

176793

I - 15

Some confusion existed during the negotiation of this contract because of Jersey's intention to induce Treasury to permit it to write down the value of its new investment by the amount of the prepayment, -i.e.- $14,400,000, during a three-year period. This plan was deemed contrary to procurement policy and to avoid the income Jersey offered a formula by which the "extra amortization" will be credited to Defense Supplies if, after contract termination, subsequent events show that the new investment is in fact useful for making aviation gasoline.  We believe this form of "government pro-tection" is satisfactory.

Our study of the price leads us to the conclusion that the propriety of writing off 28 percent of the investment over three years and 72 percent of the investment over ten years as contrasted with writing off 100 percent of the investment over ten years is a question which, while pertinent from the standpoint of procurement policy, is effectively "lost" in the uncertainties as to Jersey's ultimate profit or loss from the whole transaction.  The price quoted is a "negotiated price" in which Jersey has balanced its hope of profit against its risk of loss.  Unless Jersey runs at substantially full capacity until February 28, 1946 it will probably break even or take a loss on gasoline from the new facilities and that loss may be offset or profit gained from the sale of gasoline from its present facilities.  It has no assurance of profit and in spite of escalation clauses it has no guarantee against loss.

We recommend the acceptance of this contract by Defense Supplies Corporation.

> Very truly yours,
>
> (Sgd) Ralph K. Davies,
>            Deputy Petroleum Coordinator.

Hon. Jesse Jones,
Reconstruction Finance Corporation,
Lafayette Building,
Washington, D. C.

cc:   Mr. George Hill
        Defense Supplies Corporation
      Brig. General Walter Pyron
      Mr. Warren Ege
        War Department
      Mr. C. F. Detmar
        Navy Department

3

REPRODUCED AT THE NATIONAL ARCHIVES

176793                                                                I – 16

## DEFENSE SUPPLIES – JERSEY CONTRACT

### Signed, January 13, 1942

Productive Capacity
100 Octane Aviation Gasoline Bbls/Day

|                  | 3 cc lead | 4 cc lead |
|------------------|-----------|-----------|
| Present          | 13,000    |           |
| In Construction  | 3,000     |           |
| Proposed         | 21,000    |           |
| Total            | 37,000    |           |

Raw Materials

Refinery $C_4$'s, isopentane, catalytically cracked base stocks, etc.

Operation

Naphtha fractionation, catalytic cracking, alkylation, etc.

New Investment

Estimated $50,000,000

Investment per Barrel

Estimated $2,380 (new capacity only)

Base Price (Subject to escalation)

|                            | 3 cc lead  | 4 cc lead   |
|----------------------------|------------|-------------|
| Until February 29, 1944    | 13¢/gal.   | 12.65¢/gal. |
| After February 29, 1944    | 12¢/gal.   | 11.8¢/gal.  |

Plus terminalling and tank car and tank truck loading charges.

Cost Breakdown (1st year)

(From data supplied by Jersey)

|                                       | Per Gallon |
|---------------------------------------|------------|
| Raw materials – Replacement basis)    | $.0825     |
| Operating costs              )        |            |
| Depreciation Items                    | .0334      |
| Interest on New Investment            | .0042      |
| Contingencies           )             | .0099      |
| Profit(by difference)                 |            |
|                                       | $.1300     |

REPRODUCED AT THE NATIONAL ARCHIVES

# Exhibit 1-150

CONFORMED COPY

$\mathcal{J} 6 \, \delta$

DEFENSE SUPPLIES CORPORATION
Washington, D. C.

February 16, 1943

Standard Oil Company of Louisiana,
26 Broadway,
New York, New York.

Gentlemen:

You submitted to us a letter agreement dated March 31, 1942
covering deliveries of 100 Octane aviation gasoline within the State
of Louisiana. We were unable to execute that agreement pending certain
modifications in the contract between Standard Oil Company of New Jersey
and this Corporation dated January 13, 1942. These necessary amendments
have been effected by letter agreements dated January 7, 1943 and
January 19, 1943 executed by Standard Oil Company of New Jersey and
this Corporation, conformed copies of which are enclosed.

Under date of March 31, 1942, as amended January 29, 1943,
you wrote us as follows:

"This refers to your contract with our affiliate Standard
Oil Company of New Jersey, dated January 13, 1942 in which contract
the undersigned is named as one of the suppliers of Standard Oil
Company of New Jersey.

"We have agreed with Standard Oil Company of New Jersey to
increase our refining facilities for the production of 100 Octane
Aviation Gasoline from a present capacity of 5,600 barrels per day
to a capacity of approximately 15,500 barrels per day and to supply
to that company our entire production of 100 octane Aviation
Gasoline from such facilities to the extent that such gasoline is
required for sale to you in interstate or foreign commerce from our
refinery at Baton Rouge, Louisiana, and is not required for sale by
us under existing contracts, or hereunder.

"Subject to all of the terms of your contract with Standard
Oil Company of New Jersey, dated January 13, 1942, as amended by
letter agreements dated January 7, 1943 and January 19, 1943, we
agree to supply during the period of such contract such quantity
of 100 Octane Aviation Gasoline as you may require for delivery
in intra-state commerce within the State of Louisiana, at the price
and on the terms set forth in said contract, so far as such terms
are applicable.

-2-

"We shall expect to receive as much advance notice as possible (and in any event at least such notice as is provided in said contract) as to the quantity and quality of gasoline which you will require for delivery hereunder.

"If the foregoing is satisfactory to you will you kindly sign and return a copy of this letter which will thereupon constitute a contract between us."

You are hereby advised that the provisions of the letter above quoted are satisfactory to this Corporation and shall be considered effective as of January 1, 1943. Please indicate your acceptance by signing and returning two copies of this letter which shall thereupon constitute a contract between Standard Oil Company of Louisiana and Defense Supplies Corporation.

<div align="right">

Very truly yours,


(Signed)  H. A. Mulligan

H. A. Mulligan
President.

</div>

Accepted:

STANDARD OIL COMPANY OF LOUISIANA


By (Sgd.)  M. J. Rathbone, President.
       Name and Title

# Exhibit 1-151

REPRODUCED AT THE NATIONAL ARCHIVES

173125

CONFORMED COPY

Revised January 17, 1942.

# C O N T R A C T

between

DEFENSE SUPPLIES CORPORATION

and

THE TEXAS COMPANY

(Port Arthur Refinery)

100-OCTANE AVIATION GASOLINE

January 17, 1942.

REPRODUCED AT THE NATIONAL ARCHIVES

Revised January 17, 1942.

173125

## DEFENSE SUPPLIES – TEXAS CONTRACT

### (Port Arthur Refinery)

CONTRACT made as of January 17, 1942, between the Texas Company, a Delaware corporation, having its principal place of business at 135 E. 42nd St., New York, N. Y., hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of mutual agreements herein contained the parties agree as follows:

### I. Expansion of Seller's Refining Facilities.

Seller has facilities for the production at Port Arthur, Texas of approximately two thousand nine hundred forty (2,940) barrels per calendar day of 100-Octane aviation gasoline and is willing to expand its facilities, at an estimated cost of approximately Seven Million Five Hundred Thousand Dollars ($7,500,000.00), to a degree which it is estimated will enable Seller to produce at Port Arthur, Texas approximately six thousand seven hundred and fifty (6,750) barrels per calendar day of 100-Octane aviation gasoline. Seller shall use all reasonable efforts to expand said facilities and shall endeavor to maintain work on the expansion day and night in so far as the requisite labor and materials are available. Seller shall use its best efforts to complete such expansion as soon as possible and not later than January 1, 1943. The force majeure provisions set forth in Section X hereof shall apply in all respects to the expansion of facilities as well as the sale of gasoline and all other obligations of Seller.

### II. Sale and Storage of Products.

(a) When the aforesaid expansion of Seller's facilities shall be completed and ready for operation, Seller shall promptly notify Buyer; and from and after receipt of such notification Seller shall sell and deliver and Buyer shall buy and receive, for a period of one year from receipt of such notification, in accordance with provisions of this contract, five thousand nine hundred (5,900) barrels per calendar day of 100-Octane aviation gasoline which shall be in accordance with the alternate

173125

specifications set forth in Exhibit A attached hereto and made a part hereof or any other specification which by mutual agreement shall be attached as an addendum to Exhibit A. Wherever in this contract provision is made for the sale and delivery to Buyer of a stated quantity of gasoline, such quantity is an aggregate quantity of the various kinds of gasoline specified in Exhibit A collectively considered. Buyer may apportion such aggregate quantity among the various kinds of gasoline.

(b) During the period beginning at the end of the one year period provided in paragraph (a) above and ending December 31, 1945, Buyer shall purchase and receive and Seller shall sell and deliver a quantity of 100-Octane aviation gasoline produced in the facilities referred to in Section I hereof, which together with any other sales of said gasoline by Seller to the United States Government shall equal the pro-rata share of the entire requirements of the United States Government during such period, as hereinafter defined.

(c) Buyer on giving reasonable notice to Seller may require the delivery hereunder of 100-Octane aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with the same refining facilities and the same raw materials as are used in producing 100-Octane aviation gasoline in accordance with the specifications originally set forth in Exhibit A. The prices, specifications and quantities of such products shall be determined by negotiation between the parties, and Seller shall not be required to deliver such products unless and until an agreement has been reached. Such agreement shall be reduced to writing as an addendum to Exhibit A.

(d) The term "United States Government" shall include the War Department, the Navy Department, any other department, agency or instrumentality of the United States Government, and any corporation wholly owned by the United States.

(e) The term "pro-rata share of the entire requirements of the United States Government" shall mean a quantity equal to the proportion of the entire requirements of the United States Government for 100-Octane aviation gasoline which the refining capacity for 100-Octane aviation gasoline of the facilities referred to in Section 1 hereof less the quantity of Seller's sales of 100-Octane aviation gasoline from said facilities to

2

NARA-CP

REPRODUCED AT THE NATIONAL ARCHIVES

173125

customers other than the United States Government, bears to the total refining capacity for 100-Octane aviation gasoline of all refiners in the United States and Lago Oil & Transport Company, Ltd. in Aruba, Netherlands West Indies, less the quantity of said refiners' sales to customers other than the United States Government.  Buyer shall use its best efforts to furnish the data necessary for the calculation of such pro-rata share.

(f)  The term "barrel" as used in this contract means a barrel of forty-two (42) gallons and a gallon is a United States gallon of two hundred and thirty-one (231) cubic inches.

(g)  Seller shall maintain storage facilities at, or in the vicinity of, Port Arthur, Texas, to accommodate at least sixty (60) days' full capacity production of 100-Octane aviation gasoline.  Whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage.  If such full storage condition exists, Seller shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100-Octane aviation gasoline which was produced during such full storage condition or which would have been produced except for such full storage condition.  If, however, Seller shall produce during any such period of full storage any additional 100-Octane aviation gasoline of the kind covered by this contract, then such additional aviation gasoline shall be treated as covered by Section III hereof.

III.  Optional Gasoline.

Buyer shall have the option from time to time and at any time to purchase from Seller all or any part of the 100-Octane aviation gasoline which Seller may produce in the facilities hereinabove mentioned between the execution of this contract and receipt of the notification referred to in Section II (a) hereof to the extent that such gasoline is in excess of quantities which Seller has, prior to receipt by Seller of notification of exercise of such option, contracted to sell to parties other than Buyer.  Upon the exercise of such option Seller shall operate the facilities at full capacity or at such lesser capacity as will satisfy Buyer's indicated requirements.

3

173125

Buyer shall also have the option from time to time and at any time to purchase all or any part of the 100-Octane aviation gasoline which Seller may produce in said facilities between receipt by Buyer of the notification referred to in Section II (a) hereof and December 31, 1945 to the extent that such gasoline is in excess of the sum of (a) the quantity to be purchased by Buyer under Section II hereof and (b) the quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at such lesser capacity as will satisfy Buyer's indicated requirements.

IV. Price and Payment.

The base price of 100-Octane aviation gasoline specified as Item 1 of Exhibit A hereof, shall be thirteen and one-quarter cents ($0.1325) per gallon f.o.b. Seller's refinery at Port Arthur, Texas. The base price of 100-Octane aviation gasoline specified as Item 2 of Exhibit A hereof, shall be thirteen cents ($0.13) per gallon f.o.b. Seller's refinery at Port Arthur, Texas. Seller represents that there has not been included in its computation of such prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original estimated cost of the refining facilities used in the manufacture of said 100-Octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.

Buyer shall pay promptly, but not later than the twentieth (20th) of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month; providing, however, that Buyer may deduct from amounts due Seller, amounts due Buyer from Seller under Section VII hereof. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.

4

173125

## V. Price Escalation.

The prices of 100-Octane aviation gasoline purchased hereunder shall be subject to adjustment as follows:

(a) The said prices are based on a price of One Dollar and Twenty-five Cents ($1.25) per barrel for East Texas crude deliverable to Seller in the East Texas field. These prices shall be increased or decreased fifty-three thousandths of one cent ($0.00053) per gallon for each one cent ($0.01) advance or decrease in the average price paid for East Texas crude over or under One Dollar and Twenty-five Cents ($1.25) per barrel by the three (3) largest purchasers of such crude in the East Texas field. The prices posted for such crude in the East Texas field by such purchasers shall constitute prima facie evidence of the prices paid by such purchasers.

(b) The said prices shall also be increased or decreased by seventy-one thousandths of one cent ($0.00071) per gallon for each one point increase or decrease in the wholesale price Index Number for "All Commodities other than Farm Products and Foods", as now published by the Bureau of Labor Statistics, United States Department of Labor, which index figure is now ninety-three and five-tenths (93.5). The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number, regardless of what Seller's crude inventory may be at the time of such change. If said index shall cease to be issued, the parties shall use such other index as may closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(c) The prices herein above set forth are based upon present normal methods of transporting petroleum raw materials to Seller's refinery at Port Arthur, Texas, and upon a normal operation of that refinery, in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100-Octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refinery by other than present normal methods thereby incurring additional costs of transportation, or if

5

REPRODUCED AT THE NATIONAL ARCHIVES

173125

through an abnormal reduction of available markets for motor fuel and petroleum products other than 100-Octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any portion of the 100-Octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100-Octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a) and (b), Seller may give notice to Buyer that the delivery of 100-Octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for 100-Octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, Buyer may give notice to Seller that it desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of 100-Octane aviation gasoline by the refinery affected may be reduced as above provided.

In making adjustments under this Section, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

VI. Duration of Contract.

The original term of this contract shall expire at midnight on December 31, 1945. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety

6

REPRODUCED AT THE NATIONAL ARCHIVES

173125

(90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension. Upon such extension the obligations to purchase and receive shall be in accordance with Section II (b) hereof and the price to be paid shall be fixed by agreement of the parties hereto during the ninety (90) day period prior to each such extension. All of the other provisions of this contract except those not then applicable shall be in full force and effect.

VII. Loan to Seller.

Buyer shall loan to Seller Five Million Five Hundred Thousand Dollars ($5,500,000.00) which shall be disbursed by Buyer to Seller in approximately monthly installments as the construction of the facilities progresses. The first installment shall be disbursed in the amount of one-twelfth (1/12) of said Five Million Five Hundred Thousand Dollars ($5,500,000.00) immediately following the expiration of ninety (90) days from the date of this contract or immediately following receipt of notice by Buyer of Seller's waiver of its right to terminate this contract under Section XVII hereof, whichever event shall first occur. The remaining installments shall be disbursed when Seller shall deliver to Buyer satisfactory evidence that it has expended or firmly committed itself to expend on account of the construction of the facilities all of the funds theretofore advanced to it by Buyer and in addition has so expended or committed itself to expend from its own funds not less than thirty-six percent (36%) of the aggregate of such installments advanced by Buyer.

Such loan shall carry interest at the rate of two percent (2%) per annum on the outstanding balance thereof, until repaid, except as otherwise provided below.

Seller shall repay the aforementioned loan to Buyer in twelve (12) monthly installments of Four Hundred Fifty Eight Thousand Three Hundred Thirty-three Dollars and Thirty-three Cents ($458,333.33) each, plus interest, beginning the twentieth (20th) day of the month following the month in which Buyer receives the notification referred to in Section II (a) hereof; provided, however, that Seller may deduct from amounts due Buyer under this Section, amounts due Seller from Buyer for purchase of 100-Octane aviation gasoline under Section IV hereof; and provided further that if Buyer shall breach its obligation to disburse the installments of said loan in accordance with this Section VII or

7

173125

shall breach its obligation to buy the quantities of 100-Octane aviation gasoline called for by Section II (a) hereof, then Seller shall not be obligated to make repayments (other than repayments, if any, falling due prior to such breach), and shall be entitled to retain, without further interest, the amount of said loan then outstanding pending determination by agreement, arbitration or otherwise of Buyer's liability, if any, for such breach. Upon such determination Seller shall only be obligated to repay to Buyer the amount loaned plus interest accrued to the time of breach, less the damages, if any, sustained by Seller.

VIII. Damages.

Damages under this contract shall be limited to those damages arising proximately from a breach of contract.

IX. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract. Title to said gasoline, and risk of loss in respect thereof, shall pass from Seller to Buyer upon delivery of the gasoline at the point of manufacture.

(b) Buyer shall take delivery of said gasoline in tank cars, barges, tank vessels, or tank trucks (tank truck deliveries to be not in excess of available tank truck loading facilities for 100-Octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (1) of this Section) at its own cost and expense, at Seller's refinery in quantities approximating the current rate of production.

(c) Each vessel delivery shall be made and title and risk of loss shall pass at the intake pipe of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each barge or tank vessel and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

REPRODUCED AT THE NATIONAL ARCHIVES

173125

(d) Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.

(e) Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f) On shipments made from refineries and any other points where licensed inspectors are regularly available, Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall conform with usual industry practice. The certificates of inspection shall be issued in quadruplicate, one set of which shall accompany the relative shipment, one of which shall be forwarded forthwith to Buyer, and a third submitted to Buyer with the monthly statement required by Section IV hereof. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(g) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of deliveries into tank trucks in which case no adjustment shall be made.

(h) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product shall conform as to quality with the specifications set forth in Exhibit A hereof.

9

REPRODUCED AT THE NATIONAL ARCHIVES

173125

(i) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(k) Should any such certificate indicate a failure of the product shipped to conform, completely, to the specifications of quality, Buyer may accept delivery of the product and claim an adjustment for such deficiency, provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

(1) Notwithstanding the preceding provisions of this Section and at the request of Buyer, Seller shall utilize its existing and available facilities (other than tankers) for handling, metering and delivering the gasoline purchased by Buyer to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States served by Seller, where such gasoline is to be used, such service to be at the expense of Buyer and at Buyer's risk. In the event of loss Seller shall make its records available to Buyer to prove the extent and value of such loss.

X. Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of any governmental authority, floods, fires, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery, of any product, service or material necessary in the expansion of the facilities contemplated by Section I hereof or in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

10

173125

## XI.  Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction.  If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice.  Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone.  If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Second Circuit acting in his individual capacity, upon application therefore by either of the parties.  The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes.  Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be divided.  Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

11

REPRODUCED AT THE NATIONAL ARCHIVES

173125

## XII.  Taxes.

Buyer shall pay in addition to the price as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller or its Suppliers may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder.  Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

It is understood that Buyer's obligation under this Section shall include all presently existing taxes not now deemed applicable but which may later be held to apply to the commodities delivered hereunder.  It is understood that Buyer does not deem sales taxes or excise taxes in the nature of sales taxes to be applicable.

If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption.  Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

## XIII.  Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for whom intended at the address of such party as specified above.  A notice personally delivered to either party must be personally delivered to an officer or manager thereof.  Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery.  Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram.  Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.

12

REPRODUCED AT THE NATIONAL ARCHIVES

173125

## XIV. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect of the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.

## XV. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties hereto, provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Governmental Agency, department, instrumentality or wholly Government-owned corporation in which event Buyer shall remain liable.

## XVI. Statutory Compliance.

In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable Federal laws and further agrees to require such compliances, representations, and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable Federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any worker because of race, creed, color or national origin.

No Member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this contract or to any benefit that may arise therefrom, but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.

If any statute now in existence or hereafter enacted, or any present or future governmental ruling or order, or the action of any governmental department, agency or instrumentality shall reduce the price payable to Seller as provided for in this contract, Seller shall have the option at any time thereafter to terminate this contract by thirty (30) days written notice to Buyer. On such termination Seller shall elect by

13

REPRODUCED AT THE NATIONAL ARCHIVES

173125

written notice to Buyer either (1) to allow Buyer to purchase said 100-Octane aviation gasoline after termination in a quantity which at the governmentally controlled price will repay so much of the loan, with interest, as shall not have been repaid, or (2) to return to Buyer in cash so much of said loan, with interest, as shall not have been so repaid.

XVII.  Right to Terminate.

Seller shall have the right to terminate this contract within ninety (90) days of the date thereof, unless within said ninety (90) days it shall receive all Governmental assistance which is available or necessary for performing this contract and for the prompt completion of the expanded facilities which Seller will erect and install hereunder, including, without limitation, priorities and allocations necessary for obtaining materials, equipment, supplies and crude petroleum, and (1) such certificates or other evidence as may be necessary to permit them to invoke the provisions of Section 124, Internal Revenue Code; (2) assurances from the Treasury Department, in the form of closing agreements, that the advance payment of Five Million Five Hundred Thousand Dollars ($5,500,000.00) herein provided for, or any part thereof, will not be treated as taxable income upon receipt by Seller, but that the ratable portions thereof will be treated as amounts received for products supplied, when and as such ratable portions are credited for that purpose hereunder.

IN WITNESS WHEREOF the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By ____H. A. Mulligan____
President

ATTEST:

____Dudley H. Digges____
Acting Secretary

(Seal)

THE TEXAS COMPANY

By ____M. Halpern____
Vice-President

ATTEST:

Meeker H. Smith
Asst. Secretary

(Seal)

14

REPRODUCED AT THE NATIONAL ARCHIVES

173125

## GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to The Texas Company to enter into said contract, RECONSTRUCTION FINANCE CORPORATION does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized this 17th day of January, 1942.

RECONSTRUCTION FINANCE CORPORATION


By_____Charles B. Henderson_____
              Chairman

ATTEST:


_____Leo Nielson_____
  Assistant Secretary

(Seal)

15

173125

## EXHIBIT "A"

Item 1................................................price, 13.25 cents per
gallon F.O.B. Seller's
refinery at Port Arthur,
Texas.

U. S. ARMY - NAVY SUPPLY

AN-VV-F-781            Sept. 26, 1940

Amendment No. 3        June   6, 1941

Knock Test Method      AN-VV-F-746

                100-Octane Number by Method AN-VV-F-746

                Lead Limit 3.0 cc/Gal.


Item 2................................................price, 13.00 cents per
gallon F.O.B. Seller's
refinery at Port Arthur,
Texas.

U. S. ARMY - NAVY SUPPLY

Same as above with Amendment No. 4    Nov. 24, 1941

                Lead Limit 4.0 cc/Gal.

16

# Exhibit 1-152

CONFORMED

*3 6 ⁰*
*Bay*
*¹/₂*

C O N T R A C T

between

RECONSTRUCTION FINANCE CORPORATION

and

TIDEWATER ASSOCIATED OIL COMPANY

(Eastern Division)

(Bayonne Refinery)

100-OCTANE AVIATION GASOLINE

July 1, 1945

DECLASSIFIED
Authority NND73004

NARA-CP
RG 253
Enry 510
Box 3594
Folder: 360 Tidewater Bayonne BAY First Expansion

79018

## RECONSTRUCTION FINANCE CORPORATION - TIDEWATER ASSOCIATED - CONTRACT
### (Bayonne Refinery)

CONTRACT made the first day of July, 1945, between TIDEWATER ASSOCIATED OIL COMPANY, a Delaware corporation, with offices at No. 17 Battery Place, New York 4, N. Y., hereinafter called Seller and RECONSTRUCTION FINANCE CORPORATION, a corporation created by the United States of America having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of the mutual agreements herein contained the parties agree as follows:

I. Seller's Refining Facilities.

Seller has existing facilities for the production of approximately three thousand five hundred (3,500) barrels per calendar day of Two Pass Catalytic Aviation Base Stock, approximately two thousand five hundred (2,500) barrels per calendar day of Straight Run Aviation Base Stock and approximately three hundred seventy-five (375) barrels per calendar day of Catalytic Pentane Fraction (all hereinafter generally referred to as aviation base stocks) at its Bayonne, New Jersey refinery which will enable it to blend approximately twelve thousand (12,000) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof. The said production of 100 octane aviation gasoline consists of (1) aviation base stocks manufactured entirely by Seller at its Bayonne, New Jersey refinery by the use of pre-war facilities converted to the manufacture of such aviation base stocks, and by the use of new facilities installed, at the request of the Petroleum Administration for War, hereinafter called PAW; and (2) other components of aviation gasoline which are purchased by Seller from outside suppliers at the request or with the approval of Buyer; it being understood that the production of said approximate twelve thousand barrels per calendar day is contingent upon Seller's ability to purchase such other components under allocations of such other components to Seller by proper agencies of Government.

II. Sale and Storage of Products.

(a) Commencing July 1, 1945 and until the end of the term of this contract, Seller shall sell and deliver and Buyer shall buy and receive all of the 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof,


DECLASSIFIED
Authority NND730014

79018

or any other specification which by mutual agreement shall be attached as an addendum to Exhibit A, produced at Seller's Bayonne refinery.

(b)  Buyer on giving reasonable notice to Seller may require the delivery hereunder of aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with Seller's available raw materials and with Seller's available refining facilities then capable of use in producing 100 octane aviation gasoline in accordance with said specifications other than those originally set forth in Exhibit A.  The prices, specifications and quantities of such product shall be determined by negotiation between the parties or, failing agreement, by arbitration under section XI hereof.  Deliveries of the product shall not be suspended during such negotiation.  Such agreement shall be reduced to writing as an addendum to Exhibit A and shall constitute a part thereof.

(c)  The term "United States Government", whenever used in this contract, shall include the War Department, the Navy Department, any other department, agency or instrumentality of the United States Government, and any corporation wholly owned by the United States.

(d)  The term "barrel" as used in this contract means a barrel of forty-two (42) gallons.  The term "gallon" means a United States gallon of two hundred and thirty-one (231) cubic inches.

(e)  Seller shall maintain storage facilities at its Bayonne refinery to accommodate at least two hundred thousand (200,000) barrels of 100 octane aviation gasoline (or components thereof ready for blending) produced under this contract.

(f)  Whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said aviation gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of said aviation gasoline in storage.

(g)  In accumulating said storage, Seller may store aviation gasoline of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering delivery shall first order against the aviation gasoline in storage; provided, however, that on Buyer's request and if Seller can do so without extra cost, or if Seller can do so at extra cost and Buyer shall agree to assume such extra cost, Seller shall charge the aviation gasoline in storage to meet other specifications covered in Exhibit A hereof.

2

DECLASSIFIED
Authority NND730004

79018

(h)  Seller shall sell and deliver and Buyer shall buy and receive at the end of the term of this contract the aviation gasoline stored at that time (as such or as components thereof ready for blending) in the facilities referred to in section II (e) hereof.

III.  (Omitted).

IV.  Price and Payment.

(a)  The billing price for said 100 octane aviation gasoline specified as Item 3 of Exhibit A hereof shall be seventeen and four-tenths cents ($0.1740) per gallon f.o.b. Seller's Bayonne refinery.

(b)  The aforementioned billing price for said 100 octane aviation gasoline has been calculated as including the following elements:

| | | | |
|---|---|---|---|
| 29.3% Two Pass Catalytic Aviation Base Stock made entirely at Seller's Bayonne refinery, specified as Item 1, Exhibit A hereof | @ 16.50¢ per gal. | 4.83¢ | |
| 20.9% Straight Run Aviation Base Stock made entirely at Seller's Bayonne refinery, specified as Item 2, Exhibit A hereof. | @ 8.65¢ per gal. | 1.81¢ | |
| 3.1% Catalytic Pentane Fraction made entirely at Seller's Bayonne refinery | @ 11.00¢ per gal. | .34¢ | |
| 43.8% Purchased Aviation Alkylate | @ 19.00¢ per gal. | 8.32¢ | |
| | Plus freight | | .42¢ |
| 2.9% Purchased Cumene | @ 19.85¢ per gal. | .58¢ | |
| | Plus freight | | .05¢ |
| Allowance for cost of lead, leading, blending, handling, losses incidental to blending and leading and cost of inhibitor for aviation base stocks made entirely at Seller's Bayonne refinery | @ 0.90¢ per gal. | .48¢ | |
| Allowance for cost of lead, leading, throughput expenses, losses incidental to leading and blending, cost of inhibitor, miscellaneous expenses, blending and handling purchased blending agents | @ 1.21¢ per gal. | .57¢ | |
| Total freight, per gallon | | | .47¢ |
| Total ex freight, per gallon | | 16.93¢ | 16.93¢ |
| Billing price, per gallon | | | 17.40¢ |

The above calculation is based upon purchased ingredients having the following knock ratings with 4.6cc TEL per gallon:

Alkylate:    1-C = 106.5  and  3-C = 144 Blending Index

Cumene:    1-C = 100.0  and  3-C = 280 Blending Index

(c)  Within thirty (30) days following each successive three (3) month period during the term of this contract, Seller shall furnish Buyer with a

3

DECLASSIFIED
Authority NND730H

79018

certified statement as to the actual blends of the components listed in Paragraph (b) of this Section IV or any components substituted for or used in addition to one or more of them included in 100 octane aviation gasoline sold hereunder, the inspections to which said components conform as ascertained by Seller in accordance with its usual practice, and the actual costs of purchased blending agents' laid down at Seller's Bayonne refinery, and tetraethyl lead, which were blended in 100 octane aviation gasoline sold hereunder and other factors necessary for the determination of "X" hereinafter provided. Within ten (10) days after receipt of the aforementioned certified statement Seller shall pay to Buyer or Buyer shall pay to Seller, as the case may be, (subject to further adjustment and correction as provided in paragraph (g) of this Section IV hereof), a sum sufficient to adjust the billing price set forth in paragraph (a) of this Section IV to a final price based on the actual blends and calculated as follows:

(1) In place of the price of 16.50 cents per gallon for Two Pass Catalytic Aviation Base Stock made entirely at Seller's Bayonne refinery and specified as Item 1 of Exhibit A hereof, (hereinafter referred to as "Two Pass Base Stock") used in calculating the billing price as set forth in paragraph (b) of this Section IV, there shall be substituted the following price:

For Two Pass Base Stock produced in any three month period hereunder which shall be the three month periods ending September 30, 1945 and December 31, 1945, a base price, in cents per gallon, equal to 17.50 or to "X" in the following price formula, whichever shall be the lesser (subject to adjustment as provided in Section V and Exhibit B hereof):

$$X = \frac{A + B + C + D + E + F}{Q}$$

### Determination of A

A is in cents, Seller's net cost for petroleum raw materials for the three month period determined as follows:

$$A = (9.59G + 9.78H + 10.00I + 9.39J + 9.12K + 4.90L + 5.02M + 9.12Y) -$$
$$(7.10N + 4.90P + 3.59R + 7.31S + 11.00T + 8.21U + 3.66V + 23.93W +$$
$$9.12Z)$$

where:

G is, in gallons, the volume of debutanized Houdry first pass distillate produced between June 22, 1944 and October 1, 1944 having 400°F maximum, end point which is processed in Seller's Thermofor facilities in the three month period for the production of Two Pass Base Stock;

4


DECLASSIFIED
Authority NND730014

79018

H is, in gallons, the volume of debutanized Houdry first pass base stock produced between October 1, 1944 and January 1, 1945 having 335°F maximum, end point which is processed in Seller's Thermofor facilities in the three month period for the production of Two Pass Base Stock;

I is, in gallons, the volume of debutanized Houdry first pass base stock produced between January 1, 1945 and April 1, 1945 having 335°F maximum, end point which is processed in Seller's Thermofor facilities in the three month period for the production of Two Pass Base Stock;

J is, in gallons, the volume of debutanized Houdry first pass distillate produced between April 1, 1945 and July 1, 1945 having 435°F maximum, end point which is processed in Seller's Thermofor facilities in the three month period for the production of Two Pass Base Stock;

K is, in gallons, the volume of debutanized Houdry first pass distillate produced between July 1, 1945 and January 1, 1946 having 435°F maximum end point which is processed in Seller's Thermofor facilities in the three month period for the production of Two Pass Base Stock;

L is, in gallons, the volume of light Houdry Catalytic gas oil boiling above 435°F end point gasoline and below 700°F end point produced between January 1, 1945 and January 1, 1946 which is processed in Seller's Thermofor facilities in the three month period for the production of Two Pass Base Stock. (The volume of such light Houdry catalytic gas oil boiling above 435°F end point gasoline contained in debutanized Houdry first pass distillate shall be defined as that material boiling above a vapor temperature of 435°F in the ASTM gasoline distillation test of the debutanized Houdry first pass distillate charged to Seller's Thermofor facilities. The determination of the gas oil content of such distillate shall be based upon the weighted average of daily tests of such distillate as charged.);

M is, in gallons, the volume of light virgin gas oil having API gravity of 30°-35° and 700°F maximum, end point which is processed in Seller's Thermofor facilities in the three month period for the production of Two Pass Base Stock;

Y is, in gallons, the inventory of debutanized first pass distillate produced by Seller's Thermofor facilities which is in storage at Seller's Bayonne Refinery at the beginning of the three month period;


DECLASSIFIED
Authority NND730014

5

79018

N is, in gallons, the volume of Catalytic Naphtha boiling above Two Pass Base Stock and with approximately 435°F end point produced by Seller's Thermofor facilities in the three month period;

P is, in gallons, the volume of light Catalytic gas oil boiling above the Catalytic Naphtha represented by "N" above and with 700°F end point, produced by Seller's Thermofor facilities in the three month period;

R is, in gallons, the volume of heavy Catalytic gas oil boiling above the light catalytic gas oil represented by "P" above, produced by Seller's Thermofor facilities in the three month period;

S is, in gallons, the volume of pentane fraction produced by Seller's Thermofor facilities in the three month period for use by Seller in motor gasoline production;

T is, in gallons, the volume of pentane fraction containing 95% minimum, isopentane produced by Seller's Thermofor facilities in the three month period for blending in Seller's aviation gasoline production hereunder or it sold by Seller at a price of 11.00¢ per gallon F.O.B. Seller's Bayonne refinery to others; provided however, that in the event the isopentane content of such catalytic pentane fraction falls below ninety-five percent (95%) the numeral eleven (11.00) (the agreed credit value in cents per gallon for catalytic pentane fraction having an isopentane content of 95%) shall be reduced by 0.07 for each full unit percent by which the isopentane content of such catalytic pentane fraction falls below 95%;

U is, in gallons, the maximum volume of B-B stock produced by Seller's Thermofor facilities in the three month period which may be blended with the volume of catalytic naphtha represented by "N" and the volume of pentane fraction represented by "S" so that the vapor pressure of the total blend is equal to Seller's maximum vapor pressure specification for motor gasoline during the three month period;

V is, in gallons, the difference between the total volume of B-B stock produced by Seller's Thermofor facilities in the three month period and the volume of B-B stock represented by "U";

W is, in millions of BTU's, the heating value of fuel gas produced by Seller's Thermofor facilities in the three month period;



DECLASSIFIED
Authority NND730014

6

79018

Z is, in gallons, the inventory of debutanized first pass distillate produced by Seller's Thermofor facilities, which is in storage at Seller's Bayonne Refinery at the end of the three month period; provided however, that in the event Seller shall process any feed stocks other than those reflected under the volumes G, H, I, J, K, L, M and Y specified above, in Seller's Thermofor facilities in the three month period for the production of Two Pass Base Stock or in the event any by-product other than those reflected under volumes N, P, R, S, T, U, V, W and Z shall be produced by Seller's Thermofor facilities in the three month period, then A shall be adjusted to reflect the proper total debit and/or total credit for such other feed stocks and/or by-products respectively, such total credit and/or total debit to be determined by negotiation between the parties, or, failing agreement, by arbitration under Section XI hereof.

## Determination of B

B is in cents, a charge for operation of Seller's Thermofor facilities for the three month period, being equal to an agreed daily processing charge of 482,700 cents multiplied by the number of days in the three month period.

## Determination of C

C is in cents, the Facilities charge in respect to Seller's Thermofor facilities, for the three month period, being equal to an agreed daily charge of 119,100 cents, multiplied by the number of days in the three month period.

## Determination of D

D is in cents, the charge for invested capital in Seller's Thermofor facilities, for the three month period, being equal to an agreed daily charge of 24,400 cents, multiplied by the number of days in the three month period.

## Determination of E

E is in cents, a charge for contingencies, being equal to "Q" multiplied by one-fifth (0.20).

## Determination of F

F is in cents, a charge for management and profit, being equal to an agreed daily charge of 73,400 cents, multiplied by the number of days in the three month period.

7

DECLASSIFIED
Authority NND730014


79018

The factor "Q" in the foregoing pricing formula and determinations is, in gallons, the volume of Two Pass Base Stock produced by Seller's Thermofor facilities in the three month period.

Seller shall use its best efforts to operate the said Thermofor facilities in accordance with good refinery practice to the end that processing loss resulting from operations conducted hereunder shall be as low as possible.

(2) The base price for Straight Run Aviation base stock made entirely at Seller's Bayonne refinery, as set forth in Paragraph (b) of this Section IV shall be a firm price of eight and sixty-five hundredths (8.65) cents per gallon, provided however, that if such Straight Run Aviation Base Stock, or any substantial part thereof, does not meet the specifications set forth as Item 2 in Exhibit A hereof, or, if such Straight Run Aviation Bast Stock substantially exceeds the 1-C octane number specification set forth in Item 2 of Exhibit A hereof and the said base price has thereby become inequitable to Seller, a new base price shall be determined by negotiation between the parties, or failing agreement, by arbitration under Section XI hereof.

(3) In place of the price of 11.00 cents per gallon for Catalytic Pentane Fraction made entirely at Seller's Bayonne refinery, used in calculating the billing price set forth in Paragraph (b) of this Section IV there shall be substituted a price equal to eleven (11.00) cents per gallon reduced by seven hundredths cents ($0.0007) per gallon for each full unit percent by which the isopentane content of such Catalytic Pentane Fraction falls below 95%.

(4) In place of the price of 19.00 cents per gallon for purchased aviation alkylate and 19.85 cents per gallon for purchased cumene used in calculating the billing prices as set forth in paragraph (b) of this Section IV, Seller's weighted average invoice price, in cents per gallon, plus an allowance for actual volumetric loss hereinafter as provided of each such component or any other purchased component substituted for or supplementing one or more of them blended at Seller's Bayonne refinery, shall be used; provided the invoiced prices of such components have been approved by Buyer which approval shall not be unreasonably withheld. Such allowance for volumetric loss shall be based on Seller's actual volumetric loss without substantiation where such loss is not greater

8


DECLASSIFIED
Authority NND730014

79018

than one half of one percent of invoiced receipts, provided that such allowance may be based on an actual loss in excess of one half of one percent of invoiced receipts where such loss is properly substantiated by Seller.

(5)  The allowance for cost of lead, leading, blending, handling, losses incidental to blending and leading and cost of inhibitor for aviation base stocks made entirely at Seller's Bayonne refinery, as set forth above in Paragraph (b) of this Section IV, shall be a firm charge of nine-tenths cents (0.90¢) per gallon subject to adjustment only for changes in Seller's actual cost for tetraethyl lead.  The allowance for thruput expenses, leading and blending, losses incidental to leading and blending, cost of inhibitor, cost of lead, and miscellaneous expenses, in respect to purchased aviation alkylate and cumene, as set forth in Paragraph (b) of this Section IV, and any other purchased components substituted for or supplementing one or more of them, shall be a firm charge of 1.21¢ per gallon subject only to adjustment for changes in Seller's actual cost for tetraethyl lead (Seller's present cost for tetraethyl lead being .18¢ per cc).

(6)  In place of the freight charges as set forth above in Paragraph (b) of this Section IV, the freight charges shall be as follows:

(i)  For said purchased aviation alkylate and cumene and for any other purchased components substituted for or supplementing one or more of them the actual and proper cost paid by Seller for transporting such blending agents from the f.o.b. points therefor to Bayonne.

(d)  In the event that PAW hereafter requests or authorizes (1) a change or changes in the specifications set forth in Item 3 of Exhibit A hereof, or (2) the use of components other than those specified in Section IV (b) of this contract, and such request or authorization shall necessitate substantial alteration of the blend formula set forth in paragraph (b) of Section IV thereby substantially altering the billing price set forth in paragraph (a) of this Section IV, the parties, at the request of either party, shall negotiate a new formula and a new billing price appropriate to reflect all changes in costs resulting from the alteration in the blend formula.  Said new formula and said new billing price shall be substituted for those set forth herein, and said new billing price shall be subject to adjustment to an actual price in a manner similar to that provided for in paragraph (c) hereof.

(e)  Seller represents that there has not been included in its computation of such prices any allowance for depreciation, amortization and obsolescence

9



DECLASSIFIED
Authority NND730014

79018

in excess of ten percent (10%) per annum of that portion of the original cost of its existing refining facilities used in the manufacture of said aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.

(f) Buyer shall pay promptly, but not later than the twentieth (20th) day of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.

(g) All payments hereunder, as well as the calculations and statements upon which such payments are based shall be subject to adjustment and correction within ten (10) days after Buyer's post-audit, which Buyer shall have a right to make within one (1) year after receipt of the certified statement filed under Paragraph (c) of this Section IV.

V. Price Escalation.

The base price of Two Pass Base Stock, made at Seller's Bayonne refinery included in the 100 octane aviation gasoline purchased hereunder, shall be subject to adjustment as follows:

(a) The base price for such Two Pass Base Stock is based on an average price of One Dollar and Twenty-five Cents ($1.25) per barrel for East Texas crude deliverable in the East Texas Field. The said base price for such Two Pass Base Stock shall be increased or decreased by a percentage equal to one-half (1/2) the percentage increase or decrease in the average price paid for such crude over or under One Dollar and Twenty-five Cents ($1.25) per barrel by the three (3) largest purchasers of such crude in the East Texas Field. The prices posted for such crude in the East Texas Field shall constitute prima facie evidence of the prices paid by such purchasers.

(b) The said base price for such Two Pass Base Stock shall also be increased or decreased by a percentage equal to one-half (1/2) the percentage increase or decrease in the final monthly wholesale price Index Number for "All Commodities other than Farm Products and Foods," as now published by the Bureau of Labor Statistics, United States Department of Labor, over or under the index

10


DECLASSIFIED
Authority NND730014

79018

figure of ninety-nine and four-tenths (99.4). The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number. If said index shall cease to be issued, the parties shall use such other index as may most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(c) The price of such Two Pass Base Stock hereinabove set forth is based upon present methods of transporting petroleum raw materials to Seller's Bayonne refinery and upon a normal operation of that refinery in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of such Two Pass Base Stock. If it becomes necessary to transport petroleum raw materials to said refinery by other than present methods, thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products of the quality Seller will be able to make other than such Two Pass Base Stocks, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the present functioning of the Bayonne refinery shall be interfered with to such an extent that in the opinion of Seller the cost of manufacturing such Two Pass Base Stock is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a) and (b), Seller may give notice to Buyer that the delivery of such Two Pass Base Stock and aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of manufacturing unless Buyer shall agree with Seller to increase the price paid for such Two Pass Base Stock and aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, Buyer or Seller may give notice to the other that it desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of

11

DECLASSIFIED
Authority NND730014

79018

the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase if any, within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of such Two Pass Base Stock and aviation gasoline by the refinery affected may be reduced as above privided.

(d)  In making adjustments under this Section V, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment, and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of the adjustment.

## VI,  Duration of Contract

The term of this contract shall expire at midnight on December 31, 1945 subject to prior termination as follows:

(a)  At Buyer's option, at any time, upon ten days' written notice to Seller.

(b)  At Seller's option, in the event that Buyer shall fail to purchase and take delivery of 100 octane aviation gasoline hereunder in such quantities and at such times as will permit Seller, with the use of the storage facilities referred to in Section II paragraph (e) hereof, to operate at full capacity its facilities for producing 100 octane aviation gasoline and Buyer within five days after written notice from Seller to that effect shall fail to purchase and remove from said storage facilities such quantities of 100 octane aviation gasoline as will permit Seller to operate at full capacity its facilities for producing 100 octane aviation gasoline then Seller at any time within five days thereafter may terminate this contract upon ten days' written notice to Buyer; provided, however, that such prior termination by either Buyer or Seller shall be subject in all respects to the provisions of Section XVII  hereof.

VII.  (Omitted).

VIII.  (Omitted).

## IX.  Deliveries and Inspections

(a)  Seller warrants full and unencumbered title to all gasoline delivered under this contract.

(b)  Buyer shall take delivery of said gasoline at Seller's Bayonne refinery, in quantities approximating the current rate of production, in barges to be supplied by Buyer at its own cost and expense. Each barge delivery shall

12


DECLASSIFIED
Authority NND730014

79018

be made and title and risk of loss shall pass at the intake pipe of the barge. Seller shall furnish without cost to Buyer berth at which each barge may safely lie afloat together with all connections and facilities for loading, and shall load the product on board.

(c) Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall conform with usual industry practice. The certificates of inspection shall be issued in five counterparts, one set of which shall accompany the relative shipment, one of which shall be forwarded forthwith to Buyer, a third submitted to Buyer with the monthly statement required by Section IV hereof, a fourth set of which shall be delivered forthwith to the authorized officer or employee of the War Department or Navy Department referred to in Paragraph (h) of this Section IX. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(d) Inspection as to quantity of delivery into barges shall be made by taking the temperature and measuring and gauging the product in shore tanks from which delivery is made immediately before and after loading. Adjustments in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery.

(e) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product as shipped shall conform as to quality with the specifications set forth in Exhibit A hereof.

(f) The cost of the product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(g) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment and all other purposes of this contract.

(h) Until further notice from Buyer to Seller, for the purposes of this Section IX any officer or employee of the War Department or Navy Department who is properly authorized to accept deliveries of gasoline for his Department

13

DECLASSIFIED
Authority NND730014

79018

is hereby nominated as agent for Buyer and authorized to take delivery of aviation gasoline hereunder, to waive the aforesaid requirements of inspection by a licensed inspector, and to receipt on behalf of Buyer, in a manner approved by Buyer, for deliveries of such gasoline from Seller to Buyer.

X.  Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of the Government or of any governmental officer or agent purporting to act under authority, floods, fires, earthquakes, explosions, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery of any product, service or material necessary in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

XI.  Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction. If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Second Circuit acting in his individual capacity, upon application therefor by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the

14


DECLASSIFIED
Authority NND730014

79018

decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

XII. Taxes

(a) Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, storage, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes or amounts equal thereto on crude petroleum, or the transportation thereof, to the extent such taxes or amounts result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

(b) Buyer shall also pay in addition to the prices as established in Sections IV and V hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon or collectible from Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption. Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section IV hereof are based.

(c) If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or


DECLASSIFIED
Authority NND730014

15

79018

make satisfactory arrangements with such tax collecting agency. The provision of this paragraph shall be controlling in applying the last sentence of Section XI.

XIII.  Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be **personally** delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.

XIV.  Entirety of Contract.

This instrument contains the entire agreement between the parties in respect to the subject matter and there are not conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.

No modification shall be binding unless in writing and signed by officers of the parties. The execution of any modification hereof by the President or a Vice President of a party shall be conclusively deemed to have been authorized by the Board of Directors of the officer so acting.

XV.  Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties thereto, provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Government agency, department, instrumentality or wholly Government-owned corporation, in which event Buyer shall remain liable. With Buyer's consent, which consent shall not be unreasonably withheld, Seller may assign to any party to whom Seller may transfer substantially all of the assets of its Eastern Division, including the Bayonne, New Jersey refinery.

16


DECLASSIFIED
Authority NND730014

79018

XVI.  Statutory Compliance.

(a)  In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable federal laws and further agrees to require such compliance, representations and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable federal law; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any employee or applicant for employment because of race, creed, color or national origin and will include a similar provision in all contracts entered into by it with other incidental to or in connection with this contract.

(b)  Seller is a corporation and this contract is made with it for its general benefit and no Member of, or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.

(c)  Seller shall comply with requirements of the Walsh-Healey Act (41 USCA Sections 35-45) in so far as such Act is applicable to this transaction.

(d)  This contract shall be deemed to contain all of the provisions required by subsection (b) of the Renegotiation Act, as amended by Section 701 of the Revenue Act of 1943 (Public Law 235, 78th Congress), enacted February 25, 1944; and in compliance with that subsection Seller shall insert, in each subcontract (as that term is defined in said act) entered into by Seller a provision that: "This contract shall be deemed to contain all of the provisions required by subsection (b) of the Renegotiation Act as amended".

XVII.  Termination.

(a)  In the event of the termination of this contract by either Buyer or Seller, pursuant to the provisions of Section VI hereof, prior to midnight on December 31, 1945, then Buyer shall purchase and pay for and Seller shall sell and deliver:

(1)  All 100 octane aviation gasoline specified as Item 3 of Exhibit A hereof manufactured hereunder which is in Seller's storage facilities at Seller's Bayonne refinery on the effective date of such prior termination, at the prices for said 100 octane aviation gasoline provided in Section IV hereof;


DECLASSIFIED
Authority NND730014

17

79018

(2)  All 100 octane aviation gasoline specified as Item 3 of Exhibit A hereof produced by Seller after the effective date of such prior termination by blending (a) the finished aviation base stocks produced entirely at Seller's Bayonne refinery under this contract and in Seller's inventory on the effective date of such prior termination and (b) the components purchased by Seller pursuant to the reasonable requirements of this contract and in Seller's inventory on the effective date of such prior termination (including purchased components then en route to Seller's Bayonne refinery), at the prices for said 100 octane aviation gasoline provided in Section IV hereof, but nothing contained in this subdivision (2) shall be construed to limit Seller's right to purchase the tetraethyl lead, inhibitor, dye and other minor ingredients necessary for the blending contemplated by this subdivision (2);

(3)  All finished components for the production of 100 octane aviation gasoline hereunder on hand in Seller's storage facilities at Seller's Bayonne refinery subsequent to the blending operations referred to in subdivision (2) above (whether manufactured or purchased by Seller and if purchased whether then in inventory or en route), at the respective prices for said finished components provided in Section IV hereof; and

(4)  All unfinished debutanized Houdry first pass distillate, debutanized Houdry first pass aviation base stock and debutanized Thermofor first pass distillate manufactured for the production of Two Pass Catalytic aviation base stocks hereunder and on hand in Seller's storage facilities at Seller's Bayonne refinery on the effective date of such prior termination, at respective prices therefor, as follows:

For debutanized Houdry first pass distillate produced between June 22, 1944 and October 1, 1944 having 400°F end point                9.59 cents per gallon

For debutanized Houdry first pass base stock produced between October 1, 1944 and January 1, 1945, having 335°F end point             9.78 cents per gallon

For debutanized Houdry first pass base stock produced between January 1, 1945 and April 1, 1945 having 335°F end point              10.00 cents per gallon



DECLASSIFIED
Authority NND730014

18

79018

For debutanized Houdry first pass distillate

produced between April 1, 1945 and July 1,

1945 have 435°F end point                    9.39 cents per gallon

For debutanized Houdry first pass distillate

produced between July 1, 1945 and January 1,

1946 having 435°F end point                  9.12 cents per gallon

For debutanized Thermofor first pass distillate

produced between January 1, 1945 and January 1,

1946 having 435°F end point                  9.12 cents per gallon

For cycle gas oil, boiling above a 435°F vapor

temperature, admixed with the immediately above listed

first-pass distillates as established by ASTM distil-

lation tests of representative samples of the said

distillates                                  4.90 cents per gallon

provided that Seller shall maintain reasonable minimum working inventories

and make reasonable minimum purchases necessary to assure supply of

Buyer's indicated requirements hereunder and provided further that

Seller upon giving or receiving notice of such prior termination shall

endeavor in so far as reasonably possible to arrange its production and

purchases so that there will be on hand at the effective date of such

prior termination a minimum of unfinished distillate and base stock

referred to in subdivision (4) of this Section XVII (a), finished

components and 100 octane aviation gasoline. Buyer shall use its best

efforts to remove all such stocks as soon as possible after the effec-

tive date of such prior termination, it being agreed, however, that

Seller, at Buyer's request, shall make available for the storage of

such stocks after the effective date of such prior termination, such

portion, if any, of Seller's atmospheric storage facilities at Seller's

Bayonne refinery as will not impair Seller's normal refinery operations

thereat, and for such atmospheric storage facilities as shall be uti-

lized for the benefit of Buyer, Buyer shall pay to Seller a rental,

at the rate of one cent per barrel, for each barrel of the capacity

of such atmospheric storage facilities, for each month or fraction

thereof that the same shall be so utilized for the benefit of Buyer.

19


DECLASSIFIED
Authority NND 73004

79018

(b)  The charge for operation of Seller's Thermofor facilities referred to under the "Determination of B" in Section IV paragraph (c) subparagraph (1) hereof contains an allowance for the cost of synthetic bead catalyst, used in Seller's Thermofor facilities and hereinafter referred to as catalyst, which is composed of the sum of the following items:

| | | |
|---|---|---|
| Amortization of original catalyst cost over a period through May 12, 1946 | $782.00 per day | |
| Amortization of initial catalyst loss over a period through December 31, 1945 | 158.00 " " | |
| Cost of daily catalyst loss | 1,107.00 " " | |
| Total | $2,047.00 per day | |

Upon expiration or prior termination as provided in Section VI hereof Buyer shall compensate Seller for any unamortized portion of Seller's catalyst cost by the payment to Seller of such amount as shall equal the product of $782.00 and the number of calendar days in the period beginning on the date of such expriation or prior termination and ending May 12, 1946, and Seller shall at any time not later than sixty (60) days from such date of expiration or prior termination remove the full amount of catalyst which shall be recoverable, from Seller's Thermofor facilities for delivery to Buyer, subject however to the following:

(1)  Seller shall have the option at any time from and after such expiration or prior termination, and before the removal of catalyst from Seller's Thermofor facilities to negotiate with Buyer for acquisition of full and unencumbered right to use such catalyst to the benefit of Seller and, provided that Seller shall submit to Buyer a bona fide offer for acquisition of such catalyst accompanied by Seller's representations showing the quantity, physical condition, and activity of such catalyst, such representations to be based upon and substantiated by Seller's available data, and upon establishment of and agreement upon mutually satisfactory terms and conditions, Buyer shall release to Seller such free and unencumbered right for use of such catalyst. Buyer in the event of such a bona fide offer from Seller shall promptly communicate to Seller its decision to accept or refuse such offer, in no case more than ten days thereafter.

(2)  In the event Seller, during the period prior to such removal of such catalyst, and subsequent to such expiration or prior termination, shall continue to operate Seller's Thermofor facilities

20



DECLASSIFIED
Authority NND730014

79018

for its own benefit, which Seller shall have the right to do, and in the event the parties fail to agree upon such mutually satisfactory terms and conditions then Seller shall credit Buyer, with an amount equal to $782.00 multiplied by the number of days of such operation of Seller's Thermofor facilities for Seller's benefit.

(3)  Upon removal of such catalyst from Seller's Thermofor facilities for delivery to Buyer under the provisions of this Section XVII (b) Seller shall appropriately package, store and load such catalyst (including, at Seller's option, additional catalyst which Seller may have in inventory) for shipment in accordance with the reasonable instructions of Buyer, and in the absence of such reasonable instructions may store subject to receipt of such instructions, all such removal, packaging, storage, if any, and loading for shipment to be at Buyer's expense and for Buyer's account; provided, that the amount of catalyst deliverable to Buyer hereunder shall be equal at least to the amount of the full initial charge (632 tons) less reasonable handling losses for removal, packaging, storage and loading, or an appropriate adjustment shall be made in favor of Buyer.  Legal title to such catalyst shall pass to Buyer at the time such catalyst is loaded for shipment at Buyer's instructions.

(c)  The foregoing provisions of this Section XVII are expressly understood and agreed to provide fair compensation for termination.

IN WITNESS WHEREOF, the parties hereto have executed this contract as of the date and year first above written.

ATTEST: (SEAL)                          RECONSTRUCTION FINANCE CORPORATION

/s/ Ferris B. Thomas                    By /s/ Geo. Stoner
    Asst. Secretary                         Associate Director
                                        Office of Defense Supplies

ATTEST:  (SEAL)                         TIDEWATER ASSOCIATED OIL COMPANY

/s/ W. J. Buber                         By /s/ B. I. Graves
       Secretary                                     Vice President

21


DECLASSIFIED
Authority NND730014

79018

## EXHIBIT A

Item 1                          TWO PASS CATALYTIC AVIATION BASE STOCK

Distillation:

| | |
|---|---|
| 10% | 140°F. Max. |
| 50% | 221°F. Max. |
| 90% | 284°F. Max. |
| E.P. | 356°F. Max. |
| R.V.P. | 7.0# Max. |

Octane Number:

(A.F.D.-1-C) 4.6 cc. lead –     95 Min.
(A.F.D.-3-C) 4.6 cc. lead – S + 0.2 to S + 0.5

Item 2                          STRAIGHT RUN AVIATION BASE STOCK

Distillation:

| | |
|---|---|
| 10% | 167°F. Max. |
| 50% | 221°F. Max. |
| 90% | 275°F. Max. |
| E.P. | 356°F. Max. |
| R.V.P. | 7.0# Max. |

Octane Number:

(A.F.D.-1-C) 4.0 cc lead –     91 Min.
(A.F.D.-3-C) 4.0 cc lead –     96% S/M Min.

Item 3                          100 OCTANE AVIATION GASOLINE

U. S. ARMY – NAVY SUPPLY

AN-F-28        December 23, 1942.  Amendment 2, October 2, 1943.

        100 Octane Number by Method An-VV-F-746, or

        99 Octane Number by Method ASTM-D-357-41T

        S + 1.25 cc. Tetraethyl Lead by Method AN-VV-F-748

        Tetraethyl Lead Limit 4.6 cc/Gal.

22

DECLASSIFIED
Authority NND730014

79018

## EXHIBIT B

I. (A). Seller represents that the numeral "5.02" set forth in the formula under "Determination of A" in Section IV of the foregoing Contract, represents the agreed debit value, in cents per gallon, for light virgin gas oil defined as "M" under said "Determination of A," and includes an allowance ot twelve hundredths of a cent ($0.0012) representing paid up patent royalty which the Seller is obligated to pay to its Licensor for catalytic cracking operations carried out in manufacturing Two Pass Catalytic Aviation base stock when using such light virgin gas oil as a charge stock; that, notwithstanding that capitalization of such paid up royalty would result in a higher price to Government, Seller has computed such allowance on the basis of the current Government running royalty rate of $0.05 per barrel of fresh charge stock applicable to such catalytic cracking operations.

I. (B). In the event that any time during the term of the foregoing Contract, there shall issue to any third party a patent license covering catalytic cracking operations of the type employed by Seller at a running royalty rate lower than $0.05 per barrel of fresh stock charged to said third party's catalytic cracking operation, then as between Buyer and Seller, the first receiving such information shall notify the other and the said agreed debit value of 5.02 shall be adjusted by subtracting therefrom an amount equal to said allowance of 0.12 cents, multiplied by a factor equal to $\frac{A}{B}$, where A equals the difference between $0.05 and said lower running royalty rate payable by said third party, and B equals $0.05 and Seller shall, within sixty (60) days after the date of said notification by Buyer or Seller, to the other, refund to Buyer, without interest, an amount equal to the total number of gallons, if any, of light virgin gas oil processed in Seller's Thermofor facilities included in said "M" in making any adjustment of the foregoing contract in accordance with paragraph (c) of Section IV thereof, in respect to the period, if any, between the date such running royalty rate becomes payable by said third party and said date of notification, multiplied by (a) the said allowance of 0.12 cents and (b) by said factor $\frac{A}{B}$.

23


DECLASSIFIED
Authority NND730014

79018

## GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to Tidewater Associated Oil Company to enter into said contract, Reconstruction Finance Corporation does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided; it being further agreed that this guarantee shall cover and attach to any and all changes in amendments of, or supplements to said contract which may be hereafter agreed upon between Defense Supplies Corporation and Tidewater Associated Oil Company, and the undersigned guarantor hereby approves and consents to any and all such changes in, amendments of, or supplements to said contract.

IN WITNESS WHEREOF, RECONSTRUCTION FINANCE CORPORATION has caused this Guarantee to be executed by its officers thereunto duly authorized as of _____, 1945.

ATTEST:                                  RECONSTRUCTION FINANCE CORPORATION

                                         By_____
_____
            Secretary                                          Chairman

24


DECLASSIFIED
Authority NND 73004